| |
|---|
| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY |
| **Caption in compliance with D.N.J. LBR 9004-2(c)** <br><br> **McCARTER & ENGLISH, LLP** <br> Charles A. Stanziale, Jr. <br> Joseph Lubertazzi, Jr. <br> Lisa S. Bonsall <br> Jeffrey T. Testa <br> Four Gateway Center <br> 100 Mulberry Street <br> Newark, NJ 07102 <br> Telephone: (973) 622-4444 <br> Facsimile: (973) 624-7070 <br> Email: cstanziale@mccarter.com <br>          jlubertazzi@mccarter.com <br>          lbonsall@mccarter.com <br>          jtesta@mccarter.com <br><br> *Proposed Counsel for Debtors and Debtors in Possession* <br><br> **WEIL, GOTSHAL & MANGES LLP** <br> Michael F. Walsh <br> Philip Rosen <br> Ted S. Waksman <br> 767 Fifth Avenue <br> New York, NY 10153 <br> Telephone: (212) 310-8000 <br> Facsimile: (212) 310-8007 <br> Email: michael.walsh@weil.com <br>          philip.rosen@weil.com <br>          ted.waksman@weil.com <br><br> *Proposed Co-Counsel for Debtors and Debtors in Possession* |

| | |
|---|---|
| In re: <br><br> TCI 2 HOLDINGS, LLC, et al.,[1] <br><br>                    Debtors. | Chapter 11 <br> Case No.: _____ <br><br> (Jointly Administered) |

## DEBTORS' MOTION FOR ORDER (A) AUTHORIZING DEBTORS TO (1) PAY PREPETITION EMPLOYEE WAGES, SALARIES, BONUSES AND RELATED ITEMS, (2) REIMBURSE PREPETITION EMPLOYEE BUSINESS EXPENSES, (3) MAKE

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: TCI 2 Holdings, LLC (0526); Trump Entertainment Resorts, Inc. (8402); Trump Entertainment Resorts Holdings, L.P. (8407); Trump Entertainment Resorts Funding, Inc. (8405); Trump Entertainment Resorts Development Company, LLC (2230); Trump Taj Mahal Associates, LLC, d/b/a Trump Taj Mahal Casino Resort (6368); Trump Plaza Associates, LLC, d/b/a Trump Plaza Hotel and Casino (1643); Trump Marina Associates, LLC, d/b/a Trump Marina Hotel Casino (8426); TER Management Co., LLC (0648); and TER Development Co., LLC (0425).

ME1 8139071v.1

**PAYMENTS FOR WHICH PAYROLL DEDUCTIONS WERE MADE, (4) MAKE PREPETITION CONTRIBUTIONS AND PAY BENEFITS UNDER EMPLOYEE BENEFIT PLANS; (5)PAY PREPETITION INSURANCE PREMIUMS AND (6) PAY ALL COSTS INCIDENTAL TO THE FOREGOING PAYMENTS AND CONTRIBUTIONS AND (B) AUTHORIZING AND DIRECTING APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO RECEIVE, PROCESS, HONOR AND PAY ANY AND ALL CHECKS DRAWN ON DEBTORS' ACCOUNTS FOR SUCH PURPOSES**

TCI 2 Holdings, LLC and its debtor affiliates (collectively the "Debtors"), by and through their undersigned counsel, respectfully seek entry of an order pursuant to sections 507(a)(4), 507(a)(5) and 105(a) of Title 11 of the United States Code (the "Bankruptcy Code") (a) authorizing, but not directing, the Debtors to (i) pay to, or for the benefit of, employees accrued prepetition wages, salaries, bonuses or other compensation on the regularly scheduled post-petition pay dates in accordance with the policies and practices established prior to the Petition Date (as defined below), (ii) permit employees to use accrued prepetition paid time off, (iii) pay employees' prepetition reimbursable employee business expenses, (iv) make accrued prepetition contributions or payments directly on account of employee benefit plans, (v) pay prepetition insurance premiums, and (vi) continue such employee benefit plans postpetition; and (b) authorizing and directing the Debtors' banks to honor prepetition checks and fund transfer requests for payment of prepetition employee claims (the "Motion"). In support of this Motion, the Debtors rely upon the Declaration of John P. Burke, in Support of First Day Motions and Applications (the "Burke Declaration")[2], which is incorporated herein by reference, and respectfully represent as follows:

**JURISDICTION**

1.  This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2] Capitalized terms not defined in this Motion shall have the meanings ascribed to them in the Burke Declaration.

