UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-2(c)**

**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen (KR 4963)
Jeffrey D. Prol (JP 7454)
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: 973-597-2500
Fax: 973-597-2400
Email: krosen@lowenstein.com
       jprol@lowenstein.com

*-and-*

**STROOCK & STROOCK & LAVAN LLP**
Kristopher M. Hansen (KH 4679)
Curtis C. Mechling (CM 5957)
Erez E. Gilad (EG 7601)
Sayan Bhattacharyya (SB 3810)
180 Maiden Lane
New York, New York 10038
Tel: 212-806-5400
Fax: 212-806-6006
Email: khansen@stroock.com
       cmechling@stroock.com
       egilad@stroock.com
       sbhattacharyya@stroock.com

*Co-Counsel to Ad Hoc Committee of Holders of 8.5% Senior Secured Notes Due 2015*

| | |
|---|---|
| In re:<br><br>TCI 2 HOLDINGS, LLC, et al.,[1]<br><br>Debtors. | Chapter 11<br>Case No.: 09-13654 (JHW)<br><br>(Jointly Administered) |

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TCI 2 Holdings, LLC (0526); Trump Entertainment Resorts, Inc. (8402); Trump Entertainment Resorts Holdings, L.P. (8407); Trump Entertainment Resorts Funding, Inc. (8405); Trump Entertainment Resorts Development Company, LLC (2230); Trump Taj Mahal Associates, LLC, d/b/a Trump Taj Mahal Casino Resort (6368); Trump Plaza Associates, LLC, d/b/a Trump Plaza Hotel and Casino (1643); Trump Marina Associates, LLC, d/b/a Trump Marina Hotel Casino (8426); TER Management Co., LLC (0648); and TER Development Co., LLC (0425).

**MOTION OF THE AD HOC COMMITTEE OF HOLDERS OF THE
8.5% SENIOR SECURED NOTES DUE 2015 FOR APPOINTMENT OF
EXAMINER PURSUANT TO SECTION 1104(c) OF THE BANKRUPTCY CODE**

The ad hoc committee (the "Ad Hoc Committee") of certain holders of the 8.5% Senior Secured Notes Due 2015 (the "Senior Secured Notes") issued by Trump Entertainment Resorts Holdings, L.P. ("TER Holdings") and Trump Entertainment Resorts Funding, Inc. (together with TER Holdings and the above-captioned debtors and debtors-in-possession, the "Debtors"), by and through their undersigned counsel, hereby move this Court (this "Motion") for the entry of an order, pursuant to section 1104(c) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), directing the appointment of an examiner to investigate certain matters related to the Debtors' chapter 11 cases (the "Chapter 11 Cases"), as described in more detail below. In support hereof, the Ad Hoc Committee respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.  These Chapter 11 Cases cry out for appointment of an examiner. Unrestrained by the oversight of a trustee or official creditors committee, and apparently still in the thrall of Donald Trump, the Debtors have engaged in conduct detrimental to the Debtors' estates and in possible violation of their fiduciary duty to creditors.

2.  The Ad Hoc Committee respectfully submits that three principal matters merit investigation:

    a. **The Florida Litigation and Aborted Trump Marina Sale.** For almost five years, the Debtors have poured tens of millions of dollars into the Florida Litigation (defined below) crafted by Mr. Trump. Now the Debtors have effectively torpedoed the proposed sale of the Trump Marina Hotel Casino (the "Trump Marina") that would have settled the Florida Litigation, rid the Debtors of a money-losing operation, and provided the Debtors with a badly needed infusion of cash. They have done so purportedly for the privilege of spending many millions more in the pursuit of litigation of dubious value that they list nowhere as an asset of their estate and apparently do not include in their enterprise valuation. The Debtors' failure to close the Trump Marina sale has

-2-

itself now generated new litigation based on fraud and conspiracy against the Debtors and their CEO and General Counsel. How and why did the Debtors allow this to happen? More specifically, is there any value in the Florida Litigation and can that litigation possibly justify the loss of the Trump Marina sale?

