UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

**Caption in compliance with D.N.J. LBR 9004-2(c)**

**McCARTER & ENGLISH, LLP**
Charles A. Stanziale, Jr.
Joseph Lubertazzi, Jr.
Lisa S. Bonsall
Jeffrey T. Testa
Four Gateway Center, 100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444/Facsimile: (973) 624-7070
*Counsel for Debtors and Debtors in Possession*

- and -

**WEIL, GOTSHAL & MANGES LLP**
Michael F. Walsh
J. Philip Rosen
Ted S. Waksman
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000/Facsimile: (212) 310-8007
*Co-Counsel for Debtors and Debtors in Possession*

In re:

TCI 2 HOLDINGS, LLC, <u>et al.</u>,

Debtors.

Chapter 11
Case No.: 09-13654 (JHW)

(Jointly Administered)

**Hearing Date: August 27, 2009 2:00 p.m.**
**Objection Deadline: August 21, 2009**

## DEBTORS' OBJECTION TO THE EMERGENCY MOTION OF THE AD HOC COMMITTEE FOR AN ORDER (A) TERMINATING THE DEBTORS' EXCLUSIVE PERIOD AND (B) ADJOURNING THE HEARING TO APPROVE THE DEBTORS' DISCLOSURE STATEMENT

TO THE HONORABLE JUDITH H. WIZMUR,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

        TCI 2 Holdings, LLC ("TCI 2") and its subsidiary and other affiliated entities, as

debtors[1] and debtors in possession in the above-captioned chapter 11 cases (collectively, the

"Debtors"), as and for their objection to the Emergency Motion of the Ad Hoc Committee of

Holders of 8.5% Senior Secured Notes Due 2015 (the "Ad Hoc Committee") for an Order (A)

Terminating the Debtors' Exclusive Periods in Which to File a Plan of Reorganization and

Solicit Acceptances Thereto, And (B) Adjourning the Hearing to Approve the Debtors'

Disclosure Statement for Debtors' Joint Plan of Reorganization, dated August 11, 2009 [Docket

No. 530] (the "Exclusivity Termination Motion") respectfully represent:

## Preliminary Statement

        1.    Over the past eight months, the Debtors have done everything within their

power to facilitate a consensual financial restructuring among their three main constituencies --

Beal Bank ("Beal"), Mr. Donald Trump ("Trump"), and the Ad Hoc Committee. When it

became clear that the parties had reached a stalemate and a global agreement was not possible,

the Debtors' Board of Directors, in exercising their business judgment, determined that the best

interests of the Debtors would be served by selecting the highest and best restructuring proposal

available. It has done so and the Debtors filed their plan of reorganization (the "Plan") based on

a joint proposal from Beal and Trump. The Board did not make this decision lightly. It was

based not only on the most recent competing proposals submitted by Beal/Trump and the Ad

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TCI 2 Holdings, LLC (0526); Trump Entertainment Resorts, Inc. (8402); Trump Entertainment Resorts Holdings, L.P. (8407); Trump Entertainment Resorts Funding, Inc. (8405); Trump Entertainment Resorts Development Company, LLC (2230); Trump Taj Mahal Associates, LLC, d/b/a Trump Taj Mahal Casino Resort (6368); Trump Plaza Associates, LLC, d/b/a Trump Plaza Hotel and Casino (1643); Trump Marina Associates, LLC, d/b/a Trump Marina Hotel Casino (8426); TER Management Co., LLC (0648); and TER Development Co., LLC (0425).

Hoc Committee, but also on the opinion of their financial advisor, Lazard Frères & Co., LLC

("Lazard"), on valuation and an extensive but unsuccessful marketing effort to obtain third party

investment in the Debtors.

2.    The Ad Hoc Committee's disappointment in the Board's decision is

understandable.[2] Unfortunately, there is insufficient value in the Debtors' estates to provide any

recovery beyond Beal's $488 million of first lien debt. However, the Ad Hoc Committee's

unsupported and completely unwarranted attacks on the Debtors and their efforts to maximize

the value of their estates are not only disappointing and unproductive, but also demeaning to the

Ad Hoc Committee's own important role in the negotiation process over the last eight months.

3.    The Ad Hoc Committee now seeks to terminate the Debtors' exclusive

period in which to seek acceptances of the Plan. This is also unproductive. The Ad Hoc

Committee is entitled to oppose confirmation of the Plan, using every argument at its disposal --

at the confirmation hearing. But the Ad Hoc Committee has failed to advance any argument,

much less any evidence, that would warrant the unusual step of terminating exclusivity. It does

not and cannot prove any facts that would support the standards for terminating exclusivity set

forth in the cases: that the Debtors (i) are being dysfunctionally managed, (ii) failed to file a

reorganization plan in a reasonable time, or (iii) have used their exclusivity rights in an

oppressive or otherwise improper manner. The law is clear that the Ad Hoc Committee's

unhappiness with the Board's decision to select the Beal/Trump proposal does not satisfy its

heavy burden of demonstrating sufficient cause to terminate exclusivity.

