UNITED STATES BANKRUPTCY COURT FOR THE
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-2(c)**

**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen (KR 4963)
Jeffrey D. Prol (JP 7454)
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone:  973-597-2500
Facsimile:  973-597-2400
Email: krosen@lowenstein.com
        jprol@lowenstein.com

*-and-*

**STROOCK & STROOCK & LAVAN LLP**
Kristopher M. Hansen (KH 4679)
Curtis C. Mechling (CM 5957)
Erez E. Gilad (EG 7601)
Sayan Bhattacharyya (SB 3810)
180 Maiden Lane
New York, New York 10038
Telephone:  212-806-5400
Facsimile:  212-806-6006
Email:  khansen@stroock.com
        cmechling@stroock.com
        egilad@stroock.com
        sbhattacharyya@stroock.com

*Co-Counsel to Ad Hoc Committee of Holders of
8.5% Senior Secured Notes Due 2015*

In re:

TCI 2 HOLDINGS, LLC, et al.,

                        Debtors.

Chapter 11
Case No.: 09-13654 (JHW)

(Jointly Administered)

**DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE AD HOC
<u>COMMITTEE OF HOLDERS OF 8.5% SENIOR SECURED NOTES DUE 2015</u>**

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE FILING OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS A SOLICITATION OF ACCEPTANCES OF THE PLAN, NOR SHOULD ANY INFORMATION CONTAINED HEREIN BE RELIED UPON FOR ANY OTHER PURPOSE UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

**Page**

I. Introduction ...................................................................................................................1

II. Treatment of Holders of Claims and Equity Interests Under the Plan................................3

    A.      Overview and Summary of the Plan ..........................................................3

    B.      Summary of Classification and Treatment ...............................................3

    C.      Description and Treatment of Unclassified Claims....................................4

    D.      Description of Classified Claims ...............................................................5

          1.      Other Priority Claims (Class 1)...................................................5

          2.      Other Secured Claims (Class 2)...................................................5

          3.      First Lien Lender Secured Claims (Class 3). ..............................5

          4.      General Unsecured Claims (Class 4). ..........................................5

          5.      Convenience Claims (Class 5). ....................................................6

          6.      Intercompany Claims (Class 6)....................................................6

          7.      Section 510(b) Claims (Class 7). .................................................6

          8.      Equity Interests in TER (Class 8). ...............................................7

          9.      Equity Interests in TER Holdings (Class 9)................................7

          10.    Subsidiary Equity Interests (Class 10).........................................7

III. Transactions to be Consummated Under the Plan and Certain Corporate and Securities Laws Matters ...........................................................................................7

    A.      Restructuring Transactions .......................................................................7

          1.      The Rights Offering. ....................................................................7

          2.      The Marina Sale Agreement. .......................................................11

          3.      The Amended and Restated Credit Agreement. .........................11

          4.      Issuance of New Common Stock...................................................12

          5.      Certain Restructuring Transactions...............................................12

          6.      Dismissal of Dismissed Debtors' Cases. .....................................12

    B.      Corporate Action ......................................................................................13

C.      Securities Law Matters..................................................................13

D.      Compliance With Gaming Laws and Regulations.................................13

IV. Voting Procedures and Requirements.......................................................14

A.      Vote Required for Acceptance by a Class ...........................................14

B.      Classes Not Entitled to Vote .............................................................14

C.      Voting .............................................................................................15

V. Financial Information, Projections, and Valuation Analysis ........................15

VI. General Information .............................................................................15

A.      Description of Debtors.....................................................................15

     1.      Corporate Structure and Business. ......................................15

     2.      History and Prior Bankruptcy Proceedings............................16

B.      Prepetition Capital Structure of the Debtors ......................................18

C.      Events Leading to the Commencement of the Chapter 11 Cases ...................18

     1.      Competition......................................................................18

     2.      Regulatory and Licensing. .................................................19

     3.      Default Under the Second Lien Notes and Plan Negotiations.................20

     4.      Florida Litigation and Marina Sale Negotiations..................21

D.      Information Regarding the Ad Hoc Committee......................................23

VII. Governance .........................................................................................23

A.      Current Board of Directors, Management and Executive Compensation.............23

B.      Board of Directors of Reorganized TER ............................................23

C.      Officers of Reorganized TER ..........................................................23

D.      Continued Corporate Existence .......................................................23

VIII. Other Aspects of the Plan ....................................................................24

A.      Distributions..................................................................................24

     1.      Timing and Conditions of Distributions. ..................................24

     2.      Procedures for Treating Disputed Claims Under the Plan.......................27

B.      Treatment of Executory Contracts and Unexpired Leases ........................29

     1.      Contracts and Leases Not Expressly Rejected Are Assumed..................29

     2.      Cure of Defaults...............................................................30

     3.      Rejection Claims...............................................................30

     4.      Assignment. ....................................................................30

     5.      Survival of the Debtors' Indemnification Claims.....................31

6. Insurance Policies. ....................................................................................31

7. Casino Property Leases. ...........................................................................31

C. Exemption from Certain Transfer Taxes and Recording Fees.............................31

D. Claims Payable by Insurance Carriers ...................................................................31

E. Conditions to Effectiveness ...................................................................................32

F. Effect of Confirmation ...........................................................................................33

1. Vesting of Assets. .....................................................................................33

2. Discharge. .................................................................................................33

3. Term of Injunctions or Stays.....................................................................33

4. Exculpation. ..............................................................................................34

5. Releases.....................................................................................................34

6. Injunction Related to Releases...................................................................35

7. Survival of Indemnification. .....................................................................35

8. Retention of Causes of Action/Reservation of Rights. .............................35

G. Miscellaneous Provisions.......................................................................................36

IX. CERTAIN RISK FACTORS TO BE CONSIDERED .................................................36

A. Certain Bankruptcy Considerations .......................................................................36

B. Risks to Recovery By Holders of First Lien Lender Secured Claims and
General Unsecured Claims ......................................................................................37

1. Unforeseen Events. ....................................................................................37

2. State Gaming Laws and Regulations May Require Holders of the
Reorganized Debtors' Debt or Equity Securities to Undergo a
Suitability Investigation .............................................................................37

3. Small Numbers of Holders or Voting Blocks May Control the
Reorganized Debtors...................................................................................37

4. Other Risks.................................................................................................38

X. Confirmation of the Plan ...............................................................................................38

A. Confirmation Hearing .............................................................................................38

B. General Requirements of Section 1129 ..................................................................39

C. Best Interests Test ...................................................................................................39

D. Feasibility ...............................................................................................................39

E. Section 1129(b) .......................................................................................................40

1. No Unfair Discrimination. .........................................................................40

2. Fair and Equitable Test. .............................................................................40

XI. Alternatives to Confirmation and Consummation of this Plan..........................................41

    A.        Insider Plan ................................................................................................41

    B.        Liquidation Under Chapter 7 .................................................................41

XII. Certain United States Federal Income Tax Consequences of the Plan ...........................42

    •        U.S. Federal Income Tax Consequences to the Debtors .................................43

          •        Cancellation of Indebtedness and Reduction of Tax Attributes. ...............43

          •        Section 382 Limitations on NOLs. ...........................................................44

          •        Alternative Minimum Tax ........................................................................45

    •        U.S. Federal Income Tax Consequences to U.S. Holders ..................................46

          •        Modification of First Lien Lender Secured Claims. ..................................46

          •        Ownership and Disposition of the Modified First Lien Loans. .................49

          •        Satisfaction of General Unsecured Claims. ..............................................51

          •        Satisfaction of Convenience Claims. ........................................................52

          •        Receipt of Backstop Stock. .......................................................................52

          •        Exercise or Lapse of Subscription Rights. .................................................52

          •        Ownership and Disposition of New Common Stock. ...............................52

          •        Section 754 Election .................................................................................53

          •        Backup Withholding and Information Reporting. .....................................53

          •        Reportable Transactions............................................................................54

Exhibit A: Plan of Reorganization
Exhibit B: Debtors' Valuation Analysis
Exhibit C: Annual Report on Form 10-K for the fiscal year ended December 31, 2008
Exhibit D: Quarterly Report on Form 10-Q for the quarter ended June 30, 2009
Exhibit E: Backstop Agreement

# GLOSSARY

The terms in the following table are used in this Disclosure Statement and are the same as, or plain English summaries of, those used in the Plan. Please refer to the Plan for the complete definition of these terms. Capitalized terms used in this Disclosure Statement, and not otherwise defined herein, have the meaning ascribed to them in the Plan.

| | |
|---|---|
| *Accredited Investor* | An "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act, as of the Rights Offering Record Date. |
| *Ad Hoc Committee* | The ad hoc committee of certain holders of the Second Lien Notes represented by Stroock & Stroock & Lavan LLP and Lowenstein Sandler PC. |
| *Ad Hoc Committee Advisors* | Stroock & Stroock & Lavan LLP, Lowenstein Sandler PC, Fox Rothschild LLP and Houlihan Lokey. |
| *Administrative Agent* | Beal Bank, as administrative agent under the First Lien Credit Agreement. |
| *Administrative Expense Claim* | Any expense incurred after the commencement of the Reorganization Cases and related to their administration or the operation of the Debtors' business. |
| *Administrative Expense Claims Bar Date* | The Business Day that is thirty (30) days after the Effective Date or such other date as approved by order of the Bankruptcy Court. |
| *Amended and Restated Credit Agreement* | Means that certain amended and restated First Lien Credit Agreement to be dated as of the Effective Date, among Reorganized TER Holdings, certain subsidiaries of Reorganized TER Holdings, as guarantors, the Administrative Agent and the First Lien Lenders, with respect to the New Term Loan. |
| *Amended Organizational Documents* | The amended and/or restated certificate of incorporation or formation, the amended and/or restated bylaws, and/or such other applicable amended and/or restated organizational documents (including any limited liability company operating agreement or partnership agreement) of Reorganized TER and Reorganized TER Holdings and of the other Reorganized Debtors, which shall be included in draft form in the Plan Supplement and which shall be in form and substance acceptable to the Ad Hoc Committee. |
| *Backstop Agreement* | Means that certain Noteholder Backstop Agreement, dated as of August 10, 2009, by and among the Backstop Parties, attached hereto as Exhibit E. |
| *Backstop Commitment* | The agreement by each of the Backstop Parties pursuant to the Backstop Agreement to purchase its proportion of all of the Unsubscribed Shares that are not purchased by the Rights Offering Participants as part of the Rights Offering. |

| | |
|---|---|
| *Backstop Fees and Expenses* | Means all out-of-pocket expenses reasonably incurred by the Backstop Parties with respect to the transactions contemplated by the Backstop Agreement and the Rights Offering, including, without limitation, filing fees (if any) required by the Hart-Scott-Rodino Antitrust Improvements Act of 1976 or the requirements of the NJCCC, and any expenses relating thereto, and all Bankruptcy Court and other judicial and regulatory proceedings related to such transactions, including all reasonable fees and expenses of Stroock & Stroock & Lavan LLP, Fox Rothschild LLP and Lowenstein Sandler PC, as counsel to the Backstop Parties, and any other professionals retained by the Backstop Parties, in connection with the transactions contemplated by the Backstop Agreement or by the Plan. |
| *Backstop Parties* | The parties to the Backstop Agreement. |
| *Backstop Stock* | The 2,000,000 shares of New Common Stock to be issued to and allocated among the Backstop Parties pursuant to and in accordance with the terms of the Backstop Agreement. |
| *Bankruptcy Code* | Title 11 of the United States Code, as amended from time to time, as applicable to the Reorganization Cases. |
| *Bankruptcy Court* | The United States Bankruptcy Court for the District of New Jersey having jurisdiction over the Reorganization Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Reorganization Cases. |
| *Bankruptcy Rules* | The Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Reorganization Cases, and any Local Rules of the Bankruptcy Court. |
| *Beal Bank* | Beal Bank and Beal Bank Nevada. |
| *Beal Bank Interest Rate* | Means interest at the annual rate specified in the that certain Amended and Restated First Lien Credit Agreement in the form attached as an exhibit to that certain commitment letter dated August 3, 2009 from Beal Bank and Beal Bank Nevada to TER Holdings, or such other rate as may be determined by the Bankruptcy Court as necessary to provide the holder of Allowed First Lien Lender Secured Claims with the present value of their collateral. |
| *Business Day* | Any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order. |

| | |
|---|---|
| *Claims and Solicitation Agent* | The Garden City Group, Inc. as retained as the Debtors' claims and solicitation agent. |
| *Claims Register* | The official register of Claims and Interests maintained by the Claims and Solicitation Agent. |
| *Class* | Any group of Claims or Equity Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code. |
| *Coastal Adversary Proceeding* | That certain adversary proceeding entitled *Coastal Marina, LLC and Coastal Development, LLC v. Trump Marina Associates, LLC, Trump Entertainment Resorts, Inc., Mark Juliano, Robert M. Pickus, Trump Plaza Associates, LLC, Trump Taj Majal Associates, LLC, ABC Corporations 1-100 and John Does 1-100 and Fidelity National Title Insurance Company*, Adversary Case No. 09-02120, United States Bankruptcy Court for the District of New Jersey. |
| *Coastal Cooperation Agreement* | Means that certain Coastal Cooperation Agreement by and between the Coastal Parties and Reorganized TER, to be entered into and dated as of the Effective Date, which shall be included in draft form in the Plan Supplement and which shall be on terms and conditions acceptable to the Ad Hoc Committee. |
| *Coastal Letter of Intent* | Means that certain letter of intent dated as of August 9, 2009, from Coastal Development, LLC regarding the sale of the Trump Marina Hotel Casino. |
| *Coastal Parties* | Coastal Marina, LLC and Coastal Development, LLC. |
| *Commencement Date* | February 17, 2009. |
| *Confirmation Date* | Means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order. |
| *Confirmation Hearing* | Means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time. |
| *Confirmation Order* | Means the order of the Bankruptcy Court confirming the Plan as to each of the Debtors pursuant to section 1129 of the Bankruptcy Code. |
| *Convenience Claims* | Any General Unsecured Claim (other than the First Lien Lender Deficiency Claims or a Second Lien Note Claim) against the Debtors that otherwise would be classified in Class 5, that (a) is $10,000 or less or (b) in excess of $10,000 which the holder thereof, pursuant, to such holder's ballot or such other election accepted by the Debtors, elects to have reduced to the amount of $10,000 and to be treated as an Convenience Claim. |

| | |
|---|---|
| *Debt Service Account* | An interest-bearing debt service account to be established on the Effective Date in the event that the Bankruptcy Court determines that the First Lien Lender Collateral Value is greater than the amount of Allowed First Lien Lender Claims, which account shall be funded on the Effective date with $75 million in Rights Offering Proceeds plus the Marina Sale Proceeds. Funds contained in such account shall be used solely for the purposes of servicing payments of principal and interest under the New Term Loan in accordance with the Amended and Restated Credit Agreement. |
| *Debtors* | TER; TCI 2 Holdings, LLC; TER Holdings; TER Funding; Trump Entertainment Resorts Development Company, LLC; Trump Taj Mahal Associates, LLC, d/b/a Trump Taj Mahal Casino Resort; Trump Plaza Associates, LLC, d/b/a Trump Plaza Hotel and Casino; and Trump Marina Associates, LLC, d/b/a Trump Marina Hotel Casino; TER Management Co., LLC; and TER Development Co., LLC. |
| *Debtor Subsidiaries* | The Debtors, other than TER, TCI 2 and TER Holdings. |
| *Disbursing Agent* | Any entity (including any applicable Debtor if it acts in such capacity) designated as such by the Ad Hoc Committee in its capacity as a disbursing agent as set forth in the Plan. |
| *Disclosure Statement* | That certain disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code. |
| *Disclosure Statement Order* | The order of this Court approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code and approving the procedures for solicitation of this Plan. |
| *Dismissed Debtors* | TCI 2, TER Management and TER Development. |
| *Disputed Claims* | Any Claim on the Claims Register which has not been Allowed, and

(a)    if no proof of claim has been filed by the applicable deadline: (i) a Claim that has been or hereafter is listed on the Schedules as disputed, contingent or unliquidated; or (ii) a Claim that has been or hereafter is listed on the Schedules as other than disputed, contingent or unliquidated, but as to which the Debtors or Reorganized Debtors or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order; or