ME1 8139071v.1

2. The statutory predicates for the relief requested herein are sections 105(a) and 507 of the Bankruptcy Code.

## BACKGROUND

**A.   Procedural Background**

3. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no statutory committee or trustee has been appointed in these cases.

**B.   Factual Background**

5. The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the Burke Declaration.

## RELIEF REQUESTED

6. As of February 13, 2009, the Debtors employed approximately 9,201 persons (collectively, the "Employees"). In order to maintain operations and to thereby preserve the value of the Debtors' estates, it is essential that the Debtors retain the uninterrupted service of these Employees.

**Request for Authority to Pay Certain Prepetition Employee Compensation Claims**

7. As of the Petition Date, most of the Debtors' Employees were owed or had accrued various sums for wages, salaries, tips and gratuities, bonuses, vacation time, and other accrued compensation and benefits (collectively, "Employee Compensation"). In addition, as of the Petition Date, the Debtors had accrued deductions from Employees' paychecks to make payments on behalf of Employees for insurance programs, a medical reimbursement plan, a

3

401(k) retirement program and other similar programs on account of which the Debtors deduct a sum of money from an Employee's paycheck and transfer that amount to a third party or retain such amount on behalf of such Employee (collectively, "Deductions").

8. Employee Compensation and Deductions were due and owing as of the Petition Date because, among other things:

    a. Many payroll and expense reimbursement checks issued to Employees prior to the Petition Date had not yet been presented for payment or had not yet cleared the bank and, accordingly, had not been honored and paid as of the Petition Date;

    b. Employees had not yet been paid certain of their wages, salaries, tips and gratuities, and contractual compensation for services previously rendered to the Debtors or had not yet been reimbursed for business expenses previously advanced on behalf of the Debtors; and

    c. Certain other forms of Employee compensation related to prepetition services, including, without limitation, vacation pay, bonuses and withholdings for benefit plan contributions, had been accrued prior to the Petition Date but were not yet payable under their terms. For example, most Employees had accrued vacation time that they had not yet used.

9. The Debtors seek authority to pay all Employee Compensation and Deductions that remained unpaid as of the Petition Date. The Debtors estimate that, as of January 31, 2008, they owed approximately $8,058,000 in prepetition Employee Compensation (excluding vacation) and Deductions.

10. The Debtors also intend to honor their "policy" of paying severance benefits to terminated Employees.[3] The Debtors have a formal written policy in effect with respect to severance, which provides terminated employees with severance equal to (i) one week for each

---

[3] The policy described in this sentence does not include severance arrangements arising from executive employment agreements.

4

year of service (up to a maximum of four weeks) for salaried employees and (ii) five days pay for hourly employees (in lieu of advance notice). In addition, the Debtors have generally paid terminated Employees all of their earned and unused vacation time, any reimbursable expenses, and any health-care related reimbursements or expenses. The Debtors believe that as of the Petition Date, they had no obligation to Employees that were terminated prior to the Petition Date but had not yet been paid in full.

11. Because the Debtors may have prepetition expense reimbursement obligations to Employees remaining, the Debtors will need this Court's authorization to make payments for such other prepetition obligations.

### Wages and Salaries

12. On Friday, February 13, 2009, all of the Employees were paid wages, salaries, tips and gratuities, and overtime for services provided through Sunday, February 8, 2009. All such transactions, whether by check or ACH Direct Deposit were dated Monday, February 16, 2009. Therefore, for purposes of the Debtors' filing, all such amounts are noted as outstanding. The Employees have not been paid for wages, salaries, tips or gratuities or overtime that accrued from Monday, February 9, 2009, through the Petition Date. All payments to Employees for such latter period will be distributed after 3:00 p.m. on Friday, February 20, 2009, by means of checks or ACH Direct Deposits dated Monday, February 23, 2009. The Debtors seek authority to pay all Employee Compensation and Deductions that were payable as of the Petition Date but remained unpaid. This includes tips and gratuities that were collected and pooled by the Debtors for distribution to the Employees. The Debtors estimate that, as of January 31, 2009, they owed Employees approximately $8,058,000 in prepetition wages, salaries, tips and gratuities, and overtime.