b. **The Trump Partnership "Abandonment."** Just four days before the Debtors' bankruptcy filings last February, Mr. Trump purported to "abandon" his partnership interest in TER Holdings, declaring it to be "worthless." Although the Debtors initially challenged whether this purported renunciation of Mr. Trump's partnership interest was valid, it appears that it has not pursued the matter further as no mention of the issue is made in the plan of reorganization proposed by the Debtors and supported by Mr. Trump and Beal Bank (the "Insider Plan") or accompanying Disclosure Statement (the "Insider Disclosure Statement"). The Ad Hoc Committee believes that, by this curious maneuver, Mr. Trump sought to avoid significant personal tax liability and to foist those liabilities on the Debtors. Just what are the facts surrounding Mr. Trump's purported "abandonment" of his partnership interest, what are the tax or other implications for the Debtors of his actions and why are the Debtors not disclosing anything about this?

c. **The Insider Plan Process.** After months of assuring the Court, creditors and the investing public that it was seriously considering a plan of reorganization proposed by the Ad Hoc Committee that would provide recoveries to all creditors, the Debtors disclosed on the night of August 3 that they had already decided in <u>April</u> to adopt the Insider Plan that would turn over the Debtors to Mr. Trump and Beal Bank and wipe out every other party in the case. How and why did the Debtors and their Board of Directors secretly decide to abandon the interests of their other creditors for the benefit of a single bank and a single out-of-the-money insider shareholder who attempted to abandon his limited partnership interests in the Company and foist his potential personal tax losses on the Debtors? How is it that Beal Bank decided to partner with Mr. Trump and possibly finance his investment in the Debtors under the Insider Plan? And how long have Mr. Beal and Mr. Trump conspired to attempt their takeover in violation of the Bankruptcy Code?

As described in significantly more detail below, all of these questions and more that undoubtedly will flow from an investigation should be answered by an independent examiner before the Court can consider the approval of the Insider Disclosure Statement and before creditors are asked to vote on the Insider Plan.

3.      As shown below, appointment of an examiner is not only manifestly in the interests of creditors, but also is required as a matter of law under section 1104(c)(2) of the Bankruptcy Code. The requested investigation can be conducted at relatively modest cost and without undue delay. An examiner therefore should be appointed to investigate the three matters described above and any issues that flow from them and should report back to the Court and creditors in advance of any hearing to approve the Insider Disclosure Statement or confirm the Insider Plan.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and 157(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELEVANT BACKGROUND FACTS

**A.    The Chapter 11 Cases**

5.      On February 17, 2009 (the "Petition Date"), the Debtors each filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases and the Debtors have remained in possession of their assets and continued management of their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.      No official committee has been appointed in the Chapter 11 Cases.

7.      The Debtors filed their Insider Plan and Insider Disclosure Statement on the night of August 3, 2009.

**B.    The Debtors' Capital Structure**

8.      The Debtors' capital structure is simple and involves only two significant creditor constituents. The first is Beal Bank, which holds approximately $488.8 million in debt. The

second is comprised of the holders of Senior Secured Notes, who hold notes in the principal amount of approximately $1.25 billion. Most of the Debtors' general unsecured creditors have been paid under an extensive critical trade program approved by this Court at the inception of the Chapter 11 Cases.

9. More specifically, the Insider Plan provides for allowed claims of Beal Bank and the Senior Secured Notes in the amounts of $486 million and $1.25 billion, respectively. The Debtors' Plan also states that the Debtors' total enterprise value is $458 million and classifies the Senior Secured Notes as unsecured obligations. The Debtors' valuation also means that $28 million of Beal Bank's debt is unsecured. In addition, hundreds of millions of dollars of unsecured claims have been filed against the Debtors by Mr. Trump and other parties with whom the Debtors have contractual and other relationships.

10. It is beyond dispute that equity holders are "out of the money." Consequently, the only impaired creditor constituencies with an economic stake in the outcome of these proceedings are Beal Bank and the holders of the Senior Secured Notes.

11. Donald Trump, a major equity holder and contract counter-party of certain of the Debtors, has also been active in these Chapter 11 Cases, and is a co-proponent of the Insider Plan. Prior to the Petition Date, in addition to serving as Chairman of the Board of Trump Entertainment Resorts, Inc., the ultimate parent company of the Debtors, Mr. Trump was also a limited partner of TER Holdings before abandoning his limited partnership interests. Mr. Trump remains a large holder of TER common stock and is party to a number of agreements with certain of the Debtors.