---

[2] Demonstrating the full extent of their displeasure, the Ad Hoc Committee also seeks to have an Examiner
appointed to investigate, among other things, the process the Debtors used to select between the Beal/Trump and Ad
Hoc Committee proposals. That motion also lacks merit, and the Debtors will respond to that motion separately.

4.     The Ad Hoc Committee's claim that the Debtors' exclusivity period should be terminated merely because Trump is purchasing equity under the Plan also lacks merit. The Debtors' Board of Directors consists of six individuals, five of whom qualify as "independent." Trump has no control over the Board or the decisions it makes. Moreover, based on market testing, the only two parties with any interest in making a capital infusion into the Debtors, Beal/Trump and the Ad Hoc Committee, were both intimately involved in the negotiations that led to the Plan. The Debtors therefore have already considered the available restructuring proposals, and have adopted what, in their business judgment, is the most viable available restructuring plan.

5.     For all of the forgoing reasons, and as more fully explained below, the Court should deny the Ad Hoc Committee's Motion in its entirety.

## Background

### *General Background*

6.     On February 17, 2009 (the "Commencement Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

7.     The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

8.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee, and no statutory committee or trustee has been appointed in any of the Debtors' chapter 11 cases.

9.      Additional information regarding the Debtors and the events leading up to the Commencement Date are set forth in the Declaration of John P. Burke in Support of First Day Motions dated February 16, 2009 [Docket No. 19].

**_Background on the Proposed Plan of Reorganization and Proposed Disclosure Statement_**

10.      By order, dated June 16, 2009, the Debtors received an extension of time during which a debtor has the exclusive right to propose and file a chapter 11 plan (the "Plan Period"), and the period to obtain acceptances of such plan, during which time competing plans may not be filed (the "Solicitation Period" and, together with the Plan Period, the "Exclusive Periods"). See 11 U.S.C. §§ 1121(b), 1121(c)(3). The Plan Period and the Solicitation Period were extended through August 3, 2009, and October 1, 2009, respectively.

11.      On August 3, 2009, the Debtors filed their Plan and their proposed Disclosure Statement (as it may be amended or modified, the "Proposed Disclosure Statement") with respect to the Plan. Contemporaneously therewith, the Debtors filed their Motion for an Order Approving (i) the Disclosure Statement and Related Notice and Solicitation Procedures and (ii) the Notice and Objection Procedures for Confirmation of the Plan of Reorganization (the "Disclosure Statement Motion"). The hearing to consider that motion is scheduled for September 16, 2009 at 10:00 am.

**_Debtors Sought For Months To Reach A Consensual, Three-Way Resolution Involving Both The Ad Hoc Committee And Beal/Trump_**

12.      The Ad Hoc Committee contends without any evidentiary support that the Debtors excluded it from the plan negotiation process. This assertion is utterly without basis. Contrary to the impression presented by the Ad Hoc Committee's Motion, the Ad Hoc Committee has been an integral part of the process that led to the proposed Plan. The Debtors' Board made its decision only after months of extensive negotiations, including (i) multiple face-

to-face meetings between the Debtors and the Ad Hoc Committee or their representatives (as well as meetings with the Debtors' Board of Directors), (ii) numerous conference calls between the Debtors and the Ad Hoc Committee, (iii) dozens of email communications between the Debtors and the Ad Hoc Committee, and (iv) extensive analysis of the Ad Hoc Committee's various proposals by the Debtors and their advisors.  Throughout the entire process, the Debtors received proposals only from Beal/Trump and the Ad Hoc Committee.  And as between the two, the choice was clear.

13.     The process started in or about November of 2008, when the Debtors informed various holders of notes issued by Trump Entertainment Resorts Holdings, L.P. and Trump Entertainment Resorts Funding, Inc. ("Noteholders"), including the members of the Ad Hoc Committee, that the Debtors would not be making the December coupon payment on the outstanding debt.  After the Ad Hoc Committee retained legal and financial advisors in early December of 2008, the Debtors entered into three-way negotiations involving the Ad Hoc Committee and Trump.  These negotiations were intended to significantly de-leverage the Debtors' capital structure, and either (i) have the Noteholders buy out Trump or (ii) have Trump buy out the Noteholders.  Once a deal was reached, the Debtors intended to seek approval from Beal, the holder of the Debtors' approximately $490 million first lien debt.  The parties also contemplated that the Debtors would file a consensual prearranged chapter 11 bankruptcy to effectuate such a deal.  In December, 2008, the Debtors, Trump, Beal, and the Ad Hoc Committee entered into Forbearance Agreements, which were extended several times to allow the parties time to reach an agreement.

14.     Prior to the Debtors' chapter 11 filing, both Trump and the Ad Hoc Committee submitted several proposals to the Debtors.  Between December of 2008 and

February 15, 2009, the Debtors' representatives participated in many conference calls and meetings with representatives for the Ad Hoc Committee and Trump, including at least two meetings at which all parties were present.  Trump and the Ad Hoc Committee, however, were unable to reach an agreement.  At that point, the Ad Hoc Committee refused to extend the Forbearance Agreement beyond February 16, 2009, and stated that it intended to file an involuntary bankruptcy petition against the Debtors, thus leaving the Debtors with no choice but to file for bankruptcy protection.