(b) if a proof of claim or request for payment of an Administrative Expense Claim has been filed by the applicable |

|  | deadline: (i) a Claim for which no corresponding Claim has been or hereafter is listed on the Schedules; (ii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted in the proof of claim varies from the nature and amount of such Claim as listed on the Schedules; (iii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent or unliquidated; or (iv) a Claim for which a timely objection or request for estimation is interposed by the Debtors, the Reorganized Debtors or any other party in interest which has not been withdrawn or determined by a Final Order. |
|---|---|
| *Disputed Rights Offering List* | The General Unsecured Claims, other than Second Lien Note Claims, identified on Schedule 1.1 of the Plan with respect to each Eligible Holder's Rights Participation Claim Amount for purposes of Section 5.4 of the Plan, which schedule shall be filed within five (5) Business Days of the Subscription Commencement Date. |
| *Distribution Record Date* | Means the Confirmation Date or such other date designated in the Plan or an Order of the Bankruptcy Court. |
| *DTC* | The Depository Trust Company |
| *Effective Date* | Means the date selected by the Ad Hoc Committee that is a Business Day after the Confirmation Date on which the conditions to the effectiveness of the Plan specified in Section 9 of the Plan have been satisfied or waived. |
| *Eligible Holder* | A holder of a Rights Participation Claim Amount as of the Rights Offering Record Date who is an Accredited Investor. |
| *Equity Interests* | Means any equity security (as defined in section 101(16) of the Bankruptcy Code) or general or limited partnership interest in any of the Debtors. |
| *Final Cash Collateral Order* | Means that Final Order (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of Bankruptcy Code and (II) Providing Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 362, 363, and 364 of Bankruptcy Code, entered by the Bankruptcy Court on March 23, 2009 (as amended, modified or supplemented from time to time). |
| *Final Distribution Date* | Means, in the event there exists on the Effective Date any Disputed Claims, a date selected by the Reorganized Debtors, in their sole discretion, after which all such Disputed Claims have been resolved by Final Order. |
| *Final Order* | An order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Reorganization Cases, which has not been reversed, vacated or stayed and as to |

|  | which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order. |
|---|---|
| *First Lien Collateral Agent* | Beal Bank, as collateral agent under the First Lien Credit Agreement. |
| *First Lien Credit Agreement* | That certain Credit Agreement dated as of December 21, 2007, among TER Holdings, as borrower, TER, as a guarantor, the subsidiary guarantors named therein, Beal Bank and Beal Bank Nevada, as Lenders, and Beal Bank, as Administrative Agent and Collateral Agent, as amended by that certain First Amendment to Credit Agreement dated as of December 21, 2007, Second Amendment to Credit Agreement dated as of May 29, 2008, and Third Amendment to Credit Agreement dated as of October 28, 2008. |
| *First Lien Lenders* | Means the lenders under the First Lien Credit Agreement and any successors or assigns. |
| *First Lien Lender Claims* | All claims arising under or in connection with the First Lien Credit Agreement and all documents relating thereto. |
| *First Lien Lender Collateral Value* | The fair market value of the assets securing the First Lien Lender Claims, which for Plan purposes shall be $458 million or such other value as determined by the Bankruptcy Court. |
| *First Lien Lenders' Deficiency Claim* | The First Lien Lender Claims less the First Lien Lender Secured Claims. |
| *First Lien Lender Secured Claims* | The Secured portion of the First Lien Lender Claims, representing the amount of the First Lien Lender Collateral Value. |
| *Florida Litigation* | The case entitled *Trump Hotels & Casino Resorts Development Company, LLC v. Richard T. Fields, Coastal Development, LLC, Power Plant Entertainment, LLC, Native American Development, LLC, Joseph S. Weinberg, and The Cordish Company*, Case No. 04-20291 in the Circuit Court of the Seventeenth Judicial Circuit, |

|  |  |
|---|---|
|  | in and for Broward County, Florida. |
| *General Unsecured Claim* | Means any Claim against any of the Debtors that is not a/an (a) Intercompany Claims; (b) First Lien Lender Secured Claims; (c) Other Secured Claims; (d) Administrative Expense Claims; (e) Priority Tax Claims; (f) Other Priority Claims; and (g) Claims paid before the Effective Date in connection with that certain order entered by the Bankruptcy Court on or about February 20, 2009, authorizing the Debtors to pay certain prepetition claims of critical vendors and approving procedures related thereto.  For the avoidance of doubt, General Unsecured Claims shall include the First Lien Lenders' Deficiency Claim, if any, and the Second Lien Note Claims. |
| *Intercompany Claim* | Means any Claim of a Debtor against another Debtor. |
| *Marina Sale Agreement* | Means that certain Amended and Restated Asset Purchase Agreement, to be entered into and dated as of the Confirmation Date, by and between Trump Marina Associates, LLC as seller, Coastal Marina, LLC as buyer, TER and Coastal Development, LLC. |
| *Marina Sale Proceeds* | Means all net cash proceeds received by the Debtors or the Reorganized Debtors, as applicable, under the Marina Sale Agreement. |
| *New Common Stock* | Means the shares of common stock, par value $.001 per share, of Reorganized TER, of which 20,000,000 shares shall be authorized pursuant to the Certificate of Incorporation of Reorganized TER and 10,000,000 shares shall be initially issued and outstanding pursuant to the Plan as of the Effective Date. |
| *New Limited Partner* | The new limited partner of Reorganized Holdings to be formed on or prior to the Effective Date and which shall be a wholly-owned subsidiary of Reorganized TER. |
| *New Partnership Interests* | Means the general and/or limited partnership interests in Reorganized TER Holdings authorized under the Plan and to be issued on the Effective Date to Reorganized TER and any new limited or general partner formed pursuant to the Plan and the Restructuring Transactions, as applicable. |
| *New Term Loan* | Means the senior secured term loan facility in the aggregate principal amount equal to (A) in the event that the Bankruptcy Court determines that the First Lien Lender Collateral Value exceeds the amount of the Allowed First Lien Lender Claims, the amount of the First Lien Lender Secured Claims, or (B) in the event that the Bankruptcy Court determines that the First Lien Lender Collateral Value is equal to or less than the amount of the Allowed First Lien Lender Claims, the amount of the First Lien Lender Secured Claims minus (i) $75 million, minus (ii) the |

| | |
|---|---|
| | amount of the Marina Sale Proceeds, minus, (iii) an amount equal to all payments made to or on account of the First Lien Lenders under or pursuant to the Final Cash Collateral Order since the Commencement Date (plus an imputed interest rate on those payment amounts from the date they were received until the date they are applied to the First Lien Lender Secured Claims). In each case, the New Term Loan shall bear interest at the Beal Bank Interest Rate and shall contain such other general economic terms and conditions stated in that certain Amended and Restated First Lien Credit Agreement in the form attached as an exhibit to that certain commitment letter dated August 3, 2009 from Beal Bank and Beal Bank Nevada to TER Holdings, as shall be reflected in the Amended and Restated Credit Agreement. |
| *NJCCC* | The New Jersey Casino Control Commission. |
| *Plan or Plan of Reorganization* | The Debtors' Joint Plan Under Chapter 11 of the Bankruptcy Code, attached hereto as Exhibit A including the exhibits thereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof. |
| *Plan Supplement* | A supplemental appendix to the Plan containing forms of those documents necessary to be executed in connection with the implementation of this Plan and the Restructuring Transactions, including, among other things, forms of the (i) Amended and Restated Credit Agreement, (ii) Amended Organizational Documents for Reorganized TER and Reorganized TER Holdings, (iii) the Marina Sale Agreement, (iv) the Registration Rights Agreement, (v) the Amended and Restated Agreement of Limited Partnership of TER Holdings, (vi) Schedule of Rejected Contracts, and (vii) Confirmation Order that will be filed with the Bankruptcy Court no later than 10 calendar days prior to the deadline to file objections to confirmation of the Plan. The Plan Supplement, and each of the documents, exhibits contained therein or supplements, amendments or modifications thereto, shall be in form and substance acceptable to the Ad Hoc Committee. |
| *Personal Trump Guaranty* | That certain Guaranty dated as of December 22, 2005, by Donald J. Trump, as guarantor, in favor of U.S. Bank National Association, as indenture trustee, on behalf and for the benefit of the holders of the Second Lien Notes, pursuant to which Donald J. Trump personally provided a guarantee of up to $250,000,000 of the Second Lien Notes under certain terms and conditions. |
| *Priority Tax Claim* | Any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| *Pro Rata* | Means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class (or several Classes taken as a |

|  |  |
|---|---|
|  | whole) bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class (or several Classes taken as a whole), unless this Plan provides otherwise. |
| *Registration Rights Agreement* | Means that certain Registration Rights Agreement to be included in draft form in the Plan Supplement, which shall be consistent with the requirements contained in the Backstop Agreement and which shall otherwise be in form and substance acceptable to the Ad Hoc Committee. |
| *Reinstated* | Means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Equity Interest entitles the holder of such Claim or Equity Interest so as to leave such Claim or Equity Interest unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Commencement Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim as such maturity existed before such default; (iii) compensating the holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the holder of such Claim or Equity Interest (other than a Debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the holder thereof. |
| *Released Parties* | Means the (a) Debtors, (b) members of the Ad Hoc Committee, (c) Backstop Parties, (d) Coastal Parties, (e) Second Lien Indenture Trustee and, in the case of (b) through (e), each of their respective direct or indirect subsidiaries, current and former officers and directors, members, employees, agents, representatives, financial advisors, professionals, accountants and attorneys and all of their predecessors, successors and assigns. |
| *Reorganization Cases* | The jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on February 17, 2009, in the Bankruptcy Court and styled In re TCI 2 Holdings, LLC, et al., 09-13654 (JHW) (Jointly Administered). |
| *Reorganized Debtors* | The Debtors, as reorganized (other than the Dismissed Debtors), on or after the Effective Date, in accordance with the terms of the |

|  | Plan. |
| --- | --- |
| *Reorganized Debtor Subsidiaries* | Means all of the Debtor Subsidiaries (other than the Dismissed Debtors), as reorganized on or after the Effective Date in accordance with the terms of the Plan. |
| *Reorganized TER* | TER, as reorganized as of the Effective Date in accordance with the Plan. |
| *Reorganized TER Holdings* | TER Holdings, as reorganized as of the Effective Date in accordance with the Plan. |
| *Restructuring Transactions* | Means one or more restructuring transactions pursuant to section 1123(a)(5) of the Bankruptcy Code, which shall be described in more detail in the Plan Supplement. |
| *Rights Participation Claim Amount* | Means:<br><br>(a)      in the case of a Second Lien Note Claim, the amount of such Second Lien Note Claim;<br><br>(b)      in the case of the First Lien Lenders' Deficiency Claim, the amount of the First Lien Lenders' Deficiency Claim; and<br><br>(c)      in the case of any General Unsecured Claim other than a Second Lien Note Claim or the First Lien Lenders' Deficiency Claim,<br><br>(i) if no proof of claim has been timely filed with respect to such Claim and such Claim has been listed in the Schedules as liquidated in amount and not disputed or contingent, the amount set forth in the Schedules (subject to clause (iii) of this definition);<br><br>(ii) if a timely proof of claim has been filed with respect to such Claim in a fixed and liquidated amount and the Claim is not listed on the Disputed Rights Offering List, the amount set forth in the proof of claim;<br><br>(iii) if such Claim is on the Disputed Rights Offering List, the amount, if any, of such Claim set forth thereon in the column entitled "Amount", unless the holder of such Claim has obtained an order of the Bankruptcy Court at least five (5) calendar days prior to the Subscription Expiration Date, otherwise determining the amount of the Claim for purposes of the Rights Offering; and<br><br>(iv) other than in the circumstances described in (i), (ii) and (iii) above, the Rights Participation Claim Amount shall be zero.<br><br>Notwithstanding anything contained in the Plan to the contrary, under no circumstances shall any holder of a General Unsecured Claim that was not timely filed or deemed timely filed have any Rights Participation Claim Amount. |
| *Rights Offering* | Means the offering of Subscription Rights to purchase 7,500,000 |

|  |  |
|---|---|
|  | shares of New Common Stock to be issued by Reorganized TER pursuant to the Plan to the Rights Offering Participants, for an aggregate purchase price equal to the Rights Offering Amount. |
| *Rights Offering Amount* | Means $175,000,000. |
| *Rights Offering Pro Rata Share* | Means with respect to the Subscription Rights of each Rights Offering Participant, the ratio (expressed as a percentage) of such participant's Rights Participation Claim Amount to the aggregate amount of all Rights Participation Claim Amounts, determined as of the Subscription Expiration Date. |
| *Rights Offering Proceeds* | Means the amount of Rights Offering proceeds that are actually received by the Subscription Agent upon the consummation of the Rights Offering. |
| *Rights Offering Record Date* | Means the Voting Record Date. |
| *Schedule of Rejected Contracts* | That certain schedule of executory contracts to be rejected as of the Effective Date pursuant to this Plan, which schedule shall be included in the Plan Supplement and shall be in form and substance acceptable to the Ad Hoc Committee and the Coastal Parties. |
| *Second Lien Notes* | The Debtors' 8-1/2% Senior Secured Notes due 2015. |
| *Second Lien Note Claims* | Means all Claims arising under or in connection with (i) the Second Lien Notes and (ii) the Second Lien Notes Indenture. The Second Lien Notes Claims shall be Allowed in the aggregate amount of $1,248,968,669, plus accrued and unpaid interest accruing prior to the Commencement Date. |
| *Second Lien Notes Indenture* | Means that certain indenture governing the Second Lien Notes, dated as of May 20, 2005, by and among TER Holdings and TER Funding, as issuers, the guarantors named therein, and the Second Lien Indenture Trustee, as amended, supplemented, or modified. |
| *Second Lien Indenture Trustee* | U.S. Bank, National Association, as indenture trustee under the Second Lien Indenture. |
| *Section 510(b) Claim* | Any Claim against a Debtor that is subordinated, or subject to subordination, pursuant to section 510(b) of the Bankruptcy Code, including Claims arising from the rescission of a purchase or sale of a security of a Debtor for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim. |
| *Secured* | Means a Claim to the extent (i) secured by property of the estate, the amount of which shall be determined in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the |

| | |
|---|---|
| | amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code. |
| *Subsidiary Equity Interests* | The equity interests in the Debtor Subsidiaries. |
| *Subscription Agent* | Any entity designated as such by the Ad Hoc Committee in its capacity as a subscription agent in connection with the Rights Offering. |
| *Subscription Commencement Date* | Means date on which Subscription Forms are mailed to holders of General Unsecured Claims. |
| *Subscription Form* | Means the form to be used by a valid holder of Subscription Rights pursuant to which such holder may exercise such Subscription Rights, which form shall be in form and substance acceptable to the Ad Hoc Committee. |
| *Subscription Expiration Date* | Means the deadline for voting on the Plan as specified in the Subscription Form, subject to the Ad Hoc Committee's right to extend such date, and which shall be the final date by which a Rights Offering Participant may elect to subscribe to the Rights Offering. |
| *Subscription Payment Date* | Means the Subscription Expiration Date or such other date to be designated by the Ad Hoc Committee, by which the Subscription Purchase Price will be due. |
| *Subscription Purchase Price* | Means, for each holder of Subscription Rights, such holder's Rights Offering Pro Rata Share multiplied by the Rights Offering Amount. |
| *Subscription Rights* | Means the non-transferable, non-certificated subscription rights to purchase shares of New Common Stock in connection with the Rights Offering on the terms and subject to the conditions set forth in Section 5.4 of the Plan. |
| *Subscription Rights Equivalent Amount* | Means $0.01 per $1.00 of Allowed Claims. |
| *TCI 2* | TCI 2 Holdings, LLC, a Delaware limited liability company. |
| *TER* | Means Trump Entertainment Resorts, Inc., a Delaware corporation. |
| *TER Development* | Means TER Development Co., LLC, a Delaware limited liability company. |
| *TER Funding* | Means Trump Entertainment Resorts Funding, Inc., a Delaware corporation. |
| *TER Holdings* | Means Trump Entertainment Resorts Holdings, L.P., a Delaware |

|  |  |
|---|---|
|  | limited partnership. |
| *TER Management* | Means TER Management Co., LLC, a Delaware limited liability company. |
| *Unsecured Claims Distribution* | Means an aggregate of 500,000 shares of New Common Stock to be issued by Reorganized TER on the Effective Date pursuant to the Plan. |
| *Unsubscribed Shares* | Means those shares of New Common Stock issued in connection with the Rights Offering that are not subscribed for pursuant to the Rights Offering prior to the Subscription Expiration Date. |
| *Voting Deadline* | Means _____, 2009. |
| *Voting Record Date* | Means the date for determining which holders of Claims are entitled to receive the Disclosure Statement and vote to accept or reject this Plan, as applicable, which date is [_____], 2009 as set forth in the Disclosure Statement Order. |

## I.

### Introduction

The Ad Hoc Committee is soliciting votes to accept or reject the Plan, a copy of which is annexed as Exhibit A to this Disclosure Statement. *Please refer to the preceding Glossary for definitions of most of the capitalized terms used in this Disclosure Statement. Some terms that are used only in a specific section may be defined in that section. Some technical terms may be defined in the Plan.*

The purpose of the Disclosure Statement is to provide information of a kind and in sufficient detail to enable the creditors of the Debtors who are entitled to vote on the Plan to make an informed decision on whether to accept or reject the Plan. In summary, this Disclosure Statement includes or describes:

| Section | Summary of Contents |
|:---:|:---|
| | |
| II | • **the treatment of creditors and stockholders of the Debtors under the Plan** |
| III | • **the transactions to be consummated under the Plan**<br>• **certain corporate and securities laws matters** |
| IV | • **which parties in interest are entitled to vote**<br>• **how to vote to accept or reject the Plan** |
| V | • **selected historical financial information**<br>• **projected pro forma balance sheets and financial performance**<br>• **valuation information** |
| VI | • **the business of the Debtors**<br>• **the capital structure of the Debtors**<br>• **why the Debtors commenced the Reorganization Cases** |
| VII | • **directors and officers of the Reorganized Debtors** |
| VIII | • **how distributions under the Plan will be made**<br>• **how Disputed Claims will be resolved** |
| IX | • **certain factors creditors should consider before voting** |
| X | • **the procedure for confirming the Plan**<br>• **a liquidation analysis** |

| XI | • alternatives to the Plan |
|---|---|
| XII | • certain tax consequences |

Please note that if there is any inconsistency between the Plan (including the attached exhibits and any supplements to the Plan) and the descriptions in this Disclosure Statement, the terms of the Plan (and the attached exhibits and any supplements to the Plan) will govern.

This Disclosure Statement and the Plan are the only materials that should be used to determine whether to vote to accept or reject the Plan.

> The *deadline* to vote to accept or reject the Plan is _____, 2009 at 10:00 a.m. (New York City time). To be counted, your ballot must be actually *received* by the Voting Agent by this deadline. If your vote is received by the Voting Agent after the Voting Deadline, the Ad Hoc Committee, in its sole discretion, will decide whether your vote is counted.

The Debtors, Beal Bank and Donald J. Trump have also proposed a plan of reorganization for the Debtors (the "**Insider Plan**") and have filed a disclosure statement in connection therewith (the "**Insider Disclosure Statement**"). The Ad Hoc Committee believes that the Plan provides greater recoveries to creditors than the Insider Plan and approval of the Plan presents the best chance for the Debtors' successful emergence from chapter 11.

> **Recommendation:** The Ad Hoc Committee urges creditors to vote to accept the Plan.

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent, at the following address:



The Bankruptcy Code provides that only creditors who vote on the Plan will be counted for purposes of determining whether the requisite acceptances have been attained. Failure to timely deliver a properly completed ballot by the Voting Deadline will constitute an abstention (*i.e.,* will not be counted as either an acceptance or a rejection). Any improperly completed or late ballot will not be counted.

## II.

## Treatment of Holders of Claims and Equity Interests
## Under the Plan

**A.    Overview and Summary of the Plan**

The Ad Hoc Committee is proposing a Plan the key terms of which are summarized below.  The Plan:

- contemplates a capital contribution of $175 million in new equity capital (representing 75% of the equity of the Reorganized Debtors) in the form of a Rights Offering backstopped by certain holders of the Second Lien Notes, with subscription rights to participate in such offering being distributed to all holders of General Unsecured Claims who are Accredited Investors;

- contemplates the sale of the Trump Marina Hotel Casino to Coastal Marina, LLC (the "***Marina Sale***") for $75 million, less $17 million in deposits, and the dismissal of the Florida Litigation and the Coastal Adversary Proceeding between the Debtors and certain parties including the Coastal Parties, resulting in the infusion of immediate value to the estate in exchange for the elimination of the large cash drain caused by the Trump Marina's losses and the costs associated with prosecuting the litigation pending with the Coastal Parties;

- provides the First Lien Lenders with new debt, at an interest rate to be determined by the Court, together with the cash proceeds from the Marina Sale and $75 million of proceeds from the Rights Offering, in an aggregate amount sufficient to provide the First Lien Lenders with the present value of the secured portion of their claims;

- provides holders of General Unsecured Claims a pro rata share of 5% of the common stock of the Reorganized Debtors[1]; and

- in addition, holders of General Unsecured Claims that are not eligible to receive Subscription Rights would be entitled to receive their pro rata share of a fixed pool of cash.