ME1 8139071v.1

**Employee Expenses**

13.     Many of the Debtors' Employees regularly incur certain out-of-pocket, business-related expenses, such as necessary and authorized travel expenses. Business-related travel expenses are generally pre-approved and, to the extent possible, expenses for airfare, lodging and automobile rentals are paid directly by the Debtors to the supplier. Upon completion of travel, the Employees are required to submit an expense report with appropriate supporting documentation. This report serves as the mechanism for the Employees to receive reimbursement for out-of-pocket travel related expenses (such as lodging, automobile rentals and allowances, meals and miscellaneous expenses) within the Debtors' travel policy. Expense reports are also submitted for other business related activities, such as technical and professional fees and supplies. Expense reports are processed in due course, and copies of the reports are attached to the checks remitted to the Employees as payment. The Debtors estimate that they owe the Employees approximately $25,000 for expenses incurred prior to the Petition Date that have not been reimbursed. Although the Debtors request that the Employees submit reimbursement requests promptly after incurring expenses, not all of the Employees do so. Accordingly, there may be other prepetition expenses outstanding of which the Debtors have no specific knowledge.

**Request for Authority to Pay Prepetition Employee Benefits**

14.     The Debtors have a number of employee benefit programs, including, but not limited to: medical, executive supplemental medical, prescription, vision and dental insurance; business travel, life and accidental death and dismemberment insurance; short and long-term disability insurance; a 401(k) retirement savings plan; an optional supplemental benefits program; a tuition reimbursement plan; and a severance plan (collectively, the "Benefits"). A detailed description of the Benefits is included in the following paragraphs. The Debtors fund or subsidize some of the Benefits, which are an integral and important part of each Employee's total

6

compensation package. Interruption of the Benefits by the Debtors' bankruptcy filing would create a hardship for affected Employees, adversely affect the morale of the Employees and undermine the Debtors' efforts to retain Employees, thereby adversely affecting the Debtors' efforts to reorganize their business and maximize value for the estates.

15. The Debtors seek authority to pay the prepetition amounts attributable to such Benefits as and when such amounts come due in the ordinary course of business. The prepetition Benefits that the Debtors seek authority to pay include those arising under self-insured and insured benefit programs under which the Debtors, Employees or both contribute to the payment of premiums for insurance coverage and administration costs. The Debtors estimate that the total of such Benefits that were accrued, but unpaid, as of January 31, 2009, is approximately $3,500,000. Specific elements of this amount are explained in detail below.

### Medical, Vision and Dental Insurance

16. The Debtors offer medical, prescription, vision and dental benefits to all full-time and part-time, non-union employees (with the exception of 6 employees of the Debtors who are members of the Teamsters Union) and their dependents. The medical plans include: Preferred Provider Organization (PPO), Employer Provider Organization (EPO) and the Part-Time Health Plan (PHP), prescription and one of the dental (Dental Option) plans, which are self-funded plans. The vision and one of the dental plans (Total Care) are insured plans. The PPO, EPO, PHP, and both dental plans are administered by Horizon Blue Cross Blue Shield. The prescription plan is administered by Medco Health Solutions, Inc. (MEDCO) and the vision plan is administered by VSP. Under the terms of these plans, Employees submit claims to the administrator of the plans, and the Debtors pay the Employees in accordance with the terms of the applicable plan document. To minimize exposure for their self-insured medical plans, the Debtors also maintain stop-loss coverage with ING.

ME1 8139071v.1

17. The combined monthly cost of these benefits arrangement found in paragraph 16 is approximately $2,200,000. Approximately $810,000 of this cost is funded through withholdings from Employee wages to cover the cost of the Employees' portion of the program and the rest is paid directly by the Debtors.

18. The Debtors also have many union Employees who are subject to collective bargaining agreements. Such Employees participate in the benefit plans offered by their respective union, and the Debtors make periodic contributions to each union in accordance with the terms of the applicable collective bargaining agreement. As of January 31, 2009, the Debtors had accrued, but unpaid amounts owing in respect of their collective bargaining agreements in the amount of approximately $3,029,000.