**C.    The Insider Plan Process**

12. Starting in December 2008 and continuing through the weekend prior to the Petition Date, the Ad Hoc Committee engaged in extensive restructuring negotiations with the

Debtors and Donald Trump. In early January 2009, the Debtors presented a restructuring proposal to the Ad Hoc Committee in which the Debtors acknowledged that the Senior Secured Notes were indeed the fulcrum security and entitled to receive 95% of the stock of the restructured Debtors. The Ad Hoc Committee responded to the restructuring proposal on January 19, 2009 with incremental changes to the Debtors' proposal. Yet, despite the fact that the Ad Hoc Committee's proposal was quite close to the Debtors', the Debtors never provided a counterproposal or any response.

13. Instead, the Debtors requested that the Ad Hoc Committee negotiate directly with Donald Trump, the Chairman of the Debtors' Board of Directors during most of the negotiations, and with his daughter, Ivanka Trump. Unfortunately, those negotiations failed.[2]

14. Immediately after the Petition Date, and recognizing that Donald Trump's requests and negotiating position were vastly out of line with the economic reality of the Debtors' operations (past and present), the Ad Hoc Committee sought to negotiate directly with Beal Bank. As in its abortive attempts to negotiate with the Debtors, the Ad Hoc Committee delivered a number of term sheets to Beal Bank in the hope of generating a negotiating dialogue that would lead to an expeditious resolution. Beal Bank, however, chose not to respond to any of the Ad Hoc Committee's proposals and informed the Ad Hoc Committee that it would negotiate only with Mr. Trump.

---

[2] Despite certain members of the Ad Hoc Committee and their advisors executing confidentiality agreements and tendering diligence requests to the Debtors in December 2008 and January 2009, the Debtors were less than forthcoming on a number of fronts. For example, during the pre-bankruptcy diligence and one-way negotiating process, the Debtors failed to disclose to the Ad Hoc Committee the existence of a personal guaranty by Mr. Trump of the Senior Secured Notes in the amount of $250 million. When the Ad Hoc Committee heard about the possible existence of the guaranty, the Debtors required the Ad Hoc Committee to negotiate directly with Mr. Trump to receive the document (while the Debtors took no part in those discussions), and still provided the document only after a week had passed.

15. Since the Petition Date, the Debtors have made no attempt to craft their own plan of reorganization. Instead, the Debtors simply asked each constituent to provide the Debtors with a plan proposal. Proposals from the Ad Hoc Committee, and, upon information and belief, Beal Bank and Donald Trump, were delivered to the Debtors in April 2009. Since then, through and including a meeting with the Debtors' full Board of Directors on June 25, 2009, the Ad Hoc Committee, specifically at the request of the Debtors who assured the Ad Hoc Committee that no final decision had been made, revised its proposal several times to include greater value for creditors by increasing the amount of their proposed rights of offering commitment and bridge debtor-in-possession ("DIP") financing. The Ad Hoc Committee subsequently delivered to the Debtors a detailed plan term sheet, a draft DIP commitment letter together with a comprehensive DIP financing term sheet, and a draft rights offering backstop agreement.

16. In the six weeks since the Debtors have had what amounts to the final proposals from the only two creditor constituents, the Debtors have done little to advance a plan process other than perfunctorily ask holders of the Senior Secured Notes to negotiate with Beal Bank and Mr. Trump. The Debtors have not scheduled any meetings or teleconferences among all constituents since the commencement of the Chapter 11 Cases and have barely communicated with the Ad Hoc Committee, only calling infrequently when they needed support on motions (*i.e.*, the critical vendor support motion). Other than arrange a single diligence meeting with the Debtors' management, the Debtors have done little more than barely respond to inquiries and information requests from Noteholders with near complete radio silence over the last few weeks, all the while revising projections continually downward. Nor did the Debtors prepare a draft plan amalgamating the two camps' positions in an attempt to encourage the parties to come together.