15.    Despite filing for bankruptcy, the Debtors continued to seek a consensual three-way plan of reorganization involving both the Ad Hoc Committee and Trump.  Between February 17th and 27th, the Debtors' representatives spoke several times with the Ad Hoc Committee's representatives, using the Ad Hoc Committee's final pre-petition term sheet as a starting point for a consensual plan.  The Debtors met with both Trump and the Ad Hoc Committee and their representatives, to discuss their proposals, meeting with Trump and his representatives on February 25, and the Ad Hoc Committee and its representatives on February 27.  The Debtors also participated in a conference call with Beal to discuss the process and the desire for a consensual plan.

16.    The Debtors' efforts to reach a consensual plan continued into March.  The Ad Hoc Committee submitted proposals on March 12 and March 26, with Trump submitting a proposal on March 13.  The Debtors reviewed each proposal with Lazard, discussed the substance of each proposal with the Board of Directors, and considered a letter that the Ad Hoc Committee had sent to the Debtors' Board of Directors outlining its proposal and requesting a meeting.  Additionally, the Debtors spoke with Trump and the Ad Hoc Committee on several occasions during March in connection with their proposals, and met with each during March.

The Debtors, at the Ad Hoc Committee's request, also met with Coastal Development, LLC

("Coastal"), to discuss the status of the then-pending sale of the Trump Marina Hotel and Casino

(the "Marina Casino") to Coastal.

17.    Around this time, Lazard advised the Ad Hoc Committee and its financial

advisor that a successful restructuring of the Debtors would require a significant capital

investment.  Lazard suggested to the Ad Hoc Committee a possible proposal structure, which the

Ad Hoc Committee subsequently adopted.

18.    Also commencing in March 2009, Lazard began a comprehensive

marketing effort to seek one or more investors in the Debtors.  As part of this effort, Lazard

contacted over fifty potential financial or strategic investors.  Of those, however, only five

executed non-disclosure agreements and reviewed confidential information.  To date, the

marketing process has not resulted in the receipt of any bids.  The paucity of bids reflects the

challenging gaming market and limited interest of prospective buyers in Atlantic City gaming

properties.  In particular, several prominent concerns were cited by parties that were contacted:

- The declining revenues in the Atlantic City gaming market.

- The declining EBITDA performance of the Debtors and the lack of any market indication that such performance will improve in the near term.

- Longer-term concerns about the ability of the Atlantic City market to recover from the current economic downturn and the almost complete absence of new investment in Atlantic City.

- Significant existing competition, both from major competitors already operating in Atlantic City and from new competitors in surrounding markets, including the proliferation for gaming in neighboring jurisdictions (New York and Pennsylvania) and expanded gaming facilities in Connecticut.

- The threat of new competition, including new forms of gaming (e.g. table games in Pennsylvania, New York, and Delaware) and new facilities (Pennsylvania, New York, and Maryland).

- The difficulty in raising new capital for gaming enterprises in Atlantic City.

- The existence of other, more attractive acquisition opportunities currently available in the gaming industry.

- Preference for new development opportunities (particularly in new, limited license, regional jurisdictions) expected to provide superior investment returns.

Based on its extensive marketing efforts, Lazard advised the Debtors that the only bidders for investing in the Debtors are Beal/Trump, on which the Plan is based, and the Ad Hoc Committee, whose proposal the Debtors ultimately determined was inferior.[3]

19.    As the holder of the Debtors' first lien debt, Beal was considering requests both from Trump as well as the Ad Hoc Committee to work together to submit a joint proposal to the Debtors.  As part of this process, on or about March 23rd, Beal met with Marc Lasry, the Chief Executive Officer of Avenue Capital Group ("Lasry"), to discuss a consensual plan.  At that meeting, Beal informed Lasry that Beal would not work with the Ad Hoc Committee unless it reached an agreement with Trump.  Counsel for the Debtors, however, continued to encourage all parties to try to reach a consensual plan, but was met by strong resistance on all sides.

20.    The Debtors continued negotiating with both the Ad Hoc Committee and Trump on parallel paths in April.  Trump delivered a revised term sheet on April 8, and a due diligence meeting occurred on April 13 between the Debtors and the Ad Hoc Committee (including seven members of the Ad Hoc Committee).  The Debtors' Board of Directors met with the Ad Hoc Committee that same day to discuss its proposal, as the Ad Hoc Committee had

---

[3] The Ad Hoc Committee's claim that "prospective investors have reported. . .that they have been unable to obtain marketing materials or due diligence information from the Debtors and their financial advisors" is based on blatant hearsay and fails to identify any such "prospective investors."  Mot. at fn. 8.

previously requested. Following that meeting, the Ad Hoc Committee's counsel delivered a revised term sheet.