**B.    Summary of Classification and Treatment**

The following table designates the Classes of claims against and equity interests in the Debtors and specifies which of those Classes are (i) impaired or unimpaired by the Plan,

---

[1]    The pro rata recovery for the Second Lien Note Claims is in addition to any recovery that they could obtain under the guaranty that Mr. Trump personally provided to the Second Lien Indenture Trustee for up to $250 million of the principal amount of the Second Lien Notes.  Recoveries on account of such cause of action are not reflected in the Ad Hoc Committee Plan.

3

(ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to reject the Plan.

| Class | Designation | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Other Secured Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | First Lien Lender Secured Claim | Impaired | Yes | 100% |
| 4 | General Unsecured Claims | Impaired | Yes | [__] |
| 5 | Convenience Claims | Impaired | Yes | [__] |
| 6 | Intercompany Claims | Unimpaired | No (deemed to accept) | No recovery |
| 7 | Section 501(b) Claims | Impaired | No (deemed to reject) | No recovery |
| 8 | TER Equity Interests | Impaired | No (deemed to reject) | No recovery |
| 9 | TER Holdings Equity Interests | Impaired | No (deemed to reject) | No recovery |
| 10 | Subsidiary Equity Interests | Unimpaired | No (deemed to accept) | 100% |

## C. Description and Treatment of Unclassified Claims

Generally, the Plan provides for the payment in full of allowed (i) Administrative Expense Claims, (ii) claims for services rendered or reimbursement of expenses incurred by professionals under section 503(b) of the Bankruptcy Code and (iii) claims by taxing authorities that are entitled to priority under the Bankruptcy Code. The aggregate amount of these claims will depend, in part, on the length of the Reorganization Cases.

Allowed Administrative Expense Claims will either be paid in cash on the Effective Date or promptly after such claims become allowed. Administrative Expense Claims arising in the ordinary course of the Debtors' business operations will be paid in the ordinary course. Delays in the case due to litigation, regulatory approvals, or unforeseen events could materially increase the amount of such claims.

Allowed Priority Tax Claims will either be paid in cash on the Effective Date (or after such claims become allowed) or in equal annual payments over five (5) years, together with applicable interest. In Section II.C of the Insider Disclosure Statement, the Debtors estimate that the amount of such claims will be approximately $5,862,000. According to the Debtors, such estimate does not include claims asserted by the State of New Jersey in the aggregate approximate amount of $29 million related to the New Jersey Alternative Minimum Assessment for Trump Taj Mahal Associates, LLC, Trump Marina Associates, LLC and Trump Plaza Associates, LLC for tax years 2002 through 2006 (the *"NJ Tax Claims"*). As stated in the

4

Insider Disclosure Statement, the Debtors dispute the validity, amount, priority and extent of the NJ Tax Claims.

### D.  Description of Classified Claims

**1.    *Other Priority Claims (Class 1).***

All other allowed claims having priority under the Bankruptcy Code will be paid in cash in full.

**2.    *Other Secured Claims (Class 2).***

Except to the extent a holder has agreed to different treatment, secured claims (other than First Lien Lender Claims, and Second Lien Note Claims) will either receive the collateral securing such claims, receive cash equal to the value of such collateral, or have such claims reinstated. Such Claims include, without limitation, secured claims arising under or in connection with capital equipment leases, judicial liens, mechanic's liens and artisan's liens.  As stated in the Insider Disclosure Statement, the Debtors estimate the total amount of such secured claims to be approximately $6,019,480.

**3.    *First Lien Lender Secured Claims (Class 3).***

Holders of Allowed First Lien Lender Secured Claims shall receive, in full and final satisfaction of such Claims, their Pro Rata Share of the following:

a.    in the event that the Bankruptcy Court determines that the First Lien Lender Collateral Value is equal to or less than the amount of Allowed First Lien Lender Claims, then: (a) $75 million in Cash from the Rights Offering Proceeds, (b) the Marina Sale Proceeds, (c) the payment of interest and principal pursuant to the New Term Loan in accordance with the terms and conditions of the Amended and Restated Credit Agreement, and (d) 100% of the equity interests in TCI 2; or

b.    in the event that the Bankruptcy Court determines that the First Lien Lender Collateral Value exceeds the amount of Allowed First Lien Lender Claims: (a) payment of interest and principal pursuant to the New Term Loan in accordance with the terms and conditions of the Amended and Restated Credit Agreement, (b) a security interest in the Debt Service Account in which the Debtors shall deposit $75 million in Rights Offering Proceeds plus the Marina Sale Proceeds, which funds shall be used solely for the purpose of servicing payments of principal and interest under the New Term Loan in accordance with the Amended and Restated Credit Agreement, and (c) 100% of the equity interests in TCI 2.

**4.    *General Unsecured Claims (Class 4).***

Class 4 consists of all General Unsecured Claims against the Debtors including, the First Lien Lender Deficiency Claims (if any), the Second Lien Note Claims, and other unsecured claims that are not specifically addressed elsewhere under the Plan.  As noted above, with respect to the treatment of Class 3, based on the Debtors' valuation, the First Lien Lenders' Claims may be undersecured.  Under such circumstances, a portion of the First Lien Lenders'

Claims represented by the First Lien Lenders' Deficiency Claim would be deemed unsecured under the Bankruptcy Code and for purposes of treatment under the Plan. The Second Lien Note Claims shall be deemed allowed claims in an aggregate principal amount of approximately $1.2 billion, plus accrued and unpaid prepetition interest. To the extent that the First Lien Lender Claims are undersecured, the Second Lien Note Claims are similarly undersecured and will be treated as unsecured for purposes of treatment under the Plan. The Debtors estimate that the amount of other unsecured claims that will be included in Class 4 of the Ad Hoc Committee's Plan beyond the First Lien Lenders Deficiency Claims (if any) and the Second Lien Note Claims will be approximately $3,347,131.87. Most of the holders of unsecured claims against the Debtors for goods or services as of the Commencement Date have been previously paid as critical vendors pursuant to those orders of the Bankruptcy Court dated February 20, 2009 (Docket No. 58) and June 16, 2009 (Docket No. 399). The remaining holders of unsecured claims will receive a distribution together with the other General Unsecured Claims against the Debtors described below.

Holders of Allowed General Unsecured Claims against the Debtors shall receive, on the Effective Date, a pro rata share of 5% of the new common stock of Reorganized TER to be issued under the Plan. Additionally, holders of Unsecured Claims that are "accredited investors" shall receive rights to participate in a Rights Offering to purchase 75% of the new common stock of Reorganized TER to be issued under the Plan pursuant for an aggregate purchase price of $175 million. For further information regarding the Rights Offering, see Section III.A.1. Holders of General Unsecured Claims who are not entitled to participate in the Rights Offering by virtue of not qualifying as an "accredited investor" shall receive a cash distribution on account of their claims of up to $0.01 per $1.00 of such Claims.

### 5.   *Convenience Claims (Class 5).*

Holders of General Unsecured Claims (other than the First Lien Lender Deficiency Claims (if any) and the Second Lien Note Claims) against the Debtors in an amount of up to $10,000 (or holders of claims exceeding such amount who agree to reduce their claims to $10,000 or less) shall, on the Effective Date, receive a cash distribution equal to the lesser of 50% of their claim or their pro rata share of $500,000.

### 6.   *Intercompany Claims (Class 6).*

There shall be no distributions to holders of Intercompany Claims; provided, however, on or after the Effective Date, all Intercompany Claims will, (i) at the option of Reorganized TER, (A) be Reinstated, or (B) after setoff be contributed on a net basis to the capital of the obligor, or (ii) with the mutual consent of both the obligor and the obligee, be released, waived and discharged on and as of the Effective Date.

### 7.   *Section 510(b) Claims (Class 7).*

Holders of Section 510(b) Claims shall not receive or retain any distribution or payment on account of such Section 510(b) Claim. On the Effective Date, all such Section 510(b) Claims shall be discharged and extinguished.

6

8. ***Equity Interests in TER (Class 8).***

The existing equity interests in TER will be cancelled.

9. ***Equity Interests in TER Holdings (Class 9).***

Holders of the existing equity interests in TER Holdings shall not receive or retain any distribution or payment on account of such equity interests.  The existing equity interests in TER will be cancelled pursuant to the Plan as part of the restructuring transactions.

10. ***Subsidiary Equity Interests (Class 10).***

There shall be no distributions to holders of Subsidiary Equity Interests. Nonetheless, except as otherwise set forth in the Plan, Subsidiary Equity Interests shall be Reinstated for the benefit of the holders thereof in exchange for Reorganized Debtors' agreement to make certain distributions to the holders of Allowed Claims and Interests under the Plan, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors.

## III.

### Transactions to be Consummated Under the Plan and Certain Corporate and Securities Laws Matters

**A.    Restructuring Transactions**

1. ***The Rights Offering.***

The Plan contemplates the contribution of $175 million of new equity capital to the Reorganized Debtors in the form of a Rights Offering to holders of Claims in Class 4 – General Unsecured Claims who are Accredited Investors.  The Rights Offering will be backstopped by the members of the Ad Hoc Committee, who have committed to purchase all shares of New Common Stock offered in the Rights Offering that are not otherwise subscribed for, in exchange for a fee payable in shares of New Common Stock.  The terms of the Rights Offering are set forth below and in Section 5.4 of the Plan.

*Issuance of Subscription Rights*.  Each of the Rights Offering Participants shall be entitled to receive Subscription Rights entitling such participant to subscribe for up to its Rights Offering Pro Rata Share of New Common Stock to be issued pursuant to the Rights Offering. Rights Offering Participants have the right, but not the obligation, to participate in the Rights Offering as provided in the Plan.  If, after the Rights Offering Record Date but at least five (5) calendar days prior to the Subscription Expiration Date, a Rights Offering Participant is permitted to participate in the Rights Offering as a result of a Bankruptcy Court order estimating such Claim for the purpose of determining such holder's Rights Participation Claim Amount, such holder shall be permitted to participate in the Rights Offering to the same extent as an Eligible Holder of General Unsecured Claims as of the Rights Offering Record Date.

*Subscription Period.*  The Rights Offering shall commence on the Subscription Commencement Date and shall expire on the Subscription Expiration Date.  Each Rights Offering Participant intending to participate in the Rights Offering must affirmatively elect to exercise its Subscription Rights on or prior to the Subscription Expiration Date.  After the Subscription Expiration Date, the Unsubscribed Shares shall be treated as acquired by the Backstop Parties in accordance with and subject to the terms and conditions contained in the Backstop Agreement and this Plan, and any exercise of such Subscription Rights by any entity other than the Backstop Parties shall be null and void and there shall be no obligation to honor any such purported exercise received by the Subscription Agent after the Subscription Expiration Date, regardless of when the documents relating to such exercise were sent.

*Subscription Purchase Price.*  Each Rights Offering Participant choosing to exercise its Subscription Rights shall be required to pay such participant's Subscription Purchase Price for New Common Stock, or a lesser amount of New Common Stock, as such participant may determine, provided, however, that no Subscription Rights may be exercised for fractional shares of New Common Stock.

*Exercise of Subscription Rights.*  In order to exercise the Subscription Rights, each Rights Offering Participant must: (a) return a duly completed Subscription Form to the Subscription Agent so that such form is actually received by the Subscription Agent on or before the Subscription Expiration Date; and (b) pay to the Subscription Agent (on behalf of TER) on or before the Subscription Payment Date such holder's Subscription Purchase Price in accordance with the wire instructions set forth on the Subscription Form or by bank or cashier's check delivered to the Subscription Agent along with the Subscription Form.  If the Subscription Agent for any reason does not receive from a given holder of Subscription Rights (a) a duly completed Subscription Form on or prior to the Subscription Expiration Date, and (b) immediately available funds in an amount equal to such holder's Subscription Purchase Price on or prior to the Subscription Payment Date, such holder shall be deemed to have relinquished and waived its right to participate in the Rights Offering.  The payments made in accordance with the Rights Offering shall be deposited and held by the Subscription Agent in an interest-bearing trust account, or similarly segregated account or accounts which shall be separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien or similar encumbrance and which segregated account or accounts will be maintained for the purpose of holding the money for administration of the Rights Offering until the Effective Date.  The Subscription Agent shall not use such funds for any other purpose prior to such date and shall not encumber or permit such funds to be encumbered with any lien or similar encumbrance.  Notwithstanding the foregoing, in order for a Rights Offering Participant to exercise its Subscription Rights, such Rights Offering Participant must provide its instruction to its bank, broker, or other nominee or to its agent.  The bank, broker, or other nominee or its agent, in turn, must then convey the instruction on a master Subscription Form, and arrange for the proper payment either through the DTC or, if DTC is unable to act as intermediary for subscription instructions and payments, by following the payment instructions outlined above.

Each Rights Offering Participants may exercise all or any portion of such holder's Subscription Rights pursuant to the Subscription Form, but the exercise of any Subscription Rights shall be irrevocable.  In order to facilitate the exercise of the Subscription Rights, on the Subscription Commencement Date, the Subscription Form will be mailed to each Rights

Offering Participant together with appropriate instructions for the proper completion, due execution and timely delivery of the Subscription Form, as well as instructions for the payment of the applicable Subscription Purchase Price for that portion of the Subscription Rights sought to be exercised by such holder.  As promptly as practicable (and, in any event, not later than ten (10) Business Days) following the Subscription Expiration Date, the Subscription Agent will deliver to each Rights Offering Participant that has sought to exercise its Subscription Rights a written statement specifying the portion of the Subscription Rights that was validly and effectively exercised by such holder and the applicable Subscription Purchase Price for each such holder.

*Rights Offering Procedures.* Notwithstanding anything contained in the Plan to the contrary, the Ad Hoc Committee may modify the procedures relating to the Rights Offering or adopt such additional detailed procedures consistent with the provisions of Section 5.4 of the Plan to more efficiently administer the exercise of the Subscription Rights.

*Transfer Restriction; Revocation*.  The Subscription Rights are not transferable. Any such transfer or attempted transfer will be null and void, and no purported transferee will be treated as the holder of any Subscription Rights.  Once a Rights Offering Participants has properly exercised its Subscription Rights, such exercise will not be permitted to be revoked.

*Rights Offering Backstop*.  Subject to the terms and conditions in the Backstop Agreement, each of the Backstop Parties, severally and not jointly, has agreed to subscribe for and purchase on the Effective Date, at the aggregate Subscription Purchase Price therefor, its Backstop Commitment (as set forth on Exhibit A to the Backstop Agreement) of all Unsubscribed Shares as of the Subscription Expiration Date.  The Backstop Parties shall pay to the Subscription Agent, by wire transfer in immediately available funds on or prior to the Effective Date, Cash in an amount equal to the aggregate Subscription Purchase Price attributable to such amount of New Common Stock as provided in the Backstop Agreement.  The Subscription Agent shall deposit such payment into the same trust account into which were deposited the Subscription Purchase Price payments of Rights Offering Participants on the exercise of their Subscription Rights.  TER and the Subscription Agent shall give the Backstop Parties by e-mail and electronic facsimile transmission written notification setting forth either (i) a true and accurate calculation of the number of Unsubscribed Shares, and the aggregate Subscription Purchase Price therefor (a "***Purchase Notice***") or (ii) in the absence of any Unsubscribed Shares, the fact that there are no Unsubscribed Shares and that the Backstop Commitments are terminated (a "***Satisfaction Notice***") as soon as practicable after the Subscription Expiration Date and, in any event, no later than four (4) Business Days prior to the Effective Date.  In addition, the Subscription Agent shall notify the Backstop Parties, on each Friday during the Subscription Period and on each Business Day during the five (5) Business Days prior to the Subscription Expiration Date (and any extensions thereto), or more frequently if requested by the Backstop Parties, of the aggregate number of Subscription Rights known by the Subscription Agent to have been exercised pursuant to the Rights Offering as of the close of business on the preceding Business Day or the most practicable time before such request, as the case may be.  The Subscription Agent shall determine the number of Unsubscribed Shares, if any, in good faith, and provide each of the Backstop Parties with a Purchase Notice or a Satisfaction Notice that accurately reflects the number of Unsubscribed Shares as so determined. On the Effective Date, the Backstop Parties will purchase only such number of Unsubscribed

Shares as are listed in the Purchase Notice, without prejudice to the rights of the Backstop Parties to seek later an upward or downward adjustment if the number of Unsubscribed Shares in such Purchase Notice is inaccurate.  Delivery of the Unsubscribed Shares will be made to the accounts of the respective Investors (or to such other accounts as the Investors may designate) at 10:00 a.m., New York City time, on the Effective Date against payment of the aggregate Subscription Purchase Price for the Unsubscribed Shares by wire transfer of immediately available funds to a bank account in the United States specified by TER to the Backstop Parties at least 24 hours in advance.  All Unsubscribed Shares will be delivered with any and all issue, stamp, transfer or similar taxes or duties payable in connection with such delivery duly paid by the Debtors or the Reorganized Debtors to the extent required under the Confirmation Order or applicable law. Notwithstanding anything contained in the Plan to the contrary, the Backstop Parties, in their sole discretion, may designate that some or all of the Unsubscribed Shares be issued in the name of, and delivered to, one or more of their affiliates.

*Backstop Fees and Expenses/Backstop Stock.*  In consideration for their agreement to backstop the Rights Offering, the Backstop Parties shall receive the Backstop Stock to be allocated in the manner set forth in the Backstop Agreement, and shall be entitled to the reimbursement of all Backstop Fees and Expenses.

*Distribution of the New Common Stock.*  On the Effective Date, the Subscription Agent shall distribute the New Common Stock purchased by each Rights Offering Participant that has properly exercised its Subscription Rights to such holder and to the Backstop Parties.  If the exercise of a Subscription Right would result in the issuance of a fractional share of New Common Stock, then the number of shares of New Common Stock to be issued in respect of such Subscription Right will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share rounded up).  The total number of the shares of New Common Stock that may be purchased pursuant to the Rights Offering shall be adjusted as necessary to account for the rounding provided in this paragraph.

*Disputed Claims.*  For all purposes of Section 5.4 of the Plan, each Rights Offering Participant is entitled to participate in the Rights Offering solely to the extent of its Rights Participation Claim Amount, if any.