### Life and Accidental Death and Dismemberment Insurance

19. The Debtors provide basic and optional supplemental life and accidental death and dismemberment ("AD&D") insurance for all Employees underwritten by ING/Reliastar, Mass Mutual, and Union Central. Under these policies, the Debtors pay premiums for the basic life and AD&D insurance of their Employees. Benefits under the basic life and AD&D policies equal to: (i) $10,000 for part-time employees; (ii) $30,000 for full-time casino dealers and (iii) one (1) times an Employee's annual salary (up to a combined $1,000,000) for other full-time employees. Fulltime Employees may also purchase supplemental life insurance up to the lesser of four 4 times an Employees' annual salary (up to a combined $1,000,000). Full-time dealers may purchase supplemental life insurance in increments of $30,000 up to a maximum of $120,000. The combined monthly premium for the policies described in this paragraph is approximately $71,000 of which approximately $23,000 is funded withholdings from Employees' wages to cover the cost of each Employee's portion of the premium and the rest is paid directly by the Debtors.

8

### Supplemental Benefits for Executives

20. The Debtors provide their Employees who are Vice Presidents or above with Supplemental Life Insurance (the Debtors provide Executives with life insurance of up to three times annual salary to a maximum of $1,500,000), Supplemental Long-Term Disability Insurance, Supplemental Short-Term Disability and Supplemental Medical Insurance (the "Supplemental Benefits"). These Supplemental Benefits are also provided to certain non-executive Employees who previously received this benefit before changes were made to the program in 1996 and subsequently. The combined monthly cost for all Supplemental Benefits for Executives is approximately $49,000.

### Reimbursement Policies

21. The Debtors also intend to continue their current practice of reimbursing employees for certain approved educational courses at accredited educational institutions (the "Reimbursement Practices"). The Debtors estimate that the aggregate monthly amount payable for the Reimbursement Practices is approximately $6,000. The Debtors request authority, in their discretion, to continue with these practices.

### 401(k) Retirement Savings Plan

22. The Debtors sponsor a qualified 401(k) retirement savings plan for eligible Employees. The program permits eligible Employees to defer a portion of their wages into the plan. There are approximately 4,000 participants in the 401(k) savings plan. The 401(k) plan is funded by the Employees, and the Debtors provide a company match equal to 25% (50% through December 31, 2008) of the Employees' contributions, but subject to a maximum deferral of 6% of the respective Employee's salary, for Employees with at least one year of service. Under this plan, the Debtors estimate that approximately $855,000 was unpaid as of January 31, 2009 (representing approximately $715,000 (including loan repayments) that was accrued and

9

withheld from Employees and then contributed to the plan and approximately $140,000 to be contributed as the Debtors' matching contribution). The Debtors also pay Fidelity Investments, the company that administers the 401(k) plan, an administrative fee of approximately $800 per quarter.

### Severance

23.    The Debtors also intend to continue their current practice of paying severance benefits to terminated Employees. While the Debtors' Employees are employed as "at-will" employees, the Debtors have generally provided severance equal to, (i) for terminated salaried Employees, one (1) week salary for every year worked at the company (up to a maximum of four (4) weeks salary) and (ii) for terminated hourly employees, five (5) days pay in lieu of advance notice. In addition, the Debtors pay terminated Employees all of their accrued and unused vacation time, any reimbursable expenses outstanding as of the date of termination, and health-care related reimbursements/expenses and salaried COBRA benefits through the greater of the end of the month or length of severance/hourly health benefits through the end of the month. The Debtors request authority, in their discretion, to continue these practices for Employees terminated after the commencement of these cases.

### Vacation and Personal/Sick Leave Policies

24.    The Debtors' vacation and sick time policies apply to all qualifying regular (i.e., non-temporary) full-time and part-time Employees. Regular, full-time Employees are eligible for paid vacation days after completing twelve (12) consecutive months of service.[4] Full-time Employees receive one week of vacation after completion of their first year. Thereafter, full-time Employees are eligible to receive two (2) weeks vacation (per year) after completion of two (2) years, three (3) weeks vacation per year after completion of five (5) years, and four weeks (4)

---

[4] Certain salaried employees are subject to vacation policies which may vary slightly.

10

ME1 8139071v.1

weeks vacation per year after completion of fifteen (15) years. Part-time employees are eligible for vacation pay and sick time on a pro-rata basis in accordance with the schedule established for full-time Employees. As of January 31, 2009, accrued and unused vacation time was valued at approximately $13,595,000 or approximately $1,478 per Employee.