17.    The Debtors' initial Exclusive Period to file a plan of reorganization was set to expire on June 17, 2009, prompting the Debtors to seek a 90-day extension (the "<u>Exclusivity Extension Motion</u>").  In the Exclusivity Extension Motion, which was filed at the end of May, the Debtors assured the Court and creditors that progress was being made and that additional time was needed to formulate a plan of reorganization.  Indeed, co-counsel to the Debtors unequivocally declared that the Board was considering two competing plans and that no decision had been made.[3]  Despite serious misgivings regarding the stalemate in the case, the Ad Hoc Committee consented to a 45-day extension of exclusivity, which it would never have done had it been told the truth by the Debtors, in the hope that additional time would afford the Debtors an opportunity to take some steps to forge consensus.  Consequently, on June 16, 2009 with the support of the Ad Hoc Committee, this Court entered an order extending the Debtors' Exclusive Periods to file and solicit a plan of reorganization until August 3, 2009, and October 1, 2009, respectively.

18.    However, as the Insider Disclosure Statement makes clear, the Debtors had already decided to propose the Insider Plan <u>as far back as April 28, 2009</u>, nearly a month prior to the filing of the Debtors' Exclusivity Extension Motion.  Insider Disclosure Statement at VI. C. 3.  The Debtors' "plan process" was, in hindsight, nothing more than a charade and a stall tactic.

19.    Most dismayingly, the Insider Plan that the Debtors supposedly determined was "superior" to the proposals of the Ad Hoc Committee is a "new value" plan that purports to give 100% of the reorganized Debtors to Beal Bank and Mr. Trump and to give <u>nothing</u> to anyone else.  Specifically, the Insider Plan provides for a $100 million contribution from Beal Bank and

---

[3]    Charles Stanziale, co-counsel to the Debtors, is quoted in a media article dated June 6, 2009 as follows:  "Are the plans being reviewed by the company's financial consultant, management and legal counsel? The answer to that is yes," Stanziale said. "Has the board acted on any of these plans? No. Has there been a recommendation on either one? The answer is no."  Donald Wittkowski, *Trump Plots Comeback for Casino Ownership*, PressofAtlanticCity.com, June 6, 2009, attached hereto as Exhibit A.

Donald Trump (who may be borrowing the money he is investing in the Debtors from Beal Bank) in exchange for 100% of the new equity. In addition, the balance of Beal Bank's pre-petition debt is reinstated on modified terms, even though the Debtors value the collateral as being worth less than the face amount of the debt.

20. On its face, the Insider Plan violates the Bankruptcy Code's absolute priority rule and flagrantly favors a single creditor (wholly owned by a single individual) and an insider equity holder to the severe prejudice of all other creditors. The Ad Hoc Committee submits that it is incomprehensible how the Debtors, consistent with their fiduciary duties, possibly could advance such an inequitable plan in good faith. The very circumstances of the Insider Plan's promulgation – including Mr. Trump's past domination and control of the Debtors (through multiple prior bankruptcy proceedings), the Debtors' repeated failure to negotiate with the Ad Hoc Committee, the Debtors' insistence that the Ad Hoc Committee negotiate only with Mr. Trump and his daughter, and the Debtors' apparent misrepresentations about how they were really conducting the "plan process" – all bespeak conflicts of interest and bad faith. These facts and circumstances require investigation by an independent examiner.

**D.    The Florida Litigation and Aborted Trump Marina Sale**

21. For nearly five years, the Debtors have been pursuing litigation in Broward County Florida (the "<u>Florida Litigation</u>") against Coastal Development, LLC and others (collectively, the "<u>Litigation Defendants</u>"), alleging various causes of action for fraud, breach of fiduciary duty, conspiracy, and other alleged wrongs relating to the development and sale of Hard Rock casino and hotel projects on Seminole land in Hollywood and Tampa, Florida (the "<u>Seminole Projects</u>"). While it is difficult to ascertain exactly what the Debtors expect to gain from the Florida Litigation, it appears that they contend they should have been given the opportunity to profit from the Seminole Projects because Mr. Trump supposedly suggested the

projects to the Seminole tribe through one of the Litigation Defendants in 1995. *See, e.g.*, *Trump Sues Developer Over Seminole Casino Project*, Daily Commercial News and Construction Record, Jan. 21, 2005, http://www.dailycommercialnews.com/article/20050121600, attached hereto as Exhibit B.  The Florida Litigation has been proceeding for years at a cost of what is believed to be tens of millions of dollars to the Debtors and has been an acrimonious and intense matter, involving allegations of witness tampering against a lawyer that the Debtors sought to retain as an ordinary course professional in this case (Mr. Reardon). *See Witness Tampering in Broward?*, http://southfloridalawyers.blogspot.com/2007/12/witness-tampering-in-broward.html (last visited August 4, 2009), attached hereto as Exhibit C.