21. On April 17, the Ad Hoc Committee delivered a revised term sheet, and held a conference call with the Debtors. That same day, Trump also submitted a revised term sheet to the Debtors, which was jointly submitted for the first time with Beal. The Debtors also spoke with the Ad Hoc Committee concerning its proposal on April 21, 23rd, and 24th (with the Ad Hoc Committee's counsel submitting a further revised term sheet on April 27), and spoke with Trump and his representatives on April 22nd. On April 28, the Debtors' Board of Directors met to discuss the two proposals, and the Debtors held separate conference calls with the Ad Hoc Committee's and Trump's counsel to discuss their proposals. Although the Board expressed a preference for the Beal/Trump proposal at this time, it directed the Debtors' management and advisors to continue negotiations with both sides.[4] The Ad Hoc Committee subsequently submitted a further revised term sheet on May 1.

22. In early May, the Debtors continued their efforts to reach a consensual resolution, holding conference calls with the Ad Hoc Committee's counsel on May 5, 7 and 13, and with Trump's counsel on May 14 and 15, to discuss their proposals as well as potential ways to bridge the gaps between the proposals. Both the Debtors' counsel and Lazard suggested ways to bridge the gap between the parties. Unfortunately, neither side expressed any interest in reaching a global resolution. On May 20th, the Ad Hoc Committee's counsel distributed drafts of DIP loan documents and a commitment letter in connection with the Ad Hoc Committee's

---

[4] As the Ad Hoc Committee points out, the Debtors' Disclosure Statement states that the Board of Directors approved the Beal/Trump proposal on April 28, 2009. This language was included in an early draft of the Disclosure Statement, after which time subsequent proposals were received both from Beal/Trump and the Ad Hoc Committee, and the Debtors continued to negotiate with each. Subsequent drafts of the Disclosure Statement, however, failed to update this language. The Board did not decide to proceed with the Beal/Trump proposal, as later formulated, until July 22, 2009.

proposal, and the Debtors held a conference call with the Ad Hoc Committee's counsel on May 28 to discuss these documents.

23.     Throughout June, the Debtors continued to review the Ad Hoc Committee's revised proposal and documents and had prepared internal drafts for a chapter 11 plan and disclosure statement to implement a restructuring based on a deal with the Ad Hoc Committee.  The Debtors continued to discuss the same with their financial advisor, and to comment on the Ad Hoc Committee's draft documents.  In order to preserve both alternatives, the Debtors continued to review, discuss, and analyze the Beal/Trump proposal throughout June.  On June 2nd and June 23rd, the Debtors held conference calls with the Ad Hoc Committee and its counsel, and met on June 8th with the Ad Hoc Committee's counsel and Coastal's counsel at Coastal's office.  On June 9th, Debtors' counsel participated in a conference call with Beal and Trump regarding their proposed documents, and spoke with Beal's attorneys on June 16.

24.     On June 25th, the Debtors' Board of Directors met in person, but separately, with representatives of the Ad Hoc Committee and Trump to allow for formal presentations of their restructuring proposals.  At the Debtors' request, and in a continuing effort to promote a global resolution among all parties, additional meetings were held between representatives of the Ad Hoc Committee and Trump, including meetings between Lasry and Trump and/or Ivanka Trump.  Unfortunately, these meetings were not fruitful.

25.     After having attempted unsuccessfully for months to persuade the parties to reach a consensual resolution, the Debtors determined that they had to choose between the two sides in order to move their chapter 11 case forward.  The Debtors asked each side to submit its best proposal.  Both proposals were analyzed by the Debtors' advisors and were presented to the Debtors' Board of Directors on July 22.  At that meeting, Lazard advised the Board that, in its

opinion, the enterprise value of the Debtors was less than the amount owed to Beal and that the

Noteholders were out of the money.  Lazard also compared the two competing proposals and

advised that the proposal from the Ad Hoc Committee in aggregate involved higher risk relative

to the Beal/Trump proposal.

26.    After lengthy discussions of the advantages and disadvantages of each

proposal, the Board decided that the Debtors should file a chapter 11 plan based on the

Beal/Trump proposal.  In light of Lazard's valuation of the Debtors, the Board concluded that

Beal was the only creditor with a current economic interest in the Debtors.  In addition, Beal

made significant concessions to the Debtors with respect to the payment of its debt that further

tipped the scales in favor of the Beal/Trump proposal.  These concessions include a below-

market interest rate, the option to pay a portion of the interest in kind by having it deferred and

added to principal, and, perhaps more importantly, an eight-year extension of the maturity of the

loan (from 2012 until 2020), significantly longer than anything available in the marketplace.  In

addition, the Beal/Trump proposal provides the Debtors with valuable licensing rights to use

certain "Trump" trademarks and Trump's likeness, as well as provides for agreements under

which Trump would provide marketing and promotion services, and present certain business

opportunities, to the Debtors and would refrain from engaging in certain activities that are

competitive with the Debtors' businesses.  In comparison, the proposal submitted by the Ad Hoc

Committee was dependent on a cram down of the Beal debt and would provide significantly

greater cash flow strains on the Debtors at a time when Atlantic City casinos are under intense

economic and competitive pressures.  In consideration of these and other factors, the Board voted

to proceed with the Beal/Trump proposal.