*Subsequent Adjustments.*  If as a result of subsequent allowances of General Unsecured Claims for purposes of participating in the Rights Offering more than all of the New Common Stock subject to the Rights Offering have been subscribed for as a result of the exercise of the Subscription Rights, each properly exercising Rights Offering Participant shall be reduced on a pro rata basis based upon the number of shares of New Common Stock properly subscribed for by such participant.  The difference between the price actually paid by such exercising Rights Offering Participant and the amount of New Common Stock that such participant is entitled to acquire after giving effect to the cut back, if any, shall be refunded, with interest accrued thereon, as soon as reasonably practicable after the Effective Date.

*Validity of Exercise of Subscription Rights.*  All questions concerning the timeliness, viability, form and eligibility of any exercise of Subscription Rights shall be determined by the Ad Hoc Committee, whose good faith determinations shall be final and binding.  The Ad Hoc Committee, in its discretion, may waive any defect or irregularity, or

permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. Subscription Forms shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Ad Hoc Committee determines in its discretion. The Ad Hoc Committee will use commercially reasonable efforts to give notice to any Rights Offering Participants regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such participant and, may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Ad Hoc Committee nor the Subscription Agent shall incur any liability for failure to give such notification.

### 2.       *The Marina Sale Agreement.*

The Plan contemplates the sale of the Trump Marina to the Coastal Parties. As described further in Section VI.C.4 below, the Debtors and the Coastal Parties had been engaged in many months of unsuccessful negotiations regarding the terms of a sale of the Trump Marina. These negotiations have followed the Florida Litigation and resulted in the Coastal Adversary Proceeding. The Coastal Parties have committed to purchase the Trump Marina pursuant to the terms of the Coastal Letter of Intent for approximately $75 million after $17 million of cash previously deposited by the Coastal Parties. Along with the Marina Sale, the Coastal Parties have also agreed to enter into the Coastal Cooperation Agreement with the Reorganized Debtors, pursuant to which the parties shall coordinate on event and room overflow bookings and certain marketing efforts. The Coordination Agreement will be provided in the Plan Supplement. The Marina Sale to the Coastal Parties pursuant to the Plan will be accompanied by the dismissal or withdrawal of the Florida Litigation and the Coastal Adversary Proceeding.

As soon as practicable after the Confirmation Date, the Debtors will be authorized and directed to enter into and execute the Marina Sale Agreement and the Coastal Cooperation Agreement and to take any and all actions contemplated thereby. Subject to the terms and conditions stated in the Marina Sale Agreement, upon the Effective Date, each of the Coastal Adversary Proceeding and the Florida Litigation shall be withdrawn and dismissed with prejudice.

### 3.       *The Amended and Restated Credit Agreement.*

As described herein and in the Plan, the distribution to holders of First Lien Lender Secured Claims will include the New Term Loan pursuant to an Amended and Restated Credit Agreement between certain of the Debtors and the First Lien Lenders. The New Term Loan will be a senior secured obligation of the Reorganized Debtors party to the Amended and Restated Credit Agreement and will be secured by substantially all of the assets of Reorganized TER Holdings and the Reorganized Debtor Subsidiaries party thereto. The New Term Loans will bear interest at the annual rate specified in that certain Amended and Restated First Lien Credit Agreement in the form attached as an exhibit to that certain commitment letter dated August 3, 2009 from Beal Bank and Beal Bank Nevada to TER Holdings, or such other rate as may be determined by the Bankruptcy Court.

In the event that the Bankruptcy Court determines that the First Lien Lender Claims are oversecured, on the Effective Date, the Debtors will establish a debt service account,

to be funded by $75 million from the Proceeds of the Rights Offering and the Marina Sale Agreement. Funds contained in the debt service account will be used solely for the purpose of paying principal and interest on the New Term Loan.

On the Effective Date, Reorganized TER Holdings and the Reorganized Debtor Subsidiaries that are parties to the Amended and Restated Credit Agreement and the other Loan Documents (as such term is defined in the Amended and Restated Credit Agreement) will be authorized to execute and deliver such Loan Documents and grant the liens and security interests specified therein to and in favor of the First Lien Collateral Agent for the benefit of the First Lien Lenders.

4. *Issuance of New Common Stock.*

On the Effective Date, Reorganized TER shall issue the New Common Stock to (a) the Backstop Parties in accordance with the terms of the Backstop Agreement and (b) the holders of General Unsecured Claims (1) validly exercising their Subscription Rights pursuant to the Rights Offering and (2) in accordance with the distribution set forth in section 4.4 of the Plan.

Following the Effective Date, Reorganized TER shall as soon as reasonably practicable, but in no event later than thirty (30) calendar days after the Effective Date, file with the United States Securities and Exchange Commission a registration statement for the New Common Stock on Form 8-A or Form 10 (as determined in the Reorganized Debtors' reasonable discretion) under the Securities Exchange Act of 1934. Following the Effective Date, Reorganized TER shall use reasonable best efforts to list the New Common Stock on the NASDAQ or The New York Stock Exchange as soon as reasonably practicable.

Certain holders of New Common Stock shall be entitled to registration rights pursuant to the Registration Rights Agreement.

5. *Certain Restructuring Transactions.*

On the Effective Date, the proceeds of the Rights Offering shall be contributed by Reorganized TER to the New Limited Partner and to Reorganized TER Holdings as a capital contribution as part of the Restructuring Transactions, and the portion of the proceeds contributed to the New Limited Partner shall in turn be contributed to Reorganized TER Holdings. In consideration for such capital contributions, the New Partnership Interests of Reorganized TER Holdings shall be distributed to Reorganized TER and the New Limited Partner as shall be set forth in the Restructuring Transactions. On the Effective Date, Reorganized TER shall be authorized to enter into the Fifth Amended and Restated Agreement of Limited Partnership of TER Holdings, among Reorganized TER, as general partner, the New Limited Partner and Reorganized TER Holdings, pursuant to which TER shall continue as the general partner of TER Holdings.

6. *Dismissal of Dismissed Debtors' Cases.*

The Plan contemplates that the jointly-administered cases of TCI 2, TER Development and TER Management will be dismissed pursuant to Section 1112(b) of the

Bankruptcy Code.  TCI 2 has no assets other than a fractional partnership interest in TER Holdings.  TCI 2 is a guarantor under the First Lien Loan Documents and has no other scheduled creditors.  Pursuant to the terms of the Plan, TCI 2 will receive no distribution on account of its limited partnership interests in TER Holdings.  Also pursuant to the terms of the Plan, the First Lien Lenders will receive 100% of the equity of TCI 2, currently held by TER.  TER Management and TER Development are not obligors under either the First Lien Credit Agreement or the First Lien Notes and have no assets or liabilities listed on the Schedules of Assets and Liabilities prepared by the Debtors.  Accordingly, the Ad Hoc Committee does not believe that a restructuring of TER Management and TER Development is necessary to the reorganization of the remaining Debtors.

## B.    Corporate Action

On the Effective Date, all matters provided for in the Plan that would otherwise require approval of the stockholders, directors, general or limited partners, or members of one or more of the Debtors or Reorganized Debtors, including without limitation, the authorization to (i) issue or cause to be issued the New Common Stock and the New Partnership Interests, and (ii) documents and agreements to be effectuated pursuant to the Plan, the election or appointment as the case may be, of directors and officers of the Reorganized Debtors pursuant to the Plan and the Amended Organizational Documents, and the qualification of each of the Reorganized Debtors as a foreign corporation or entity wherever the conduct of business by such entity requires such qualification shall be deemed to have occurred and shall be in effect from and after the pursuant to the applicable general corporation, limited partnership or limited liability company law of the states in which the Debtors or the Reorganized Debtors are organized, without any requirement of further action by the stockholders, directors, general or limited partners, or members of the Debtors or the Reorganized Debtors.

## C.    Securities Law Matters

The issuance of the New Common Stock, the New Partnership Interests and any and all other securities, notes, stock, instruments, certificates, and other documents or agreements required to be issued, executed or delivered pursuant to the Plan and the distribution thereof under this Plan, and distribution and exercise of the Subscription Rights, shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, Section 4(2) of the Securities Act and/or other applicable exemptions.

## D.    Compliance With Gaming Laws and Regulations

Reorganized TER shall not distribute New Common Stock to any person or entity in violation of the gaming laws and regulations in the states in which the Debtors or the Reorganized Debtors, as applicable, operate.  Consequently, no holder shall be entitled to receive New Common Stock unless and until such holder has been licensed, qualified, found suitable, or has obtained a waiver or exemption from such license, qualification, or suitability requirements. Until such holder has complied with applicable gaming laws and regulations, such holder shall not be a shareholder of Reorganized TER and shall have no voting rights or other rights of a stockholder or Reorganized TER.

If a holder is entitled to receive New Common Stock under the Plan and is required, under applicable gaming laws to be licensed, qualified or found suitable and thus is required to undergo a suitability investigation and such holder either (i) refuses to undergo the necessary application process for such suitability investigation or (ii) after submitting to such investigation, is determined to be unsuitable to hold the New Common Stock or withdraws from the suitability investigation prior to its completion, then, in that event, Reorganized TER shall hold the New Common Stock and (x) such holder shall only receive such distributions from Reorganized TER as are permitted by the applicable gaming authorities, (y) the balance of the New Common Stock to which the holder would otherwise be entitled will be marketed for sale by Reorganized TER, as agent for holder, and (z) the proceeds of any such sale shall be distributed to holder as soon as such sale can be facilitated and subject to regulatory approval.  In addition, in the event that the applicable gaming authorities object to the possible suitability of any holder, the New Common Stock shall be distributed only to such holder upon a formal finding of suitability.  If a gaming authority subsequently issues a formal finding that a holder lacks suitability, or such holder withdraws from or does not fully cooperate with the suitability investigation, then the process for the sale of that holder's New Common Stock shall be as set forth in (x), (y), and (z) above.

## IV.

### Voting Procedures and Requirements

Detailed voting instructions are provided with the ballot accompanying this Disclosure Statement. For purposes of the Plan, only Classes 3, 4 and 5, which are comprised of the First Lien Lender Secured Claims, General Unsecured Claims and Convenience Claims, respectively, are entitled to vote. If your claim is not in one of these Classes, you are not entitled to vote on the Plan and you will not receive a ballot with this Disclosure Statement. If your claim is in one of these Classes, you should read your ballot and follow the listed instructions carefully. Please use only the ballot that accompanies this Disclosure Statement.

**IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT, YOU MAY CONTACT THE VOTING AGENT**

### A.    Vote Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a Plan by creditors in a class of claims is determined by calculating the number and the amount of claims voting to accept, based on the actual total allowed claims voting. Acceptance by a class of creditors requires an affirmative vote of more than one-half of the total allowed claims voting and two-thirds in amount of the total allowed claims voting.

### B.    Classes Not Entitled to Vote

Under the Bankruptcy Code, creditors are not entitled to vote on, and are deemed to have accepted, the Plan if their contractual rights are left unimpaired by the Plan. In addition, classes of claims or interests that are not entitled to receive property under the Plan are not entitled to vote on, and deemed not to have accepted the Plan. Based on this standard, for

example, the holders of Other Priority Claims are not being affected by the Plan and thus deemed to have accepted the Plan.  Conversely, holders of equity interests in TER, for example, are not entitled to vote on, and are deemed not to have accepted, the Plan because they are not receiving any property under the Plan.

**C.      Voting**

In order for your vote to be counted, your vote must be actually ***received*** by the Voting Agent at the following address before the Voting Deadline of __:00 _.m., (Eastern Time), on _____, 2009:

```
Voting Agent


```

**If your vote is received by the Voting Agent after the Voting Deadline, the Ad Hoc Committee, in its sole discretion will decide whether or not your vote will be counted.**

If the instructions on your ballot require you to return the ballot to your bank, broker, or other nominee, or to their agent, you must deliver your ballot to them in sufficient time for them to process it and return it to the Voting Agent before the Voting Deadline. If a ballot is damaged or lost, you may contact the Voting Agent at the number set forth above. Any ballot that is executed and returned but which does not indicate an acceptance or rejection of the Plan will not be counted.

## V.

### Financial Information, Projections, and Valuation Analysis

For purposes of the Plan, the Ad Hoc Committee refers to the projections and valuation analysis prepared by the Debtors in connection with the Insider Plan (the "***Debtors' Valuation Analysis***"), subject to the Bankruptcy Court determining a different valuation for the Debtors.  The Debtors' Valuation Analysis, as contained in Section V of the disclosure statement for the Insider Plan is annexed hereto as Exhibit B.

## VI.

### General Information

**A.      Description of Debtors**

**1.      *Corporate Structure and Business.***

TER is a publicly-held company and general partner of TER Holdings, which owns the operating casino entities. The predecessor entity to TER was Trump Hotels & Casino Resorts, Inc. ("***THCR***"). THCR was incorporated in Delaware in March 1995 and became a public company in June 1995. Like TER, THCR and its affiliates and subsidiaries owned and

operated three casino hotel properties in Atlantic City, New Jersey: Trump Taj Mahal Resort, Trump Plaza Casino, and Trump Marina Casino. In addition, THCR and its affiliates and subsidiaries owned and operated casino properties in California and Indiana.

TER's common stock began trading on the Nasdaq Stock Market under the ticker symbol "TRMP" in September 20, 2005. On February 17, 2009, TER received a notification from the Nasdaq Stock Market indicating that it had determined, in accordance with Nasdaq Marketplace Rules, that TER's common stock would be delisted from the Nasdaq Stock Market in light of the filing of the Chapter 11 Cases, concerns about the residual equity interest of the existing listed security holders and concerns about TER's ability to sustain compliance with all of Nasdaq's listing requirements. Trading in TER common stock was suspended on February 26, 2009. On March 12, 2009, Nasdaq announced that it would file a Form 25 with the SEC to complete the delisting. The delisting was effective on March 22, 2009.

As of August 3, 2009, the outstanding equity of TER consisted of (i) 31,715,876 shares of common stock (with approximately 2,864 holders of record of TER common stock) and (ii) 900 shares of TER's class B common stock. The issued and outstanding shares of class B common stock are held by Mr. Trump and have the voting equivalency of 9,377,484 shares of TER common stock. TER's principal assets consist of its general and indirect limited partnership interests in TER Holdings, which holds, through its subsidiaries, substantially all of the assets of the Debtors' businesses. TER Holdings is currently owned by TER as General Partner (with an aggregate percentage interest of approximately 99.98814%), TER's wholly owned subsidiary TCI 2, a Limited Partner (with an aggregate percentage interest of approximately 0.00461%), and ACE Entertainment Holdings, Inc., also a Limited Partner (with an aggregate percentage interest of approximately 0.00725%). TER Holdings also owns 100% of several other limited liability company debtors.

As the sole general partner of TER Holdings, TER generally has the exclusive rights, responsibilities and discretion as to the management and control of TER Holdings and its subsidiaries.

For more information about TER and its business, reference is made to TER's 2008 Form 10-K and Second Quarter Form 10-Q, attached hereto as Exhibit C and Exhibit D, respectively.

## 2.   *History and Prior Bankruptcy Proceedings.*

On November 21, 2004, THCR, together with 28 affiliates and subsidiaries (collectively, the "***2004 Debtors***"), filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the District of New Jersey (Case No. 04-46898 (JHW)) (Jointly Administered) (the "***2004 Chapter 11 Cases***"), as part of a conceptually agreed upon plan.

On April 5, 2005, the United States Bankruptcy Court for the District of New Jersey entered an order confirming the Debtors' Second Amended Joint Plan of Reorganization (the "***Prior Plan***"), which became effective on May 20, 2005 (the "***Prior Effective Date***"). Upon the Prior Effective Date, all material conditions to the Prior Plan were satisfied and the 2004 Debtors emerged from chapter 11 as the Debtors. Pursuant to the Prior Plan, the 2004 Debtors

were recapitalized and renamed, certain subsidiaries were merged and/or dissolved, indebtedness was consolidated and debt service was substantially reduced.

The Debtors' current capital structure arises from the Prior Plan. The Debtors implemented a 1,000 for 1 reverse stock split of THCR's common stock such that each 1,000 shares of THCR common stock immediately prior to the reverse stock split were consolidated into one share of common stock of the reorganized debtor, TER, resulting in the distribution of approximately 19,944 shares of TER common stock (approximately 0.05% on a fully diluted basis for holders other than Mr. Trump), in aggregate, to holders of THCR common stock. Holders of THCR common stock received approximately $0.88 for each share of THCR common stock owned by each holder, an aggregate of $17.5 million, and also obtained a pro rata share of the net proceeds from the sale of the former World's Fair site in Atlantic City, a total of $25.2 million. All options to acquire THCR common stock were cancelled, and holders (other than Mr. Trump) of THCR common stock also received Class A Warrants to purchase up to approximately 2,207,260 shares of TER common stock (approximately 5.34% on a fully diluted basis). The Class A Warrants were either exercised by or converted to shares under the Prior Plan on May 22, 2006.

On the Prior Effective Date, TER Holdings and Trump Entertainment Resorts Funding, Inc. *("TER Funding")* issued $1.25 billion aggregate principal amount of 8.5% Senior Secured Notes due 2015 (the *"Second Lien Notes"*) in connection with the Prior Plan. In addition, the Debtors implemented a debt restructuring whereby pro rata distributions of cash, Senior Secured Notes, or TER common stock were made to: (i) holders of $1.3 billion aggregate principal amount of 11.25% First Mortgage Notes of Trump Atlantic City Associates, Trump Atlantic City Funding, Inc., Trump Atlantic City Funding, II, Inc. and Trump Atlantic City Funding, III, Inc.; (ii) holders of approximately $435 million aggregate principal amount of 11.625% First Priority Mortgage Notes due 2010 of Trump Casino Holdings, LLC and Trump Casino Funding, Inc.; and (iii) holders of $54.6 million aggregate principal amount of 17.625% of Second Priority Notes due 2010 of Trump Casino Holdings, LLC. Payment of up to $250 million in principal amount of the Second Lien Notes was personally guaranteed by Mr. Trump pursuant to the Personal Guaranty. The Personal Trump Guaranty contains a number of conditions to Mr. Trump's personal liability thereunder and payment under the Personal Trump Guaranty must be pursued by the Indenture Trustee for the Second Lien Notes.

The Debtors also entered into a $500 million secured credit facility on the Prior Effective Date with a syndicate of bank lenders (the "*2005 Credit Facility*"). The proceeds from the 2005 Credit Facility were used to repay up to $100 million in debtor in possession financing that the 2004 Debtors had obtained on November 22, 2004 during the 2004 Chapter 11 Cases. The 2005 Credit Facility was secured by substantially all of the assets of the Debtors, and senior in priority to the Senior Secured Notes.