25. The Debtors also grant their Employees sick time. After three (3) months of continuous service with the Debtors, Employees accrue sick time at the rate of four (4) hours per month, which are carried over into subsequent years. However, when an Employee leaves the employ of the Debtors, such Employee is not compensated for unused sick time.

26. The Debtors are requesting authority to permit Employees to use, in the ordinary course, the scheduled vacation time and sick time that they earned accrued and did not use prior to the Petition Date, to the extent that such Employees do not terminate their employment with the Debtors. In addition, the Debtors request authority to continue to pay out earned vacation time at termination, in accordance with their prepetition policies.

### Workers' Compensation

27. In the ordinary course of their business, the Debtors maintain workers' compensation insurance policies to provide benefits to their employees (the "Workers' Compensation Policies"). The current Workers' Compensation Policies cover the period August 1, 2008 to July 31, 2009. The Workers' Compensation Policies entail a $500,000 per occurrence maximum, and the annual premium payable for such coverage is approximately $826,000. Workers' compensation premiums are allocated based on each of the Debtors' payrolls compared to the total payrolls of all entities covered by the master workers' compensation policies.

28. Actual losses to the Debtors pursuant to the Policies are billed to insurance carriers and subsequently reimbursed by the Debtors. As of January 31, 2009, the Debtors owed

11

approximately $340,740 to its workers compensation insurance carriers. To pay the claims that it does handle, the Debtors maintain cash collateral accounts of approximately $755,000. As funds are applied to claims, the Debtors refresh the cash collateral accounts. The insurance carriers will not pay any claim that would exceed its escrowed amount and seeks authority from the Debtors before any claim is settled for an amount exceeding $25,000. These actual costs are then billed to the insurance carriers that incurred the claim (as described herein, the "Workers' Compensation Program").

## Miscellaneous Insurance

29. The Debtors believe that they are authorized to continue making premium payments on their miscellaneous insurance policies (e.g., property insurance, comprehensive general liability insurance, employee theft insurance) in the ordinary course under section 363(c) of the Bankruptcy Code. However, given the vital importance of this coverage to the Debtors' operations, the Debtors are seeking the relief requested in this Motion to ensure that any premiums due continue unabated to provide some comfort to customers, employees and vendors at this critical juncture (as set forth, the "Insurance").

30. The Debtors submit that the Debtors' insurance policies are essential to the preservation of the Debtors' business. Certain types of coverage are required by state and/or federal law. Adequate insurance coverage is also a requirement under the U.S. Trustee's Operating Guidelines. *See* U.S. Trustee Manual § 3-3.2.3 (Oct. 1998) ("A debtor must obtain appropriate insurance coverage, and documentation regarding the existence of the coverage must be provided to the United States Trustee as early as possible in the case.").

12

### Request for Authority (a) for Banks to Honor
### Checks and (b) for the Debtors to Pay Incidental Costs

31.     The Debtors further request that all applicable banks and other financial institutions be authorized and directed to receive, process, honor and pay any and all checks drawn on the Debtors' accounts related to Employee Compensation, Deductions and Benefits, whether presented prior to or after the Petition Date, upon the receipt by each such bank and institution of notice of such authorization, provided only that sufficient funds are on deposit in the applicable accounts to cover such payments. In addition, the Debtors request that they be permitted, but not directed, to pay all costs incident to Employee Compensation and Deductions, such as employer payroll-related taxes and processing costs. The Debtors further represent that they expect to have available cash sufficient to pay all Employee Compensation, Deductions and Benefits, to the extent described herein, and all costs incident thereto, as such amounts become due.