22.    Prior to the Petition Date, the Florida Litigation was placed on hold when the Debtors entered into a purchase and sale agreement (the "Marina Sale Agreement") for the Trump Marina with Coastal Development, LLC (one of the Litigation Defendants) and Coastal Marina, LLC (together, "Coastal") that, if closed, would have resulted in the dismissal of the Florida Litigation.  The Marina Sale Agreement was dated May 28, 2008, and initially provided for a purchase price of $316 million, subject to an EBITDA-based adjustment.  While the Debtors' credit agreement with Beal Bank provides for the payment of proceeds from the sale of the Debtors' assets to Beal Bank, the Ad Hoc Committee believes that a significant portion of the proceeds from that sale were slated to be given directly to Mr. Trump as some form of finder's fee for orchestrating the Florida Litigation and that the Debtors' Board of Directors somehow approved of this arrangement.  For reasons allegedly related to a slumping economy, the Marina Sale Agreement was amended on October 28, 2008, to reduce the purchase price to $270 million and eliminate the EBITDA-based adjustment in exchange for Coastal agreeing to post an additional $2 million deposit and consent to the release of $15 million in deposits to the Debtors.

-10-

Even though the price was reduced, it is believed that Mr. Trump was still slated to receive a significant portion of the sale proceeds, despite public comments by the Debtors' CEO saying that the Debtors were still figuring out what to do with such proceeds. See Judy DeHaven, *Owner Reduces Price in Trump Marina Deal*, The Star-Ledger, Oct. 29, 2008, http://www.nj.com/business/index.ssf/2008/10/owner_reduces_price_in_trump_m.html, attached hereto as Exhibit D.

23. In January 2009, the Debtors forecast that the Trump Marina would generate only $2.4 million in EBITDA for 2009, yet the property was under contract to be sold for $270 million, a price widely acknowledged by the market as far in excess of the property's actual worth. Given the Debtors' projections for the property and the immaterial benefits inuring to the estate upon the contract's termination (*i.e.*, a $2 million deposit and the right to proceed with a precarious litigation that is the brainchild of Mr. Trump), the Ad Hoc Committee urged the Debtors to engage in a full court press to try and close a deal that was more in line with economic reality. After commencing the Chapter 11 Cases, the Debtors allowed the outside closing date under the Marina Sale Agreement date to pass without the Debtors accepting repeated offers from Coastal to purchase the Trump Marina, even though the Trump Marina has become a cash drain on the Debtors and is projected to continue to detract from its operations for the foreseeable future. Indeed, prior to the filing of the Insider Disclosure Statement, the Debtors' financial advisor and their management took the position that the Trump Marina had negative value.

24. At the urging of the Ad Hoc Committee, Coastal has since provided the Debtors with a renewed proposal for the acquisition of the Trump Marina—one that would provide substantial present value into the Debtors' estates in exchange for a property that loses money

every day for the Debtors. The Debtors, however, rejected the new Coastal proposal on many grounds, including that the purchase price was far less than its original contract price, would net no recovery for the Debtors, and that Coastal was not likely to close the transaction. In response, Coastal assured the Debtors that it would escrow the purchase price immediately and address any other concerns that the Debtors had. Remarkably, the Debtors chose not to respond to such a proposal other than to state in the Insider Disclosure Statement that to date the terms of Coastal's renewed sale proposals have been unacceptable to them. *See* Insider Disclosure Statement at VI. C. 4.

25. Soon after the expiration of the Marina Sale Agreement, the Debtors sought to hire three law firms in connection with the recommencement of the Florida Litigation, including Mr. Reardon, against whom witness tampering and other allegations of professional misconduct had been leveled in connection with the Florida Litigation. *See* Sal Martucci, *Secret Trump Tapes Bring Sale and Settlement, The Donald Gets $300M for Marina*, NJ Casino News, http://www.njcasinonews.com/trumpsettlement.html (last visited August 4, 2009), attached hereto as Exhibit E.