***The Ad Hoc Committee's Misleading Contentions Concerning Coastal's Failure To Close Its
Contract For The Purchase Of the Marina Casino And Mischaracterization Of Debtors'
Response To Coastal's Renewed Expressions of Interest***

27.     Although only tangentially relevant to this Motion, the Ad Hoc Committee

goes on a misleading excursion into facts regarding the Debtors' dealings with Coastal over the

past five years.  To counter the Ad Hoc Committee's misleading presentation, it is necessary to

provide some background, beginning with a lawsuit the Debtors filed against Coastal in 2004.

28.     In or about December of 2004, TER Development Company, LLC ("TER

Development") filed a Complaint against Coastal and others in Florida state court (the "Florida

Lawsuit"), alleging claims for, *inter alia*, fraud, breach of fiduciary duty, and violations of the

Florida Deceptive and Unfair Trade Practices Act.  Despite the defendants' numerous motions

for summary judgment and other attempts to obtain dismissal of the claims, TER Development's

claims against all defendants for fraud and conspiracy and TER Development's claim against

Coastal under the Florida Deceptive and Unfair Trade Practices Act remain pending before the

Florida court.  Although the case is currently stayed, TER Development intends to pursue its

claims against Coastal vigorously when the Florida Lawsuit resumes.  The defendants seek no

relief against TER Development in the Florida Lawsuit other than requesting attorneys' fees and

costs in the event they prevail at trial.

29.     On or about May 28, 2008, following months of intense negotiations, TER

Development and its subsidiary, Trump Marina Associates, LLC (collectively the "Sellers")

entered into an agreement with Coastal to sell the Marina Casino.  Under the Asset Purchase

Agreement (the "Agreement"), Coastal agreed to pay $316 million and the Sellers agreed to

dismiss the Florida Lawsuit upon closing.  Coastal placed an initial deposit of $15 million in

escrow and agreed to seek financing for the balance, with the Agreement giving Sellers the right

to terminate the transaction if Coastal did not obtain such financing by October 28, 2008.

30.     Coastal failed to obtain financing by October 28, 2008 (which was a

material breach of the Agreement).  Rather than declare Coastal's default under the Agreement,

the Debtors agreed to enter into an amendment to the Agreement, which provided Coastal with

additional time to secure financing, and also reduced the purchase price to $270 million,

extended the walk-away date provided for in the Agreement to May 28, 2009, provided for the

unconditional release of the Initial Deposit to the Seller (to be credited against the purchase

price), and provided for an additional $2,000,000 deposit to be paid by Coastal.

31.     By May 1, 2009, Coastal still had not obtained the required financing.  On

that date, however, Coastal sent a letter to the Sellers' counsel, alleging that Sellers had failed to

maintain the Marina Casino and the quality of its facilities as required by the Agreement.[5]  After

the Sellers responded on May 15, 2009,[6] stating that the Marina Casino had been properly

maintained and that Sellers were ready, willing, and able to consummate the closing on the

agreed terms, Coastal proposed a significant reduction to the agreed purchase price and provided

no comfort that it would close the transaction in accordance with its terms.  The Agreement

expired by its terms when the outside closing date of May 28, 2009, passed.

32.     Even though the Agreement had expired and Coastal had neither tendered

payment nor an assurance of payment, on June 1, 2009, Coastal alleged by letter that the Sellers

had breached the Agreement and thus Coastal would not close the transaction.  Sellers responded

that same day by delivering a letter formally terminating the Agreement.

---

[5] A copy of the May 1st Letter is attached hereto as Exhibit A.

[6] A copy of the May 15th Letter is attached hereto as Exhibit B.

33.    On June 9, 2009, Coastal sent a letter to one of the Debtors' directors, proposing that Coastal would purchase the Marina Casino as a "closed" facility for a net closing price of $58 million ($75 million less the $15 non-refundable deposit previously earned by the Debtors and the $2 million deposit that Coastal forced the escrow agent not to release as was required under the Agreement, as amended).[7] The offer also proposed that the Debtors would remain responsible for all employee benefits, severance obligations, and similar shut down costs, and that the Florida Lawsuit would be dismissed with prejudice upon either the closing of the sale to Coastal or the acceptance of any superior offer from a third-party.