On December 21, 2007, the Debtors entered into a $493.3 million secured credit facility, which was amended in March 2008, May 2008, and October 2008 (the "*2007 Credit Facility*"), the proceeds of which were used to repay all amounts outstanding under the 2005 Credit Facility and $6.6 million of associated transaction costs.

B.    **Prepetition Capital Structure of the Debtors**

The capital structure of the Debtors consists primarily of equity and secured notes. As of August 3, 2009, the outstanding equity of TER consisted of (i) 31,715,876 publicly traded shares of common stock (with approximately 2,864 holders of record of TER common stock). Nine hundred shares of TER's class B common stock are owned by Mr. Trump.

In addition, TER and TER Holdings have consolidated long-term debt under the 2007 Credit Facility of approximately $493,250,000. As of March 31, 2009, the total amount outstanding under the 2007 Credit Facility was $488,525,000. The 2007 Credit Facility matures on December 21, 2012 and must be repaid during the final year of the loans in equal quarterly amounts, subject to amortization of approximately 1.0% per year prior to the final year. Borrowings under the 2007 Credit Facility are secured by a first priority security interest in and lien on substantially all of the assets of TER Holdings and its operating subsidiaries, and the guaranty of TER.

In addition, TER Holdings and TER Funding have consolidated long term debt under the Senior Secured Notes of approximately $1,250,000,000 in principal amount due June 1, 2015. The Senior Secured Notes were used to pay distributions under the Prior Plan. The Senior Secured Notes bear interest at 8.5% per annum. The obligations under the Senior Secured Notes are secured by second mortgages on the Debtors' real property, certain intellectual property rights, and related personal property, all subordinate to liens securing amounts borrowed under the 2007 Credit Facility and certain other permitted prior liens.

As of January 31, 2009, the Debtors' books and records reflected accounts payable due and owing in the approximate amount of $8,069,675, plus an additional $12,421,174 in costs for construction in progress, an additional estimated $12,421,174 for other vendors (such as utilities) who have not provided invoices to the Debtors for services and products already provided. Total trade debt was approximately $33,182,677. In addition, the Debtors are obligated for approximately $6,124,442 million for leases and other ordinary course financing arrangements.

C.    **Events Leading to the Commencement of the Chapter 11 Cases**

The Debtors' operating results during 2008 and 2009 have been affected by various factors, including most significantly the competition in nearby or adjoining states and general and significant weakening of the economy. Other factors affecting performance included the pending sale of the Trump Marina Casino (as described below) and smoking restrictions under local legislation.

1.    *Competition.*

The Atlantic City market primarily serves the New York-Philadelphia-Baltimore-Washington D.C. corridor with nearly 30 million adults living within a three-hour driving radius. The Atlantic City market is the second largest gaming market in the United States, after Las Vegas. In 2007, the casinos in the Atlantic City market generated $4.9 billion in casino revenue. The Debtors' three casinos combined comprise approximately 21% of the gaming positions and

21% of the hotel rooms in the Atlantic City market and generate approximately 21% of the market gaming revenue.

Competition in Atlantic City is intense and increasing. At the present time, the 11 casino hotels located in Atlantic City, including the Debtors' three properties, compete with each other on the basis of customer service, quality and extent of amenities and promotional offers. For this reason, the Debtors and their competitors require substantial capital expenditures to compete effectively.

For the quarter ended March 31, 2009, gross gaming revenues in the Atlantic City market (as reported to the NJCCC) compared to the same quarter in 2008 decreased 12.1% overall, while slot revenues decreased 14.5%. For the quarter ended March 31, 2009, the Debtors experienced a 10.7% decrease in overall gross gaming revenue and a 16.3% decrease in slot revenue at their three properties, compared to the prior-year period.

For the year ended December 31, 2008, gross gaming revenues in the Atlantic City market (as reported to the NJCCC) decreased 7.6% overall, while slot revenues decreased 9.6% compared to 2007. During the year ended December 31, 2008, the Debtors experienced an 8.0% decrease in overall gross gaming revenue and a 10.0% decrease in slot revenue at their three properties compared to the prior year period.

Beginning in late 2006 and continuing in 2007, several new gaming properties debuted in Pennsylvania that have introduced over 9,000 new slot machines within the Debtors' competitive marketplace. Importantly, these new facilities are located in close proximity to the Debtors' significant customer base in southeastern Pennsylvania, and this convenience factor is proving quite persuasive to particular segments of the Debtors' customers. Furthermore, the City of Atlantic City imposed a partial smoking ban that took effect in April 2007 that mandated each Atlantic City casino designate at least seventy-five percent of its gaming area smoke-free.

As a result of these developments, in 2007, the Atlantic City gaming industry experienced its first year-over-year revenue decline since the first casino opened its doors in 1978. The effect of new competition from Pennsylvania and the partial smoking ban implemented by the City of Atlantic City was broad. From the city's largest property to its smallest, the financial effects of the recent market changes have been widespread and have continued. This decline was repeated in 2008, and in fact economic conditions exacerbated such decline.

## 2. *Regulatory and Licensing.*

On April 15, 2007, an ordinance in Atlantic City became effective which extended smoking restrictions under the New Jersey Smoke-Free Air Act. The Atlantic City ordinance mandated that casinos restrict smoking to designated areas of up to 25% of the casino floor. During April 2008, Atlantic City's City Council unanimously approved an amendment to the Atlantic City ordinance which bans smoking entirely on all casino gaming floors and casino simulcasting areas, but allows smoking in separately exhausted, non-gaming smoking lounges. The amendment to the ordinance became effective on October 15, 2008, however, on October 27, 2008, Atlantic City's City Council voted to postpone the full smoking ban for at least one

year due to, among other things, the weakened economy and increased competition in adjoining states. The postponement of the full smoking ban went into effect on November 16, 2008. While the Debtors are unable to quantify the impact of the smoking restrictions, the Debtors believe that the smoking restrictions have negatively impacted their gaming revenues and income from operations as their competition in adjacent states continues to permit smoking. Although the Debtors constructed a smoking lounge on the casino floor at each of their properties as permitted by the ordinance, the Debtors believe their gaming revenues and income from operations were negatively affected by the full smoking ban and that a future complete ban on smoking in casino and casino simulcasting areas could further adversely affect their results.

In addition, the gaming industry is highly regulated and the Debtors must maintain their casino licenses and pay gaming taxes in order to continue their gaming operations. For more information about the regulation of the gaming industry, reference is made to the 2008 Form 10-K attached hereto as Exhibit C.

### 3.    *Default Under the Second Lien Notes and Plan Negotiations.*

TER Holdings and TER Funding did not make the interest payment due December 1, 2008 on the Second Lien Notes.  After the Debtors failed to make their interest payment on the Second Lien Notes and entered into the grace period with respect thereto, the Ad Hoc Committee formed to negotiate a restructuring of the Debtors' liabilities and equity interests.  The discussions included discussions among certain members of the Ad Hoc Committee, the advisors to the Ad Hoc Committee, and Mr. Trump and his representatives.

On December 31, 2008, the members of the Ad Hoc Committee entered into a forbearance agreement with the Debtors to facilitate these discussions.  The Debtors simultaneously entered into a forbearance agreement with their senior lenders and Mr. Trump pursuant to which the respective parties agreed to forbear from exercising certain rights during the term of the forbearance agreement.  As the discussions regarding a restructuring continued, these forbearance agreements were extended a number of times, with the term of the latest extension dated as of February 11 expiring at 9:00 a.m. on February 17, 2009.

Starting in December 2008 and continuing through the weekend prior to the Debtors' bankruptcy filing, the Ad Hoc Committee attempted to find a consensus with the Debtors and Mr. Trump.  In early January 2009, the Debtors presented a restructuring proposal to the Ad Hoc Committee providing for the exchange of the Second Lien Notes for virtually all of the Debtors' equity.  The Ad Hoc Committee responded to the restructuring proposal on January 19, 2009, and, despite the fact that the Ad Hoc Committee's proposal was quite close to the Debtors', the Debtors never formally responded.  Instead, prior to the filing date, the Debtors requested that the Ad Hoc Committee negotiate directly with Mr. Trump, who, during most of the negotiations, was the Chairman of the Debtors' board of directors, and his daughter, Ivanka Trump also served on the Board.  Those negotiations failed due to Mr. Trump's unrealistic expectations and the unwillingness of the Debtors to attempt to find a middle ground.  Seeing that there was no way to bridge the gap between their own position and that of Mr. Trump as an out-of-the-money equity holder who demanded control of the reorganized company, the Ad Hoc Committee chose not to extend their forbearance agreement past February, and the Debtors subsequently commenced these cases.

After the commencement of their chapter 11 cases, the Debtors publicly announced that they did not intend to formulate their own stand-alone plan of reorganization and instead solicited restructuring proposals from the Ad Hoc Committee, on the one hand, and Mr. Trump and Beal Bank on the other. The Ad Hoc Committee delivered an initial proposal to the Debtors in April 2009, which included a proposal for up to $150 million of new capital to be provided in the form of a rights offering to be backstopped by the members of the Ad Hoc Committee, as well as a bridge debtor-in-possession financing ("**DIP**"). The Ad Hoc Committee subsequently delivered to the Debtors a detailed plan term sheet, a draft DIP commitment letter together with a comprehensive DIP financing term sheet, and a draft rights offering backstop agreement. Since then, the Ad Hoc Committee, specifically at the request of the Debtors who assured the Ad Hoc Committee that no final decision had been made by the Debtors with respect to a restructuring proposal, has, on several occasions, revised its proposal to include greater value for creditors by increasing the amount of their proposed rights offering commitment and bridge bankruptcy financing; however, the Debtors provided little feedback or response to these proposals other than to direct the Ad Hoc Committee to negotiate directly with Mr. Trump and Beal Bank.

The Debtors' initial exclusive period to file a plan of reorganization was set to expire on June 17, 2009, prompting the Debtors to seek a 90-day extension (the "**Exclusivity Extension Motion**"). In the Exclusivity Extension Motion, which was filed at the end of May, the Debtors assured the Court and creditors that progress was being made and that additional time was needed to formulate a plan of reorganization. Despite misgivings regarding the stalemate in the case, the Ad Hoc Committee consented to a 45-day extension of exclusivity, in the hope that additional time would afford the Debtors an opportunity to take some steps to forge consensus. Consequently, on June 16, 2009 with the support of the Ad Hoc Committee, this Court entered an order extending the Debtors' Exclusive Periods to file and solicit a plan of reorganization until August 3, 2009, and October 1, 2009, respectively.

On August 3, 2009 the Debtors' filed the Insider Plan and Insider Disclosure Statement, in which the Debtors state that they state that, contrary to their indications to the Ad Hoc Committee and the Bankruptcy Court, they had selected the Beal/Trump proposal on April 28, 2009. The filing of the Insider Plan and Insider Disclosure Statement prompted the Ad Hoc Committee to move to terminate the Debtors' exclusive periods to file and solicit a plan of reorganization and on August 11, 2009 the Ad Hoc Committee filed a motion to terminate the Debtors' exclusivity. By an order of the Bankruptcy Court dated August 31, 2009, the Debtors' exclusive right to solicit a plan of reorganization was terminated and the Ad Hoc Committee was authorized to file the Plan.

**4.**    ***Florida Litigation and Marina Sale Negotiations.***

On or about December 30, 2004, the Debtors commenced a litigation entitled *Trump Hotels & Casino Resorts Development Company, LLC v. Richard T. Fields, Coastal Development, LLC, Power Plant Entertainment, LLC, Native American Development, LLC, Joseph S. Weinberg, and The Cordish Company*, Case No. 04-20291 in the Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County, Florida (the "**Florida Litigation**"). In the Florida Litigation, the Debtors alleged that the defendants (the "**Litigation Defendants**") defrauded the Debtors of the opportunity to construct, operate and ultimately reap the proceeds

of the sale of Hard Rock casino and hotel projects on Seminole land in Hollywood and Tampa, Florida. The Debtors have incurred substantial costs pursuing the Florida Litigation, which may exceed $10 to $15 million in costs and professional fees.

The Florida Litigation was placed on hold on May 28, 2008, as Trump Marina Associates, LLC, d/b/a Trump Marina Hotel Casino entered into an Asset Purchase Agreement (the "***Initial APA***") to sell the Trump Marina Casino to the Coastal Parties, which provided, among other things, for the dismissal of the Florida Litigation upon the consummation of the sale. The Initial APA originally provided for a purchase price of $316 million, subject to a working capital adjustment and EBITDA-based adjustment. On October 28, 2008, the parties entered into an amendment to the Initial APA to modify certain terms and conditions of the APA, including to reduce the purchase price to $270 million and eliminate the EBITDA-based adjustment in exchange for Coastal agreeing to post an additional $2 million deposit and to consent to the release of $15 million in deposits previously made by Coastal to the Debtors. Under both of these sale agreements, the Ad Hoc Committee believes that Mr. Trump personally was to receive sums in excess of $20 million from the asset sale proceeds as some form of fee in connection with orchestrating the Florida Litigation and that this fee was approved by the other members of the Debtors' Board of Directors.

The closing was subject to the satisfaction of certain conditions, including receipt of approvals from New Jersey governmental authorities and this Court. In January 2009, the Debtors forecast that the Trump Marina would generate only $2.4 million in EBITDA for 2009 and the $270 million purchase price under the Initial APA as amended was widely acknowledged as far in excess of the property's actual worth. Given the Debtors' projections for the property and the immaterial benefits inuring to their estates upon the termination of the Initial APA, as amended, (i.e., the retention of Coastal's deposits and the right to proceed with the Florida Litigation), the Ad Hoc Committee urged the Debtors to try and close a deal that was more in line with economic reality. On May 28, 2009, the Initial APA terminated, as the outside closing date passed without the Debtors accepting amended offers from Coastal.

At the urging of the Ad Hoc Committee, following the termination of the Initial APA, Coastal submitted written non-binding indications of interest on June 9, 2009 and July 16, 2009 describing certain terms under which it would acquire the Marina. The Debtors rejected the new Coastal proposals on several grounds, including that the purchase price was far less than its original contract price, would net no recovery for the Debtors, and that Coastal was not likely to close the transaction. In response, Coastal assured the Debtors that it would escrow the purchase price immediately and address any other concerns that the Debtors had. The Debtors chose not to respond to such a proposal other than to state in the Insider Disclosure Statement that to date the terms of Coastal's renewed sale proposals have been unacceptable to them. On July 28, 2009, Coastal commenced an adversary proceeding against the Debtors and their CEO and General Counsel, Messrs. Mark Juliano and Robert Pickus, respectively, alleging that the Debtors let the Trump Marina fall into serious disrepair and hid property defects from them during the negotiations, and ultimately engaged in a conspiracy to defraud Coastal of its deposit and to purchase an asset at far more than its actual worth.

In connection with the Plan, the Ad Hoc Committee has negotiated a renewed proposal for the purchase of the Marina with the Coastal Parties. The terms of this proposal are

reflected in a letter of intent, attached as an exhibit to the Plan.  Pursuant to the terms of the Marina Sale Agreement, in connection with the Plan, the Coastal Parties will purchase the Marina for a purchase price of $75 million, less the $17 million in deposits previously made to the Debtors in connection with the Initial APA.  The net proceeds from the sale of the Marina will be used to pay down the secured portion of the First Lien Lender Claims against the Debtors.  The consummation of the sale will also result in the withdrawal of the Florida Litigation and the Coastal Adversary Proceeding.

### D.    Information Regarding the Ad Hoc Committee

The Ad Hoc Committee is comprised of certain holders of the Debtors' Second Lien Notes, including Avenue Capital, Brigade Capital Management, Contrarian Capital Management, Goldentree Asset Management, Lowes, MFC Global/Hancock, Northeast Management & Research, Oaktree Capital Management, and Polygon Investment Partners.  As described above, the Ad Hoc Committee formed in December 2008 to engage in restructuring negotiations with the Debtors.  The Ad Hoc Committee is represented by Stroock & Stroock & Lavan LLP, Lowenstein Sandler PC and Fox Rothschild LLP as co-counsel and Houlihan Lokey Howard & Zukin as financial advisor.

## VII.

## Governance

### A.    Current Board of Directors, Management and Executive Compensation

For information about TER's current board of directors, management and executive compensation policies reference is made to the 2008 Form 10-K attached hereto as Exhibit C.

### B.    Board of Directors of Reorganized TER

The board of directors of Reorganized TER shall be composed of a total of five members, who shall be licensable individuals selected by the Ad Hoc Committee.  The members of the board will be identified no later than the confirmation hearing. The board shall also have independent audit and compensation committees.

### C.    Officers of Reorganized TER

The officers of TER immediately prior to the Effective Date will serve as the officers of Reorganized TER on and after the Effective Date in accordance with any employment and severance agreements with Reorganized TER and applicable non-bankruptcy law.

### D.    Continued Corporate Existence

Except as provided in the Plan, each Debtor will, as a Reorganized Debtor (other than the Dismissed Debtors), continue to exist after the Effective Date as a separate corporation, partnership or limited liability company, with all of the powers of such entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger,

dissolution or otherwise) under applicable state law. Except as provided in the Plan, all property of the estate of a Debtor, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest in such Reorganized Debtor, free and clear of all claims, liens, charges, other encumbrances and interests. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. On the Effective Date, except as provided in the Plan, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Debtors or their estates shall be fully released, terminated and discharged without further notice or action by the Debtors, Reorganized Debtors, holders of any such mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Debtors or their estates, the Bankruptcy Court or any applicable federal, state or local governmental agency or department. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for professional fees and expenses, disbursements, expenses or related support services (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

The Plan may result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting, or acquiring corporations, partnerships or limited liability companies. In each case in which the surviving, resulting, or acquiring corporation, partnership or limited liability company in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring corporation, partnership or limited liability company will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan, including among other things, to pay or otherwise satisfy the allowed claims against such Reorganized Debtor, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring corporation, partnership or limited liability company, which may provide that another entity will perform such obligations.

## VIII.

## Other Aspects of the Plan

A.    **Distributions**

1.    ***Timing and Conditions of Distributions.***

(i)    Distribution Record Date.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Equity Interests.  The Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date.

(ii)   <u>Postpetition Interest on Claims.</u>

Except as required by applicable bankruptcy law, postpetition interest will not accrue on or after the Commencement Date on account of any claim.

(iii)   <u>Date of Distributions.</u>

Except as otherwise provided in the Plan, any distributions and deliveries to be made thereunder shall be made on the Effective Date or as soon thereafter as is practicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

(iv)   <u>Disbursing Agent.</u>

All distributions under the Plan shall be made by an entity or entities designated by the Ad Hoc Committee as Disbursing Agent, on or after the Effective Date or as otherwise provided in the Plan.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by Reorganized TER.