### Justifications for Granting Requested Relief

32.     The Debtors seek the relief requested herein because any delay in paying Employee Compensation, Deductions, Benefits or Insurance could destroy the Debtors' relationships with the Employees and irreparably impair employee morale at the very time when the dedication, confidence and cooperation of these Employees is most critical. The Debtors face the imminent risk that their operations may be severely impaired if the Debtors are not immediately granted authority to make the payments described in this Motion. Employee support for the Debtors' reorganization efforts is crucial to the success of those efforts, particularly given the unique knowledge the Employees' have of the Debtors' hotel and gaming operations. At this early stage of these Cases, the Debtors simply cannot risk the substantial disruption to their business operations that would inevitably attend any decline in work force morale attributable to

13

the Debtors' failure to pay Employee Compensation, Deductions and Benefits in the ordinary course. Given the highly regulated and competitive nature of the hotel and gaming business and given the Debtors' financial situation, replacing many key Employees vital to the Debtors' continued operation may be extremely difficult. Accordingly, preserving Employee morale and retaining the Employees is essential to the Debtors' ability to maintain operations and attempt to reorganize their businesses. Finally, to remain in a position to maintain necessary operational integrity, oversight and quality control, the Debtors' must continue their corporate policies of permitting certain Employees to incur business-related expenses and thereafter to seek reimbursement by submitting appropriate invoices or vouchers evidencing such out-of-pocket disbursements.

33. Because the amounts represented by Employee Compensation, Benefits, Insurance, and Deductions are needed to enable the Employees to meet their own personal obligations, absent the relief requested herein, the Employees could suffer undue hardship and, in many instances, serious financial difficulties. Moreover, without the requested relief, the stability of the Debtors will be undermined by the potential threat that otherwise loyal Employees at all levels will seek other employment.

34. The relief sought herein does not materially harm the Debtors' estates or creditors, as the vast majority of the prepetition Employee Compensation, Deductions and Benefits that the Debtors seek authority to pay would be recoverable by the Employees as a priority claim if the Motion was denied. Under section 507(a)(4) of the Bankruptcy Code, each Employee may be granted a priority claim for allowed unsecured claims, but only to the extent of $10,950 for each individual or corporation, as the case may be, earned within 180 days before

14

ME1 8139071v.1

the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for:

> (A) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual; or
>
> (B) sales commissions earned by an individual or by a corporation with only 1 employee, acting as an independent contractor in the sale of goods or services for the debtor in the ordinary course of the debtor's business if, and only if, during the 12 months preceding that date, at least 75 percent of the amount that the individual or corporation earned by acting as an independent contractor in the sale of goods or services was earned from the debtor.

11 U.S.C. §507(a)(4). Likewise, under section 507(a)(5) of the Bankruptcy Code, each Employee may be granted a priority claim for contributions to an employee benefit plan:

> (A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
>
> (B) for each such plan, to the extent of:
>
> (i) the number of employees covered by each such plan multiplied by $10,950; less
>
> (ii) the aggregate amount paid to such employees under paragraph (4) of this subsection [regarding certain wages, salaries or commissions], plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

11 U.S.C. §507(a)(5).

35. The average cash payout per Employee of prepetition Employee Compensation, Deductions and Benefits is less than the $10,950 limit for administrative claims under section 507.[5] In certain instances, however, aggregate Employee Compensation, Deductions, and Benefits due and owing by the Debtors to a particular Employee may exceed the sum of $10,950 allowable as a priority claim under section 507(a)(4) or section 507(a)(5). All but approximately

---

[5] Excluding accrued and unused paid time off and bonuses (if any).

15

3 of the Employees are owed less than $10,950 in wages, salaries, bonuses that are currently payable and severance. As a general rule, these 3 Employees are critical to the Debtors' business and have accrued more than $10,950 in compensation, deductions and benefits largely because of the length of their employment and key nature of their responsibilities. Notwithstanding the $10,950 limitation placed upon such claims, for the foregoing reasons and in light of the possibility that certain Benefits including, without limitation, paid time off may, in fact, constitute administrative claims of these estates, the Debtors should be permitted to pay Employee Compensation, Deductions and Benefits to the fullest extent described above and hereby request authority to pay such amounts in the ordinary course of the Debtors' businesses.

36. It also bears emphasis that the Deductions and certain of the Benefits (e.g., 401(k) contributions and health plan deductions) (the "Trust Funds") represent funds that the Debtors are not entitled to hold for any protracted period, since the Debtors effectively hold these amounts in trust and the Employees themselves hold a direct claim against such funds. Because it is likely that, whatever the outcome of these chapter 11 cases, the Debtors will ultimately be required to disgorge funds equivalent to the amount of the Trust Funds, there is ample justification for the payment of the Trust Funds to or on behalf of the Employees in the ordinary course of the Debtors' businesses.