26. On July 28, 2009, Coastal commenced an adversary proceeding in these Chapter 11 Cases (the "Coastal Adversary Proceeding") against the Debtors and their CEO and General Counsel, Messrs. Mark Juliano and Robert Pickus, respectively, alleging that the Debtors let the Trump Marina fall into serious disrepair and hid property defects from them during the negotiations, and ultimately engaged in a conspiracy to defraud Coastal of its deposit and to purchase an asset at far more than its actual worth.

27. Even though it is believed that the Debtors have spent tens of millions of dollars pursuing Mr. Trump's Florida Litigation and have hired professionals in this case whose sole

representation relates to the Florida Litigation, they have not listed the Florida Litigation on their schedule of assets. Nor do they attribute any value to the litigation in the recently filed Insider Plan. Nevertheless, the Debtors have rejected offers from Coastal to purchase the Trump Marina for cash when the Trump Marina costs the Debtors millions of dollars a year to keep open. They also will need to spend significant sums defending themselves in the Coastal Adversary Proceeding.

28.  To ignore real purchase offers for the Trump Marina and to take on hugely expensive and disruptive litigation connected to it, the Debtors must believe that the Florida Litigation has value. And yet, as noted, they do not ascribe any value to the Florida Litigation in the Insider Disclosure Statement. Before any disclosure statement can be approved and before any confirmation proceedings can occur on the Insider Plan, creditors of the Debtors' estates and this Court need to know the truth behind the countless fraud allegations swirling around the Florida Litigation, the Coastal Adversary Proceeding and the related sale of the Trump Marina. There are no statutory committees in this case. Due to the significant allegations of fraud that surround these issues, an examiner must be appointed to investigate them and render a report.

**E.    The Trump Partnership "Abandonment"**

29.  On February 13, 2009, just four days before the bankruptcy filing, Donald Trump and his daughter Ivanka Trump resigned from the TER Board of Directors. That same day, Mr. Trump sent a letter to the Debtors stating that he had determined that his limited partnership interests in TER Holdings were worthless, and that he was abandoning them.[4]  Mr. Trump publicly disassociated himself from management[5] and declared that "my investment in [the

---

[4]   A true and correct copy of Mr. Trump's February 13, 2009 letter is attached hereto as Exhibit F.

[5]   Despite Mr. Trump's public statements disassociating himself from the history of these Debtors, Mr. Trump has been an integral part of the Trump hotels and casinos in his varying capacities, including substantial (and at

-13-

Debtors] is worthless to me now." *See* Kyle Peterson, *Trump Entertainment Files for Bankruptcy*, Reuters.com, Feb. 17, 2009, attached hereto as Exhibit G; Jeffrey McCracken and Tamara Audi, *Trump Unit to Seek Chapter 11*, Wall Street Journal, http://online.wsj.com/article/SB123482989751595525.html, attached hereto as Exhibit H.

30. On March 12, 2009, the Debtors sent a letter responding to Mr. Trump's letter referencing the terms of the TER Holdings partnership agreement that requires the prior written consent of the general partner (Trump Entertainment Resorts, Inc.) to the withdrawal of a limited partner from the partnership, which consent had not been given. Accordingly, the Debtors were of the view that Mr. Trump's purported abandonment was not accepted and not valid.[6]

31. While it is unclear what Mr. Trump's goal was in attempting to abandon his partnership interests or whether such abandonment was effective, the Ad Hoc Committee believes that Mr. Trump's purported abandonment was an attempt by Mr. Trump to insulate himself from potential tax liabilities and to shift those liabilities to the Debtors. The appointment of an examiner in these cases is needed to investigate the effectiveness of Mr. Trump's purported abandonment of his partnership interests, what, if any, injury to the Debtors has or would result from such abandonment and the implications thereof on the Debtors' reorganization.

## RELIEF REQUESTED

32. The Ad Hoc Committee requests the appointment of an examiner to conduct an investigation of the Debtors and their respective directors and senior officers, in respect of the following issues:

- The facts and circumstances of the Debtors' proposal of the Insider Plan;

---

times, sole) equity holder, chairman of the Board of Directors, and president and/or CEO all through three prior chapter 11 proceedings.