34.    The Debtors responded to this offer on June 11, 2009, enumerating several problems with Coastal's terms, including that the net purchase price, factoring closing costs, would be under $38 million and that Coastal demanded the dismissal of the Florida Lawsuit even if the Debtors accepted a greater offer from a different purchaser.[8] In the Debtors' view, closing the Marina Casino and putting thousands of employees out of work, even as part of a sale to Coastal, would cause substantial adverse repercussions to their other businesses and would be unacceptable for that reason, even apart from the direct monetary costs associated with closure. At the Debtors' urging, Coastal responded to the Debtors' June 11 letter by a letter dated July 16, 2009,[9] but failed to address the issues raised in the Debtors' June 11, 2009 letter. The Debtors remained in continuous contact with Coastal until July 28, 2009, at which point Coastal inexplicably filed an adversary proceeding in this Court against, among others, Trump Entertainment Resorts, Inc. ("TER"), its related entities, as well as TER's Chief Executive

---

[7] A copy of the June 9th Letter is attached hereto as Exhibit C.

[8] A copy of the June 11th Letter is attached hereto as Exhibit D.

[9] A copy of the July 16 Letter is attached hereto as Exhibit E.

Officer, and Chief Administrative Officer and General Counsel, seeking to rescind the
Agreement and the return of its deposits, plus interest and compensatory and consequential
damages.

35.     In short, the Ad Hoc Committee's recitation of the Coastal lawsuit and the
attempted sale of the Marina Casino is highly slanted and misleading and plainly reflects the Ad
Hoc Committee's alliance with, and bias towards, Coastal, against the interests of the Debtors.
In addition, Coastal, which entered into the Agreement partially or wholly to attain a dismissal of
the Florida Lawsuit, which alleges fraud and other bad acts by Coastal, has defaulted twice under
the Agreement and has inexplicably brought suit against the Debtors with respect to the
Agreements on which it defaulted, and is now asking the Debtors to "trust it" one more time.
Finally, the Ad Hoc Committee has materially based its new plan proposal on Coastal's purchase
of the Marina Casino under a new agreement – an event the Debtors consider highly unlikely,
given the past history.

## ARGUMENT

I.    *Cause Does Not Exist to Terminate Exclusivity*

A.    **The Ad Hoc Committee Cannot Satisfy
the Narrow Legal Standards for Terminating Exclusivity**

36.     A chapter 11 case is intended to permit the formulation, confirmation, and
consummation of a consensual plan that facilitates distributions to the debtor's economic
stakeholders.  To that end, the Bankruptcy Code provides for exclusive periods that afford a
debtor the opportunity to propose a plan and solicit acceptances of such plan without the
disruption that might result from the filing of competing plans.  To be sure, section 1121(d) of
the Bankruptcy Code provides great latitude to the bankruptcy court to extend or terminate
exclusive periods based on a showing of "cause."  Because of Congress' decision, however, to

afford the Debtor the unimpeded initial opportunity to develop a reorganization plan without

interference, it is settled that a party seeking to reduce a Debtor's exclusivity period must meet a

"heavy burden" in establishing sufficient "cause." See In re Geriatrics Nursing Home, Inc., 187

B.R. 128, 132 (D.N.J. 1995); In re Central Jersey Airport Services, LLC, 282 B.R. 176 , 184

(Bankr. D.N.J. 2002).[10]

      37.    While the courts have historically relied on a large number of wide-

ranging factors in determining whether cause exists to *extend* the exclusivity period, the range of

factors considered in determining whether cause exists to *terminate* exclusivity is far narrower.

In determining whether there is cause to terminate exclusivity, courts have looked to whether

particular circumstances exist showing that the debtor has (i) grossly mismanaged its operations,

In re Crescent Beach Inn, Inc., 22 B.R. 155, 159 (Bankr. D. Me. 1982), (ii) used the exclusivity

period to force creditors to accept an unsatisfactory plan, In re Texaco, Inc., 81 B.R. 806, 812-13

(Bankr. S.D.N.Y. 1988), (iii) delayed in filing a plan, In re Eagle-Picher Indus., Inc., 176 B.R.

143, 147 (Bankr. S.D. Ohio 1994), or where (iv) acrimonious relations exist between the debtor's

principals. In re Texas Extrusion Corp., 68 B.R. 712, 725 (N.D. Tex. 1986). In short, courts

have looked by and large to whether circumstances show a dysfunctional debtor, or one that is

abusing the process.

      38.    None of those circumstances is present in this case. The Ad Hoc

Committee has made no showing of gross mismanagement, failure to proceed towards the

proposal of a plan, oppressive or acrimonious conduct by the Debtors, or any other situation that

---

[10] The exclusivity period arises from "a delicate balance arrived at by Congress as an opportunity for a debtor on the one hand to negotiate with creditors and have the exclusive right to propose a plan, versus on the other side a protection of the interest of creditors and their opportunity to propose a plan." See In re: THCR/LP Corporation, et al., Case No. 04-46898 (JHW), February 23, 2005, Hrg. Tr. 103:10-22 (Bankr. D.N.J. Feb. 23, 2005); see also H.R. Rep. No. 95-595, at 231-32 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 6191 (noting that Congress intended to give bankruptcy courts flexibility to protect a debtor's interests by allowing unimpeded opportunity to negotiate settlement of debts without interference from other parties in interest).

courts have considered cause to terminate exclusivity.  Moreover, as described in detail above, it

is simply untrue that the Ad Hoc Committee has been excluded from the plan process.  In fact,

the extended negotiations with the Ad Hoc Committee was an essential element to the process.