(v)   <u>Powers of Disbursing Agent.</u>

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated thereby and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan.

(vi)   <u>Surrender of Instruments.</u>

As a condition to receiving any distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee.  Any holder of such instrument or note that fails to (i) surrender such instrument or note, or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent and furnish a bond in form, substance and amount reasonably satisfactory to the Disbursing Agent before the first anniversary of the Effective Date shall be deemed to have forfeited all rights and Claims and may not participate in any distribution under the Plan.  Any distribution so forfeited shall become property of the Reorganized Debtors.

(vii)    Delivery of Distributions.

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders of Allowed Claims.  In the event that any distribution to any holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred. If the Ad Hoc Committee and the Second Lien Indenture Trustee agree that the Second Lien Indenture Trustee shall serve as the Disbursing Agent, all distributions on account of Second Lien Note Claims shall be made: (a) to the Second Lien Indenture Trustee; or (b) with the prior written consent of the Second Lien Indenture Trustee, through the facilities of DTC (if applicable).  If a distribution is made to the Second Lien Indenture Trustee, the Second Lien Indenture Trustee shall administer the distribution in accordance with the Plan and the Second Lien Indenture and shall be compensated for all of its reasonable services and disbursements related to distributions pursuant to the Plan (and for the related reasonable fees and expenses of any counsel or professional engaged by the Second Lien Indenture Trustee with respect to administering or implementing such distributions), by the Debtors or the Reorganized Debtors, as appropriate, in the ordinary course upon the presentation of invoices by such Second Lien Indenture Trustee for such services.  The compensation of the Second Lien Indenture Trustee for services relating to distributions under the Plan shall be made without the need for filing any application or request with, or approval by, the Bankruptcy Court.  Distributions made by the Second Lien Indenture Trustee to the record holders of the Second Lien Notes, and in turn by the record holders of the Second Lien Notes to the beneficial holders of the Second Lien Notes, shall not be made as of the Distribution Record Date but rather shall be accomplished in accordance with the Second Lien Notes Indenture and the policies and procedures of DTC.

The Second Lien Indenture Trustee shall not be required to give any bond, surety, or other security for the performance of its duties with respect to the administration and implementation of distributions.  Any and all distributions on account of Second Lien Note Claims shall be subject to the right of the Second Lien Indenture Trustee to exercise its charging lien for any unpaid fees and expenses of the Second Lien Indenture Trustee, and any fees and expenses of the Second Lien Indenture Trustee incurred in making distributions pursuant to the Plan.

(viii)    Manner of Payment Under the Plan.

At the option of the Debtors, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

(ix)    Allocations of Principal Between Principal and Interest.

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

(x)    Setoffs.

The Debtors and the Reorganized Debtors may (with the consent of the Ad Hoc Committee), but shall not be required to, set off against any claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such Claim.

(xi)    Distributions After the Effective Date.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

**2.    *Procedures for Treating Disputed Claims Under the Plan.***

(i)    Disputed Claims.

A disputed claim is any claim that has not been allowed pursuant to the Plan or a final order of the Bankruptcy Court, and

a.    if no proof of claim has been filed by the applicable deadline: (i) a claim that has been or hereafter is listed on the schedules as disputed, contingent or unliquidated; or (ii) a claim that has been or hereafter is listed on the schedules as other than disputed, contingent or unliquidated, but as to which the Debtors or Reorganized Debtors or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a final order of the Bankruptcy Court; or

b.    if a proof of claim or request for payment of an Administrative Expense Claim has been filed by the applicable deadline: (i) a claim for which no corresponding claim has been or hereafter is listed on the schedules; (ii) a claim for which a corresponding claim has been or hereafter is listed on the schedules as other than disputed, contingent or unliquidated, but the nature or amount of the claim as asserted in the proof of claim varies from the nature and amount of such claim as listed on the schedules; (iii) a claim for which a corresponding claim has been or hereafter is listed on the schedules as disputed, contingent or unliquidated; or (iv) a claim for which a timely objection or request for estimation is interposed by the Debtors, the Reorganized Debtors or any other party in interest which has not been withdrawn or determined by a final order of the Bankruptcy Court.

27

      (ii)     <u>Distributions Relating to Disputed Claims.</u>

At such time (if any) as a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the holder of such Claim, such holder's Pro Rata portion of the property distributable with respect to the Class in which such Claim belongs.  To the extent that all or a portion of a Disputed Claim is Disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is Disallowed and any property withheld pending the resolution of such Claim shall be reallocated Pro Rata to the holders of Allowed Claims in the same class.

      (iii)    <u>Distributions after Allowance.</u>

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, a distribution shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim, the distribution to which such holder is entitled under the Plan.

      (iv)    <u>Estimation of Claims.</u>

Prior to the Effective Date, the Ad Hoc Committee, and after the Effective Date, the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

      (v)     <u>Objections to Claims.</u>

Prior to the Effective Date, the Ad Hoc Committee (or the Debtors, acting at the direction of the Ad Hoc Committee), and after the Effective Date, the Reorganized Debtors shall be entitled to object to Claims other than Claims that are expressly Allowed pursuant to the Plan or Allowed by Final Order subsequent to the Effective Date.  Any objections to Claims shall be served and filed on or before the later of: (a) one hundred twenty (120) days after the Effective Date, and (b) such date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) above.

(vi)    <u>Payments and Distributions with Respect to Disputed Claims.</u>

Notwithstanding any other provision hereof, if any portion of a claim is a disputed claim, no payment or distribution provided under the Plan shall be made on account of such claim unless and until such disputed claim becomes an allowed claim.

(vii)    <u>Preservation of Rights to Settle Claims.</u>

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) all Causes of Action, whether in law or in equity, whether known or unknown, that the Debtors or their estates may hold against any person or entity without the approval of the Bankruptcy Court, subject to the terms of section 7.1 of the Plan, the Confirmation Order, the Purchase Agreement, the Amended and Restated Credit Agreement and any contract, instrument, release, indenture or other agreement entered into in connection herewith.  The Reorganized Debtors or their successor(s) may pursue such retained claims, rights or causes of action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

(viii)    <u>Disallowed Claims.</u>

All claims held by persons or entities against whom or which any Debtor or Reorganized Debtor has commenced a proceeding asserting a cause of action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed" claims pursuant to section 502(d) of the Bankruptcy Code and holders of such claims shall not be entitled to vote to accept or reject the Plan.  Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtors or the Reorganized Debtors from such party have been paid.

**B.    Treatment of Executory Contracts and Unexpired Leases**

**1.    *Contracts and Leases Not Expressly Rejected Are Assumed.***

As of, and subject to the occurrence of the Effective Date, and subject to Section 8.2 of the Plan, all executory contracts and unexpired leases (including, in each case, any related amendments, supplements, consents, estoppels, or ancillary agreements) to which any of the Debtors are parties will be assumed except for an executory contract or unexpired lease that (i) previously has been assumed or rejected pursuant to Final Order of the Bankruptcy Court, (ii) is specifically designated by the Ad Hoc Committee and the Coastal Parties or the Debtors (with the consent of the Ad Hoc Committee and the Coastal Parties), as a contract or lease to be rejected on the Schedule of Rejected Contracts to be included in the Plan Supplement, or (iii) is the subject of a separate (a) assumption motion filed by the Debtors with the Ad Hoc Committee's consent, or (b) rejection motion filed by the Debtors with the Ad Hoc Committee's consent under section 365 of the Bankruptcy Code prior to the Confirmation Date.

2.      *Cure of Defaults.*

Except to the extent that different treatment has been agreed to by the nondebtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Section 8.1 of the Plan, the Ad Hoc Committee or the Debtors (with the consent of the Ad Hoc Committee) shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, no later than the Voting Deadline, file and serve a schedule with the Bankruptcy Court listing the cure amounts of all executory contracts or unexpired leases to be assumed.  Any party that fails to object to the applicable cure amount within ten (10) calendar days of the filing of such schedule, shall be forever barred, estopped and enjoined from disputing the cure amount and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth in the schedule of cure amounts.  If there are any timely objections filed, the cure payments, if any, required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such dispute. The Debtors shall retain their right to reject any of their executory contracts or unexpired leases that are subject to a dispute, including contracts or leases that are subject to a dispute concerning amounts necessary to cure any defaults, until the entry of a Final Order resolving such dispute.

3.      *Rejection Claims.*

In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Reorganized Debtors on or before the date that is thirty (30) days after the Confirmation Date or such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults.

4.      *Assignment.*

Any executory contract or unexpired lease assumed or assumed and assigned shall remain in full force and effect for the benefit of the Reorganized Debtor or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type described in sections 365(b)(2) of the Bankruptcy Code) that prohibits, restricts or conditions such assumption, transfer or assignment. Any provision that prohibits, restricts or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

5.     *Survival of the Debtors' Indemnification Claims.*

Any obligations of the Debtors pursuant to their corporate charters and bylaws or other organizational documents to indemnify current and former officers and directors of the Debtors with respect to all present and future actions, suits and proceedings against the Debtors or such directors and/or officers, based upon any act or omission for or on behalf of the Debtors shall be deemed and treated as executory contracts to be assumed or rejected by the Debtors under the Plan; *provided*, *however*, that prepetition indemnification obligations shall be rejected on the Effective Date.

6.     *Insurance Policies.*

All insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed or rejected by the respective Debtors and Reorganized Debtors under the Plan.  All other insurance policies shall revest in the Reorganized Debtors.

7.     *Casino Property Leases.*

The Casino Property Leases (as defined in the Plan) shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and Reorganized Debtors and shall continue in full force and effect.

## C.     Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; (4) the Marina Sale Agreement; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## D.     Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such

Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

## E.    Conditions to Effectiveness

The Plan is subject to certain conditions to consummation.  Following are the conditions to consummation of the Plan, as set forth in Section 9 of the Plan.

a.    all actions, documents and agreements necessary to implement the Plan, including, without limitation, all actions, documents and agreements necessary to implement the Rights Offering, the Marina Sale Agreement, the Amended and Restated Credit Agreement and the Amended Organizational Documents, each in form and substance satisfactory to the Ad Hoc Committee (and, solely as it relates to the Marina Sale Agreement, the Ad Hoc Committee and the Coastal Parties), and the transactions and other matters contemplated thereby, shall have been effected or executed;

b.    there shall have been no modification or stay of the Confirmation Order or entry of other court order prohibiting transactions contemplated by the Plan from being consummated;

c.    the Debtors shall have received the Rights Offering Payment, in Cash, net of any fees or expenses authorized by a Final Order to be paid from the Rights Offering Payment;

d.    the Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents necessary to implement the Plan and that are required by law, regulation or order;

e.    the Debtors shall have distributed the Backstop Stock to the Backstop Parties in accordance with the terms and conditions in the Backstop Agreement, and shall have paid the Backstop Fees and Expenses and the reasonable and documented fees and expenses of the Ad Hoc Committee Advisors and the Second Lien Indenture Trustee, in full in Cash, without the need for any of the members of the Ad Hoc Committee, the Backstop Parties, the Second Lien Indenture Trustee or the Ad Hoc Committee Advisors to file retention applications or fee applications with the Bankruptcy Court unless otherwise required by order of the Bankruptcy Court; and

f.    the board of directors of Reorganized TER shall have been appointed.

Additionally, the outside date for the Plan to be consummated is 180 days following the entry of the order confirming the Plan.  Each of the conditions precedent to consummation may be waived by the Ad Hoc Committee.

## F.    Effect of Confirmation

### 1.    *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' estates shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided in the Plan.  The Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided in the Plan.  On the Effective Date, except as provided in the Plan, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Debtors or their estates shall be fully released, terminated and discharged without further notice or action by the Debtors, Reorganized Debtors, holders of any such mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Debtors or their estates, the Bankruptcy Court or any applicable federal, state or local governmental agency or department.

### 2.    *Discharge.*

Except as otherwise provided in or contemplated by the Plan, the rights afforded under the Plan and the payments and distributions to be made thereunder shall (i) discharge all existing debts and Claims against the Debtors (other than the Dismissed Debtors), and (ii) terminate all Equity Interests of any kind, nature or description whatsoever against or in TER, TER Holdings and the Debtor Subsidiaries, to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as otherwise provided in the Plan or in the Confirmation Order, all persons or entities who have held, now hold, or may hold Claims against any of the Debtors (other than the Dismissed Debtors) or Equity Interests in TER or TER Holdings, and all other parties in interest, along with their respective present and former employees, agents, officers, directors, principals and affiliates, are permanently enjoined from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to such Claim against the Debtors (other than the Dismissed Debtors) or the Reorganized Debtors or Equity Interest in TER or TER Holdings, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors or the Reorganized Debtors, (iii) creating, perfecting or enforcing any encumbrance of any kind against the Debtors (other than the Dismissed Debtors) or the Reorganized Debtors or against the property or interests in property of the Debtors (other than the Dismissed Debtors) or the Reorganized Debtors, or (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors (other than the Dismissed Debtors) or the Reorganized Debtors, with respect to such Claim against any of the Debtors (other than the Dismissed Debtors) or Equity Interest in TER or TER Holdings.  Such injunction shall extend to any successors of the Debtors (other than the Dismissed Debtors) and Reorganized Debtors and their respective properties and interest in properties.

### 3.    *Term of Injunctions or Stays.*

Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees,

33

agents, officers, directors or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

### 4. *Exculpation.*

As of the Effective Date, the following parties, entities and individuals shall have no liability for act taken or omitted to be taken in connection with, or related to the Reorganization Cases or formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, the Disclosure Statement, the Marina Sale Agreement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors except for any express contractual or financial obligations arising under or that is part of the Plan or an agreement entered into pursuant to, in connection with or contemplated by, the Plan: (i) the members of the Ad Hoc Committee; (ii) the Backstop Parties; (iii) the Coastal Parties; (iv) the Second Lien Indenture Trustee; (v) current and former directors, officers and employees of the persons in clauses (i)-(iv); and (vi) the affiliates, agents, financial advisors, investment bankers, professionals, accountants and attorneys of the persons in clauses (i)-(v) and their respective partners, owners and members.  Such parties, entities and individuals shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and the ancillary documents thereto.  Notwithstanding the foregoing, the provisions of Section 10.6 of the Plan shall not limit any liability on the part of the aforementioned parties that is determined by a Final Order of a court of competent jurisdiction for actions or failure to act amounting to willful misconduct, intentional fraud or criminal conduct.

### 5. *Releases.*

On the Effective Date, the Released Parties shall be deemed to unconditionally and irrevocably release each other from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity or person would have been legally entitled to assert (whether individually or collectively), relating to any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganization Cases, or the Plan, except that (i) no Released Party shall be released from any act or omission that constitutes gross negligence, willful misconduct or fraud as determined by Final Order of a court of competent jurisdiction, and (ii) the foregoing release shall not apply to any express contractual or financial obligations or any right or obligation arising under or that is part of the Plan or an agreement entered into pursuant to, in connection with or contemplated by, the Plan such as the Marina Sale Agreement or the Coastal Cooperation Agreement.  The Released Parties shall be deemed to unconditionally release each of the current officers and directors of the Debtors from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity or person would have been legally entitled to assert (whether individually or collectively), relating to any act or transaction taken by such officer or director in accordance with the terms of the Confirmation Order, this Plan and the transactions contemplated thereby.

34

6.    ***Injunction Related to Releases.***

Upon the Effective Date, the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities (a) released pursuant to the Plan, including but not limited to the Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Sections 10.5 and 10.6 of the Plan, or (b) subject to indemnification, if any, by the Debtors or Reorganized Debtors pursuant to Section 8.5 of the Plan, shall be enjoined.

7.    ***Survival of Indemnification.***

Any obligations of the Debtors pursuant to their corporate charters and bylaws or other organizational documents to indemnify current and former officers and directors of the Debtors with respect to all present and future actions, suits and proceedings against the Debtors or such directors and/or officers, based upon any act or omission for or on behalf of the Debtors shall be deemed and treated as executory contracts to be assumed or rejected by the Debtors under the Plan; provided, however, that prepetition indemnification obligations shall be rejected on the Effective Date.

8.    ***Retention of Causes of Action/Reservation of Rights.***

Nothing contained in the Plan or in the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors or the Reorganized Debtors may have or which the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law or rule, common law equitable principle or other source of right or obligation, including, without limitation, (i) any and all Claims or Causes of Action against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors or representatives; and (ii) the turnover of any property of the Debtors' estates; *provided*, *however*, that this Section 8 shall not apply to any claims released in Section 10.5 of the Plan.

Nothing contained in the Plan or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan. The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such Claims, Causes of Action, rights of setoff and other legal or equitable defenses which they had immediately prior to the Commencement Date fully as if the Reorganization Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Reorganization Cases had not been commenced.

## G.      Miscellaneous Provisions

The Plan also contains provisions relating, but not limited to, vesting of assets, injunction against interference with the Plan, payment of statutory fees, substantial consummation, compliance with tax requirements, severability, revocation and amendment of the Plan, governing law, and timing.  For more information regarding these items, see the Plan attached hereto as Exhibit A.

## IX.

## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF ALLOWED FIRST LIEN LENDER SECURED CLAIMS, GENERAL UNSECURED CLAIMS AND CONVENIENCE CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

## A.      Certain Bankruptcy Considerations

Although the Ad Hoc Committee believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes. Although the Ad Hoc Committee believes that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. In the event the conditions precedent described in section 9.1 of the Plan have not been satisfied or waived (to the extent possible) by the Ad Hoc Committee (as provided for in the Plan) as of the Effective Date, then the Confirmation Order will be vacated, no distributions under the Plan will be made, and the Debtors and all holders of claims and equity interests will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though such Confirmation Date had never occurred.

The Plan provides for no distribution to Classes 7, 8 and 9. The Bankruptcy Code conclusively deems these Classes to have rejected the Plan. Notwithstanding the fact that these Classes are deemed to have rejected the Plan, the Bankruptcy Court may confirm the Plan if at least one impaired class votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class). Thus, for the Plan to be confirmed with respect to each Debtor, Class 3, Class 4 or Class 5 must vote to accept the Plan. As to each impaired class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these classes. The Ad Hoc Committee believes that the Plan satisfies these requirements. For more information, see Section X below.

**B.      Risks to Recovery By Holders of First Lien Lender Secured Claims and General Unsecured Claims**

The ultimate recoveries under the Plan to holders of allowed First Lien Lender Secured Claims and General Unsecured are subject to a number of material risks, including, but not limited to, those specified below.