37. This type of relief has been granted in many chapter 11 cases, and was granted in the predecessor entities' bankruptcy on November 22, 2004. See In re THCR/LP Corporation, et al., Case No. 04-46898 (Jointly Administered) (JHW) (Bankr. D. N.J. Nov. 22, 2004); see also In re Shapes/Arch Holdings, L.L.C., Chapter 11, Case No. 08-14631 (GMB) (Bankr. D. N.J. Mar. 16, 2008); In re Leiner Health Prods., Inc., Case No. 08-10446 (KJC) (Bankr. D. Del. April 9, 2008); In re Wickes Holdings, LLC, Case No. 08-10212 (KJC) (Bankr. D. Del. Feb. 5, 2008); In

16

re Pope & Talbot, Inc., Case No. 07-11738 (CSS) (Bankr. D. Del. Nov. 21, 2007); In re Tweeter Home Entm't Group, Inc., Case No. 07-10787 (PJW) (Bankr. D. Del. June 13, 2007); In re Hancock Fabrics, Inc., Case No. 07-10353 (BLS) (Bankr. D. Del. Mar. 22, 2007).

**Request for Authority for Banks to Honor Checks**

38.     The Debtors further request that all applicable banks and other financial institutions be authorized and directed to receive, process, honor and pay any and all checks drawn on the Debtors' accounts related to Employee Compensation, Deductions and Benefits, whether presented prior to or after the Petition Date, upon the receipt by such bank and institution of notice of such authorization, provided only that sufficient funds are on deposit in the applicable accounts to cover such payments.

**WAIVER OF MEMORANDUM OF LAW**

39.     This Motion does not raise any novel issues of law and, accordingly, the Debtors respectively request that the Court waive the requirement contained in the District of New Jersey Local Bankruptcy Rules, D.N.J. LBR 9013-2 that a separate memorandum of law be submitted.

**WAIVER OF BANKRUPTCY RULES 6003 AND 6004**

40.     The Debtors request that the Court waive Bankruptcy Rules 6003 and 6004 to enable the relief described herein to be effective and enforceable immediately upon entry of an Order.

**NOTICE**

41.     No trustee, examiner or creditors committee has been appointed in this case. Notice of this Motion has been given to (i) the Office of the United States Trustee for the District of New Jersey; (ii) counsel for the Debtors; (iii) counsel to U.S. Bank National Association, as Noteholder Collateral Agent; (iv) counsel to the Ad Hoc Noteholder Committee; (v) counsel to Beal Bank, S.S.B. and Beal Bank Nevada; (vi) counsel to any Official Unsecured Creditors'

ME1 8139071v.1

Committee appointed in these cases, or the twenty (20) largest unsecured creditors of the Debtors, if an Official Unsecured Creditors' Committee has not been appointed; (vii) the United States Securities and Exchange Commission; (viii) the United States Attorney's Office for the State of New Jersey; (ix) the Attorney General's Office for the State of New Jersey; (x) the Internal Revenue Service and other government agencies to the extent required by the Bankruptcy Rules and the Local Rules, including applicable gaming authorities and to any parties specifically effected by the relief sought herein.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary. As this Motion is seeking first day relief, notice of this Motion will be served as required by the General Order Adopting Guidelines Governing First Day Matters, entered March 31, 2003, by the United States Bankruptcy Court for the District of New Jersey by fax or email if available and if not available by overnight mail to the parties' last known address.

## NO PRIOR REQUEST

42.    No prior request for the relief sought in this Motion has been made to this or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form of the Order submitted concurrently herewith, granting the relief requested herein and such other and further relief as this Court deems just and proper.

ME1 8139071v.1

Dated: February 17, 2009

Respectfully submitted,
**McCARTER & ENGLISH, LLP**

By: */s/ Charles A. Stanziale, Jr.*
Charles A. Stanziale, Jr.
Joseph Lubertazzi, Jr.
Lisa S. Bonsall
Jeffrey T. Testa
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444
Facsimile: (973) 624-7070

*Proposed Counsel for Debtors and Debtors in Possession*

**WEIL, GOTSHAL & MANGES LLP**

Michael F. Walsh
Ted S. Waksman
Philip Rosen
767 Fifth Avenue
New York, NY 10153
Phone: 212-310-8362
Fax: 212-310-8677

*Proposed Co-Counsel for Debtors and Debtors in Possession*

ME1 8139071v.1