[6] A true and correct copy of the Debtors' March 12, 2009 letter is attached hereto as Exhibit I.

- The facts and circumstances of the Florida Litigation, the aborted Marina Sale Agreement and the related Coastal Adversary Proceedings; and

- Donald Trump's purported "abandonment" of his partnership interests and the tax and other financial implications thereof for the Debtors.

## ARGUMENT

**A.    The Appointment of an Examiner is Mandatory in These Cases**

33.    Section 1104(c) of the Bankruptcy Code provides:

> If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court <u>shall</u> order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—
>
> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
>
> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c) (emphasis added).

34.    Section 1104(c) thus mandates the appointment of an examiner upon the satisfaction of four factors: First, the debtor must still be in possession of the estate and a trustee must not have been appointed. Second, a plan must not have been confirmed. Third, a party in interest or the United States Trustee must request the appointment. Lastly, one of the conditions set forth in section 1104(c)(1) or (c)(2) must be satisfied—either the appointment of the examiner is in the best interests of the creditors <u>or</u> the specified unsecured debts exceed $5 million. *See, e.g.*, *In re UAL Corp.*, 307 B.R. 80, 84 (Bankr. N.D. Ill. 2004) ("[A]ppointment of

an examiner is mandatory if the four conditions are met, but the court retains the discretion to determine the nature and scope of the examiner's investigation.").

35. There is no question that no trustee has been appointed,[7] no plan has been confirmed, and that the Ad Hoc Committee is a party in interest in these cases. Furthermore, as described above, the fixed and liquidated value of the unsecured claims against the Debtors, other than debts for goods, services or taxes, or owing to an insider, far exceeds $5 million. Where the circumstances set forth in section 1104(c)(2) are present, the plain language of the statute requires the appointment of an examiner. *See In re Revco D.S., Inc.*, 898 F.2d 498, 500-01 (6th Cir. 1990); *In re Vision Dev. Group of Broward County, LLC*, 2008 WL 2676827, at *3 (Bankr. S.D. Fla. June 30, 2008) (finding that appointment of an examiner was mandatory where mezzanine lenders had claims of over $5 million); *In re Loral Space & Comm., Ltd.*, No. 04 Civ. 8645RPP, 2004 WL 2979785, at *5 (S.D.N.Y. Dec. 23, 2004) (finding that section 1104(c)(2) mandates the appointment of an examiner where the debt threshold is met); *In re Big Rivers Elec. Corp.*, 213 B.R. 962, 965-66 (Bankr. W.D. Ky. 1997) (finding that appointment of an examiner was mandatory because debt met $5 million threshold). Accordingly, under the plain meaning of section 1104(c)(2), the appointment of an examiner is mandatory in these cases.

36. Although some courts have concluded that the appointment of an examiner under section 1104(c)(2) is discretionary in certain extreme circumstances, the facts of those cases are readily distinguishable and such cases are inapplicable here. *See, e.g.*, *In re Rutenberg*, 158 B.R.

---

[7] The statute provides that an examiner cannot be appointed if a trustee has been appointed; however, this limitation was not intended to require the denial of a motion to appoint a trustee as a precondition to the appointment of an examiner. *See Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 855 (Bankr. S.D.N.Y. 1994) (stating that "[a] motion to appoint an examiner stands on its own, and need not be part of an unsuccessful motion to appoint the trustee."); *see also Gilman Servs.*, 46 B.R. at 322 (granting motion to appoint examiner where no separate motion to appoint a trustee had been filed). In fact, several cases have concluded that a court may appoint an examiner *sua sponte*. *See In re Public Serv. Co. of N.H.*, 99 B.R. 177, 182 (Bankr. D.N.H. 1989); *In re UNR Indus., Inc.*, 789, 795 (Bankr. N.D. Ill. 1987).