The bottom line is that the Ad Hoc Committee is simply unhappy that its proposal was not

selected by the Debtors.  This is no surprise, because, under the Debtors' filed plan, no recovery

will run to the Noteholders, who are out of the money.  As courts have consistently held,

however, a creditor's unhappiness with a debtor's proposed plan of reorganization is plainly

insufficient to carry its heavy burden of establishing "cause" to terminate exclusivity.

      39.    For example, in In re Geriatrics, 187 B.R. 128 (D.N.J. 1995), a secured

creditor sought to terminate exclusivity and file an alternative plan after the Debtors had filed

their plan of reorganization.  Although the Bankruptcy Court granted the secured creditor's

motion, the District Court reversed the decision after determining that the Bankruptcy Court had

erred in its legal conclusion that "cause" existed to terminate the Debtors' exclusivity period.

See 187 B.R. at 134.  In doing so, the Court specifically noted that it was:

> not satisfied that statements made by creditors and parties in interest that they
> were prepared to offer more favorable plans if the court were to terminate the
> exclusivity period constitutes sufficient cause to cut short the debtor's window of
> opportunity opened by Congress… Further, the Court cannot conclude, based on
> reasoning of the Bankruptcy cases treating of "cause" under 11 U.S.C. § 1121(d)
> (discussed supra), that the fact that one creditor constituency is not happy with the
> debtor's plan constitutes cause to undermine the debtor's chances of winning final
> confirmation of its plan during the exclusive period.

Id. at 134.

      40.    Similarly, in denying a creditor's committee motion to terminate

exclusivity, the court in In re Eagle-Picher Industries, Inc., 176 B.R. 143, 147 (Bankr. S.D. Ohio

1994), specifically noted that "where the only grounds suggested by a movant for termination of

the exclusivity period in order that it may file an alternative plan, are, first, that it has been

treated unfairly because it has been excluded from negotiations being conducted under the aegis of a mediator, and second, that the filing of a competing plan will expedite the prompt resolution of these bankruptcy cases, this court is unable to find the cause required by § 1121(d)." The court further opined that the fact that discussions were unsuccessful did not demonstrate that the process had been unfair, and that there was no evidence that any undue delay had occurred or that the exclusivity period was being used as a tactical device to put pressure on the creditors committee. *Id.* at 147.

41.    Finally, as this Court noted in denying a motion to terminate exclusivity in the prior chapter 11 cases for these Debtors, the mere fact that a creditor may believe that a different plan may be "better" is not a basis for terminating exclusivity:

> [t]he fact that there may be other options, that there may be a better plan, that if we get to confirmation and the confirmation of the plan is denied, that we will be at square one and will have to understand the direction to pursue in terms of how to reorganize the debtors, all of that is understood and all of that occurs in every case, if the plan proposed by a debtor during exclusivity is not confirmed. Indeed, I think that there are risks to the process by terminating exclusivity, … which will be given serious account in the context of confirmation… Most significantly, it seems to me that where the debtor presents a prompt and comprehensive plan that has some support, that is not unconfirmable on its face. The debtor has the opportunity under the statute to proceed to confirmation in an exclusive way in the context in which the issue is presented, and I will offer the debtor the opportunity to do that.

See In re THCR/LP Corp., et al., Case No. 04-46898 (JHW), February 23, 2005, Hrg. Tr. 110:1-111:13 (Bankr. D.N.J. Feb. 23, 2005).[11]

42.    The Ad Hoc Committee has made no showing of the type required by the cases.  Its unhappiness is a direct consequence of the Debtors' business judgment to base their Plan on the proposal made by Beal/Trump.  That decision depended, in no small part, on the fact that Beal's debt has a senior claim to the Debtors' assets and those assets are worth less than

---

[11] A copy of the relevant portions of the transcript from the February 23, 2005 hearing is attached hereto as Exhibit F.

Beal's debt.  To the extent that the Ad Hoc Committee disagrees, it will have ample opportunity

to raise any objections to the Debtors' plan, whether related to issues of valuation, viability, or

otherwise, in the plan confirmation process.[12]  At the present time, and on this Motion, however,

the Ad Hoc Committee's unhappiness with the Debtors' chapter 11 plan is not sufficient cause to

terminate the Debtors' exclusivity.[13]

**B.    The Filing of The Plan Does
Not Constitute *Per Se* Grounds for Termination of Exclusivity**

43.    The Ad Hoc Committee also asserts that exclusivity should be terminated

because the Debtors' Plan, formulated after several months of negotiations, as detailed above in

¶¶ 13-26, provides that Trump will purchase new equity in the Debtors.  Citing to <u>Bank of</u>

<u>America National Trust and Savings Association v. 203 North LaSalle Street Partnership</u>, 526

U.S. 434 (1999) ("<u>LaSalle</u>"), the Ad Hoc Committee claims that an "equity holder's exclusive

right to file a 'new value' plan" is a property right subject to the absolute priority rule.  Mot. at

¶ 28.  <u>LaSalle</u>, however, expressly passed on the issue of "[w]hether a market test would require

an opportunity to offer competing plans or would be satisfied by a right to bid for the same

interest sought by old equity. . . ."  <u>LaSalle</u>, 526 U.S. at 458.