**1.      *Unforeseen Events.***

Future performance of the Reorganized Debtors is, to a certain extent, subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond their control. While no assurance can be provided, based upon the current level of operations and anticipated increases in revenues and cash flows described in the Projections, the Ad Hoc Committee believes that the Debtors' cash flow from operations and available cash will be adequate to fund the Plan and meet their future liquidity needs.

**2.      *State Gaming Laws and Regulations May Require Holders of the Reorganized Debtors' Debt or Equity Securities to Undergo a Suitability Investigation***

Many jurisdictions require any entity that acquires beneficial ownership of debt or equity securities of a gaming company to apply for qualification or a finding of suitability. Any Entity that has acquired New Common Stock or (or has the right to acquire such securities pursuant to Plan) and that is found unsuitable or unqualified by a state gaming regulator may be required to divest such securities (or may be barred from receiving such securities). Failure to comply with these laws and regulations may be a criminal offense. The Plan provides that New Common Stock will be issued only in compliance with state gaming laws and regulations. In addition, the Amended Organizational Documents for Reorganized TER will provide that Reorganized TER may redeem Reorganized TER securities from holders thereof to ensure compliance with applicable gaming laws and regulations. The failure by a holder of a claim to comply with these laws and regulations may result in such holder not receiving New Common Stock or pursuant to the Plan, or may result in Reorganized TER redeeming such securities. Please see Section III.B to this Disclosure Statement for a further discussion of the consequences of a holder failing to comply with gaming laws and regulations.

**3.      *Small Numbers of Holders or Voting Blocks May Control the Reorganized Debtors***

Consummation of the Plan may result in a small number of holders owning a significant percentage of the shares of the outstanding New Common Stock of Reorganized TER. These holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors and approve significant mergers, other material corporate transactions, or the sale of all or substantially all of the assets of the Reorganized Debtors. The Ad Hoc Committee believes that of the members of the Ad Hoc Committee, Avenue Capital is likely to own more than 15% of the outstanding New Common Stock of Reorganized TER upon consummation of the Plan and is in the process of getting licensed.

4.    *Other Risks.*

A discussion of TER's business risks are set forth in greater detail in the 2008 Form 10-K and the Second Quarter Form 10-Q, each of which is attached hereto as Exhibit C and Exhibit D, respectively.

## X.

### Confirmation of the Plan

## A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a Plan. On, or as promptly as practicable after the Commencement Date, the Ad Hoc Committee will request that the Bankruptcy Code schedule the confirmation hearing. Notice of the confirmation hearing will be provided to all known creditors, equity holders or their representatives. The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a Plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of claims or interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Michael F. Walsh, Esq. and Ted S. Waksman, Esq.) and McCarter & English, LLP, Four Gateway Center, 100 Mulberry Street, Newark, New Jersey 07102 (Attn: Charles A. Stanziale, Jr., Esq. and Joseph Lubertazzi, Jr., Esq.), attorneys for the Debtors, (ii) the Office of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, New Jersey 07102 (Attn: Jeffrey M. Sponder, Esq.), (iii) Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201 (Attn: Charles R. Gibbs, Esq.), attorneys for the Administrative Agent for the First Lien Lenders, (iv) Kasowitz, Benson, Torres & Friedman LLP, 1633 Broadway New York, New York 10019 (Attn: David M. Friedman, Esq. and Adam L. Shiff, Esq.), attorneys for Mr. Trump, (v) Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038 (Attn: Kristopher M. Hansen, Esq.), attorneys for the Ad Hoc Committee, and (v) such other parties as the Bankruptcy Court may order.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**B.      General Requirements of Section 1129**

At the confirmation hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied.

**C.      Best Interests Test**

The Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. Other liquidation costs include the expenses incurred during the Chapter 11 Cases allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals for the Debtors. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims. The Debtors believe that in a chapter 7 liquidation, no prepetition claims or equity interests would receive any distribution of property.

The Debtors have prepared a liquidation analysis (the "***Debtors Liquidation Analysis***") in connection with the disclosure statement for the Insider Plan.  The Ad Hoc Committee refers to the Debtors' Liquidation Analysis for purposes of the Plan.  For information regarding the Debtors' Liquidation Analysis, see Section XI.A of the Insider Disclosure Statement.  The Ad Hoc Committee believes that under the Plan all holders of impaired claims and equity interests will receive property with a value not less than the value such holder would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**D.      Feasibility**

The Bankruptcy Code requires that a proponent demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Ad Hoc Committee has analyzed the Debtors' ability to meet their obligations under the Plan.  As part of this analysis, the Ad Hoc Committee has referred to the projections prepared by the Debtors.  Based upon such projections, the Ad Hoc Committee believes that the Debtors will be able to make all payments required pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  Pursuant to the Ad Hoc Committee's Plan, the Reorganized Debtors will be substantially less leveraged upon their emergence from bankruptcy than under the Insider Plan as a result of the substantial cash

payments to the First Lien Lenders contemplated by the Plan.  As a result, the Ad Hoc Committee believes that the Plan is more feasible than the Insider Plan.

**E.    Section 1129(b)**

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan of reorganization by a class of claims or equity interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

**1.    *No Unfair Discrimination.***

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the plan of reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

**2.    *Fair and Equitable Test.***

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or equity interests in such class:

- *Secured Creditors*. Each holder of an impaired secured claim either (i) retains its liens on the property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the Effective Date, of at least the allowed amount of such claim, or (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof) or (iii) receives the "indubitable equivalent" of its allowed secured claim.

- *Unsecured Creditors*. Either (i) each holder of an impaired unsecured claim receives or retains under the plan of reorganization property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization.

- *Equity Interests*. Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of equity interests that are junior to the equity interests of the dissenting class will not receive any property under the plan of reorganization.

The Ad Hoc Committee believes the Plan will satisfy the "fair and equitable" requirement notwithstanding that Classes 7, 8 and 9 are deemed to reject the Plan because no Class that is junior to such Class will receive or retain any property on account of the equity interests in such Class.  The Ad Hoc Committee also believes that the Plan will satisfy the "fair

and equitable" requirements notwithstanding that Class 3 may vote to reject the Plan because the Plan provides that each holder of a secured claim in Class 3 will retain its liens on the property, to the extent of the allowed amount of its secured claim and will receive deferred cash payments having a value, as of the Effective Date, of at least the allowed amount of such claim, and will otherwise receive the "indubitable equivalent" of such claim.

## XI.

## Alternatives to Confirmation and Consummation of this Plan

### A.    Insider Plan

By order of the Bankruptcy Court dated August 31, 2009, the Debtors' exclusive right to solicit a plan of reorganization was terminated and the Bankruptcy Court has ordered the Insider Plan to be solicited simultaneously with the Ad Hoc Committee's Plan.  Under the Insider Plan, all of the equity of the Reorganized Debtors would be acquired by the First Lien Lenders and Mr. Trump in exchange for a capital contribution of $100 million.  Additionally, holders of Second Lien Notes and other unsecured claims would receive no distribution under the Insider Plan.  By contrast, under the Ad Hoc Committee's Plan, the Debtors would receive $175 million of new equity capital from the proceeds of a rights offering open to holders of unsecured claims, including the holders of Second Lien Notes, who are accredited investors. Additionally, holders of unsecured claims would receive a pro rata share of 5% of the equity of the Reorganized Debtors and creditors who are not entitled to participate in the Rights Offering by virtue of not qualifying as an "accredited investor" would receive a pro rata share of a fixed pool of cash.  Also, under the Ad Hoc Committee's Plan, the First Lien Lenders would receive a substantial cash paydown of their debt, as well as a new debt instrument on substantially the same terms as proposed under the Insider Plan.  Furthermore, the Ad Hoc Committee's Plan contemplates the sale of the Trump Marina, currently a cash drain for the Debtors, and the entry by the Debtors into a cooperation agreement with the Coastal Parties, which will provide that the parties shall coordinate on event and room overflow bookings and certain marketing efforts. Accordingly, the Ad Hoc Committee's plan provides significantly more capital for the Debtors' business operations and results in a significantly less leveraged capital structure than the Insider Plan.  Moreover, the Ad Hoc Committee's Plan provides for a meaningful distribution to creditors who would otherwise receive no distribution under the Insider Plan.

### B.    Liquidation Under Chapter 7

If no chapter 11 plan can be confirmed, the Reorganization Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effect that a chapter 7 liquidation would have on the recoveries of holders of claims is set forth in Section X.D of this Disclosure Statement. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because (a) the likelihood that other assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion, (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, (c) additional expenses

and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations. In a chapter 7 liquidation, the Debtors believe that there would be no distribution to holders of allowed claims in Classes 4A-4J, 5A-5J, 6, 7, 8, 9, and 10 and the distribution to holders of allowed claims in Class 3A-3J would be materially less.

## XII.

### Certain United States Federal Income Tax Consequences of the Plan

The following discussion summarizes certain material U.S. federal income tax consequences expected to result to (i) the Debtors and the Reorganized Debtors, (ii) the First Lien Lenders, (iii) the holders of General Unsecured Claims and (iv) the holders of Convenience Claims (the *"Holders"*). The following summary does not address the U.S. federal income tax consequences to holders whose claims are not impaired (e.g., Other Priority Claims and Other Secured Claims) or to Mr. Trump or ACE Entertainment Holdings, Inc. In addition, the following does not address the U.S. federal income tax consequences to holders of TER Equity Interests and holders of TER Holdings Equity Interests, as they are deemed to reject the Plan. This discussion is based on current provisions of the Tax Code, applicable Treasury regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the *"Service"*). There can be no assurance that the Service will not take a contrary view. No ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to the Holders, the Debtors and the Reorganized Debtors. It cannot be predicted whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to the Holders, the Debtors or the Reorganized Debtors.

The following discussion is for general information only, and does not address the tax consequences to holders of Claims who are not Holders (as defined above). The tax treatment of a Holder may vary depending upon such Holder's particular situation. In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, real estate investment trusts, U.S. persons whose functional currency is not the U.S. dollar, traders that mark-to-market their securities, taxpayers subject to the alternative minimum tax, tax-exempt organizations (including, without limitation, certain pension funds), persons holding an equity interest as part of an integrated constructive sale, hedge, conversion transaction or straddle, pass-through entities and investors in pass-through entities). Furthermore, this summary does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires loans governed by the Amended and Restated Credit Agreement (*"Modified First Lien Loans"*) in the secondary market. This discussion assumes that the First Lien Lender Claims, the Second Lien Note Claims, the New Common Stock and the Modified First Lien Loans are held

as "capital assets" (generally, held for investment) within the meaning of Section 1221 of the Tax Code and that TER Holdings has been and will be treated and taxed as a partnership for U.S. federal income tax purposes. EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR AS TO THE PARTICULAR TAX CONSEQUENCES TO IT OF THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX LAWS.

<u>CIRCULAR 230 NOTICE:</u> TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE PROPONENTS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

- **U.S. Federal Income Tax Consequences to the Debtors**

- ***Cancellation of Indebtedness and Reduction of Tax Attributes.***

The transactions in respect of the General Unsecured Claims (including the First Lien Lender Deficiency Claims and the Second Lien Note Claims) and the Convenience Claims will result in cancellation of indebtedness *("COD")* income and the modification of the First Lien Lender Secured Claims pursuant to the Amended and Restated Credit Agreement may result in COD income if the issue price of the Modified First Lien Loans is less than the adjusted issue price of the First Lien Lender Secured Claims prior to being modified. *See "U.S.* Federal Income Tax Consequences to U.S. Holders—Modification of First Lien Lender Claims," below.

Under Section 108 of the Tax Code, COD income is excluded from income if it occurs in a case brought under the Bankruptcy Code, provided the taxpayer is under the jurisdiction of a court in such case and the cancellation of indebtedness is granted by the court or is pursuant to a plan approved by the court (the "***Bankruptcy Exception***"). Generally, under Section 108(b) of the Tax Code, any COD income excluded from income under the Bankruptcy Exception must be applied against and reduce certain tax attributes of the taxpayer. Unless the taxpayer elects to have such reduction apply first against the basis of its depreciable property, such reduction is first applied against net operating losses ("***NOLs***") of the taxpayer (including NOLs from the taxable year of discharge and any NOL carryover to such taxable year), and then to certain tax credits, capital loss and capital loss carryovers, and tax basis. Any reduction in tax attributes in respect of excluded COD income does not occur until after the determination of the taxpayer's income or loss for the taxable year in which the COD income is realized. Accordingly, assuming the Marina Sale occurs in the same taxable year in which the COD income is realized, such tax attributes should be available to offset or reduce any gain recognized by Reorganized TER on the Marina Sale.

Under Section 108(d)(6) of the Tax Code, when an entity (like TER Holdings) that is taxed as a partnership realizes COD income, its partners are treated as receiving their allocable share of such COD income and the Bankruptcy Exception (and related attribute reduction) is applied at the partner level rather than at the entity level. Accordingly, TER and the other partners of TER Holdings will be treated as receiving their allocable share of the COD income realized by TER Holdings. However, TER will not be required to include in its income any COD income generated by and allocated to it as a result of the implementation of the Plan because the cancellation of indebtedness will occur in a case brought under the Bankruptcy Code and TER will qualify for the Bankruptcy Exception. TER will be required to reduce its tax attributes in an amount equal to the amount of COD income excluded from income under the Bankruptcy Exception. TER currently expects, subject to the discussion in the next paragraph, that COD income resulting from the Plan and allocated to it will be excluded from its income under the Bankruptcy Exception, and, as a result, it will reduce its NOLs by the amount of such COD income. TER does not expect to have sufficient NOLs to fully offset its COD income, and accordingly expects to be required under Section 108(b) of the Tax Code to reduce other tax attributes.

Changes to the Tax Code as a result of the American Recovery and Reinvestment Act of 2009 would permit TER Holdings to elect to defer its partners' inclusion of COD income resulting from the Plan. Subject to certain circumstances where the recognition of COD income is accelerated, the amount of COD income would under that election be includible in the partners' income ratably over a five-taxable year period beginning with the fifth taxable year after the COD income arises. The election to defer COD income would be in lieu of excluding it and reducing NOLs and certain tax attributes as described above. The collateral tax consequences of making such election are complex. The Ad Hoc Committee is currently analyzing whether the deferral election would be advantageous to Reorganized TER.

- ***Section 382 Limitations on NOLs.***

The Plan will trigger an "ownership change" of TER on the Effective Date for purposes of Section 382 of the Tax Code. Consequently, following the Effective Date, any remaining NOL carryforwards and certain other tax attributes (including current year NOLs) of TER allocable under the tax law to periods prior to the Effective Date (collectively, "pre-change losses") will be subject to limitation under Section 382, subject to the following discussion regarding special rules in the context of certain bankruptcy proceedings. Any Section 382 limitations apply in addition to, and not in lieu of, the attribute reduction that results from the COD arising in connection with the Plan.

Under Section 382 of the Tax Code, if a corporation undergoes an ownership change and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. In general, the amount of the annual limitation is equal to the product of (i) the fair market value of the stock of the corporation *immediately before* the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 4.48% for ownership changes occurring in August, 2009). For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value

44

of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change after giving effect to the surrender of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets. An exception to the foregoing annual limitation rules generally applies where qualified creditors and stockholders of a debtor corporation receive, in respect of their claims or shares, at least 50% of both the voting power and the value of the stock of the reorganized debtor pursuant to a confirmed Chapter 11 plan. It is not expected that this exception will be applicable to the ownership change resulting from the Plan.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, or if certain shareholders claim worthless stock deductions and continue to hold their stock in the corporation at the end of the taxable year, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below. Generally, NOL carryforwards expire 20 years after they first arise.

Section 382 of the Tax Code also limits the deduction of certain built-in losses recognized subsequent to the date of the ownership change. If a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built- in" income, gain, loss and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and will be subject to the annual Section 382 limitation. Conversely, if the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to a Service notice, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual Section 382 limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.

Accordingly, the impact of any ownership change depends upon, among other things, the amount of pre-change losses remaining after the use or reduction of attributes due to the COD, the value of both the stock and assets of TER at such time, the continuation of its business and the amount and timing of future taxable income.

- ***Alternative Minimum Tax***

In general, an alternative minimum tax *("AMT")* is imposed on a corporation's alternative minimum taxable income *("AMTI")* at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

45

In addition, if a corporation undergoes an ownership change and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets is generally reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Thus, for tax periods after the Effective Date, Reorganized TER may have to pay AMT regardless of whether it generates a NOL or has sufficient NOL carryforwards to offset regular taxable income for such periods. Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

- **U.S. Federal Income Tax Consequences to U.S. Holders**

For purposes of the following discussion, a "U.S. Holder" is a Holder who or that is or is treated for U.S. federal income tax purposes as (1) an individual that is a citizen or resident of the United States, (2) a corporation or other entity taxable as a corporation created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (3) an estate, the income of which is subject to U.S. federal income tax regardless of its source, or (4) a trust, if a U.S. court can exercise primary supervision over the administration of the trust and one or more U.S. persons can control all substantial trust decisions, or, if the trust was in existence on August 20, 1996, and it has validly elected to continue to be treated as a U.S. person.

- ***Modification of First Lien Lender Secured Claims.***

The modification of the terms of a debt instrument will be treated, for U.S. federal income tax purposes, as a "deemed" exchange of the old debt instrument for a new debt instrument if such modification is a "significant modification" under applicable Treasury regulations. In general, a modification is a "significant modification" if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered are economically significant. Under the Treasury Regulations, a modification that adds, deletes or alters customary accounting or financial covenants is, without more, not a significant modification.

Treasury regulations provide that a change in the yield of a debt instrument is a significant modification if the yield on the modified instrument varies from the annual yield on the unmodified instrument (determined as of the date of the modification) by more than the greater of 25 basis points or five percent of the annual yield of the unmodified instrument. Also, a modification that changes the timing of payments due under a debt instrument is a significant modification if it results in the material deferral of scheduled payments. The materiality of the deferral depends on all the facts and circumstances, including the length of the deferral, the original term of the instrument, the amounts of the payments that are deferred and the time period between the modification and the actual deferral of payments.

The Ad Hoc Committee believes, and the remainder of this discussion assumes, that the modification of the First Lien Lender Secured Claims pursuant to the Amended and

Restated Credit Agreement constitutes a "significant modification" and thus results in a deemed exchange of the First Lien Lender Secured Claims. In addition, the Ad Hoc Committee believes, and the remainder of this discussion assumes, that any cash received in respect of a First Lien Lender Secured Claim should be treated as a payment of principal occurring immediately prior to the deemed exchange and not as a consideration received in the deemed exchange.  If a contrary position with respect to either of these two items is successfully asserted by the Service, the U.S. federal income tax consequences of the modification of the First Lien Lender Secured Claims could materially differ from those described below. Each U.S. Holder should consult its own tax advisor with respect to the correctness of the Ad Hoc Committee's positions and the tax consequences of the modification of the First Lien Lender Secured Claims if those positions are not correct.