230, 233 (Bankr. M.D. Fla. 1993) (court denied motion for appointment of examiner where an individual debtor was no longer engaged in business); *In re GHR Cos.*, 43 B.R. 165, 176 (Bankr. D. Mass. 1984) (court denied motion for appointment of examiner where court was considering appointing a trustee instead); *In re Shelter Res. Corp.*, 35 B.R. 304, 305 (Bankr. N.D. Ohio 1983) (denying motion to appoint a trustee to investigate fairness of settlement where such investigation was rendered moot by approval of settlement); *In re Bradlee Stores, Inc.*, 209 B.R. 36, 38 (Bankr. S.D.N.Y. 1997) (denying motion to appoint a trustee due to the fact that the movants were petitioning the court for appointment mere weeks before the statute of limitations on certain claims expired).

**B.     The Appointment of an Examiner Is Also Justified Under Section 1104(c)(1)**

37.     While the appointment of an examiner in this case is mandated by the provisions of section 1104(c)(2), grounds for such appointment also exist under section 1104(c)(1). To determine whether appointment of an examiner under section 1104(c)(1) is appropriate, courts must determine "whether the creditors and equity security holders would be served by the appointment of an examiner and whether the costs of an examiner are not disproportionately high." *See In re Gilman Servs., Inc.*, 46 B.R. 322, 327 (Bankr. D. Mass. 1985) (finding that benefit to the estate of appointment of an examiner outweighed the costs where: (1) there had been an unexplained loss of assets since the filing of the bankruptcy, (2) the debtor's financial reporting was deficient, and (3) transfer of real estate assets to a partnership owned by shareholders of the debtors may have been a fraudulent conveyance). In the similar case of *Keene Corp.*, the court appointed an examiner pursuant to section 1104(c)(1) because actions were filed against the debtor and former officers and directors alleging fraud relating to postpetition transfers of property of the debtor. 164 B.R. at 856. Noting that *Keene* was a "textbook" case calling for the appointment of an examiner in the interests of creditors, the court

also focused on the fact that the chairman and president were also named defendants in the cases brought against the debtor and an impartial investigation would eliminate any conflict of interest. *Id.*

38. Under the facts and circumstances of this case, the appointment of an examiner is justified under section 1104(c)(1) because investigation into the issues enumerated above would serve the interest of creditors, particularly as no official committee has been appointed in these cases to take on an oversight or investigatory role with respect to the Debtors. The Debtors' creditors are entitled to understand and investigate the facts surrounding management's proposal of a plan that wipes out all but a single creditor, the murky circumstances surrounding the Florida Litigation and aborted sale of the Trump Marina, and the facts and implications of Mr. Trump's mysterious "abandonment" of his partnership interests. This interest would be served by having an independent third party conduct an investigation as proposed in this Motion. Moreover, as these matters are the subject of existing or anticipated litigation, the appointment of, and investigation of these matters by, an examiner would come at little incremental expense to the Debtors' estates.

## NOTICE

39. Notice of this Motion has been given to (i) the Office of the United States Trustee for the District of New Jersey; (ii) counsel for the Debtors; (iii) counsel to U.S. Bank National Association, as Indenture Trustee; (iv) counsel to Beal Bank; and (v) to any parties that requested notice in these cases. The Ad Hoc Committee submits that no other or further notice is required under the circumstances.

40. No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Ad Hoc Committee respectfully requests that this Court enter an order, substantially in the form of the proposed order attached hereto, appointing an examiner in these Chapter 11 Cases and granting the relief requested herein and granting the Ad Hoc Committee such other and further relief as is just and proper.

Dated: August 11, 2009

Respectfully submitted,

LOWENSTEIN SANDLER PC

By:  /s/ *Jeffrey D. Prol*
Kenneth A. Rosen (KR 4963)
Jeffrey D. Prol (JP 7454)
65 Livingston Avenue
Roseland, New Jersey 07068
Tel:  973-597-2500
Fax:  973-597-2400
Email:  krosen@lowenstein.com
            jprol@lowenstein.com

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen (KH 4679)
Curtis C. Mechling (CM 5957)
Erez E. Gilad (EG 7601)
180 Maiden Lane
New York, New York 10038
Tel: 212-806-5400
Fax:  212-806-6006
Email:  khansen@stroock.com
            cmechling@stroock.com
            egilad@stroock.com

*Co-Counsel to the Ad Hoc Committee of Holders of 8.5% Senior Secured Notes Due 2015*