44.    Citing to two post-<u>LaSalle</u> bankruptcy court decisions from 2000, the Ad

Hoc Committee contends that "termination of exclusivity is justified when persons controlling

---

[12] Despite the Ad Hoc Committee's assertion that "now is not the time to adjudicate confirmation objections," it inexplicably devotes almost three pages of its Motion arguing confirmation objections, claiming that its proposal constitutes the "better, safer alternative."  *See* Mot. at ¶¶ 34-37.  The Ad Hoc Committee's proposed standard is not clear, but, in any event, Debtors respectfully submit that any objections relating to confirmation should be addressed at the appropriate juncture in these chapter 11 cases.

[13] The Ad Hoc Committee also asserts in ¶¶ 31-33, again without any evidentiary support, that Debtors failed "to consider restructuring alternatives that would maximize value" and "abdicated their duty to formulate a plan or reorganization of their own or meaningfully attempt to foster consensus."  As explained in detail above, the Ad Hoc Committee's own involvement in the plan process belies any assertion that the Debtors failed to consider available options and failed to "attempt to foster consensus."  This factually and legally unsupported argument only further demonstrates the Ad Hoc Committee's unhappiness that Debtors did not select its proposal and provides no basis to terminate exclusivity.

the debtor 'determine, without the benefit of a public auction or competing plans, who will own

the equity of [the reorganized debtor] and how much they will pay for that privilege.'" Mot. at

¶ 29.   The Ad Hoc Committee fails to recognize two key differences between this case and the

ones they cite.   First, Trump does not control the Debtors.   He resigned from the Board of

Directors before the chapter 11 cases were commenced.   Even when he was on the Board, the

majority of the directors were independent (as required under the Debtors' previous chapter 11

plan).

      45.     Second, as detailed above, the Debtors have run an open and competitive

process to obtain the necessary support for the Plan.   The Ad Hoc Committee well knows that an

"independent" chapter 11 plan was not possible in this case due to the need for a significant cash

infusion by a third party.   The assertion that Beal/Trump was the only party afforded the

opportunity to bid on the new equity of the Debtors is simply not true.   The Ad Hoc Committee

has been integrally involved in the bidding process over the course of the last several months.   In

addition, the Debtors' financial advisor actively marketed these casino properties to potential

strategic and financial investors who were unconnected with the Debtors' current affairs.   None

of those parties submitted a bid.

      46.     Accordingly, the Debtors have already, in effect, held an "auction" to

determine the terms of the most viable reorganization plan and the Debtors' financial advisors

have already actively marketed the Debtors' equity as an investment opportunity.   The

negotiation process was a non-exclusive and continuing discussion, and the Ad Hoc Committee's

claim that Beal/Trump was the only party afforded the opportunity to bid on the new equity of

the Debtors is simply not true.   After exploring all such alternatives, the Debtors determined that

the terms of the plan of reorganization ultimately filed with the Court represented the best and

most viable terms of a reorganization. Accordingly, the Debtors respectfully submit that exclusivity should not be terminated simply because Trump has agreed to make an equity investment in the Debtors as part of the Plan.

**II.**   ***The Disclosure Statement Hearing Should Not Be Adjourned***

47.    The Ad Hoc Committee also requests that the Court adjourn the hearing on the Disclosure Statement. This request should be denied for the same reasons, as expressed above, that exclusivity should not be terminated.

## WAIVER OF MEMORANDUM OF LAW

48.    The legal authority supporting the relief requested by this Objection has been cited herein. Accordingly, Debtors respectfully request that the Court waive the requirement in Rule 9013-2 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey that a response be accompanied by a memorandum of law.

## CONCLUSION

WHEREFORE the Debtors respectfully request entry of an order denying the Exclusivity Termination Motion in its entirety and granting such other and further relief as is just and proper.

Dated:     August 21, 2009
           New York, New York

                        /s Charles A. Stanziale, Jr.
                        Charles A. Stanziale, Jr.
                        Joseph Lubertazzi, Jr.
                        Lisa S. Bonsall
                        Jeffrey T. Testa
                        McCARTER & ENGLISH, LLP
                        Four Gateway Center, 100 Mulberry Street
                        Newark, NJ 07102
                        Telephone: (973) 622-4444
                        Facsimile: (973) 624-7070

                        *Counsel for Debtors and Debtors in Possession*

                                   -and-

                        Michael F. Walsh
                        J. Philip Rosen
                        Ted S. Waksman
                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, NY 10153
                        Telephone: (212) 310-8000
                        Facsimile: (212) 310-8007

                        *Co-Counsel for Debtors and Debtors in Possession*