*Fully Taxable Exchange*. The deemed exchange of the First Lien Lender Secured Claims will be treated as a fully taxable transaction. Accordingly, the exchanging U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the fair market value of the equity interests of TCI 2, if any, plus the "issue price" of the Modified First Lien Loans received (other than in respect of accrued but unpaid interest and possibly accrued original issue discount ("*OID*")) (*see* "—Ownership and Disposition of the Modified First Lien Loans—Stated Interest and Original Issue Discount," below) and (ii) the U.S. Holder's adjusted tax basis in the First Lien Lender Secured Claims exchanged (other than any basis attributable to accrued but unpaid interest and possibly accrued OID). *See* "—Character of Gain or Loss," below. In addition, a U.S. Holder will have interest income to the extent of any consideration allocable to accrued but unpaid interest not previously included in income. *See* "—Payment of Accrued Interest," below.  The exchanging U.S. Holder should consult his or her own tax advisor regarding the possible application of the installment method of accounting under Section 453 of the Tax Code to any gain that the U.S. Holder realizes on the deemed exchange.

Generally, assuming no prior bad debt deduction has been claimed, a U.S. Holder's adjusted tax basis in a First Lien Lender Secured Claim will be equal to the cost of the Claim to such U.S. Holder, increased by any OID previously included in income (but *see* "—Payment of Accrued Interest," below, regarding the possible treatment of accrued OID). If applicable, a U.S. Holder's tax basis in a First Lien Lender Secured Claim will also be (i) increased by any market discount previously included in income by such U.S. Holder pursuant to an election to include market discount in gross income currently as it accrues, and (ii) reduced by any cash payments received on the First Lien Lender Secured Claim (including any cash payments received pursuant to the Plan) other than payments of "qualified stated interest," and by any amortizable bond premium that the U.S. Holder has previously deducted.

A U.S. Holder's tax basis in the Modified First Lien Loans received will equal the issue price of such instruments, and its tax basis in the equity interests of TCI 2 will equal the fair market value of such equity, if any. The U.S. Holder's holding period in the Modified First Lien Loans and equity interests of TCI 2 should begin on the day following the exchange date.

*Character of Gain or Loss*.  Where gain or loss is recognized by a U.S. Holder in respect of the deemed exchange of the First Lien Lender Secured Claims, unless the U.S. Holder previously claimed a bad debt deduction with respect to such Claim and subject to the discussion

47

below in "—Payment of Accrued Interest," such gain or loss generally will be capital gain or loss except to the extent any gain is recharacterized as ordinary income pursuant to the market discount rules discussed below. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital losses is subject to significant limitations.

A U.S. Holder that purchased its First Lien Lender Secured Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount. The *de minimis* amount is equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity. Generally, qualified stated interest is a stated amount of interest payable in cash at least annually.

Under these market discount rules, any gain recognized on the deemed exchange of First Lien Lender Secured Claims generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. Holder, on a constant interest basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued. If a U.S. Holder did not elect to include market discount in income as it accrued and thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its First Lien Lender Secured Claims, such deferred amounts would become fully deductible at the time of the exchange.

***Payment of Accrued Interest***.  In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest or OID was previously included in its gross income and is not paid in full. However, the Service has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly it is also unclear whether, by analogy, a U.S. Holder would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that consideration received in respect of a Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest (in contrast, for example, to a pro rata allocation of a portion of the consideration received between principal and interest, or an allocation first to accrued but unpaid interest). *See* Section 6.10 of the Plan. There is no assurance that the Service will respect such allocation for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest and accrued OID for U.S. federal income tax purposes.

- ***Ownership and Disposition of the Modified First Lien Loans.***

   ***Stated Interest, OID and Issue Price.*** A U.S. Holder of Modified First Lien Loans will be required to include stated interest on the Modified First Lien Loans in income in accordance with the U.S. Holder's regular method of accounting to the extent such stated interest is "qualified stated interest." Stated interest generally is "qualified stated interest" if it is unconditionally payable in cash at least annually. Subject to the application of the option rule discussed below, the stated interest payable on the Modified First Lien Loans should be qualified stated interest.

   A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than qualified stated interest.

   The "issue price" of the Modified First Lien Loans depends on whether, at any time during the 60-day period ending 30 days after the exchange date, the Modified First Lien Loans are traded on an "established market" or the First Lien Lender Secured Claims exchanged for the Modified First Lien Loans are traded on an established market. Pursuant to applicable Treasury regulations, an "established market" need not be a formal market. It is sufficient that the Modified First Lien Loans or First Lien Lender Secured Claims appear on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions. Also, under certain circumstances, debt is considered to be traded on an established market when price quotations for such debt are readily available from dealers, brokers or traders.

   If the Modified First Lien Loans or the First Lien Lender Secured Claims are treated for U.S. federal income tax purposes as traded on an established market, the issue price of the Modified First Lien Loans will equal the fair market value of such loans on the Effective Date. In such event, a Modified First Lien Loan will be treated as issued with OID to the extent that its issue price is less than its stated redemption price at maturity. Depending on the fair market value of the Modified First Lien Loans, the total amount of OID could be substantial.

   If neither the Modified First Lien Loans nor the First Lien Lender Secured Claims are traded on an established market, the issue price for the Modified First Lien Loans should be the stated redemption price at maturity of the Modified First Lien Loans.

   It is uncertain whether the First Lien Lender Secured Claims are, or whether the Modified First Lien Loans will be, traded on an established market. TER Holdings, however, intends to treat the Modified First Lien Loans as having an issue price equal to their stated redemption price at maturity. In general, TER Holding's determination of issue price will be binding on all holders of Claims, other than a holder that explicitly discloses its inconsistent treatment in a statement attached to its timely filed tax return for the taxable year in which the deemed exchange occurs. There can be no assurance, however, that the IRS will not successfully assert a contrary position. If, contrary to TER Holding's intended treatment, the Modified First Lien Loans are treated as issued with OID, a U.S. Holder of a Modified First Lien Loan will be

subject to the rules governing OID. Unless otherwise indicated, the remainder of this discussion assumes that the Modified First Lien Loans are not issued with OID.

The terms of the Modified First Lien Loans provide for certain deferrals of principal and interest payments based on available cash flow, which deferred amounts would accrue interest at a higher interest rate than the regular interest rate on the Modified First Lien Loans. Additionally, Reorganized TER Holdings generally has the unconditional option to prepay the Modified First Lien Loans at any time without premium or penalty. For purposes of initially determining the yield and maturity of the Modified First Lien Loans under applicable Treasury Regulations, Reorganized TER Holdings will be deemed to exercise or not exercise this option in a manner that minimizes the yield on the Modified First Lien Loans. Accordingly, Reorganized TER Holdings should be deemed for these purposes to exercise its option to prepay the Modified First Lien Loans in full immediately before any deferral of a principal or interest payment on the Modified First Lien Loans, and not to exercise its option to prepay the Modified First Lien Loans in part or in full on earlier dates. If Reorganized TER Holdings does not in fact exercise its option to prepay the Modified First Lien Loans in full at that time, a U.S. Holder's OID calculation for future periods will be adjusted by treating the Modified First Lien Loans as if they had been retired and then reissued for an amount equal to their adjusted issue price at that time and re-calculating the total amount of OID and yield to maturity of the reissued Modified First Lien Loans (taking into account the application of the option rule under the applicable Treasury regulations discussed above).

The rules regarding the determination of issue price and OID are complex, and the OID rules described above may not apply in all cases. **Additionally, it is possible that the option rule discussed above may not be applicable to the Modified First Lien Loans, in which case the Modified First Lien Loans might be subject to special rules governing contingent payment debt instruments** *("CPDI")*. While TER Holdings intends to take the position that the Modified First Lien Loans are not subject to the CPDI rules, the IRS may successfully assert a contrary conclusion. Accordingly, you should consult your own tax advisor regarding the determination of the issue price of the Modified First Lien Loans and the possible application of the OID and CPDI rules.

*Sale, Redemption or Repurchase*. U.S. Holders generally will recognize capital gain or loss upon the sale, redemption or other taxable disposition of Modified First Lien Loans in an amount equal to the difference between the U.S. Holder's adjusted tax basis in the Modified First Lien Loans and the sum of the cash plus the fair market value of any property received from such disposition (other than amounts attributable to accrued but unpaid stated interest on the Modified First Lien Loans, which will be taxable as ordinary income for U.S. federal income tax purposes to the extent not previously so taxed). Generally, a U.S. Holder's adjusted tax basis in a Modified First Lien Loan will be equal to its initial tax basis (as determined above), increased by any OID previously included in income, and reduced by any cash payments received on the Modified First Lien Loan other than payments of "qualified stated interest."

The gain or loss generally will be treated as capital gain or loss. Any capital gain or loss generally should be long-term if the U.S. Holder's holding period for its Modified First Lien Loans is more than one year at the time of disposition. A reduced tax rate on long-term

capital gain may apply to non-corporate U.S. Holders. The deductibility of capital loss is subject to significant limitations. If the Modified First Lien Loans were treated as CPDI, any gain would be ordinary income and not capital gain, and in certain circumstances all or a portion of any loss may be treated as ordinary loss.

- ***Satisfaction of General Unsecured Claims.***

Pursuant to the Plan, holders of General Unsecured Claims will receive in satisfaction of their claims a combination of New Common Stock and either cash or Subscription Rights, depending on whether the holder of the General Unsecured Claim is an accredited investor. Accordingly, each U.S. Holder of General Unsecured Claims generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the "amount realized" by such U.S. Holder in satisfaction of its claims (other than any consideration received in respect of accrued but unpaid interest (*see* "—Modification of First Lien Lender Secured Claims—Payment of Accrued Interest," above)) and (ii) the U.S. Holder's adjusted tax basis in the General Unsecured Claims surrendered. Generally, the "amount realized" by a U.S. Holder will equal the sum of the fair market value of the New Common Stock plus the fair market value of any Subscription Rights or the amount of cash, as applicable, received.

***Character of Gain or Loss.*** Where gain or loss is recognized by a U.S. Holder in respect of its General Unsecured Claims, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the General Unsecured Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether the General Unsecured Claim was acquired at a market discount and whether and to what extent the U.S. Holder had previously claimed a bad debt deduction (*see* "—Modification of First Lien Lender Secured Claims—Character of Gain or Loss," above).

***Basis and Holding Period.*** In general, a U.S. Holder's aggregate tax basis in any New Common Stock and, if applicable, Subscription Rights received in respect of a General Unsecured Claim will equal the fair market value of such New Common Stock and Subscription Rights and its holding period in any such New Common Stock and Subscription Rights will begin on the day following the issuance of such property.

***Alternative Characterization.*** Notwithstanding the foregoing, it is possible that the Service may attempt to characterize the receipt of New Common Stock and Subscription Rights or cash, as applicable, as part of a non-recognition transaction. If such a characterization were successfully asserted by the Service, U.S. Holders would not be permitted to recognize any loss on the satisfaction of their General Unsecured Claims and would only be required to recognize gain to the extent of the fair market value of any non-stock consideration (e.g., cash or Subscription Rights) received. In such event, each U.S. Holder generally would have an aggregate tax basis in the New Common Stock received equal to its adjusted tax basis in the General Unsecured Claims surrendered, decreased by the fair market value of any non-stock consideration received and increased by any gain recognized in the transaction. In addition, a U.S. Holder's holding period in New Common Stock generally would include its holding period in the General Unsecured Claims surrendered. Each U.S. holder is urged to consult its own tax

51

advisor regarding the proper characterization of the receipt of New Common Stock and either cash or Subscription Rights, as applicable, in satisfaction of its General Unsecured Claims.

- ***Satisfaction of Convenience Claims.***

The U.S. federal income tax consequences of the Plan to holder of Convenience Claims generally will be the same as that described above with respect to holders of General Unsecured Claims

- ***Receipt of Backstop Stock.***

The receipt of the Backstop Stock by the Backstop Parties should be treated as consideration received for entering into the Backstop Agreement.  Accordingly, each U.S. Holder that receives Backstop Stock should include in income the fair market value of the Backstop Stock it receives.

- ***Exercise or Lapse of Subscription Rights.***

A U.S. Holder of Subscription Rights generally will not recognize gain or loss upon the exercise of such Subscription Rights.  A U.S. Holder's tax basis in any New Common Stock received upon exercise of a Subscription Right generally will equal the sum of (i) the holder's tax basis in the Subscription Right (which for this purpose should equal the fair market value of the Subscription Right (see, "—Satisfaction of General Unsecured Claims—Basis and Holding Period")) and (ii) the amount paid for the New Common Stock.  A U.S. Holder's holding period in any New Common Stock received upon exercise of a Subscription Right generally will begin on the day following its acquisition.

Upon the lapse of a Subscription Right, a U.S Holder generally would recognize a short-term capital loss in an amount equal to its tax basis in the Subscription Right.

- ***Ownership and Disposition of New Common Stock.***

***Distributions.***  Distributions, if any, paid on the New Common Stock, to the extent made from the current or accumulated earnings and profits of Reorganized TER, as determined for United States federal income tax purposes, will be treated as dividends and included in income by a U.S. Holder when received or accrued in accordance with such U.S. Holders method of accounting.  Distributions in excess of such amount will first be treated as a non-taxable return of capital that reduces the U.S. Holder's tax basis in the New Common Stock, and thereafter as taxable gain from the sale or exchange of the New Common Stock.  Taxable distributions received by certain non-corporate taxpayers, including individuals, prior to January 1, 2011 generally will be taxed at a maximum rate of 15%.  Taxable distributions received on or after January 1, 2011 will be subject to tax at ordinary income tax rates.  Taxable distributions made to corporate holders may qualify for the dividends received deduction.

***Sale, Exchange or Other Disposition.***  A U.S. holder that disposes of its New Common Stock by sale, exchange or other disposition generally will recognize taxable gain or loss in an amount equal to the difference between (i) the amount of cash and the fair market value of other property received in exchange for the New Common Stock and (ii) the U.S.

Holder's tax basis in the New Common Stock.  Any such gain generally will be treated as ordinary income to the extent of (a) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to the Second Lien Note Claim for which New Common Stock was received and any ordinary loss deductions incurred upon satisfaction of the Second Lien Note Claim, less any income (other than interest income) recognized by the U.S. Holder upon satisfaction of the Second Lien Note Claim, (b) with respect to a cash-basis U.S. Holder, any amounts which would have been included in its gross income if the U.S. Holder's Second Lien Note Claim had been satisfied in full but which was not included by reason of the cash method of accounting and (c) any accrued market discount that was not previously included in income.  Any gain in excess of such amounts and any loss generally will be treated as capital gain or loss.  The maximum United States federal income tax rate on capital gains realized by certain non-corporate taxpayers, including individuals, generally is 15% for capital assets held for more than one year and disposed of prior to January 1, 2011.  Capital gains on the sale of capital assets held for one year or less are subject to United States federal income tax at ordinary income rates.  The deductibility of capital losses is subject to limitations.

- *Section 754 Election*

The Tax Code provides for adjustments to the basis of partnership property upon distributions (including a deemed distribution as a result of a decrease in a partner's share of partnership liabilities) of partnership property to a partner provided that the partnership has made the election set forth in Section 754 of the Tax Code.  Under those rules, a partnership generally will increase the basis of its property by the amount of any gain recognized by the distributee partner as a result of the distribution.

Pursuant to the Plan, the equity interests of certain limited partners of TER Holdings will be cancelled resulting in a deemed distribution to those partners, which may require the affected partners to recognize gain.  If the Debtors conclude that the affected partners will be required to recognize gain, TER Holdings will likely make the election set forth in Section 754 of the Tax Code and increase its basis in its property by the amount of such gain.

- *Backup Withholding and Information Reporting.*

A U.S. Holder may be subject to backup withholding at the applicable tax rate (currently 28%) with respect to payments of interest (including accruals of OID), dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the Modified First Lien Loans or the New Common Stock, unless such U.S. Holder (x) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact or (y) provides a correct taxpayer identification number ("*TIN*") on Service Form W-9 (or a suitable substitute form), certifies as to no loss of exemption from backup withholding and complies with applicable requirements of the backup withholding rules. An otherwise exempt U.S. Holder may be subject to backup withholding if, among other things, the U.S. Holder (i) fails to properly report payments of interest and dividends or (ii) in certain circumstances, has failed to certify, under penalty of perjury, that such U.S. Holder has furnished a correct TIN. U.S. Holders that do not provide a correct TIN may also be subject to penalties imposed by the Service.

53

Backup withholding is not an additional tax. Rather, the amount of tax withheld will be credited against the U.S. federal income tax liability of persons subject to backup withholding. If withholding results in an overpayment of U.S. federal income taxes, a U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for refund with the Service.

The Reorganized Debtors (or their paying agent) may be obligated to provide information statements to the Service and to U.S. Holders who receive payments (except with respect to U.S. Holders that are exempt from the information reporting rules, such as corporations). Each U.S. Holder should consult its own tax advisor regarding its qualification for exemption from backup withholding and information reporting and the procedures for obtaining such exemption.

- ***Reportable Transactions.***

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Each U.S. Holder is urged to consult its own tax advisor regarding these regulations and whether the transactions occurring pursuant to the Plan would be subject to these regulations and require disclosure on its tax return.

THE FOREGOING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. ACCORDINGLY, EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN AND THE APPLICATION OF U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS.

**Conclusion**

The Ad Hoc Committee believes the Plan is in the best interests of all creditors and urges the holders of impaired claims in Classes 3, 4 and 5 to vote to accept the Plan and to evidence such acceptance by returning their Ballots.

Dated: August 31, 2009
New York New York, New Jersey

Respectfully submitted,

**LOWENSTEIN SANDLER PC**

By: _/s/ Jeffrey D. Prol_____
Kenneth A. Rosen
Jeffrey D. Prol
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone:  973-597-2500
Facsimile:  973-597-2400
Email: krosen@lowenstein.com
        jprol@lowenstein.com

**STROOCK & STROOCK & LAVAN LLP**
Kristopher M. Hansen
Curtis C. Mechling
Erez E. Gilad
Sayan Bhattacharyya
180 Maiden Lane
New York, New York 10038
Telephone:  212-806-5400
Facsimile:  212-806-6006
Email: khansen@stroock.com
        cmechling@stroock.com
        egilad@stroock.com
        sbhattacharyya@stroock.com

On behalf of the Ad Hoc Committee of Holders of 8.5% Senior Secured Notes Due 2015