UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-2(c)**

**McCARTER & ENGLISH, LLP**
Charles A. Stanziale, Jr.
Joseph Lubertazzi, Jr.
Lisa S. Bonsall
Jeffrey T. Testa
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444
Facsimile: (973) 624-7070
Email: cstanziale@mccarter.com
        jlubertazzi@mccarter.com
        lbonsall@mccarter.com
        jtesta@mccarter.com

*Counsel for Debtors and Debtors in Possession*

**WEIL, GOTSHAL & MANGES LLP**
Michael F. Walsh
Philip Rosen
Ted S. Waksman
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: michael.walsh@weil.com
        philip.rosen@weil.com
        ted.waksman@weil.com

*Co-Counsel for Debtors and Debtors in Possession*

In re:

TCI 2 HOLDINGS, LLC, et al.,

Debtors.

Chapter 11
Case No.: 09-13654 (JHW)

(Jointly Administered)

**Hearing Date: October 7, 2009 10:00 a.m.**

**SECOND AMENDED AND RESTATED DISCLOSURE STATEMENT FOR
DEBTORS' JOINT PLAN UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

TABLE OF CONTENTS

**Page**

I.   Introduction ................................................................................................. 1

II.  Treatment of Holders of Claims and Equity Interests Under the Plan ........................... 3

     A.   Overview and Summary of the Plan ................................................................ 3

     B.   Summary of Classification and Treatment ........................................................ 4

     C.   Description of Unclassified Claims ................................................................ 5

     D.   Description of Classified Claims .................................................................... 5

          1.   Other Priority Claims (Class 1A-1J) .................................................... 5

          2.   Other Secured Claims (Class 2A-2J) ................................................... 5

          3.   First Lien Lender Claims (Class 3A-3J) ............................................... 6

          4.   Second Lien Note Claims (Class 4A-4E) .............................................. 6

          5.   Intercompany Claims (Class 5) ........................................................... 7

          6.   Section 510(b) Claims (Class 6) .......................................................... 7

          7.   General Unsecured Claims of the Debtors (Class 7) .............................. 7

          8.   Equity Interests in TER (Class 8) ........................................................ 7

          9.   Equity Interests in TER Holdings (Class 9) ......................................... 7

          10.  Subsidiary Equity Interests (Class 10) ................................................ 7

III. Transactions to be Consummated Under the Plan and Certain Corporate and
     Securities Laws Matters ................................................................................. 7

     A.   Restructuring Transactions ........................................................................... 7

          1.   The Purchase Agreement ..................................................................... 8

          2.   The Amended and Restated Credit Agreement .................................... 10

          3.   Issuance of New Common Stock ........................................................ 10

          4.   Waivers ............................................................................................. 10

     B.   Conditions Precedent ................................................................................ 10

     C.   Related Agreements ................................................................................... 12

          1.   The Trademark License Agreement .................................................... 12

          2.   The Trademark Security Agreement ................................................... 15

          3.   The Value Enhancement Agreement ................................................... 15

          4.   The Amended and Restated Services Agreement ................................ 17

     D.   Corporate Action ...................................................................................... 18

     E.   Securities Law Matters .............................................................................. 18

IV.  Voting Procedures and Requirements ................................................................ 18

     A.   Vote Required for Acceptance by a Class ..................................................... 19

     B.   Classes Not Entitled to Vote ...................................................................... 19

C.       Voting ........................................................................................................... 19

V.    Financial Information, Projections, Marketing Eforts, and Valuation Analysis ............ 20

A.       Introduction ................................................................................................. 20

B.       Operating Performance ................................................................................. 20

C.       Projections ................................................................................................... 20

         1.       Unaudited Projected Statement of Operations ..................................... 23

         2.       Unaudited Projected Balance Sheets .................................................... 24

         3.       Unaudited Projected Cash Flow Statements ......................................... 25

         4.       Notes to Statement of Operations ........................................................ 26

                  (i)       Approach ................................................................................. 26

                  (ii)      Revenues ................................................................................. 26

                  (iii)     Costs and Expenses ................................................................. 26

                  (iv)      Interest Expense ...................................................................... 27

                  (v)       Income Taxes .......................................................................... 27

         5.       Notes to Balance Sheets and Cash Flow Statements ............................ 27

D.       Marketing Efforts ........................................................................................ 28

E.       Valuation ..................................................................................................... 29

         1.       Introduction ........................................................................................ 29

         2.       Total Enterprise Value ........................................................................ 30

                  (i)       Description of Approach .......................................................... 30

                  (ii)      Valuation Implications of Marina ........................................... 31

VI.   General Information ................................................................................................ 32

A.       Description of Debtors ................................................................................. 32

         1.       Corporate Structure and Business ........................................................ 32

         2.       History and Prior Bankruptcy Proceedings ........................................... 33

B.       Prepetition Capital Structure of the Debtors ................................................. 34

C.       Events Leading to the Commencement of the Chapter 11 Cases ..................... 35

         1.       Competition ........................................................................................ 36

         2.       Regulatory and Licensing ..................................................................... 36

         3.       Default Under the Second Lien Notes and Negotiations with
                  Noteholder Advisors ............................................................................ 36

         4.       The Florida Litigation and Pending Sale of the Trump Marina
                  Casino .................................................................................................. 37

         5.       Mr. Trump's Abandonment of his Limited Partnership Interests
                  in TER Holdings ................................................................................... 38

         6.       Examiner .............................................................................................. 39

| | | | | |
|---|---|---|---|---|
| VII. | Governance | | | 39 |
| | A. | Current Board of Directors, Management and Executive Compensation | | 39 |
| | B. | Board of Directors of New General Partner | | 39 |
| | C. | Officers of Reorganized TER | | 39 |
| | D. | Continued Corporate Existence | | 40 |
| VIII. | Other Aspects of the Plan | | | 40 |
| | A. | Plan Supplement | | 40 |
| | B. | Distributions | | 41 |
| | | 1. | Timing and Conditions of Distributions | 41 |
| | | | (i)   Distribution Record Date | 41 |
| | | | (ii)   Postpetition Interest on Claims | 41 |
| | | | (iii)   Date of Distributions | 41 |
| | | | (iv)   Disbursing Agent | 41 |
| | | | (v)   Powers of Disbursing Agent | 41 |
| | | | (vi)   Surrender of Instruments | 42 |
| | | | (vii)   Delivery of Distributions | 42 |
| | | | (viii)   Manner of Payment Under the Plan | 42 |
| | | | (x)   Setoffs | 42 |
| | | | (xi)   Distributions After the Effective Date | 43 |
| | | | (xii)   Allocations of Principal Between Principal and Interest | 43 |
| | | 2. | Procedures for Treating Disputed Claims Under the Plan | 43 |
| | | | (i)   Disputed Claims | 43 |
| | | | (ii)   Distributions Relating to Disputed Claims | 43 |
| | | | (iii)   Distributions after Allowance | 43 |
| | | | (iv)   Estimation of Claims | 44 |
| | | | (v)   Objections to Claims | 44 |
| | | | (vi)   Payments and Distributions with Respect to Disputed Claims | 44 |
| | | | (vii)   Preservation of  Rights to Settle Claims | 44 |
| | | | (viii)   Disallowed Claims | 45 |
| | C. | Treatment of Executory Contracts and Unexpired Leases | | 45 |
| | | 1. | Contracts and Leases Not Expressly Rejected Are Assumed | 45 |
| | | 2. | Cure of Defaults | 45 |
| | | 3. | Rejection Claims | 45 |

|   | 4. | Assignment | 46 |
|   | 5. | Survival of the Debtors' Indemnification Claims | 46 |
|   | 6. | Assumption of Trademark License Agreement | 46 |
|   | 7. | Insurance Policies | 46 |
|   | 8. | Casino Property Leases | 46 |
| D. | | Effect of Confirmation | 47 |
|   | 1. | Vesting of Assets | 47 |
|   | 2. | Discharge of Claims and Termination of Equity Interests | 47 |
|   | 3. | Term of Injunctions or Stays | 47 |
|   | 4. | Exculpation | 48 |
|   | 5. | Mutual Releases | 48 |
|   | 6. | Injunction Related to Releases | 48 |
|   | 7. | Survival of Indemnification | 49 |
|   | 8. | Retention of Causes of Action/Reservation of Rights | 50 |
| E. | | Miscellaneous Provisions | 50 |
| IX. | | CERTAIN RISK FACTORS TO BE CONSIDERED | 50 |
| A. | | Certain Bankruptcy Considerations | 50 |
| B. | | Risks to Recovery By Holders of First Lien Lender Claims and Equity Interests of TER Holdings | 51 |
|   | 1. | Variances from Projections | 51 |
|   | 2. | Unforeseen Events | 51 |
|   | 3. | Other Risks | 52 |
| C. | | Reorganized TER May Fail to Meet All Conditions Precedent to the Purchase Agreement and Amended and Restated Credit Agreement | 52 |
| X. | | Confirmation of the Plan | 52 |
| A. | | Confirmation Hearing | 52 |
| B. | | General Requirements of Section 1129 | 53 |
| C. | | Best Interests Test | 53 |
| D. | | Liquidation Analysis | 53 |
| E. | | Feasibility | 54 |
| F. | | Section 1129(b) | 54 |
|   | 1. | No Unfair Discrimination | 55 |
|   | 2. | Fair and Equitable Test | 55 |
| XI. | | Alternatives to Confirmation and Consummation of this Plan | 55 |
| A. | | Liquidation Under Chapter 7 | 55 |

B.    Alternative Plan ................................................................................... 56

XII.    Certain Federal Income Tax Consequences of the Plan  ................................................. 57

A.    U.S. Federal Income Tax Consequences to the Debtors .................................... 59

1.    Cancellation of Indebtedness and Reduction of Tax Attributes ............ 59

2.    Section 328 Limitations on NOLs ........................................................ 60

3.    Alternative Minimum Tax ..................................................................... 61

B.    U.S. Federal Income Tax Consequences to U.S. Holders ................................. 61

1.    Modification of First Lien Lender Claims ............................................ 61

2.    Satisfaction of Second Lien Note Claims .............................................. 62

3.    Character of Gain or Loss ..................................................................... 63

4.    Payment of Accrued Interest ................................................................. 63

5.    Ownership and Disposition of the Modified First Lien Loans .............. 64

6.    Backup Withholding and Information Reporting ................................... 66

7.    Reportable Transactions ........................................................................ 66

XIII.    Conclusion ....................................................................................................................... 67

Exhibit A: Plan of Reorganization
Exhibit B: Purchase Agreement
Exhibit C: Terms of Amended and Restated Credit Agreement
Exhibit D: Annual Report on Form 10-K for the fiscal year ended December 31, 2008
Exhibit E: Quarterly Report on Form 10-Q for the quarter ended June 30, 2009
Exhibit F: Liquidation Analysis

# GLOSSARY

The terms in the following table are used in this Disclosure Statement and are the same as, or plain English summaries of, those used in the Plan. Please refer to the Plan for the complete definition of these terms. Capitalized terms used in this Disclosure Statement, and not otherwise defined herein, have the meaning ascribed to them in the Plan.

| | |
|---|---|
| *Ad Hoc Committee* | The ad hoc committee of certain holders of Second Lien Notes represented by Stroock & Stroock & Lavan LLP and Lowenstein Sandler PC. |
| *Administrative Agent* | Beal Bank, as administrative agent, under the First Lien Credit Agreement. |
| *Administrative Expense Claim* | Any expense incurred after the commencement of Chapter 11 Cases and related to their administration or the operation of the Debtors' business. |
| *Agents* | Means the Administrative Agent and Collateral Agent. |
| *Amended and Restated Credit Agreement* | Means that certain amended and restated First Lien Credit Agreement to be dated as of the Effective Date, among Reorganized TER Holdings, certain subsidiaries of Reorganized TER Holdings, as guarantors, the Administrative Agent and the First Lien Lenders, in the form attached as an exhibit to that certain commitment letter dated August 3, 2009 from Beal Bank and Beal Bank Nevada to TER Holdings (the "Beal Commitment Letter"). |
| *Amended Organizational Documents* | The amended and/or restated certificate of incorporation or formation, the amended and/or restated bylaws and/or such other applicable amended and/or restated organizational document (including any limited liability company operating agreement or partnership agreement) of Reorganized TER and Reorganized TER Holdings and of the other Reorganized Debtors, each in form and substance acceptable to the First Lien Lenders and Mr. Trump. |
| *Bankruptcy Code* | Title 11 of the United States Code. |
| *Bankruptcy Court* | The United States Bankruptcy Court for the District of New Jersey having jurisdiction over the Chapter 11 Cases. |
| *Bankruptcy Rules* | The Federal Rules of Bankruptcy Procedure. |
| *BNAC* | Means BNAC, Inc., a Texas corporation, and a direct or indirect wholly-owned subsidiary of Beal Bank Nevada. |
| *Business Day* | Any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or permitted to close by law or executive order. |
| *Chapter 11 Cases* | The jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on February 17, 2009, in the Bankruptcy Court and styled *In re TCI 2 Holdings, LLC, et al.,* 09-13654 (JHW) (Jointly Administered). |
| *Class* | Any group of claims or equity interests classified in the Plan. |
| *Collateral Agent* | Means Beal Bank, as collateral agent under the First Lien Credit Agreement. |
| *Commencement Date* | February 17, 2009. |
| *Confirmation Date* | Means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order. |
| *Confirmation Order* | Means the order of the Bankruptcy Court confirming the Plan as to each of the Debtors pursuant to section 1129 of the Bankruptcy Code. |
| *Debtors* | TCI 2; TER; TER Holdings; Trump Entertainment Resorts Funding, Inc.; Trump Entertainment Resorts Development Company, LLC; Trump Taj Mahal Associates, |

|  | LLC, d/b/a Trump Taj Mahal Casino Resort; Trump Plaza Associates, LLC, d/b/a Trump Plaza Hotel and Casino; Trump Marina Associates, LLC, d/b/a Trump Marina Hotel Casino; TER Management Co., LLC; and TER Development Co., LLC. |
|---|---|
| *Debtor Subsidiaries* | The Debtors, other than TER, TCI 2 and TER Holdings. |
| *Disbursing Agent* | Any entity (including any applicable Debtor if it acts in such capacity) in its capacity as a disbursing agent as set forth in the Plan. |
| *Disclosure Statement* | This document together with the annexed exhibits and schedules. |
| *Disputed Claims* | Any Claim which has not been Allowed pursuant to the Plan or a final order of the Bankruptcy Court, and:

(a) if no proof of claim has been filed by the applicable deadline: (i) a Claim that has been or hereafter is listed on the schedules as disputed, contingent or unliquidated; or (ii) a Claim that has been or hereafter is listed on the schedules as other than disputed, contingent or unliquidated, but as to which the Debtors or Reorganized Debtors or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a final order of the Bankruptcy Court; or

(b) if a proof of claim or request for payment of an Administrative Expense Claim has been filed by the applicable deadline: (i) a Claim for which no corresponding Claim has been or hereafter is listed on the schedules; (ii) a Claim for which a corresponding Claim has been or hereafter is listed on the schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted in the proof of claim varies from the nature and amount of such Claim as listed on the schedules; (iii) a Claim for which a corresponding Claim has been or hereafter is listed on the schedules as disputed, contingent or unliquidated; or (iv) a Claim for which a timely objection or request for estimation is interposed by the Debtors, the Reorganized Debtors or any other party in interest which has not been withdrawn or determined by a final order of the Bankruptcy Court. |
| *Distribution Record Date* | Five Business Days prior to the Confirmation Date. |
| *Effective Date* | Means a Business Day on or after the Confirmation Date selected by the Debtors on which the conditions to the effectiveness of the Plan specified in Section 9 hereof have been satisfied or waived; *provided, however,* that: (a) the Effective Date shall be no later than (i) the First Closing Date (as defined in the Purchase Agreement) or (ii) the fifth Business Day after such conditions have been satisfied or waived; and (b) the day that follows consecutively and immediately after the Effective Date shall be a Business Day. |
| *Equity Interests* | Means any equity security (as defined in section 101(16) of the Bankruptcy Code) or general or limited partnership interest in any of the Debtors. |
| *Escrow Agreement* | Means that certain Escrow Agreement, dated as of the Effective Date, by and among Reorganized TER Holdings, BNAC, Inc., Mr. Trump, Newco, New General Partner and the Escrow Agent (as defined in the Escrow Agreement). |
| *Final Cash Collateral Order* | Means that final order of the Bankruptcy Court (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of Bankruptcy Code and (II) Providing Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 362, 363, and 364 of Bankruptcy Code, entered by the Bankruptcy Court on March 23, 2009 (as amended, modified or supplemented from time to time). |
| *First Closing Date* | Shall have the meaning set forth in the Purchase Agreement. |

| | |
|---|---|
| *First Lien Credit Agreement* | That certain Credit Agreement, dated as of December 21, 2007, among TER Holdings, as borrower, TER, as a guarantor, the subsidiary guarantors named therein, Beal Bank and Beal Bank Nevada, as lenders, and Beal Bank, as administrative and collateral agent, as amended by that certain First Amendment to Credit Agreement dated as of December 21, 2007, Second Amendment to Credit Agreement dated as of May 29, 2008, and Third Amendment to Credit Agreement dated as of October 28, 2008. |
| *First Lien Lenders* | Lenders under the First Lien Credit Agreement and any successors or assigns. |
| *First Lien Lender Claim* | Means any and all claims arising under or in connection with the First Lien Credit Agreement and all documents relating thereto. |
| *First Lien Loan Documents* | Means all Loan Documents (as defined in the First Lien Credit Agreement) and any other agreements and documents delivered pursuant thereto or in connection therewith. |
| *General Unsecured Claim* | Means any unsecured claim against any of the Debtors, including, without limitation, unpaid unsecured prepetition claims of vendors, *provided, however,* that the following claims shall not be "General Unsecured Claims": (a) claims of the Debtors against each other; (b) First Lien Lender Claims; (c) Second Lien Note Claims; (d) Administrative Expense Claims; (e) claims entitled to priority; and (f) claims paid before the Effective Date in connection with that certain order entered by the Bankruptcy Court on or about February 20, 2009, authorizing the Debtors to pay certain prepetition claims of critical vendors and approving procedures related thereto. |
| *Intercompany Claim* | Means any Claim of a Debtor against another Debtor. |
| *New Common Stock* | Means 100 shares of common stock of Reorganized TER to be issued to Mr. Trump on the First Closing Date, which common stock shall represent all issued and outstanding capital stock of, and all other equity or ownership interests in, Reorganized TER on the First Closing Date. |
| *New General Partner* | Means a Nevada limited liability company to be formed, or caused to be formed, by BNAC and Mr. Trump prior to the First Closing Date for the purpose of serving as the new general partner of Reorganized TER Holdings on and after the Second Closing Date, (a) 50.01% of the beneficial ownership of which shall be held, directly or indirectly, by BNAC, and (b) 49.99% of the beneficial ownership of which shall be held, directly or indirectly, by Trump. |
| *New Partnership Interests* | Means the general or limited partnership interests in Reorganized TER Holdings authorized hereunder and to be adjusted or issued, as applicable, on the First Closing Date and the Second Closing Date in accordance with the terms of the Purchase Agreement. |
| *Newco* | Means a Nevada limited liability company to be formed, or caused to be formed, by BNAC and Mr. Trump prior to the First Closing Date to be a limited partner of Reorganized TER Holdings commencing on the Second Closing Date as provided herein, (a) 79% of the beneficial ownership of which shall be held, directly or indirectly, by BNAC, and (b) 21% of the beneficial ownership of which shall be held, directly or indirectly, by Trump. |
| *Non-Debtor Released Parties* | Means the Released Parties other than the Debtors and Reorganized Debtors. |
| *Plan or Plan of Reorganization* | The Debtors' Amended and Restated Joint Plan Under Chapter 11 of the Bankruptcy Code, attached hereto as Exhibit A. |
| *Plan Filing Date* | Means the first date that this Plan is filed with the Bankruptcy Court. |
| *Plan Investor* | Shall mean any party that contributes an equity investment to Reorganized TER |

|  | Holdings pursuant to the Purchase Agreement. |
|---|---|
| *Plan Supplement* | A supplemental appendix to the Plan containing, among other things, forms of the (i) Amended and Restated Credit Agreement, (ii) Amended Organizational Documents for Reorganized TER and Reorganized TER Holdings, (iii) the Purchase Agreement, (iv) the Escrow Agreement, and (v) Confirmation Order that will be filed with the Bankruptcy Court no later than 10 calendar days prior to the deadline set to file objections to confirmation of the Plan. |
| *Purchase Agreement* | Means that certain purchase agreement, dated as of August 3, 2009, and thereafter amended on October 5, 2009, by and among TER, TER Holdings, BNAC, and Mr. Trump under which BNAC, and Mr. Trump have each committed to contribute to Reorganized TER Holdings $56,978,650 for BNAC and $56,958,650 for Mr. Trump, subject to the terms and conditions set forth in the Plan. |
| *Released Parties* | Means each of the Debtors, the Reorganized Debtors, the First Lien Lenders, the Agents, Mr. Trump, Ivanka M. Trump and each of their respective direct or indirect subsidiaries, current and former officers and directors, members, employees, agents, representatives, financial advisors, professionals, accountants and attorneys and all of their predecessors, successors and assigns. |
| *Reorganized Debtors* | The Debtors, as reorganized on the Effective Date in accordance with the terms of the Plan. |
| *Reorganized Debtor Subsidiaries* | Means all of the Debtor Subsidiaries, as reorganized on the Effective Date in accordance with the terms of the Plan. |
| *Reorganized TCI 2* | TCI 2, as reorganized on the Effective Date, in accordance with the terms of the Plan (including any successor corporation, partnership or limited liability company by merger). |
| *Reorganized TER* | TER, as reorganized on the Effective Date, in accordance with the terms of the Plan (including any successor corporation, partnership or limited liability company by merger). |
| *Reorganized TER Holdings* | TER Holdings, as reorganized on the Effective Date, in accordance with the terms of the Plan (including any successor corporation, partnership or limited liability company by merger). |
| *SEC* | The Securities and Exchange Commission. |
| *Second Closing Date* | Has the meaning set forth in the Purchase Agreement, and which will occur on the day after the First Closing Date. |
| *Second Lien Notes* | The Debtors' 8-1/2% Senior Secured Notes due 2015. |
| *Second Lien Note Claims* | Means all Claims arising under or in connection with (i) the Second Lien Notes and (ii) that certain indenture governing the Second Lien Notes, dated as of May 20, 2005, by and among TER Holdings and TER Funding, as issuers, the guarantors named therein, and U.S. Bank, National Association, as indenture trustee, including Claims arising under guaranties of the Second Lien Notes by Trump Marina Associates, LLC, Development Co., LLC, Trump Plaza Associates, LLC, and Trump Taj Mahal Associates, LLC. |
| *Subsidiary Equity Interests* | The equity interests in the Debtor Subsidiaries. |
| *Securities Act* | The Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder. |
| *Tax Code* | Title 26 of the United States Code. |
| *TCI 2* | TCI 2 Holdings, LLC, a Delaware limited liability company. |
| *TER* | Trump Entertainment Resorts, Inc., a Delaware corporation. |

| | |
|---|---|
| *TER Holdings* | Trump Entertainment Resorts Holdings, L.P., a Delaware limited partnership. |
| *Voting Agent* | Means The Garden City Group, Inc.  See Section I of this Disclosure Statement for contact information. |
| *Voting Deadline* | [_____], 2009 at 10:00 a.m. (New York City time) is the deadline for the actual receipt of ballots to accept or reject the Plan. |

**I.**

**Introduction**

The Debtors are soliciting votes to accept or reject the Plan, a copy of which is annexed as Exhibit A to this Disclosure Statement.  *Please refer to the preceding Glossary for definitions of most of the capitalized terms used in this Disclosure Statement.  Some terms that are used only in a specific section may be defined in that section.  Some technical terms may be defined in the Plan.*

The purpose of the Disclosure Statement is to provide information of a kind and in sufficient detail to enable the creditors of the Debtors who are entitled to vote on the Plan to make an informed decision on whether to accept or reject the Plan.  In summary, this Disclosure Statement includes or describes:

| Section | Summary of Contents |
|:---:|:---|
| II | • the treatment of creditors and stockholders of the Debtors under the Plan |
| III | • the transactions to be consummated under the Plan<br>• certain corporate and securities laws matters |
| IV | • which parties in interest are entitled to vote<br>• how to vote to accept or reject the Plan |
| V | • selected historical financial information<br>• projected pro forma balance sheets and financial performance<br>• valuation information |
| VI | • the business of the Debtors<br>• the capital structure of the Debtors<br>• why the Debtors commenced the Chapter 11 Cases |
| VII | • directors and officers of the Reorganized Debtors |
| VIII | • how distributions under the Plan will be made<br>• how Disputed Claims will be resolved |
| IX | • certain factors creditors should consider before voting |
| X | • the procedure for confirming the Plan<br>• a liquidation analysis |
| XI | • alternatives to the Plan |
| XII | • certain tax consequences |

Please note that if there is any inconsistency between the Plan (including the attached exhibits and any supplements to the Plan) and the descriptions in this Disclosure Statement, the terms of the Plan (and the attached exhibits and any supplements to the Plan) will govern.

This Disclosure Statement and the Plan are the only materials that should be used to determine whether to vote to accept or reject the Plan.

> **The *deadline* to vote to accept or reject the Plan is [_____], 2009 at 10:00 a.m.  (New York City time) To be counted, your ballot must be actually *received* by the Voting Agent by this deadline.  If your vote is received by the Voting Agent after the Voting Deadline, the Debtors, in their sole discretion, will decide whether your vote is counted.**
>
> **The *record date* for determining which creditors may vote on the Plan is [            ], 2009 at 5:00 p.m. (New York City time).**

The Plan was developed over several months and after extensive negotiations among the Debtors, the Debtors' principal creditor constituencies, and Donald J. Trump (hereinafter "***Mr. Trump***"). The Debtors believe that approval of the Plan presents the best chance for the Debtors' successful emergence from chapter 11.

The Ad Hoc Committee has also proposed a plan of reorganization for the Debtors (the "***AHC Plan***") and has filed its own disclosure statement in connection therewith (the "***AHC Disclosure Statement***").  The Debtors believe that the Plan provides significantly better payment terms for the Debtors, including without limitation, a below market interest rate and a 2020 maturity date on the Debtors' first lien debt.  In addition, the Debtors' Plan provides a $13.9 million cash payment to holders of Second Lien Note Claims, which represents approximately 1% cash recovery with respect to those claims.  In contrast, the AHC Plan provides for less than a 1% recovery for holders of Second Lien Note Claims in the form of new common stock and rights to purchase additional new common stock.  Furthermore,  the Debtors believe certain key aspects of the AHC Plan, specifically the sale of the Trump Marina Casino (as defined below) and the assumption that the proposed treatment of the Debtors' first lien debt will be comparable under the AHC Plan, to be far too contingent and unlikely to be consummated.  Beal Bank has advised the Debtors that for a variety of reasons, including the significant value that Beal Bank places on Mr. Trump's continued involvement in the business of the Debtors and the belief that similar value could not be provided by the Ad Hoc Committee, it will not agree to similar concessions under any chapter 11 plan sponsored by the Ad Hoc Committee.  Accordingly, the Debtors believe the Plan presents the best chance for the Debtors to successfully emerge from chapter 11 and to continue as a thriving enterprise.

> **Recommendation:**  The Debtors urge creditors to vote to accept the Plan.

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent, at the following address:

> **The Garden City Group, Inc.**
> **Attn: Trump Entertainment Resorts, Inc.**
> **P.O. Box 9000 #6517**
> **Merrick, New York 11566-9000**
> **Tel: (866) 396-9680**

The Bankruptcy Code provides that only creditors who vote on the Plan will be counted for purposes of determining whether the requisite acceptances have been attained.  Failure to timely deliver a properly completed ballot by the Voting Deadline will constitute an abstention (*i.e.*, will not be counted as either an acceptance or a rejection).  Any improperly completed or late ballot will not be counted.

## II.

## Treatment of Holders of Claims and Equity Interests
## Under the Plan

### A.    Overview and Summary of the Plan

The Debtors have two principal prepetition creditor groups.  The first group consists of Beal Bank and Beal Bank Nevada, whose claims are approximately $485 million and are secured by a first priority lien on substantially all the Debtors' assets (the "***First Lien Lender Claims***").  The second group consists of holders of the Debtors' 8-1/2% Senior Secured Notes due 2015 in the outstanding principal amount of $1.25 billion (the "***Second Lien Note Claims***").  These notes were issued in the Debtors prior chapter 11 case (pending in 2004-05) and were granted a second priority lien on the Debtors' casino and hotel properties.

The Debtors believe that the value of their business operations is less than the amount of the First Lien Lender Claims.  That means that there is no value available for the holders of the Second Lien Note Claims.  The Debtors' valuation conclusions are based on its own financial projections (described in Section V.C, below) and the efforts of Lazard Frères & Co., LLC ("***Lazard***"), the Debtors' financial advisor, to sell some or all of the Debtors' casino operations or properties (described in Section V.D, below).  In addition, the Debtors' projections indicate that they need to modify the payment terms of the First Lien Lender Claims in order to avoid potential defaults in the future.

The Debtors need to raise additional capital to remain competitive in the Atlantic City gaming market.  As described in detail below in Section VI.C.1, competition among casino and hotel operators in the Atlantic City market is intense and increasing.  Casino hotels in Atlantic City, as well as new casino operators opening in the surrounding markets, compete on the basis of customer service, quality and extent of amenities and promotional offers.  This level of competition requires a significant amount of working capital to maintain a competitive advantage.  Moreover, the casino hotels in Atlantic City that have recently made substantial investments in capital expenditures have generated significantly more revenue than those casino hotels that have not made investments to update their facilities.  The Debtors have determined that similar upgrades and capital investments to their facilities will be necessary to attract and retain customers.

Since the Debtors' filed their original Plan, the Court terminated the Debtors' exclusive right to file and seek acceptances of a chapter 11 plan.  The Ad Hoc Committee has filed a competing chapter 11 plan that provides a recovery to the holders of Second Lien Note Claims of less than 1% in the form of common equity and rights to purchase additional equity.  The disclosure statement for the Ad Hoc Committee's plan asserts a valuation range for the Debtors with a midpoint of $499 million (approximately $13.9 million more than the outstanding principal of the First Lien Lender Claims).  Although the Debtors disagree with the Ad Hoc Committee's valuation, they have decided to include a $13.9 million cash recovery in the Plan for the holders of Second Lien Note Claims.  BNAC and Mr. Trump have agreed to increase their investment in the Debtors from $100 million to $113.9 million to provide for this additional distribution.

Based on these circumstances, the Debtors are proposing the Plan the terms of which:

- retains the First Lien Lender Claims, but modifies them materially to (i) extend repayment until December, 2020 (compared to the current maturity date of 2012), (ii) provide a below-market rate of interest, and (iii) provide significant flexibility in the payment of cash interest;

- provides for a payment of approximately $13.9 million in cash to the holders of the Second Lien Note Claims;

- provides no recovery to holders of General Unsecured Claims and Equity Interests; and

- provides for an investment of $113.9 million from BNAC (an affiliate of a holder of First Lien Lender Claims) and Mr. Trump (one of the Debtors' current creditors and an equity holder of TER) in exchange for issuing them all of the equity interests in the Reorganized TER and Reorganized TER Holdings.

After emergence from chapter 11, subject to the approval of the board of directors of the Reorganized Debtors, management anticipates using approximately one-half the new investment from BNAC and Mr. Trump in 2010 for capital projects, such as restaurant renovations, hotel and suite upgrades, slot machine location improvements, and IT network improvements. The Debtors anticipate using the balance of the new investment in 2011 for numerous projects, including major renovations to the facilities at the Trump Taj Mahal.

## B.      Summary of Classification and Treatment

The following table designates the Classes of claims against and equity interests in the Debtors and specifies which of those Classes are (i) impaired or unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to reject the Plan. Classes designated with the letters A – J refer to Classes of Claims against each of the Debtors. The Classes designated 4A – 4E refer to Second Lien Note Claims against TER Holdings, Trump Marina Associates, LLC, TER Development Co., LLC, Trump Plaza Associates, LLC, and Trump Taj Mahal Associates, LLC.

| Class | Designation | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| 1A-1J | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2A-2J | Other Secured Claims | Unimpaired | No (deemed to accept) | 100% |
| 3A-3J | First Lien Lender Claims | Impaired | Yes | 94%[1] |
| 4A-4E | Second Lien Note Claims | Impaired | Yes | 1.11 % |
| 5A-5J | General Unsecured Claims | Impaired | No (deemed to reject) | No recovery |

---

[1] Recoveries to the holder of First Lien Lender Claims are subject to applicable dilution by Administrative Expense Claims, Compensation and Reimbursement Claims, Priority Tax Claims, Other Priority Claims and Other Secured Claims.

| 6 | Intercompany Claims | Unimpaired | No (deemed to accept) | No recovery |
| 7 | Section 501(b) Claims | Impaired | No (deemed to reject) | No recovery |
| 8 | TER Equity Interests | Impaired | No (deemed to reject) | No recovery |
| 9 | TER Holdings Equity Interests | Impaired | No (deemed to reject) | No recovery |
| 10 | Subsidiary Equity Interests | Impaired | No (deemed to reject) | No recovery |

## C.    Description and Treatment of Unclassified Claims

Generally, the Plan provides for the payment in full of allowed (i) Administrative Expense Claims, (ii) claims for services rendered or reimbursement of expenses incurred by professionals under section 503(b) of the Bankruptcy Code and (iii) claims by taxing authorities that are entitled to priority under the Bankruptcy Code. The aggregate amount of these claims will depend, in part, on the length of the Chapter 11 Cases.

Allowed Administrative Expense Claims will either be paid in cash on the Effective Date or promptly after such claims become allowed.  Administrative Expense Claims arising in the ordinary course of the Debtors' business operations will be paid in the ordinary course.  The Debtors estimate the amount of such claims through the end of October 2009 will be approximately $90,986,000, which claims consist almost entirely of normal operating expenses of the Debtors' businesses, including without limitation, accounts payable, accrued payroll and related expenses, unredeemed chip and token liabilities, and other gaming liabilities.  In addition, the Debtors estimate chapter 11 professional fees and expenses to be approximately $13,600,000 for this same period. Delays in the case due to litigation, regulatory approvals, or unforeseen events could materially increase the amount of such claims.

Allowed Priority Tax Claims will either be paid in cash on the Effective Date (or after such claims become allowed) or in equal annual payments over five (5) years, together with applicable interest.  The Debtors estimate that the amount of such claims will be approximately $5,862,000.  Such estimate does not include claims asserted by the State of New Jersey in the aggregate approximate amount of $29 million related to the New Jersey Alternative Minimum Assessment for Trump Taj Mahal Associates, LLC, Trump Marina Associates, LLC and Trump Plaza Associates, LLC for tax years 2002 through 2006 (the "***NJ Tax Claims***").  The Debtors dispute the validity, amount, priority and extent of the NJ Tax Claims and reserve all rights with respect thereto. In addition, to the extent that any of the NJ Tax Claims are valid, the Debtors believe such claims are General Unsecured Claims.

## D.    Description of Classified Claims

### 1.    *Other Priority Claims (Class 1A through 1J).*

All other allowed claims having priority under the Bankruptcy Code will be paid in cash in full.  The Debtors are not aware of any other priority claims.

### 2.    *Other Secured Claims (Classes 2A through 2J).*

Except to the extent a holder has agreed to different treatment, secured claims (other than First Lien Lender Claims, and Second Lien Note Claims) will either receive the collateral

securing such claims, receive cash equal to the value of such collateral, or have such claims reinstated.  Such Claims include, without limitation, secured claims arising under or in connection with capital equipment leases, judicial liens, mechanic's liens and artisan's liens.  The Debtors estimate the total amount of such secured claims to be approximately $6,019,480.

3.      *First Lien Lender Claims (Classes 3A through 3J).*

        The First Lien Lender Claims will be deemed allowed in the aggregate principal amount of $485,062,701.38.  The First Lien Lenders will receive, in full satisfaction of the First Lien Lender Claims, the payment of interest and principal in accordance with the terms and conditions of the Amended and Restated Credit Agreement.  The obligations of Reorganized TER Holdings and the Reorganized Debtor Subsidiaries under the Amended and Restated Credit Agreement shall be secured by all Prepetition First Priority Liens (as defined in the Final Cash Collateral Order) other than Prepetition First Priority Liens in property of TER and TCI 2 which shall be cancelled and extinguished in accordance with the Plan.  In addition, the repayment terms of the First Lien Lender Claims will be materially modified to, among other things, extend the maturity by eight years to 2020 and reduce the interest rate.  These and other covenant changes are contained in the Amended and Restated Credit Agreement, a copy of which will appear in a Plan Supplement.

        In accordance with the terms of the Final Cash Collateral Order, the Debtors have been making payments to Beal Bank on an ongoing basis of, *inter alia*, current cash payments of principal and interest at the rate in effect immediately preceding the Commencement Date.  The Debtors continue to pay Beal Bank because Section 6(a) of the Final Cash Collateral Order provides that the Debtors shall pay Beal Bank its interest and principal when due under the First Lien Credit Agreement and its fees and expenses, including legal fees.  If Beal Bank is determined by a final order of the Bankruptcy Court to be under-secured, then any adequate protection payments shall be subject, upon motion by the Debtors, the United States Trustee, the Ad Hoc Committee or other party in interest (and upon further order of the Court) to recharacterization as repayments of principal.

        As set forth above, the estimated recovery to the holders of First Lien Lender Claims under the Plan will be approximately 94%.  Despite the fact that the Debtors have been making ongoing payments described above, the Plan is not paying more than full value to Beal Bank because the terms of the Amended and Restated Credit Agreement – including the interest rate, maturity date and other material payment terms – are below market, which means that the value of the note to Beal Bank will be less than its full face value and the present value of the payment stream under that revised loan is less than the value of the collateral.

4.      *Second Lien Note Claims (Classes 4A through 4E).*

        The Second Lien Note Claims will be deemed allowed claims against TER Holdings and certain of its guarantor subsidiaries in an aggregate principal amount of $1.2 billion.  These claims were originally secured by substantially the same property (other than current assets) that secures the First Lien Lender Claims.  On the Commencement Date, however, the value of the property securing the Second Lien Notes Claims did not exceed the aggregate Allowed amount of the First Lien Claims and currently has a value less than the aggregate Allowed amount of the First Lien Lender Claims.  Accordingly, the Second Lien Lender Claims are no longer "secured" claims for purposes of treatment under the Bankruptcy Code.  Holders of Second Lien Note Claims shall receive, in full satisfaction of the Second Lien Note Claims, their pro rata share of $13.9 million.

5.        *General Unsecured Claims of the Debtors (Classes 5A through 5J).*

Approximately $418,904,000 in General Unsecured Claims have been filed in the Debtors' Chapter 11 Cases, of which, the Debtors estimate that only approximately $3,347,000 will be allowed.  Most of the holders of General Unsecured Claims as of the Commencement Date have been previously paid as critical vendors pursuant to those orders of the Bankruptcy Court dated February 20, 2009 (Docket No. 58) and June 16, 2009 (Docket No. 399).  The remaining holders of General Unsecured Claims will not receive or retain any distribution or payment under the Plan.  On the Effective Date, all General Unsecured Claims will be discharged and extinguished.]

6.        *Intercompany Claims (Class 6).*

On or after the Effective Date, all Intercompany Claims will, (i) at the option of Reorganized TER Holdings, subject to the consent of the New General Partner, (A) be preserved and reinstated, or (B) after setoff, be contributed on a net basis to the capital of the obligor, or (ii) with the mutual consent of both the obligor and the obligee (subject also to the consent of the New General Partner), be released, waived and discharged on and as of the Effective Date, *provided*, *however*, the (a) Intercompany Claims of TER or TCI 2 Holdings against Debtors other than TER and TCI 2 Holdings shall be released, waived and discharged unless otherwise agreed to in writing by BNAC and (b) holders of Intercompany Claims against Trump Marina Associates, LLC, TER Development Co., LLC, Trump Plaza Associates, LLC, and Trump Taj Mahal Associates, LLC shall not receive or retain any distribution or payment on account of such Claims.

7.        *Section 510(b) Claims (Class 7).*

Holders of Section 510(b) Claims shall not receive or retain any distribution or payment on account of such Section 510(b) Claim.  On the Effective Date, all such Section 510(b) Claims shall be discharged and extinguished.

8.        *Equity Interests in TER (Class 8).*

The existing equity interests in TER will be cancelled.

9.        *Equity Interests in TER Holdings (Class 9).*

Holders of the existing equity interests in TER Holdings shall not receive or retain any distribution or payment on account of such equity interests.

10.        *Subsidiary Equity Interests (Class 10).*

The Subsidiary Equity Interests will be cancelled.

**III.**

**Transactions to be Consummated Under the Plan and
Certain Corporate and Securities Laws Matters**

A.        **Restructuring Transactions**

The following is a summary of various documents expected to be executed in connection with the restructuring.  Certain of these documents are not complete; however, those

documents to which the Debtors are a party and are to be entered into prior to the Effective Date are complete.

### 1. *The Purchase Agreement.*

In addition to the treatment of creditors and equity interest holders specified above, the Plan provides for a capital contribution of $113.9 million in Reorganized TER Holdings to be made by BNAC, indirectly through Newco and General Partner, and by Mr. Trump, directly and indirectly through Newco, General Partner, Ace Entertainment Holdings, Inc., Restructured TER and TCI 2, pursuant to the terms of the Purchase Agreement. The Purchase Agreement was entered into, on August 3, 2009, and thereafter amended on October 5, 2009, by BNAC, Mr. Trump and, subject to Bankruptcy Court approval, TER and TER Holdings. As a result of such capital contributions, BNAC and Mr. Trump will own, directly or indirectly, all of the issued and outstanding equity interests in Reorganized TER Holdings, and, indirectly, all of the outstanding equity interests of the Debtor Subsidiaries. The Purchase Agreement, among other things, requires BNAC and Mr. Trump to make such contributions, subject to the terms and conditions set forth therein. Pursuant to the terms of a capital funding agreement entered into between BNAC and Beal Bank Nevada in connection with the Purchase Agreement, Beal Bank Nevada has agreed to contribute cash to the equity or debt capital of BNAC, if necessary, in order to fund BNAC's capital contribution to Reorganized TER Holdings as required by the Purchase Agreement. TER Holdings is a third party beneficiary of the capital funding agreement.

In consideration for the capital contribution by each of the Plan Investors (including BNAC and Mr. Trump) in the Debtors, in accordance with the terms and conditions of the Purchase Agreement, the equity interests in TER Holdings will be allocated, as of the Second Closing Date, as follows:

- the terms of the existing Equity Interests in TER Holdings of Reorganized TER, Reorganized TCI 2 and Ace Entertainment Holdings, Inc. will be adjusted as provided in the Purchase Agreement; and

- additional Equity Interests in Reorganized TER Holdings will be issued to Newco, New General Partner and Mr. Trump as provided in the Purchase Agreement.

The following is a summary of the equity ownership interests of the Reorganized TER Holdings immediately after the Second Closing Date as provided by the Purchase Agreement:

| | |
|---|---|
| New General Partner: | 1.0% |
| Mr. Trump: | 35.329% |
| Newco: | 62.671% |
| Ace: | 0.1% |
| Reorganized TER: | 0.8% |
| Reorganized TCI 2: | 0.1% |

In addition, in connection with the Plan, all of the New Common Stock will be issued to Mr. Trump and as a result, Mr. Trump will own all of the issued and outstanding shares of capital stock of Reorganized TER on the First Closing Date. Pursuant to the terms of the Escrow Agreement, there are no other conditions to the release and delivery of the balance of the $113.9 million capital contribution to TER Holdings other than the actual occurrence of the first Business Day after the First Closing Date, which will be the Second Closing Date.

As a fundamental part of the restructuring Mr. Trump has agreed to provide additional marketing and other support to the Reorganized Debtors. This includes Mr. Trump:

- entering into a Second Amended and Restated Trademark License Agreement, which grants to Reorganized TER Holdings, subject to the terms and conditions thereof, a license (and a sublicense to the Reorganized Debtor Subsidiaries that operate the three casinos) to use the "Trump" name for use in gaming and certain related activities, and a related Second Amended and Restated Trademark Security Agreement;

- entering into a Value Enhancement Agreement, in which he agrees, subject to the terms and conditions thereof, to (i) refrain from conducting any casino business other than through Reorganized TER Holdings and (ii) offer and provide to Reorganized TER any and all investment, ownership, and management opportunities available to him in the gaming industry;

- agreeing not to compete with Reorganized TER Holdings; and

- providing additional services to Reorganized TER Holdings.

The consideration weighed by the Debtors in evaluating whether to base the Plan on the Purchase Agreement were the (i) modifications to the First Lien Credit Agreement and (ii) the original $100 million investment by BNAC and Mr. Trump. Although, the Debtors have not sought an appraisal or other third party valuation of Mr. Trump's non-cash contributions, the Debtors believe that Mr. Trump's active promotion of the Debtors' businesses is significantly more valuable than the simple license of his intellectual property. For a description of the existing trademark license agreement and trademark security agreement, see Item 13. "Certain Relationships and Related Transactions" in TER's Annual Report on Form 10-K for the year ended December 31, 2008 (the "***2008 Form 10-K***") which is attached hereto as Exhibit D and incorporated herein by reference.

As required by the Purchase Agreement, on the Effective Date all Subsidiary Equity Interests in existence on the Commencement Date will be cancelled and will be replaced by new Subsidiary Equity Interests so as to maintain the legal existence and organizational structure of the Debtor Subsidiaries existing on the date immediately prior to the Effective Date. The maintenance of this structure is required by the Purchase Agreement and does not represent a distribution of value on account of the Subsidiary Equity Interests in existence on the Commencement Date.

Pursuant to a Fifth Amended and Restated Agreement of Limited Partnership of TER Holdings (the "***Amended Partnership Agreement***") to be entered into on the First Closing Date and subject to the terms of the Escrow Agreement, TER shall continue as the general partner of TER Holdings until the occurrence of the Second Closing, at which time, TER will no longer be the general partner of TER Holdings and New General Partner will be the sole general partner of Reorganized TER Holdings as of the Second Closing Date. Reorganized TER and Reorganized TCI 2 are authorized to enter into the Amended Partnership Agreement of TER Holdings.

The Amended Partnership Agreement has not yet been finalized and is being negotiated by the parties thereto. At present, the parties to the Amended Partnership Agreement contemplate that the agreement will provide for typical pro rata tax distributions by Reorganized TER Holdings to fund taxes payable by its partners in respect of income earned by Reorganized TER Holdings and that, unlike the existing Fourth Amended and Restated Agreement of Limited

Partnership of TER Holdings, Mr. Trump would no longer be entitled to a special tax indemnity by Reorganized TER Holdings.

2.    ***The Amended and Restated Credit Agreement.***

On the Effective Date, Reorganized TER Holdings and the Reorganized Debtor Subsidiaries that are parties to the Amended and Restated Credit Agreement and the other Loan Documents (as such term is defined in the Amended and Restated Credit Agreement) are authorized to execute and deliver such Loan Documents and grant the liens and security interests specified therein to and in favor of the Collateral Agent for the benefit of the First Lien Lenders.

3.    ***Issuance of New Common Stoc**k.*

In accordance with the terms of the Purchase Agreement, all of the New Common Stock will be issued to Mr. Trump or his designees on the First Closing Date.  As a result thereof, Mr. Trump or his designees will own all issued and outstanding shares of capital stock of, and all other equity or ownership interests in, Reorganized TER on the First Closing Date.  Reorganized TCI 2 will remain a wholly owned subsidiary of Reorganized TER.

4.    ***Waivers***.

Mr. Trump and Ivanka Trump have filed approximately 40 proofs of claim against the Debtors, generally reserving certain respective rights and asserting damages for, *inter alia*, breach of the Amended and Restated Trademark License Agreement dated May 20, 2005, damage to trademarks, brand and reputation, and misappropriation of image for commercial purposes.  While the Debtors have not fully evaluated these claims, the Debtors believe that a release of such claims is in their best interests both in terms of reducing liabilities of the estates and eliminating costs associated with litigation.  Accordingly, the estates are benefited by the complete waiver of these claims, as contemplated by the Plan.  Except as otherwise specifically provided in the Plan, subject to the occurrence of the Effective Date, Mr. Trump has agreed to waive any and all claims he or his affiliates or relatives may have against the Debtors, including claims, if any, that are senior in priority to the claims of the First Lien Lenders.

**B.    Conditions Precedent**

The transactions described in Section III.A. above are subject to various conditions precedent, including:

- a final non-appealable order approving the Plan, in form and content satisfactory to BNAC, the Agents, the First Lien Lenders, Mr. Trump and the Debtors being entered by the Bankruptcy Court on or before January 15, 2010;

- that TER Holdings execute and deliver at the First Closing (as defined in the Purchase Agreement) a certificate regarding an interim closing of the books of TER Holdings for all periods ending in the year in which the First Closing Date occurs for purposes of determining and reporting the amount of all items of income, gain, loss and deduction of TER Holdings to be allocated for each such period;

- that the Debtors have total working capital, including cash and cash equivalents (but excluding restricted cash, including, without limitation, deposits in respect

of workers' compensation and letter of credit obligations and subject to certain adjustments) of at least $50 million, determined on a pro forma basis, as of the Business Day preceding the Effective Date (a substantial portion of which is expected to be required to be used as cage cash pursuant to regulatory requirements).  Based upon the Company's projections, the Debtors anticipate having total working capital, on a pro forma basis, in excess of $50 million on the Effective Date and being able to satisfy this condition;

• if prior to the Effective Date, the Debtors have sold any of the collateral securing the First Lien Credit Agreement for cash, 100% of the net sale proceeds (after payment of customary closing costs approved by the First Lien Lenders) shall have been applied to reduce the outstanding balance under the First Lien Credit Agreement;

• the Amended and Restated Credit Agreement being entered into pursuant to documents reasonably acceptable to the First Lien Lenders, TER Holdings and Reorganized TER (a form of which Amended and Restated Credit Agreement is attached to the Beal Commitment Letter);

• that the Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents necessary to implement the Plan and that are required by law, regulation or order; and

• other customary conditions for the transactions described in Section III.A. above.

In addition, the Beal Commitment Letter dated August 3, 2009 relating to the amendment and restatement of the First Lien Credit Agreement contains various conditions, including without limitation, that no material adverse change shall have occurred with respect to Beal Bank's collateral taken as a whole.  A copy of the Beal Commitment Letter has been filed on TER's Current Report on Form 8-K filed with the SEC on August 4, 2009 (the "*August 8-K*") and the Debtors will file a copy of the Beal Commitment Letter with the Plan  Supplement.

The Debtors have been advised by Beal Bank that, other than casino approval, there are no regulatory issues that could adversely affect the Debtors' Plan.

As holding companies of New Jersey casino licensees, TER and TER Holdings are subject to regulation by the New Jersey Casino Control Commission (the "*NJ CCC*").  The restructuring as proposed in the Plan, including the restructuring of the first lien obligations of TER and affiliates, requires certain approvals be obtained from the NJ CCC.  In order to acquire the equity interest in TER Holdings as proposed in the Plan, BNAC, Beal Bank and Beal Bank Nevada, as well as certain newly formed entities directly and/or indirectly owned by BNAC and Mr. Trump (collectively, the "*New Qualifiers*"), will be required to qualify as holding companies or entity qualifiers of casino licensees Trump Taj Mahal Associates, LLC, Trump Plaza Associates, LLC and Trump Marina Associates, LLC in accordance with the New Jersey Casino Control Act (the "*Casino Act*") and the regulations promulgated thereunder.  Further, individual officers and directors of the New Qualifiers may also be required to qualify to the standards for Casino Key Employees under the Casino Act, unless such qualification is waived.  Similarly, any financial backer of a casino project, may be required to qualify as a financial source, unless qualification is waived.

BNAC and its affiliates have filed a petition with the NJ CCC seeking declaratory rulings as to the status as either holding companies or entity qualifiers of each of the New Qualifiers

and identification of the officers and directors of such companies would be required to be qualify, and waiver of Beal Financial Corp. as a holding company or entity qualifier (the "***BNAC Petition***").  The Debtors will file a petition with the NJ CCC seeking approval of the restructuring in accordance with the Plan, qualification of the New Qualifiers in accordance with the BNAC Petition, qualification or waiver of the officers and directors of the New Qualifiers and a finding of financial stability following consummation of the Plan.   Each of the New Qualifiers and the officers and directors required to qualify have filed or will file completed disclosure forms as required by the NJ CCC.  While the Debtors cannot be certain that the approvals, qualifications and waivers sought will be granted by the NJ CCC, the Debtors have no reason to believe that they will be denied.

The Debtors anticipate that the Effective Date will occur in January 2010.  However, a January, 2010 Effective Date may be delayed due to litigation relating to the AHC Plan and/or any delays in the receipt of approvals from the NJ CCC.

## C.    Related Agreements

The following summaries of documents and agreements to be executed and/or delivered in connection with the restructuring were provided to the Debtors by counsel to Mr. Trump.  The descriptions below are only summaries of such documents and agreements and, notwithstanding the contents of such summaries, the terms of the final forms of such documents and agreements will control in all respects.  In addition, such agreements may be modified at any time in accordance with their respective terms, including, without limitation, pursuant to the Purchase Agreement.

### 1.    *The Trademark License Agreement*

*License*

Under the Second Amended and Restated Trademark License Agreement (the "***Trademark License Agreement***") to be entered into by Reorganized TER Holdings and Mr. Trump on the First Closing Date pursuant to the Purchase Agreement, Mr. Trump grants to Reorganized TER Holdings a perpetual, exclusive, royalty-free, worldwide right and license, subject to the terms and conditions therein, to:

- use certain trademarks and service marks set forth on a schedule to the Trademark License Agreement (the "***Licensed Marks***"), as well as the names "DONALD J. TRUMP", "DONALD TRUMP", "D. J. TRUMP", "D. TRUMP" and "TRUMP" (collectively, the "***Trump Names***"), solely for Casino Services and Products (as defined in the Trademark License Agreement), subject to certain limitations;

- use Mr. Trump's likeness solely for Casino Services and Products;

- use the Licensed Marks in the entity names of Reorganized TER Holdings or its sublicensees or in any Internet domain name, if such domain name is used only as a URL for a website maintained by Reorganized TER Holdings or any of its sublicensees solely for the purposes of advertising and/or offering Casino Services and Products; and

- subject to certain limitations set forth in the Trademark License Agreement, use the stylized form of "Trump" depicted in U.S. Registration Number 3,566,654 and U.S. Application Number 77/192,256 solely on or within Partnership Property (as defined in the Trademark License Agreement).

The Trademark License Agreement provides that the license does not include any right to use the Licensed Marks, Trump Names or Mr. Trump's likeness for any online or Internet gaming or any form of electronic gaming activities, which activities are expressly prohibited under the Trademark License Agreement.  The Reorganized Debtor Subsidiaries that own and operate the three casinos will join in executing the Trademark License Agreement as approved sublicensees.

*Quality Control*

To maintain the validity of, and to protect the goodwill and integrity associated with, the Licensed Marks, Trump Names and Mr. Trump's likeness, Mr. Trump will have the right to exercise certain quality controls over the use of the Licensed Marks, Trump Names and Trump's likeness, as set forth in the Trademark License Agreement.  Uses of the Licensed Marks and Trump Names by Reorganized TER Holdings and its sublicensees that are not substantially similar (including level of quality) to the uses of the Licensed Marks and Trump Names by TER Holdings and its sublicensees prior to the Effective Date ("***Prior Uses***"), as well as any and all new uses of Trump's likeness, must be at a level consistent with or exceeding the standards of quality associated with the Licensed Marks, Trump Names and Trump's likeness as used by Reorganized TER Holdings and its sublicensees as of the Effective Date.  Upon Mr. Trump's request, Reorganized TER Holdings must submit for Mr. Trump's prior approval, representative samples of proposed uses (other than Prior Uses) of the Licensed Marks and Trump Names by Trump Holdings and its sublicensees; except that Reorganized TER Holdings must submit for Mr. Trump's prior approval samples of all proposed uses of Mr. Trump's likeness (other than uses of Mr. Trump's likeness made prior to the Effective Date at a level of quality consistent with such uses prior to the Effective Date).

*Royalty-Bearing License*

The Trademark License Agreement provides that, upon the consummation of any sale of any Partnership Property (as defined in the Trademark License Agreement) by Reorganized TER Holdings or any of its subsidiaries in connection with a foreclosure or similar action (a "***Foreclosure Sale***") under the Amended and Restated Credit Agreement (such date of consummation, the "***Conversion Date***"), the license granted under the Trademark License Agreement may be assigned in such a transaction solely with respect to such Partnership Property that was sold or otherwise disposed to the purchaser in such Foreclosure Sale and, in that event, will convert to a royalty-bearing license (the "***Royalty License***").  For each Partnership Property purchased by the purchaser in a Foreclosure Sale, the royalty will be $500,000 or $100,000 per annum depending on whether the applicable Partnership Property has annual EBITDA of greater than or less than $25 million, respectively.  The Royalty License will have a term of 10 years from the Conversion Date.  If a Partnership Property covered by the Royalty License ceases to be principally branded under a name that uses the Licensed Marks or Trump Names, Mr. Trump will have the right to terminate the Royalty License with respect to such Partnership Property after the expiration of a 30-day waiting period.  The transferee of the Partnership Property can terminate the Royalty License at any time upon 30 days' prior notice to Mr. Trump.

*Term and Termination*

The Trademark License Agreement will terminate:  (a) if a Deadlock Sale (as defined in the Amended Partnership Agreement) has not previously been consummated and the loan under the Amended Credit and Restated Agreement (the "***Restructured Loan***") has been satisfied in full, the earlier of (i) the date on which Beal Financial Corporation and its affiliates no longer directly or indirectly beneficially own at least 5% of the outstanding New Partnership Interests, or (ii) the third anniversary of the date on which the Restructured Loan was satisfied in full; (b) in connection with a

consummated Deadlock Sale, if all (but not less than all) of the rights and obligations under the Trademark License Agreement and the Amended and Restated Credit Agreement have been assumed by the acquiror pursuant to the Amended Partnership Agreement, the earlier of (x) the "Maturity Date" under the Amended and Restated Credit Agreement, as in effect on the date of the Trademark License Agreement, (y) the third anniversary of the consummation date of the Deadlock Sale, or (z) 30 days after written notice of termination of the Trademark License Agreement is received by Mr. Trump from the acquiror of Reorganized TER Holdings' rights under the Trademark License Agreement pursuant to such Deadlock Sale; (c) in connection with a consummated Deadlock Sale, if all (but not less than all) of the rights and obligations under the Trademark License Agreement and the Amended and Restated Credit Agreement have not been assumed by the acquiror, the date on which such Deadlock Sale is consummated; (d) upon the consummation of the sale or other disposition of all or substantially all of the assets of Reorganized TER Holdings (other than pursuant to a Deadlock Sale or Foreclosure Sale); or (e) if the license is converted into a Royalty License, the date of termination of such Royalty License by Mr. Trump as described in the previous paragraph.

Reorganized TER Holdings may terminate the Trademark License at any time upon 30 days' prior written notice to Mr. Trump.  Furthermore, Mr. Trump may terminate the Trademark License (i) if Reorganized TER Holdings or its sublicensee, or any purchaser of the Partnership Property in a Foreclosure Sale or sublicensee of any such purchaser, commits a material breach of the Trademark License Agreement and fails to cure such breach within 30 days after receipt of written notice of the breach or (ii) a court determines that Reorganized TER Holdings has failed to comply with a court order or injunction respecting quality standards obtained by Mr. Trump in a proceeding brought by Mr. Trump pursuant to the Trademark License Agreement.

The Trademark License Agreement will amend and restate the current Amended and Restated Trademark License Agreement by and among Mr. Trump, TER, TER Holdings and the sublicensees Trump Taj Mahal Associates, LLC, Trump Plaza Associates, LLC and Trump Marina Associates, LLC, dated May 20, 2005 ("***2005 License Agreement***").  Mr. Trump believes that the manner of the uses by TER Holdings and its sublicensees of Mr. Trump's likeness and trademarks that are licensed under the 2005 License Agreement constitute a breach of such agreement by TER Holdings and its sublicensees such that Mr. Trump has the right to terminate the 2005 License Agreement.

The Trademark License Agreement will provide many significant benefits to the Debtors.  Most significantly, the Trademark License Agreement provides for the waiver by Mr. Trump of all existing defaults and breaches of the 2005 License Agreement by TER Holdings and its sublicensees.  The Trademark License Agreement also prohibits Mr. Trump from asserting any breaches under the Trademark License Agreement based on uses of Mr. Trump's likeness and various trademarks that are licensed thereunder (collectively, the "***Trump Marks***") by TER Holdings and its sublicensees (such as many of the current uses that Mr. Trump believes are in breach of the 2005 License Agreement) as they exist as of the effective date of the Trademark License Agreement.

Even if the 2005 License Agreement were not terminated as a result of the breaches mentioned above, under the 2005 License Agreement, the occurrence of one of various specified events would trigger the conversion of the license to a royalty-bearing license for a term of ten years, upon expiration of which the 2005 License Agreement would terminate.  The Trademark License Agreement provides for the conversion to a royalty-bearing license only upon a foreclosure or similar event.  Thus, there is a much greater likelihood that the license under the Trademark License Agreement will remain royalty-free for its duration.  The 2009 License Agreement also grants TER Holdings and its sublicensees a license to use the Trump Marks in their entity names and to use the

Trump stylized logo, and provides that TER Holdings and its sublicensees may use the Trump Marks to advertise over the Internet.

2. ***The Trademark Security Agreement***

The Purchase Agreement provides that Mr. Trump and Reorganized TER Holdings will enter into a Second Amended and Restated Trademark Security Agreement (the "***Trademark Security Agreement***") on the First Closing Date in connection with the Trademark License Agreement.  The proposed Trademark Security Agreement provides that to secure performance by Mr. Trump of his obligations under the Trademark License Agreement, Mr. Trump grants to Reorganized TER Holdings a first priority security interest in the Licensed Marks and the right to use Mr. Trump's likeness.

3. ***The Value Enhancement Agreement***

*Covered Opportunities*

Under the Value Enhancement Agreement (the "***Value Enhancement Agreement***") to be entered into by Reorganized TER Holdings and Mr. Trump on the First Closing Date pursuant to the Purchase Agreement, the parties acknowledge that Mr. Trump and his affiliates are engaged in a variety of real estate, entertainment and other businesses and, in furtherance thereof, as a material and continuing part of their business, have engaged in, and from time to time in the future will engage in, a broad range of real estate and other projects, properties or opportunities (as an owner, lessor, lessee, manager or licensor or in other capacities), including, without limitation, office, retail, bar, restaurant, riverboat, cruise ship, transportation, hotel, hotel-condominium, resort, entertainment, sports and golf course projects, properties or opportunities ("***Trump Projects***").  During the term and subject to the conditions of the Value Enhancement Agreement, if (i) Mr. Trump (or any of his affiliates solely controlled by him) is presented with a Trump Project which contemplates as part thereof investment in, ownership, leasing or management of, or affiliation with, any casino or gaming business, including without limitation any project similar in nature to any of the current hotel casino properties owned by Reorganized TER Holdings and its subsidiaries located in Atlantic City, New Jersey and known as the Trump Taj Mahal Casino Resort, Trump Plaza Hotel and Casino and Trump Marina Hotel Casino (a "***Covered Opportunity***"), or (ii) an existing Trump Project in which Reorganized TER Holdings is not currently involved is or becomes a Covered Opportunity, and in the case of each of (i) and (ii), Mr. Trump determines, in good faith, that Mr. Trump is interested in considering the pursuit of the related Trump Project or that such Covered Opportunity may present a viable opportunity for Reorganized TER Holdings, Mr. Trump will discuss with the Board of Managers of the New General Partner such Covered Opportunity to determine whether or not an opportunity exists for Reorganized TER Holdings to enter into a licensing, management, leasing or ownership arrangement with respect to such Covered Opportunity.  If the Board of Managers determines that such Covered Opportunity should be pursued by Reorganized TER Holdings, Mr. Trump will, in good faith, use commercially reasonable efforts to support and facilitate Reorganized TER Holdings' pursuit of such Covered Opportunity, including arranging meetings and discussions with, and assisting with obtaining information as may be reasonably requested by the Board of Managers from, the third party developers, owners or managers of such Covered Opportunity regarding such opportunity and, subject to confidentiality or similar restrictions, provide material information related to such Covered Opportunity in the possession of Mr. Trump (or his affiliates solely controlled by him) that may be reasonably requested by the Board of Managers.

*Marketing and Promotional Activities*

The Value Enhancement Agreement provides that Mr. Trump will, in good faith and in the exercise of his reasonable business judgment, use commercially reasonable efforts to provide Reorganized TER Holdings with certain opportunities to participate in marketing and promotional activities associated with the assets and businesses of Mr. Trump, as set forth in the Value Enhancement Agreement, as well as access to certain specified other assets owned in whole or in part by Mr. Trump.

*No Compensation to Mr. Trump*

The Value Enhancement Agreement provides that Reorganized TER Holdings will not be required to pay Mr. Trump any fees in exchange for the agreements made by Mr. Trump under the Value Enhancement Agreement.  However, any services obtained from third parties as a result of the Value Enhancement Agreement may require payment of compensation to those third parties.

*Termination*

The Value Enhancement Agreement is terminable:  (a) upon the mutual consent of the parties; (b) by Reorganized TER Holdings, at any time, upon 30 days' written notice to Mr. Trump; (c) by Mr. Trump, upon the occurrence or during the continuance of a material breach of the agreement by Reorganized TER Holdings; (d) if a Deadlock Sale has not previously been consummated and the Restructured Loan has been satisfied in full, automatically on the earlier of (i) the date on which Beal Financial Corporation and its affiliates no longer directly or indirectly beneficially own at least 5% of the outstanding New Partnership Interests, and (ii) the third anniversary of the date on which the Restructured Loan was fully satisfied; (e) in connection with a consummated Deadlock Sale, if all (but not less than all) of the rights and obligations under the Value Enhancement Agreement, the Trademark License Agreement and the Amended and Restated Credit Agreement have been expressly assumed in writing by the acquiror pursuant to the Amended Partnership Agreement, automatically upon the earlier of (x) the "Maturity Date" of the Restructured Loan pursuant to the Amended and Restated Credit Agreement, (y) the third anniversary of the consummation date of the Deadlock Sale, or (z) 30 days after written notice of termination is received by Mr. Trump from the acquiror of Reorganized TER Holdings' rights under the Value Enhancement Agreement pursuant to such Deadlock Sale; (f) in connection with a consummated Deadlock Sale, if all (but not less than all) of the rights and obligations under the Value Enhancement Agreement, the Trademark License Agreement and the Amended and Restated Credit Agreement have not been expressly assumed in writing by the acquiror, automatically on the date on which such Deadlock Sale is consummated; (g) subject to (e) and (f) above, automatically upon the consummation of the sale or other disposition of all or substantially all of the assets of Reorganized TER Holdings; (h) automatically upon the consummation of any sale or other disposition of assets of Reorganized TER Holdings pursuant to or in connection with a foreclosure or similar action under the Amended and Restated Credit Agreement (or any loan or similar obligation refinancing in full the Amended and Restated Credit Agreement or any such refinancing loan or similar obligation); or (i) automatically upon the death of Mr. Trump.

There is currently no agreement in place that obligates Mr. Trump to perform the services for the Debtors that are contemplated by the Value Enhancement Agreement.  The Value Enhancement Agreement is a new agreement under which Mr. Trump will provide significant benefits to the Debtors.  The Value Enhancement Agreement provides that, subject to the terms and conditions of the agreement, Mr. Trump will offer to TER Holdings certain opportunities for investment in, ownership, leasing or management of, or affiliation with, certain casino or gaming

businesses that are presented to him from time to time.  The Value Enhancement Agreement also provides that Mr. Trump will use commercially reasonable efforts to present opportunities to TER Holdings to participate in marketing and promotional activities associated with the assets and businesses of Mr. Trump as well as provide access to the other assets owned in whole or in part by Mr. Trump, in each case as set forth in the Value Enhancement Agreement.

4.    ***The Amended and Restated Services Agreement***

*Duties of Mr. Trump*

The Amended and Restated Services Agreement (the "***Services Agreement***"), which is to be entered into by Reorganized TER Holdings and Mr. Trump on the First Closing Date pursuant to the Purchase Agreement, provides that Reorganized TER Holdings may request that Mr. Trump participate in certain promotional or marketing activities on behalf of Reorganized TER Holdings. Subject to the terms and conditions of the Services Agreement, Mr. Trump will be obligated to participate in up to six such promotional or marketing events each year.  In addition, pursuant to the Services Agreement, Mr. Trump will participate in the production of advertisements on behalf of Reorganized TER Holdings (including print, billboard, television and radio advertisements).

*Expense Reimbursement/No Compensation*

The Services Agreement provides that Reorganized TER Holdings will reimburse Mr. Trump for reasonable and documented expenses incurred by Mr. Trump in connection with the performance of his obligations under the Services Agreement, but that Reorganized TER Holdings will have no further obligation to pay any expense, salary, fee or bonus to Mr. Trump for his services under the Services Agreement.

*Termination*

The Services Agreement is terminable:  (i) by Mr. Trump if TER Holdings materially breaches any of its obligations under the Services Agreement, upon 30 days' written notice to Reorganized TER Holdings; (ii) by Reorganized TER Holdings, at any time, upon 30 days' written notice to Mr. Trump; (iii) because of Mr. Trump's Permanent Disability (as defined in the Services Agreement), upon 30 days' written notice to Mr. Trump from Reorganized TER Holdings or to Reorganized TER Holdings from Mr. Trump; (iv) automatically in the event of Mr. Trump's death; (v) if a Deadlock Sale (as defined in the Services Agreement) has not been consummated and the Restructured Loan has been satisfied in full, automatically on the earlier of (A) the date on which Beal Financial Corporation and its affiliates no longer directly or indirectly beneficially own at least 5% of the outstanding New Partnership Interests, and (B) the third anniversary of the date on which the Restructured Loan was fully satisfied; (vi)  in connection with a consummated Deadlock Sale, if all (but not less than all) of the rights and obligations under the Services Agreement, the Trademark License Agreement and the Amended and Restated Credit Agreement have been expressly assumed in writing by the acquiror pursuant to the Amended Partnership Agreement, automatically upon the earlier of (x) the "Maturity Date" of the Restructured Loan pursuant the Amended and Restated Credit Agreement, (y) the third anniversary of the consummation date of the Deadlock Sale, or (z) 30 days after written notice of termination is received by Mr. Trump from the acquiror of Reorganized TER Holdings' rights under the Services Agreement pursuant to such Deadlock Sale; (vii) in connection with a consummated Deadlock Sale, if all (but not less than all) of the rights and obligations under the Services Agreement, the Trademark License Agreement and the Amended and Restated Credit Agreement have not been expressly assumed in writing by the acquiror, automatically on the date on which such Deadlock Sale is consummated; (viii) subject to (vi) and (vii) above,

automatically upon the consummation of the sale or other disposition of all or substantially all of the assets of Reorganized TER Holdings; or (ix) automatically upon the consummation of any sale or other disposition of assets of Reorganized TER Holdings pursuant to or in connection with a foreclosure or similar action under the Amended and Restated Credit Agreement (or any loan or similar obligation refinancing in full the Amended and Restated Credit Agreement or any such refinancing loan or similar obligation).

The Services Agreement will amend and restate the current Services Agreement by and among Mr. Trump, TER and TER Holdings dated May 20, 2005 (the "**2005 Services Agreement**"). The Services Agreement contains a number of differences from the 2005 Services Agreement which benefit the Debtors. As is the case under the 2005 Services Agreement, the Services Agreement provides for Mr. Trump to perform certain marketing, promotional and advertising services for TER Holdings, subject to the terms and conditions of the Services Agreement. However, unlike the 2005 Services Agreement, which provides for Mr. Trump to receive (i) an annual base fee of $2 million, (ii) certain perquisites and benefits, (iii) a warrant to purchase common stock of TER and (iv) the possibility of further compensation, the Services Agreement provides that TER Holdings has no obligation to compensate Mr. Trump for his services thereunder (except that Mr. Trump will be entitled to receive reimbursement for limited expenses). In addition, the termination provisions of the Services Agreement materially differ from those contained in the 2005 Services Agreement and limit Mr. Trump's ability to terminate the Services Agreement for "good reason" to only instances where TER Holdings materially breaches the agreement.

**D.    Corporate Action**

On the Effective Date, all matters provided for in the Plan that would otherwise require approval of the stockholders, directors, general or limited partners, or members of one or more of the Debtors or Reorganized Debtors, including without limitation, the authorization to (i) issue or cause to be issued the New Common Stock and the New Partnership Interests, and (ii) documents and agreements to be effectuated pursuant to the Plan, the election or appointment as the case may be, of directors and officers of the Reorganized Debtors pursuant to the Plan and the Amended Organizational Documents, and the qualification of each of the Reorganized Debtors as a foreign corporation or entity wherever the conduct of business by such entity requires such qualification shall be deemed to have occurred and shall be in effect from and after the pursuant to the applicable general corporation, limited partnership or limited liability company law of the states in which the Debtors or the Reorganized Debtors are organized, without any requirement of further action by the stockholders, directors, general or limited partners, or members of the Debtors or the Reorganized Debtors.

**E.    Securities Law Matters**

The issuance of the New Common Stock, the New Partnership Interests and interests in Reorganized TER and Reorganized TER Holdings is exempt from registration under the Securities Act pursuant to Section 4(2) thereof as a private placement.

**IV.**

**Voting Procedures and Requirements**

Detailed voting instructions are provided with the ballot accompanying this Disclosure Statement. For purposes of the Plan, only Class 3A-3J and Class 4A-4E are entitled to vote. If your claim is not in one of these Classes, you are not entitled to vote on the Plan and you will

not receive a ballot with this Disclosure Statement.  If your claim is in one of these Classes, you should read your ballot and follow the listed instructions carefully.  Please use only the ballot that accompanies this Disclosure Statement.

---

**IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT, YOU MAY CONTACT THE VOTING AGENT AT THE GARDEN CITY GROUP, INC., ATTN: TRUMP ENETERTAINMENT RESORTS, INC., P.O. BOX 9000 #6517, MERRICK, NEW YORK 11566-9000, TEL: (866) 396-9680**

---

**A.       Vote Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a Plan by creditors in a class of claims is determined by calculating the number and the amount of claims voting to accept, based on the actual total allowed claims voting.  Acceptance by a class of creditors requires an affirmative vote of more than one-half of the total allowed claims voting and two-thirds in amount of the total allowed claims voting.

**B.       Classes Not Entitled to Vote**

Under the Bankruptcy Code, creditors are not entitled to vote on, and are deemed to have accepted, the Plan if their contractual rights are left unimpaired by the Plan.  In addition, classes of claims or interests that are not entitled to receive property under the Plan are not entitled to vote on, and deemed not to have accepted the Plan.  Based on this standard, for example, the holders of other priority claims are not being affected by the Plan and thus deemed to have accepted the Plan.  Conversely, holders of equity interests in TER, for example, are not entitled to vote on, and are deemed not to have accepted, the Plan because they are not receiving any property under the Plan.

**C.       Voting**

In order for your vote to be counted, your vote must be actually ***received*** by the Voting Agent at the following address before the Voting Deadline of 10:00 a.m., (Eastern Time), on [_____], 2009:

---

**Voting Agent For Voting Classes 3A-3J and 4A-4E:**

**The Garden City Group, Inc.**
**Attn: Trump Entertainment Resorts, Inc.**
**P.O. Box 9000 #6517**
**Merrick, New York 11566-9000**
**Tel: (866) 396-9680**

---

**If your vote is received by the Voting Agent after the Voting Deadline, the Debtors, in their sole discretion will decide whether or not your vote will be counted.**

If the instructions on your ballot require you to return the ballot to your bank, broker, or other nominee, or to their agent, you must deliver your ballot to them in sufficient time for them to process it and return it to the Voting Agent before the Voting Deadline.  If a ballot is damaged or lost, you may contact the Voting Agent at the number set forth above.  Any ballot that is executed and returned but which does not indicate an acceptance or rejection of the Plan will not be counted.

**V.**

**Financial Information, Projections, Marketing Efforts, and Valuation Analysis**

**A.      Introduction**

       This section provides summary information concerning the recent financial performance of the Debtors, as well as projections for the remainder of fiscal year 2009, and fiscal years 2010 through 2013.  This section also sets forth an estimate of a going concern valuation for the Debtors.

       The Projections (as defined below) assume an Effective Date of November 1, 2009, with allowed claims treated in accordance the Plan.  Expenses incurred as a result of the Chapter 11 Cases are assumed to be paid on the Effective Date.  If the Debtors do not emerge from chapter 11 as currently scheduled, additional Administrative Expenses will be incurred until such time as a Plan is confirmed and becomes effective.  These Administrative Expenses could significantly impact the Debtors' cash flows.

       Please refer to Section IX of this Disclosure Statement for a discussion of some of the factors that could have a material effect on the information provided in this section.

       The estimates of value are not intended to reflect the values that may be attainable in public or private markets.  They also are not intended to be appraisals or reflect the value that may be realized if assets are sold.

**B.      Operating Performance**

       The Debtors' consolidated financial statements for the year ended December 31, 2008 are included in the 2008 Form 10-K and for the six months ended June 30, 2009 are included in TER's Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2009 (the "***Second Quarter Form 10-Q***"), which are attached hereto as Exhibit D and Exhibit E, respectively.

**C.      Projections**

       The following projected consolidated statements of operations, balance sheets and cash flows (the "***Projections***") reflect the projected operations of the Debtors and include those of Trump Entertainment Resorts Holdings and its majority-owned subsidiaries ("***TERH***").  The following projections present results of operations at Trump Marina Hotel Casino (the "***Trump Marina Casino***") as a discontinued operation within the projected statements of operations and the long-lived assets of Trump Marina Casino as assets held for sale on the projected balance sheets.  The projections do not reflect a disposal of Trump Marina Casino in any of the years presented.

       It is important to note that the Projections may differ from actual performance.  The competitive environment facing the Debtors is highly dynamic and will likely be affected by a number of factors, including (i) potential competition from new projects due to open in the near future, previously postponed projects that could be revived and potential expanded gaming in neighboring jurisdictions outside New Jersey, (ii) promotional competition within Atlantic City and between Atlantic City and surrounding gaming markets, (iii) the potential for further deterioration of the macroeconomic environment – both in Atlantic City and generally, (iv) the impact of regulatory developments, including for example, the possible implementation of a complete smoking ban in Atlantic City casinos, and (v) potential regulatory changes in neighboring jurisdictions, including for

example, the possible introduction of live table games in Delaware, New York and/or Pennsylvania. All of these factors make it particularly challenging to forecast future operating performance.

The Projections assume that the Plan will be confirmed and consummated in accordance with its terms. The Projections assume an effective date of the Plan of November 1, 2009, with allowed claims treated in accordance with the Plan. Expenses incurred as a result of the Chapter 11 Cases are assumed to be paid upon the effective date of the Plan. If the Debtors do not emerge from chapter 11 by November 1, 2009, as assumed for purposes of this analysis, additional bankruptcy expenses will be incurred until such time as a Plan is confirmed. These expenses could significantly impact the Debtors' results of operations and cash flows.

The Projections make a number of key fundamental assumptions, including, without limitation, the following: (i) they make assumptions with respect to the potential competitive impact of slot facilities either newly-opened or expected to open in Pennsylvania, including Philadelphia; a racetrack with slot machines in New York; and the opening of a competitive facility in Atlantic City; (ii) other than the foregoing, they assume no other new competition or property closures; (iii) they assume implementation of future strategic operating initiatives to enhance profitability during non-peak periods; (iv) they assume a payment to the State of New Jersey during 2010 to settle disputed alternative minimum assessments plus accumulated interest for prior years; and (v) they assume that a total of $18 million of Atlantic City real estate tax credits will be utilized to reduce future cash property tax payments from 2010 to 2013.

The Projections should be read in conjunction with (i) the assumptions, qualifications and footnotes to the Projections set forth herein, (ii) the historical consolidated financial information (including the notes and schedules thereto) and (iii) the unaudited actual results reported in the monthly operating reports of the Debtors. The Projections were prepared by management in mid-fiscal year 2009 and were prepared in good faith based upon assumptions believed to be reasonable and applied in a manner consistent with past practice.

The Debtors do not, as a matter of course, publicly disclose projections as to their future revenues, earnings, or cash flow. Accordingly, neither the Debtors nor the Reorganized Debtors intend to update or otherwise revise the Projections to reflect circumstances existing since their preparation, the occurrence of unanticipated events, or changes in general economic or industry conditions, even in the event that any or all of the underlying assumptions are shown to be inaccurate.

The Projections were not prepared with a view toward complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants. The Projections are not presented in accordance with generally accepted accounting principals ("**GAAP**"). The Projections have not been compiled, or prepared for examination or review, by the Debtors' independent auditors (who accordingly assume no responsibility for them).

While presented with numerical specificity, the Projections are based upon a variety of assumptions and are subject to significant business, economic, and competitive uncertainties and contingencies, many of which are beyond the control of the Debtors. These assumptions were based, in part, on economic, competitive, and general business conditions prevailing at the time the Projections were developed, as well as management's forecast for the Atlantic City gaming industry and anticipated future performance of the Debtors. Consequently, the inclusion of the Projections herein should not be regarded as a representation by the Debtors (or any other person) that the Projections will be realized, and actual results may vary materially from those presented below. The industry in which the Debtors compete is highly competitive and the Debtors' results of operations may be significantly adversely affected by, among other things, changes in the competitive

environment, increased state and local regulatory and licensing requirements, and general decline in the economy.  Due to the fact that such Projections are subject to significant uncertainty and are based upon assumptions which may not prove to be accurate, neither the Debtors nor any other person assumes any responsibility for their accuracy or completeness.

The estimates of value included in the Projections are not intended to reflect the values that may be attainable in public or private markets. They also are not intended to be appraisals or reflect the values that may be realized if assets are sold.

TERH is expected to adopt "fresh start" reporting in accordance with GAAP.  Fresh-start reporting requires that the reorganization value of Reorganized TERH be allocated to its assets and liabilities consistent with Statement of Financial Accounting Standards No. 141R, "Business Combinations" (SFAS No. 141R). The total enterprise value used in preparing the projected condensed consolidated balance sheets of Reorganized TERH was assumed to be $458 million. Based on this assumed enterprise value of $458 million and a capital contribution of $100 million, the partners' capital of Reorganized TERH was assumed to be $100 million.

A fair market value analysis of the assets and liabilities of Reorganized TERH, as required for purposes of fresh-start accounting, has not been completed. The allocation of the reorganization value to individual assets and liabilities is therefore subject to change and could result in material differences to the allocated values estimated in these Projections.

1.    *Unaudited Projected Statement of Operations.*

**Trump Entertainment Resorts Holdings**
**Projected Condensed Consolidated Statement of Operations**
**(In Thousands)**
**(Unaudited)**

| | Year Ending December 31, | | | | |
|---|---|---|---|---|---|
| | **2009P** | **2010P** | **2011P** | **2012P** | **2013P** |
| **Revenues:** | | | | | |
| Gaming | $ 689,909 | $ 698,404 | $ 705,816 | $ 659,106 | $ 687,406 |
| Rooms | 80,330 | 84,105 | 87,982 | 85,772 | 89,578 |
| Food and beverage | 85,936 | 87,387 | 90,941 | 92,205 | 95,294 |
| Other | 33,234 | 33,793 | 34,931 | 36,573 | 37,725 |
| | 889,409 | 903,689 | 919,670 | 873,656 | 910,003 |
| Less: promotional allowances | (214,398) | (212,048) | (212,408) | (195,548) | (203,398) |
| Net revenues | 675,011 | 691,641 | 707,262 | 678,108 | 706,605 |
| **Costs and expenses:** | | | | | |
| Gaming | 318,738 | 322,663 | 326,087 | 314,723 | 324,799 |
| Rooms | 16,869 | 17,662 | 18,476 | 18,012 | 18,811 |
| Food and beverage | 39,960 | 40,635 | 42,288 | 42,875 | 44,312 |
| General and administrative | 212,385 | 211,102 | 210,852 | 211,494 | 210,412 |
| Corporate expenses | 18,767 | 12,905 | 13,099 | 13,295 | 13,494 |
| Reorganization expense | 34,677 | - | - | - | - |
| | 641,396 | 604,967 | 610,802 | 600,399 | 611,828 |
| **Adjusted EBITDA (1)** | 33,615 | 86,674 | 96,460 | 77,709 | 94,777 |
| Depreciation and amortization | 54,328 | 27,166 | 30,743 | 33,950 | 36,379 |
| Intangible and other asset impairment charges | 1,127,481 | - | - | - | - |
| Cancellation of indebtedness income | (1,445,389) | - | - | - | - |
| Income from operations | 297,195 | 59,508 | 65,717 | 43,759 | 58,398 |
| Interest income | 1,093 | 4,574 | 1,590 | 967 | 538 |
| Interest expense | (166,155) | (42,140) | (41,717) | (41,293) | (40,523) |
| Other | 379 | - | - | - | - |
| (Loss) income before income taxes and discontinued operations | 132,512 | 21,942 | 25,590 | 3,433 | 18,413 |
| Income tax (expense) benefit | - | 4,333 | - | - | - |
| (Loss) income from continuing operations | 132,512 | 26,276 | 25,590 | 3,433 | 18,413 |
| Income (loss) from discontinued operations - Trump Marina: | | | | | |
| Adjusted EBITDA | (5,702) | (5,583) | (5,589) | (10,458) | (8,470) |
| Marina deposit | 15,196 | - | - | - | - |
| Asset impairment charges | (204,672) | - | - | - | - |
| Interest (expense) income, net | (47) | - | - | - | - |
| Income (loss) from discontinued operations | (195,225) | (5,583) | (5,589) | (10,458) | (8,470) |
| **Net (loss) income** | **$ (62,713)** | **$ 20,693** | **$ 20,001** | **$ (7,025)** | **$ 9,943** |

(1)  Reorganization expenses include the non-cash write-down of $14,432 of deferred financing costs associated with the Senior Notes and Credit Agreement.

(2)  Adjusted EBITDA is income from operations excluding depreciation and amortization, asset impairment charges, cancellation of indebtedness income and income related to the terminated Trump Marina Casino transaction. Adjusted EBITDA is not a GAAP measurement, but is commonly used in the gaming industry as a measure of performance and as a basis for the valuation of gaming companies.  All companies do not calculate Adjusted EBITDA in the same manner; accordingly, Adjusted EBITDA presented herein may not be comparable to Adjusted EBITDA reported by other companies.

**2.    *Unaudited Projected Balance Sheets ($ in thousands).***

**Trump Entertainment Resorts Holdings, L.P.**
**Projected Condensed Consolidated Balance Sheets**
**(In Thousands)**
**(Unaudited)**

| | December 31, | | | | |
|---|---|---|---|---|---|
| | **2009P** | **2010P** | **2011P** | **2012P** | **2013P** |
| **Current assets:** | | | | | |
| Cash and cash equivalents | $ 155,018 | $ 109,676 | $ 90,412 | $ 70,001 | $ 71,730 |
| Accounts receivable, net | 41,356 | 41,356 | 41,356 | 41,356 | 41,356 |
| Accounts receivable, other | 5,381 | 5,381 | 5,381 | 5,381 | 5,381 |
| Property taxes receivable | 3,983 | 3,983 | 4,978 | 4,978 | - |
| Inventories | 5,147 | 5,147 | 5,147 | 5,147 | 5,147 |
| Prepaid expenses and other current assets | 17,251 | 17,251 | 17,251 | 17,251 | 17,251 |
| Assets held for sale | 23,500 | 23,500 | 23,500 | 23,500 | 23,500 |
| Total current assets | 251,636 | 206,294 | 188,025 | 167,614 | 164,365 |
| **Net property and equipment** | 380,320 | 407,486 | 429,725 | 439,007 | 432,268 |
| **Other assets:** | | | | | |
| Property taxes receivable | 12,583 | 9,243 | 4,737 | - | - |
| Other assets | 87,895 | 95,264 | 102,691 | 109,571 | 116,733 |
| Total other assets | 100,478 | 104,507 | 107,428 | 109,571 | 116,733 |
| **Total assets** | **$ 732,434** | **$ 718,287** | **$ 725,178** | **$ 716,192** | **$ 713,366** |
| **Current liabilities:** | | | | | |
| Accounts payable | $ 32,740 | $ 32,740 | $ 32,740 | $ 32,740 | $ 32,740 |
| Accrued payroll and related expenses | 27,861 | 27,861 | 27,861 | 27,861 | 27,861 |
| Self insurance reserves | 14,857 | 14,857 | 14,857 | 14,857 | 14,857 |
| Other current liabilities | 31,795 | 31,795 | 31,795 | 31,795 | 31,795 |
| Current maturities of long-term debt | 4,840 | 4,840 | 4,840 | 4,840 | 4,840 |
| Total current liabilities | **112,093** | **112,093** | **112,093** | **112,093** | **112,093** |
| **Long-term debt:** | | | | | |
| Term Loan | 479,185 | 474,345 | 469,505 | 467,544 | 454,775 |
| Other | 5,896 | 5,896 | 5,896 | 5,896 | 5,896 |
| Total long-term debt | **485,081** | **480,241** | **475,401** | **473,440** | **460,671** |
| **Other long-term liabilities** | 35,260 | 5,260 | 5,260 | 5,260 | 5,260 |
| **Partners' capital** | 100,000 | 120,693 | 132,424 | 125,399 | 135,342 |
| **Total liabilities and partners' capital** | **$ 732,434** | **$ 718,287** | **$ 725,178** | **$ 716,192** | **$ 713,366** |

### 3.    *Unaudited Projected Cash Flow Statements ($ in thousands).*

**Trump Entertainment Resorts Holdings, L.P.**
**Projected Condensed Consolidated Statement of Cash Flows**
**(In Thousands)**
**(Unaudited)**

| | Year Ending December 31, | | | | |
|---|---|---|---|---|---|
| | **2009P** | **2010P** | **2011P** | **2012P** | **2013P** |
| **CASH FROM OPERATING ACTIVITIES:** | | | | | |
| Net (loss) income | $ (62,713) | $ 20,693 | $20,001 | $ (7,025) | $ 9,943 |
| Adjustments to reconcile net loss | | | | | |
| to net cash flows provided by operating activities: | | | | | |
| Depreciation and amortization | 54,328 | 27,166 | 30,743 | 33,950 | 36,379 |
| Intangible and other asset impairment charges | 1,332,153 | - | - | - | - |
| Cancellation of indebtedness income | (1,445,389) | - | - | - | - |
| Amortization of deferred financing costs | 470 | - | - | - | - |
| Stock-based compensation expense | 1,830 | - | - | - | - |
| Accretion of interest income related to property tax settlemer | (823) | (660) | (489) | (263) | (21) |
| Valuation allowance-CRDA investments | 1,954 | 3,685 | 3,713 | 3,440 | 3,581 |
| Provisions for losses on receivables | 10,561 | 9,422 | 9,261 | 8,624 | 8,989 |
| Income related to termination of Marina Agreement | (15,196) | - | - | - | - |
| Non-cash reorganization expense | 14,432 | - | - | - | - |
| Other | (214) | - | - | - | - |
| Changes in operating assets and liabilities: | | | | | |
| Accounts receivable | (13,557) | (9,422) | (9,261) | (8,624) | (8,989) |
| Property tax receivable | 4,000 | 4,000 | 4,000 | 5,000 | 5,000 |
| Inventories | 791 | - | - | - | - |
| Other current assets | (204) | - | - | - | - |
| Other assets | (5,120) | - | - | - | - |
| Accounts payable | 7,675 | - | - | - | - |
| Accrued expenses | 2,021 | - | - | - | - |
| Accrued interest payable | 124,970 | - | - | - | - |
| Other current liabilities | (969) | - | - | - | - |
| Other long-term liabilities | (171) | (30,000) | - | - | - |
| **Net cash flow provided by (used in) operating activities** | **10,829** | **24,884** | **57,968** | **35,102** | **54,882** |
| **CASH FLOW FROM INVESTING ACTIVITIES:** | | | | | |
| Purchases of property and equipment, net | (35,159) | (54,332) | (52,982) | (43,232) | (29,641) |
| Purchase of CRDA investments | (11,216) | (11,054) | (11,140) | (10,320) | (10,743) |
| Decrease in restricted cash | 2,807 | - | - | - | - |
| **Net cash provided by (used in) investing activities** | **(43,568)** | **(65,386)** | **(64,122)** | **(53,552)** | **(40,384)** |
| **CASH FLOW FROM FINANCING ACTIVITIES:** | | | | | |
| Repayment of term loans | (4,923) | (4,840) | (4,840) | (4,840) | (12,769) |
| Interest paid in kind | - | - | - | 2,879 | - |
| Increase (Decrease) in Other Debt | (36) | - | - | - | - |
| Partner contributions | 100,000 | - | - | - | - |
| Partner distributions | - | - | (8,270) | - | - |
| CRDA grant proceeds received | 6,533 | - | - | - | - |
| **Net cash provided by (used in) financing activities** | **101,574** | **(4,840)** | **(13,110)** | **(1,961)** | **(12,769)** |
| Net (decrease) increase in cash and equivalents | 68,835 | (45,342) | (19,264) | (20,411) | 1,729 |
| Cash and equivalents at beginning of period | 86,183 | 155,018 | 109,676 | 90,412 | 70,001 |
| **Cash and equivalents at end of period** | **$ 155,018** | **$ 109,676** | **$90,412** | **$70,001** | **$71,730** |

**4.**     *Notes to Statement of Operations.*

(i)     Approach.

The Projections consolidate the projected financial performance of TERH using an approach established by the Debtors' management to forecast operating results. The statements of operations are based on assumptions with respect to overall Atlantic City market conditions as well as property-specific factors; including size of property, competitiveness of the physical plant, future projected capital expenditures, market position and each property's location within Atlantic City.

The Projections were prepared by the Debtors' management and consider the revenues and operating expenses of each individual property and forecasted capital expenditures. Each property's financial projections were then aggregated with unallocated corporate expenses to develop the consolidated Projections.

(ii)     Revenues.

Gross revenues are revenues derived from casino, hotel, food and beverage, and other operations. Net revenues represent total gross revenues less promotional allowances, which include the retail value of accommodations, food and beverage and other services provided to casino patrons without charge ("complimentaries") and other awards, such as cash coupons, rebates, cash complimentaries and refunds.  The majority of the Debtors' net revenues result from gaming revenues. The Debtors' management projected its gaming revenues by forecasting overall Atlantic City gaming revenues based upon macroeconomic and Atlantic City market-specific conditions and the market share of the Debtors' casino properties.  The potential competitive impact of new properties in surrounding jurisdictions is also considered in the Projections.

(iii)     Costs and Expenses.

Gaming, rooms and food and beverage expenses represent the direct costs associated with, among other things, operating casinos, hotel rooms and suites, food and beverage outlets, and other operations. These direct operating costs primarily relate to payroll, and in the case of food and beverage operations, the cost of goods sold.

General and administrative expenses typically consist of utility costs, marketing and advertising, repairs and maintenance, insurance, property taxes and other general and administrative costs.

Corporate expenses consist of executive compensation (including stock-based compensation during 2009), professional fees and other general and administrative costs.  Corporate expenses during 2010 through 2013 assume Reorganized TERH is a privately-held entity.

Reorganization expense reflects an estimate of costs and expenses expected to be incurred in connection with the Chapter 11 Cases and assume that the Plan will be effective as of November 1, 2009.  Reorganization expenses include the non-cash write-down of $14,432 of deferred financing costs associated with the Senior Notes and Credit Agreement.   If the Debtors do not emerge from chapter 11 by November 1, 2009, as assumed for purposes of the Projections, additional bankruptcy expenses will be incurred until such time as a Plan is confirmed.  These expenses could significantly impact the Debtors' results of operations and cash flows.

    (iv)    <u>Interest Expense.</u>

Interest expense reflects amounts incurred under the Amended and Restated Credit Agreement which would be entered into by and among the Debtors and Beal Bank. Interest expense was calculated using a LIBOR floor and an applicable margin of 5.75%.

    (v)    <u>Income Taxes.</u>

The accompanying Projections do not include a provision for federal income taxes since Reorganized TERH is taxed as a partnership for federal income tax purposes. Therefore, Reorganized TERH's income and losses are allocated and reported for federal income tax purposes by Reorganized TERH's partners.

**5.**    ***Notes to Balance Sheets and Cash Flow Statements***

The balance sheets reflect certain adjustments as a result of consummation of the Plan. Certain liabilities will be extinguished, while others will be adjusted in accordance with the Plan.

The Debtors have made adjustments to certain assets and liabilities to reflect the assumed equity value as of the Effective Date based on the assumed enterprise value. The effect of fresh start accounting, when implemented, may result in further adjustments to assets and liabilities to reflect the appropriate equity value. The preliminary fresh start accounting and reorganization adjustments have been prepared for illustrative purposes only. Actual adjustments could be materially different from those presented herein.

The Projections reflect the utilization of Atlantic City real estate tax credits to reduce future cash property tax payments as follows: 2009 - $4,000; 2010 - $4,000; 2011 - $4,000; 2012 - $5,000; and 2013 - $5,000.

The Projections include future deposits required to be made to the Casino Reinvestment Development Authority pursuant to the Casino Control Act and the related valuation allowance necessary to record the deposits at their estimated fair value.

The Projections assume a payment to the State of New Jersey during 2010 to settle disputed alternative minimum assessments plus accumulated interest for prior years.

The Projections reflect quarterly term loan repayments of 0.25% of the principal amount of all outstanding term loans on the Effective Date. Under the terms of the Amended and Restated Credit Agreement, the Debtors are required to use a portion of its Available Cash Flow to repay amounts outstanding under its term loan.

The Projections reflect the payment of estimated tax distributions which may be required to be made to the partners of Reorganized TERH pursuant to its partnership agreement. The Debtors continue to assess the tax implications of the Plan.

With respect to the Trump Taj Mahal Casino Resort (the "***Trump Taj Mahal Resort***"), projected capital expenditures include project-related capital expenditures that management believes are required to maintain market share in Atlantic City given the relative amenities and condition of other top-performing properties, as well as to remain competitive with surrounding regional competitors. These projects include minor casino floor renovations, technological

enhancements on the casino floor, various restaurant-related renovations and improvements as well as a renovation of the spa and pool area. In addition, projected maintenance capital expenditures at the Trump Taj Mahal Resort include renovation of certain hotel rooms and hallways in the original Taj Tower as well as replacement of slot equipment and signage.

With respect to the Trump Plaza Hotel and Casino ("***Trump Plaza Casino***") and Trump Marina Casino properties, projected capital expenditures are maintenance-related and relate to replacing/converting slot inventory and other gaming equipment beginning in 2010.

Projected capital expenditures also include certain shared services expenditures to enhance and maintain the Debtors' information technology infrastructure.

## D.    Marketing Efforts

Commencing in March 2009, Lazard began a comprehensive marketing effort to seek one or more investors in the Debtors. As part of this effort, Lazard contacted over 50 potential financial or strategic investors. Of those, only five (5) executed non-disclosure agreements and reviewed confidential information. To date, the marketing process has not resulted in the receipt of any bids. The paucity of bids reflects the challenging gaming market and the limited interest of prospective buyers in Atlantic City gaming properties. In particular, several prominent concerns were cited by parties that were contacted:

- The magnitude of deferred maintenance at the Debtors' properties and the need for additional ongoing capital investment to keep the Debtors' properties competitive

- The declining revenues in the Atlantic City gaming market

- The declining EBITDA performance of the Debtors and the lack of any market indications that such performance will improve in the near term

- Longer term concerns about the ability of the Atlantic City market to recover from the current economic downturn and the relative absence of new investment in Atlantic City

- Significant existing competition, both from major competitors already operating in Atlantic City and from new competitors in surrounding markets, including the proliferation of gaming in neighboring jurisdictions (New York and Pennsylvania) and expanded gaming facilities in Connecticut

- The threat of new competition, including new forms of gaming (e.g. table games in Pennsylvania, New York, and Delaware) and new facilities (Pennsylvania, New York, and Maryland)

- The difficulty in raising new capital for gaming enterprises in Atlantic City

- The existence of other, more attractive acquisition opportunities currently available in the gaming industry

- Preference for new development opportunities (particularly in new, limited license, regional jurisdictions expected to provide superior investment returns

Based on its extensive marketing efforts, Lazard has advised the Debtors that the only proposals for investing in the Debtors are from Beal and Mr. Trump, on which the Plan is based, and from the members of the Ad Hoc Committee, and the Debtors have determined that the recently filed AHC Plan is inferior (see Section XI.B, below).  In addition, there is a new expression of interest with respect to a potential purchase of the Trump Marina Casino, described more fully in Section VI.C.

**E.**     **Valuation**

      **1.**     *Introduction.*

The Debtors have directed Lazard to assess the enterprise value of the Reorganized Debtors (the "*Valuation Analysis*"). The following discussion of the Valuation Analysis should be read in conjunction with the discussion of the risk factors contained in Article IX ("Certain Risk Factors to Be Considered") below.

**THE VALUATION INFORMATION CONTAINED IN THIS SECTION IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.   THIS VALUATION ANALYSIS DOES NOT CONSTITUTE A RECOMMENDATION TO ANY HOLDER OF ALLOWED CLAIMS AS TO HOW SUCH PERSON SHOULD VOTE OR OTHERWISE ACT WITH RESPECT TO THE PLAN.**

The Valuation Analysis is as of July 15, 2009, and is based upon management's Projections, dated as of May 12, 2009.  Neither Lazard nor the Debtors make representations as to any changes to such data, information that may have become available, or events that may have occurred since that date.

In preparing the Valuation Analysis, Lazard, among other things:  (i) conducted discussions with various senior executives and property-level managers with respect to the Debtors' business operations, both current and projected; (ii) conducted in-person property tours of the Debtors' three casino properties and those of several of their key competitors; (iii) reviewed the operations and historical financial performance of the Debtors, including year-to-date results relative to the Debtors' business plan; (iv) reviewed management's initial 2009-2013 projections (dated as of March 27, 2009) and consulted with management in running sensitivities thereon; (v) reviewed the Projections and consulted with management as to the key assumptions underlying such Projections; (vi) analyzed current market conditions and general trends impacting the general gaming industry, the Atlantic City market, and the greater Northeastern gaming market; (vii) analyzed the performance, financial information, and market position of the Debtors relative to certain competitors and/or publicly traded reference companies; (viii) considered the results of Lazard's extensive efforts to market the Debtors' business and the feedback received from parties contacted during that process; (ix) reviewed various securities analyst research reports on the gaming industry and its participants; (x) surveyed potential precedent transactions in the gaming industry; (xi) reviewed various documents and pleadings in the Chapter 11 Cases, and (xii) reviewed such other information and conducted such other analyses as Lazard deemed appropriate.  For a variety of reasons discussed below in Section VI.C.4, Lazard did not attribute any value to the Florida Litigation (as defined in that Section) in preparing the Valuation Analysis.  Lazard's estimate of the enterprise value of the Debtors does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

Lazard assumed, without independent verification, the accuracy, completeness, and fairness of all of the financial and other information available to it from public sources or as provided to Lazard by the Debtors or their representatives.  Lazard did not make any independent evaluation or appraisal of the Debtors' assets, nor did Lazard independently verify any of the information it reviewed.  Lazard has assumed that the Projections, which were prepared by the Debtors' management and reviewed by the Board of Directors of the Debtors, were reasonably prepared by them on bases reflecting the best estimates and good faith judgments of the Debtors' management as to future operating and financial performance as of the date of their preparation, and that the Debtors have informed Lazard of all known circumstances occurring since such date that could make the Projections incomplete or misleading.  Lazard conducted the Valuation Analysis with the explicit understanding that it is based on standards of assessment, including economic, political, legal, and other conditions, in existence as of the date of the Valuation Analysis that are beyond Lazard's and the Debtors' control.  Such standards of assessment may change in the future, and such changes could have a material impact (positive or negative) on its assessment of the valuation of the Reorganized Debtors set forth in this Disclosure Statement.  To the extent the Valuation Analysis is dependent upon the Reorganized Debtors' achievement of the Projections, and the assumption that general economic, financial, and market conditions as of the Effective Date will not differ materially from those prevailing as of the date of the Valuation Analysis, the Valuation Analysis must be considered theoretical.  Lazard disclaims any responsibility for any impact any change in such factors may have on the assessment of the enterprise value of the Reorganized Debtors.

**THE ENTERPRISE VALUATION RANGE PRESENTED BELOW REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD AS OF THE DATE OF THIS DISCLOSURE STATEMENT.  IN ADDITION, THE PROJECTIONS USED TO DEVELOP THE VALUATION ANALYSIS ASSUME THAT GENERAL ECONOMIC, FINANCIAL, AND MARKET CONDITIONS WILL NOT DIFFER MATERIALLY FROM THOSE CONDITIONS PREVAILING AS OF THE DATE OF THE VALUATION ANALYSIS.  ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD, NOR THE DEBTORS HAS ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATES.**

2. *Total Enterprise Value.*

(i)  Description of Approach.

The Valuation Analysis summarizes Lazard's view with respect to the total enterprise value of the Reorganized Debtors.  In conducting this analysis, Lazard analyzed the ongoing operations of the Trump Taj Mahal Resort and the Trump Plaza Casino, which form the basis for the Debtors' business plan.  The Trump Marina Casino, which has been considered a discontinued operation of the Debtors, was separately valued and the details of such valuation are described in greater detail in Section 2(ii) below.

In preparing a valuation analysis, Lazard generally uses the following three accepted valuation methodologies:  (i) valuation based on how the market values comparable publicly traded companies with relatively similar operating or financial characteristics (herein referred to as the "***Public Trading Analysis***"), (ii) valuation of the business as calculated using the present value of expected future cash flows generated by the business (the "***DCF Analysis***") and (iii) valuation of the business based on the consideration paid in publicly announced merger and acquisition transactions for comparable companies over time (the "***Precedent Transactions Analysis***").

The Public Trading Analysis involved carefully selecting reference companies and using an appropriate range of valuation multiples to calculate an estimated Total Enterprise Value for the Reorganized Debtors. The reference companies selected consist of a group of mid-size gaming operators that (like the Reorganized Debtors) lack substantial Las Vegas Strip or international operations. Lazard then computed a range of appropriate EBITDA multiples derived from a comparison of the total enterprise value for each company in the reference group to its trailing twelve- month, 2009 estimated, and 2010 projected EBITDA figures.

After determining the reference group and respective multiples, Lazard selected an appropriate range of valuation multiples for the Debtors' business, taking into account the Debtors' operating metrics relative to that of the overall reference group (size, number of casino properties, geographic diversification, growth rate, profitability, and free cash flow) and other factors.

The DCF Analysis estimates the value of the Debtors' ongoing properties/operations, the Trump Taj Mahal Resort and the Trump Plaza Casino, based on the present value of the unlevered free cash flows for these two properties. The projected cash flows were derived from the Projections. Lazard discounted these projected cash flows by the Reorganized Debtors' risk-adjusted cost of capital — or weighted average cost of capital ("*WACC*") — to derive a present value. Lazard calculated the present value of all cash flows after 2013 using terminal values, calculated by applying exit multiples to obtain a range of terminal values and discounting those amounts to the present.

Lazard has chosen not to rely on a Precedent Transactions Analysis in deriving a valuation range because, with the possible exception of the still-pending acquisition of the Tropicana Atlantic City, (i) previous transactions involving gaming properties occurred under drastically different industry conditions than are currently extant, (ii) the companies involved in such transactions had significantly different business and property profiles from the Reorganized Debtors and (iii) such transactions were based on an acquisition financing market that, in the current macroeconomic environment, does not exist. The only recent transaction that is comparable is the still-pending acquisition of the Tropicana Atlantic City. However, Lazard believes that it is not appropriate to use the Precedent Transactions Analysis with only a single transaction, which, in this case, would depress the overall going concern valuation.

Based on the foregoing methodologies, as of July 15, 2009, Lazard estimates that the theoretical range of total enterprise value for the Reorganized Debtors (excluding the Trump Marina Casino) is $404 million to $464 million with a midpoint value of $434 million.

(ii)      Valuation Implications of Marina.

Lazard has separately considered the theoretical valuation of the Trump Marina Casino, which has been classified as a "discontinued operation" of the Debtors. The Trump Marina Casino is located in the Marina District of Atlantic City, which is separate from the Boardwalk and is also the location of two of the leading properties in Atlantic City: Harrah's Marina and the Borgata. Since 2006, the business performance of the Trump Marina Casino has deteriorated dramatically, which can be attributed partially to the overall deterioration in the financial performance of all the Atlantic City casinos, partially to increased competition in the Marina District and, most recently, to uncertainty among Marina customers over the potential sale of the Trump Marina Casino to Coastal Marina, LLC and Coastal Development, LLC (collectively, "*Coastal*"), which sale was announced in May 2008 and was formally terminated on June 1, 2009.

The Trump Marina Casino currently is, and is projected to continue to be, a cash drain on the Debtors. Because it is not expected to generate positive EBITDA, Lazard has decided to

value the Trump Marina Casino separately from the Debtors' other properties. (The cash drain from the Trump Marina Casino is not part of the Valuation Analysis with respect to the other two properties.)   The Trump Marina Casino has been the subject of an ongoing marketing effort by the Debtors for several years that resulted in the recently terminated sale to Coastal.  The Debtors efforts have been wholly unsuccessful in obtaining a bid or other indication of interest for any property of the Debtors (other than as described in the following paragraph).

As discussed in greater detail below in Section VI.C, on June 9, 2009 and July 16, 2009, Coastal submitted written non-binding indications of interest describing certain terms under which it would acquire the Trump Marina Casino.  The Coastal proposal, as most recently described, contains conditions and terms that are unacceptable to the Debtors because they would entail significant execution risk, likely adverse consequences to the Debtors' remaining properties and high costs.  Lazard calculated a maximum net present value of $47 million of proceeds at June 30, 2009 (assuming a 14.5% discount rate) if the Trump Marina Casino could be sold as a going concern at December 31, 2009 for the indicative $58 million purchase price described in the Coastal letter (less an estimated $2 million of customary transaction costs (e.g., legal costs, financial advisor fees, etc.) and approximately $5 million of expected negative operating cash flow to carry the facility to closing).   Negative interim operating cash flow reflects property EBITDA, CRDA obligations, maintenance capital expenditures and allocated corporate expenses.  Lazard applied a 50% probability to reflect the likelihood that such transaction with Coastal could be successfully closed and therefore determined, for purposes of the Valuation Analysis, that the value of the Trump Marina Casino is approximately $24 million.

Adding this value for the Trump Marina Casino to the enterprise value presented above for the Trump Taj Mahal Resort and the Trump Plaza Casino results in a theoretical enterprise valuation range of $428 to $488 million.  Lazard believes that $458 million – the midpoint of this range – constitutes a reasonable valuation estimate of the Reorganized Debtors.

## VI.

## General Information

### A.   Description of Debtors

#### 1.   *Corporate Structure and Business.*

TER is a publicly-held company and general partner of TER Holdings, which owns the operating casino entities.  The predecessor entity to TER was Trump Hotels & Casino Resorts, Inc. ("**THCR**").  THCR was incorporated in Delaware in March 1995 and became a public company in June 1995.  Like TER, THCR and its affiliates and subsidiaries owned and operated three casino hotel properties in Atlantic City, New Jersey:  Trump Taj Mahal Resort, Trump Plaza Casino, and Trump Marina Casino.  In addition, THCR and its affiliates and subsidiaries owned and operated casino properties in California and Indiana.

TER's common stock began trading on the Nasdaq Stock Market under the ticker symbol "TRMP" in September 20, 2005.  On February 17, 2009, TER received a notification from the Nasdaq Stock Market indicating that it had determined, in accordance with Nasdaq Marketplace Rules, that TER's common stock would be delisted from the Nasdaq Stock Market in light of the filing of the Chapter 11 Cases, concerns about the residual equity interest of the existing listed security holders and concerns about TER's ability to sustain compliance with all of Nasdaq's listing requirements.  Trading in TER common stock was suspended on February 26, 2009.  On March 12,

2009, Nasdaq announced that it would file a Form 25 with the SEC to complete the delisting.  The delisting was effective on March 22, 2009.

As of August 3, 2009, the outstanding equity of TER consisted of (i) 31,715,876 shares of common stock (with approximately 2,864 holders of record of TER common stock) and (ii) 900 shares of TER's class B common stock.  The issued and outstanding shares of class B common stock are held by Mr. Trump and have the voting equivalency of 1,407 shares of TER common stock.  TER's principal assets consist of its general and indirect limited partnership interests in TER Holdings which holds, through its subsidiaries, substantially all of the assets of the Debtors' businesses.  TER Holdings is currently owned by TER as General Partner (with an aggregate percentage interest of approximately 99.98814%), TER's wholly owned subsidiary TCI 2, a Limited Partner (with an aggregate percentage interest of approximately 0.00461%), and ACE Entertainment Holdings, Inc., also a Limited Partner and an affiliate of Mr. Trump (with an aggregate percentage interest of approximately 0.00725%).  TER Holdings also owns 100% of several other limited liability company debtors.

As the sole general partner of TER Holdings, TER generally has the exclusive rights, responsibilities and discretion as to the management and control of TER Holdings and its subsidiaries.

For more information about TER and its business reference is made to TER's 2008 Form 10-K and Second Quarter Form 10-Q, attached hereto as Exhibit D and Exhibit E, respectively.

## 2.     *History and Prior Bankruptcy Proceedings.*

On November 21, 2004, THCR, together with 28 affiliates and subsidiaries (collectively, the "*2004 Debtors*"), filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the District of New Jersey (Case No. 04-46898 (JHW)) (Jointly Administered) (the "*2004 Chapter 11 Cases*"), as part of a conceptually agreed upon plan.

On April 5, 2005, the United States Bankruptcy Court for the District of New Jersey entered an order confirming the Debtors' Second Amended Joint Plan of Reorganization (the "*Prior Plan*"), which became effective on May 20, 2005 (the "*Prior Effective Date*").  Upon the Prior Effective Date, all material conditions to the Prior Plan were satisfied and the 2004 Debtors emerged from chapter 11 as the Debtors.  Pursuant to the Prior Plan, the 2004 Debtors were recapitalized and renamed, certain subsidiaries were merged and/or dissolved, indebtedness was consolidated and debt service was substantially reduced.

The Debtors' current capital structure arises from the Prior Plan.  The Debtors implemented a 1,000 for 1 reverse stock split of THCR's common stock such that each 1,000 shares of THCR common stock immediately prior to the reverse stock split were consolidated into one share of common stock of the reorganized debtor, TER, resulting in the distribution of approximately 19,944 shares of TER common stock (approximately 0.05% on a fully diluted basis for holders other than Mr. Trump), in aggregate, to holders of THCR common stock.  Holders of THCR common stock received approximately $0.88 for each share of THCR common stock owned by each holder, an aggregate of $17.5 million,  and also obtained a pro rata share of the net proceeds from the sale of the former World's Fair site in Atlantic City, a total of $25.2 million.  All options to acquire THCR common stock were cancelled, and holders (other than Mr. Trump) of THCR common stock also received Class A Warrants to purchase up to approximately 2,207,260 shares of TER common stock (approximately 5.34% on a fully diluted basis).  The Class A Warrants were either exercised by or converted to shares under the Prior Plan on May 22, 2006.

On the Prior Effective Date, TER Holdings and Trump Entertainment Resorts Funding, Inc. ("*TER Funding*") issued $1.25 billion aggregate principal amount of 8.5% Senior Secured Notes due 2015 (the "*Second Lien Notes*") in connection with the Prior Plan.  In addition, the Debtors implemented a debt restructuring whereby pro rata distributions of cash, Senior Secured Notes, or TER common stock were made to: (i) holders of $1.3 billion aggregate principal amount of 11.25% First Mortgage Notes of Trump Atlantic City Associates, Trump Atlantic City Funding, Inc., Trump Atlantic City Funding, II, Inc. and Trump Atlantic City Funding, III, Inc.; (ii) holders of approximately $435 million aggregate principal amount of 11.625% First Priority Mortgage Notes due 2010 of Trump Casino Holdings, LLC and Trump Casino Funding, Inc.; and (iii) holders of $54.6 million aggregate principal amount of 17.625% of Second Priority Notes due 2010 of Trump Casino Holdings, LLC.

The Debtors also entered into a $500 million secured credit facility on the Prior Effective Date with a syndicate of bank lenders (the "*2005 Credit Facility*").  The proceeds from the 2005 Credit Facility were used to repay up to $100 million in debtor in possession financing that the 2004 Debtors had obtained on November 22, 2004 during the 2004 Chapter 11 Cases.  The 2005 Credit Facility was secured by substantially all assets of the Debtors, and senior in priority to the Senior Secured Notes.

On December 21, 2007, the Debtors entered into a $493.3 million secured credit facility, which was amended in March 2008, May 2008, and October 2008 (the "*2007 Credit Facility*"), the proceeds of which were used to repay all amounts outstanding under the 2005 Credit Facility and $6.6 million of associated transaction costs.

## B.      Prepetition Capital Structure of the Debtors

The capital structure of the Debtors consists primarily of equity and secured notes.  As of August 3, 2009, the outstanding equity of TER consisted of (i) 31,715,876 publicly traded shares of common stock (with approximately 2,864 holders of record of TER common stock).  Nine hundred (900) shares of TER's class B common stock are owned by Mr. Trump and represent the right to vote 1,407 shares of TER common stock.

In addition, TER and TER Holdings have consolidated long term debt under the 2007 Credit Facility of approximately $493,250,000.  As of June 30, 2009, the total amount outstanding under the 2007 Credit Facility was $486,293,000.  The 2007 Credit Facility matures on December 21, 2012 and must be repaid during the final year of the loans in equal quarterly amounts, subject to amortization of approximately 1.0% per year prior to the final year.  Borrowings under the 2007 Credit Facility are secured by a first priority security interest in and lien on substantially all of the assets of TER Holdings and its operating subsidiaries, and the guaranty of TER.

In addition, TER Holdings and TER Funding have consolidated long term debt under the Senior Secured Notes of approximately $1,250,000,000 in principal amount due June 1, 2015.  The Senior Secured Notes were used to pay distributions under the Prior Plan.  The Senior Secured Notes bear interest at 8.5% per annum.  The obligations under the Senior Secured Notes are secured by second mortgages on the Debtors' real property, certain intellectual property rights, and related personal property, all subordinate to liens securing amounts borrowed under the 2007 Credit Facility and certain other permitted prior liens.  In addition, Mr. Trump has provided a guaranty of up to $250,000,000 of the Second Lien Notes under certain terms and conditions (the "*Guaranty*").  See "Item 13 – Certain Relationships and Related Transactions – Debt Guarantee" in the 2008 Form 10-K which is attached hereto as Exhibit D.

As of June 30, 2009, the Debtors' books and records reflected accounts payable due and owing in the approximate amount of $12,104,000, plus an additional $69,000 in costs for construction in progress, an additional estimated $19,295,000 for other vendors (such as utilities) who have not provided invoices to the Debtors for services and products already provided. Total trade debt was approximately $31,468,000. In addition, the Debtors are obligated for approximately $6,019,000 for leases and other ordinary course financings arrangements.

## C.     Events Leading to the Commencement of the Chapter 11 Cases

The Debtors' operating results during 2008 and 2009 have been affected by various factors, including most significantly the competition in nearby or adjoining states and general and significant weakening of the economy. Other factors affecting performance included the pending sale of the Trump Marina Casino (as described below) and smoking restrictions under local legislation.

### 1.     *Competition.*

The Atlantic City market primarily serves the New York-Philadelphia-Baltimore-Washington D.C. corridor with nearly 30 million adults living within a three-hour driving radius. The Atlantic City market is the second largest gaming market in the United States, after Las Vegas. In 2008, the casinos in the Atlantic City market generated $4.5 billion in casino revenue. The Debtors' three casinos combined comprise approximately 21% of the gaming positions and 21% of the hotel rooms in the Atlantic City market and generate approximately 21% of the market gaming revenue.

Competition in Atlantic City is intense and increasing. At the present time, the 11 casino hotels located in Atlantic City, including the Debtors' three properties, compete with each other on the basis of customer service, quality and extent of amenities and promotional offers. For this reason, the Debtors and their competitors require substantial capital expenditures to compete effectively.

For the quarter ended June 30, 2009, gross gaming revenues in the Atlantic City market (as reported to the NJ CCC) compared to the same quarter in 2008 decreased 14.5% overall, while slot revenues decreased 14.8%. For the quarter ended June 30, 2009, the Debtors experienced a 15.5% decrease in overall gross gaming revenue and a 14.0% decrease in slot revenue at their three properties, compared to the prior-year period.

For the six months ended June 30, 2009, gross gaming revenues in the Atlantic City market (as reported to the NJ CCC) decreased 15.3% overall, while slot revenues decreased 15.9% compared to the six months ended June 30, 2008. For the six months ended June 30, 2009, the Debtors experienced a 14.0% decrease in overall gross gaming revenue and a 14.9% decrease in slot revenue at their three properties compared to the prior year period.

Beginning in late 2006 and continuing in 2007, several new gaming properties debuted in Pennsylvania that have introduced over 9,000 new slot machines within the Debtors' competitive marketplace. Importantly, these new facilities are located in close proximity to the Debtors' significant customer base in southeastern Pennsylvania, and this convenience factor is proving quite persuasive to particular segments of the Debtors' customers. Furthermore, the City of Atlantic City imposed a partial smoking ban that took effect in April 2007 that mandated each Atlantic City casino designate at least seventy-five percent of its gaming area smoke-free.

As a result of these developments, in 2007, the Atlantic City gaming industry experienced its first year-over-year revenue decline since the first casino opened its doors in 1978.

The effect of new competition from Pennsylvania and the partial smoking ban implemented by the City of Atlantic City was broad. From the city's largest property to its smallest, the financial effects of the recent market changes have been widespread and have continued. This decline was repeated in 2008, and in fact economic conditions exacerbated such decline.

**2.** *Regulatory and Licensing.*

On April 15, 2007, an ordinance in Atlantic City became effective which extended smoking restrictions under the New Jersey Smoke-Free Air Act. The Atlantic City ordinance mandated that casinos restrict smoking to designated areas of up to 25% of the casino floor. During April 2008, Atlantic City's City Council unanimously approved an amendment to the Atlantic City ordinance which bans smoking entirely on all casino gaming floors and casino simulcasting areas, but allows smoking in separately exhausted, non-gaming smoking lounges. The amendment to the ordinance became effective on October 15, 2008, however, on October 27, 2008, Atlantic City's City Council voted to postpone the full smoking ban for at least one year due to, among other things, the weakened economy and increased competition in adjoining states. The postponement of the full smoking ban went into effect on November 16, 2008. While the Debtors are unable to quantify the impact of the smoking restrictions, the Debtors believe that the smoking restrictions have negatively impacted their gaming revenues and income from operations as their competition in adjacent states continues to permit smoking. Although the Debtors constructed a smoking lounge on the casino floor at each of their properties as permitted by the ordinance, the Debtors believe their gaming revenues and income from operations were negatively affected by the full smoking ban and that a future complete ban on smoking in casino and casino simulcasting areas could further adversely affect their results.

In addition, the gaming industry is highly regulated and the Debtors must maintain their casino licenses and pay gaming taxes in order to continue their gaming operations. For more information about the regulation of the gaming industry, reference is made to the 2008 Form 10-K attached hereto as Exhibit D.

**3.** *Default Under the Second Lien Notes and Negotiations with Noteholder Advisors.*

As a result of the above factors, the Debtors' cash flow suffered. TER Holdings and TER Funding did not make the interest payment due December 1, 2008 on the Second Lien Notes. From that date forward, the Debtors and their representatives pursued discussions with certain holders of the Second Lien Notes and their representatives regarding a possible negotiated restructuring of the Debtors' capital structure.

Thereafter, the Ad Hoc Committee was formed and retained financial and legal advisors (the "*Noteholder Advisors*"). In December 2008, the Debtors entered into confidentiality agreements with the Noteholder Advisors pursuant to which the Debtors furnished extensive non-public financial and operational information to the Noteholder Advisors to facilitate negotiations. On December 31, 2008, the Debtors entered into a forbearance agreement with certain Noteholders and a forbearance agreement with the Debtors' senior lenders pursuant to which the respective parties agreed to forbear from exercising certain rights during the term of the forbearance agreement. As the discussions regarding a restructuring continued, these forbearance agreements were extended a number of times, with the term of the latest extension dated as of February 11 expiring at 9:00 a.m. on February 17, 2009.

The discussions addressed, among other things, various proposals for a negotiated restructuring of the Debtors' capital structure pursuant to a case under chapter 11 of title 11 of the

United States Code, and included discussions among certain Noteholders, the Noteholder Advisors, Mr. Trump and his representatives regarding the potential treatment in a restructuring of the Debtors of the various existing agreements between Mr. Trump, on the one hand, and the Debtors and its subsidiaries, on the other. To facilitate these discussions, Mr. Trump entered into a forbearance agreement whereby he agreed to forbear from exercising certain rights during the term of the forbearance agreement. As the discussions regarding a restructuring continued, this forbearance agreement was extended a number of times, with the term of the latest extension expiring, as noted above, on the morning of February 17, 2009.

In an effort to reach a global compromise, prior to the commencement of the Chapter 11 Cases, the TER board of directors invited Mr. Trump and Ivanka Trump to participate in initial negotiations with the Ad Hoc Committee. However, neither of them participated in any vote of the board on any issue related to the restructuring of the Debtors as each of Mr. Trump and Ivanka Trump had resigned from the board prior to any vote related to the restructuring. After the commencement of the Chapter 11 Cases, Mr. and Ms. Trump had no role on the board and attended only one meeting at which they presented the Beal/Trump proposal. Representatives of the Ad Hoc Committee attended that meeting after the presentation from Mr. and Ms. Trump.

Over the course of the last few months, the Company has received several proposals from the Ad Hoc Committee, on the one hand, and the First Lien Lenders and Mr. Trump, on the other, regarding restructuring alternatives. A discussion of the AHC Plan is set forth below in Section XI. B (Alternative Plan). In considering and comparing these restructuring alternatives, the Debtors, including their management and respective boards, considered numerous factors, including which option would maximize the value of the estates' assets for creditors, and certainty of consummation. In addition, the Debtors considered the extensive marketing and sale efforts that they had conducted with the assistance of Lazard, their financial advisors. After such processes, the senior management recommended, and the Board eventually resolved, that the restructuring alternative that provided for an additional investment of $100 million by the Plan Investors, and the favorable terms of the Amended and Restated Credit Agreement represented the best available approach to maximize the value of the Debtors' assets for creditors. The Purchase Agreement was amended on October 5, 2009, to provide for an additional investment by the Plan Investors in the aggregate amount of $13.9 million, for a total aggregate investment of $113.9 million. In addition, the proposal of the Plan Investors provides the Debtors with licensing rights to use certain "Trump" trademarks and Mr. Trump's likeness, as well as provides for agreements under which Mr. Trump would provide marketing and promotional services, and present certain business opportunities, to the Debtors and would refrain from engaging in certain activities that are competitive with the Debtors' businesses. Therefore, in the view of the Debtors, pursuit of the transactions described herein is in the best interests of the estates. Accordingly, on July 22, 2009, the Debtors decided to proceed with the proposals put forth by the First Lien Lenders and Mr. Trump.

### 4.    *The Florida Litigation and Pending Sale of the Trump Marina Casino.*

As set forth in further detail in Exhibit D, one of the Debtors, Trump Entertainment Resorts Development Company, LLC, is a plaintiff in litigation pending in Florida (the "***Florida Litigation***") against Richard Fields ("***Fields***") and Coastal Development, LLC, Power Plant Entertainment, LLC, the Cordish Company, Native American Development, LLC and Joseph Weinberg (collectively, the "***Defendants***"). The suit alleges a conspiracy among the Defendants pursuant to which Fields, a former consultant for the negotiation and development of Trump properties, used his relationship with the Debtors and/or Mr. Trump to partner with the Seminole Indian Tribe of Florida to develop and open two Hard Rock hotel and casino properties in Florida. The Debtors believe the lawsuit to be an asset of the estate, but for many reasons, including that

discovery and trial on liability and damages have been bifurcated, they are unable to value the asset at this time. The Defendants did not assert counterclaims in the Florida Litigation and did not file any proofs of claims against any of the Debtors in the Chapter 11 Cases. Several of the Defendants contend that they have future contingent claims against the Debtors relating to the litigation, most particularly claims for attorneys' fees under Florida law. The Bankruptcy Court has ruled that the attorney fee claims are prepetition claims (although any unaccrued malicious prosecution claim is not). Several Defendants, who admit making a decision not to file proof of claims in Bankruptcy Court, have appealed the Bankruptcy Court's ruling. In addition, one of the Defendants and an affiliate have filed an adversary complaint against the Debtors alleging claims arising from a failed prepetition settlement of the Florida Litigation (described below). The Debtors believe the Bankruptcy Court's ruling was correct and that the adversary complaint has no merit.

As a part of a prepetition settlement of the Florida Litigation, on May 28, 2008, Trump Marina Associates, LLC, d/b/a Trump Marina Hotel Casino entered into an Asset Purchase Agreement (the "*APA*") to sell the Trump Marina Casino to Coastal. On October 28, 2008, the parties entered into an amendment to the APA to modify certain terms and conditions of the APA. The closing was subject to the satisfaction of certain conditions, including receipt of approvals from New Jersey governmental authorities and this Court. To date, despite the Debtors agreeing to amendments to the APA, Coastal has never evidenced financing commitments or an ability to close on any of its proposed transactions. On May 28, 2009, the APA terminated as a result of the buyer's inability to close.

Since the termination of Coastal's most recent proposal, Coastal submitted written non-binding indications of interest on June 9, 2009 and July 16, 2009 describing certain terms under which it would acquire the Trump Marina Casino. To date, however, such terms have been unacceptable to the Debtors. The Debtors continue to explore with Coastal their interest in pursuing a purchase of the Marina property. On July 28, 2009, Coastal filed an adversary proceeding against the Debtors in the Bankruptcy Court seeking to recover certain deposits relating to the APA. As stated above, the Debtors believe the complaint to be without merit. In addition, the Ad Hoc Committee and Coastal have suggested that potential causes of action may be asserted against Donald and Ivanka Trump, including without limitation, for Mr. Trump's role in the negotiations surrounding the sale of the Trump Marina Casino. The Debtors are not aware of any claims against Mr. Trump with respect to the Trump Marina Casino negotiations or otherwise, and, therefore, have not conducted any investigation. The Debtors have never agreed to pay Mr. Trump a finder's fee in connection with the sale of the Trump Marina Casino.

**5.**    ***Mr. Trump's Abandonment of his Limited Partnership Interests in TER Holdings.***

As disclosed in the Debtors' 2008 Form 10-K, annexed hereto as Exhibit D, by letter dated February 13, 2009, Mr. Trump notified TER that he had abandoned any and all of his 23.5% direct limited partnership interest in TER Holdings and relinquished any and all rights under the Fourth Amended and Restated Agreement of Limited Partnership of TER Holdings (the "***Partnership Agreement***") or otherwise with respect to TER Holdings and Mr. Trump's limited partnership interest. That same day, Donald and Ivanka Trump resigned as members of the board of directors of TER Inc., pursuant to written letters of resignation. Pursuant to the terms of the Partnership Agreement, the prior written consent of TER, as the general partner of TER Holdings, is required for a limited partner to withdraw from TER Holdings. TER did not consent to a withdrawal by Mr. Trump from TER Holdings. Accordingly, at the time of Mr. Trump's abandonment, the Debtors reserved all rights and remedies against Mr. Trump with respect thereto. Since the time that Mr.

Trump notified TER that he was abandoning his partnership interest, the Debtors have determined that such action will have no material effect on the Debtors, financial or otherwise.

### 6. *Examiner.*

On August 11, 2009, the Ad Hoc Committee filed a Motion to Appoint an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code. On September 15, 2009, the Bankruptcy Court entered an order (the "***Examiner Order***") approving the motion and directing the Examiner to "(a) investigate the negotiating process on the selection of the Beal/Trump plan, the considerations of the Debtors in terms of the desirability of that plan over the Ad Hoc Committee's plan, how that process went forward and the role of Mr. Trump in that context; and (b) otherwise perform, to the extent further directed by the Court upon notice and a hearing, such other duties as set forth in 11 U.S.C. § 1106(a)(3) and 11 U.S.C. § 1106(a)(4) of the Bankruptcy Code." In addition, the Bankruptcy Court ordered that the examiner shall, within ten (10) business days after entry of the Examiner Order, propose a work plan and provide his or her estimated costs to complete the investigation. On September 21, 2009, Michael St. Patrick Baxter, Esq. was appointed as the examiner.

### VII.

### Governance

**A.**        **Current Board of Directors, Management and Executive Compensation**

For information about TER's current board of directors, management and executive compensation policies reference is made to the 2008 Form 10-K attached hereto as Exhibit D.

**B.**        **Board of Directors of New General Partner**

The board of managers of New General Partner shall be composed of a total of four members, two of which shall be licensable individuals selected by Mr. Trump and two of which shall be licensable individuals selected by BNAC. The members of the board will be identified no later than the confirmation hearing. The board shall also have an independent audit committee.

**C.**        **Officers of Reorganized TER**

The officers of TER immediately prior to the Effective Date will serve as the officers of Reorganized TER on and after the Effective Date in accordance with any employment and severance agreements with Reorganized TER and applicable non-bankruptcy law. On and after the Effective Date, the officers of Reorganized TER will be determined by Reorganized TER's board of directors, provided that the following officers and employees of TER will be offered one year severance arrangements, which are substantially similar to, and no less favorable than, those in effect prior to the date of the filing of the Chapter 11 Cases in respect of such officers' and employees' salaries and associated benefits and titles. Such agreements shall not contain change of control provisions or equity participation but shall contain a severance benefit equal to one year's salary triggered upon a termination without cause or any diminution in job title or responsibilities: Don Browne, John Burke, Mark Juliano, Rosalind Krause, Chris Latil, Loretta Pickus, Robert Pickus, James Rigot, Mark Sachais, and Franco Pilli.

### D.        Continued Corporate Existence

Except as provided in the Plan, each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate corporation, partnership or limited liability company, with all of the powers of such entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law. Except as provided in the Plan and other than the Prepetition First Priority Liens (as defined in the Final Cash Collateral Order) or any other liens or security interests granted to secure any indebtedness and obligations under the Amended and Restated Credit Agreement or any other "Loan Documents" as defined therein, as of the Effective Date, all property of the estate of a Debtor, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest in such Reorganized Debtor, free and clear of all claims, liens, charges, other encumbrances and interests.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  On the Effective Date, except as provided in the Plan and except for the Prepetition First Priority Liens (as defined in the Final Cash Collateral Order) or any other liens or security interests granted to secured any indebtedness and obligations under the Amended and Restated Credit Agreement or any other "Loan Documents" as defined therein, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Debtors or their estates shall be fully released, terminated and discharged without further notice or action by the Debtors, Reorganized Debtors, holders of any such mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Debtors or their estates, the Bankruptcy Court or any applicable federal, state or local governmental agency or department. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for professional fees and expenses, disbursements, expenses or related support services (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

The Plan may result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting, or acquiring corporations, partnerships or limited liability companies.  In each case in which the surviving, resulting, or acquiring corporation, partnership or limited liability company in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring corporation, partnership or limited liability company will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan, including among other things, to pay or otherwise satisfy the allowed claims against such Reorganized Debtor, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring corporation, partnership or limited liability company, which may provide that another entity will perform such obligations.

### VIII.

### Other Aspects of the Plan

### A.        Plan Supplement

The Plan Supplement will be filed with the Bankruptcy Court by no later than ten calendar days prior to the deadline set to file objections to confirmation of the Plan.  All contents of the Plan Supplement are required to be in form and substance acceptable to BNAC, the Agents, the First Lien Lenders and Mr. Trump.  Upon its filing with the Bankruptcy Court, the Plan Supplement

may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Documents to be included in the Plan Supplement will be posted at www.terrecap.com as they become available, but no later than 10 calendar days prior to the deadline set to file objections to confirmation of the Plan.

**B.      Distributions**

      **1.      *Timing and Conditions of Distributions.***

           (i)      <u>Distribution Record Date.</u>

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of claims or equity interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the claims or equity interests.  The Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of the claims or equity interests occurring on or after the Distribution Record Date.

           (ii)      <u>Postpetition Interest on Claims.</u>

Except as required by applicable bankruptcy law, postpetition interest will not accrue on or after the Commencement Date on account of any claim.

           (iii)      <u>Date of Distributions.</u>

Unless otherwise provided in the Plan, any distributions and deliveries to be made pursuant to the Plan will be made on the Effective Date or as soon thereafter as is practicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but will be deemed to have been completed as of the required date.

           (iv)      <u>Disbursing Agent.</u>

All distributions hereunder shall be made by Reorganized TER Holdings (or such other entity designated by Reorganized TER Holdings), as Disbursing Agent, on or after the Effective Date or as otherwise provided in the Plan.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by Reorganized TER.

           (v)      <u>Powers of Disbursing Agent.</u>

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all distributions contemplated hereby, and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan of Reorganization.

(vi)    Surrender of Instruments.

As a condition to receiving any distribution under the Plan of Reorganization, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee. Any holder of such instrument or note that fails to (i) surrender such instrument or note, or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent and furnish a bond in form, substance, and amount reasonably satisfactory to the Disbursing Agent before the first anniversary of the Effective Date shall be deemed to have forfeited all rights and claims and may not participate in any distribution hereunder. Any distribution so forfeited shall become property of the Reorganized Debtors.

(vii)    Delivery of Distributions.

Subject to Bankruptcy Rule 9010, all distributions to any holder of an allowed claim shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders of allowed claims. In the event that any distribution to any holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date. After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the claim of any other holder to such property or interest in property shall be discharged and forever barred.

(viii)    Manner of Payment Under the Plan.

At the option of the Debtors, any cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

(ix)    Allocations of Principal Between Principal and Interest.

To the extent that any allowed claim entitled to a distribution under the Plan of Reorganization is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the claim first, and then to accrued but unpaid interest.

(x)    Setoffs.

The Debtors and the Reorganized Debtors may, but shall not be required to, set off against any claim (for purposes of determining the allowed amount of such claim on which distribution shall be made), any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such claim, but neither the failure to do so nor the allowance of any claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such claim; provided, however, that, subject to the Effective Date, the Debtors and the Reorganized Debtors shall not be permitted to setoff against any Allowed Claim held by (a) a Plan Investor or the distributions to be made pursuant to this Plan or the Purchase Agreement to a Plan Investor or (b) any of the Agents or any First Lien Lender.

(xi)    Distributions After the Effective Date.

Distributions made after the Effective Date to holders of Disputed claims that are not allowed claims as of the Effective Date but which later become allowed claims shall be deemed to have been made on the Effective Date.

(xii)    Allocation of Distributions Between Principal and Interest.

To the extent that any allowed claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the claim first, and then to accrued but unpaid interest

**2.    *Procedures for Treating Disputed Claims Under the Plan*.**

(i)    Disputed Claims.

A disputed claim is any claim that has not been allowed pursuant to the Plan or a final order of the Bankruptcy Court, and

a.    if no proof of claim has been filed by the applicable deadline:  (i) a claim that has been or hereafter is listed on the schedules as disputed, contingent or unliquidated; or (ii) a claim that has been or hereafter is listed on the schedules as other than disputed, contingent or unliquidated, but as to which the Debtors or Reorganized Debtors or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a final order of the Bankruptcy Court; or

b.    if a proof of claim or request for payment of an Administrative Expense Claim has been filed by the applicable deadline:  (i) a claim for which no corresponding claim has been or hereafter is listed on the schedules; (ii) a claim for which a corresponding claim has been or hereafter is listed on the schedules as other than disputed, contingent or unliquidated, but the nature or amount of the claim as asserted in the proof of claim varies from the nature and amount of such claim as listed on the schedules; (iii) a claim for which a corresponding claim has been or hereafter is listed on the schedules as disputed, contingent or unliquidated; or (iv) a claim for which a timely objection or request for estimation is interposed by the Debtors, the Reorganized Debtors or any other party in interest which has not been withdrawn or determined by a final order of the Bankruptcy Court.

(ii)    Distributions Relating to Disputed Claims.

At such time as a disputed claim becomes an allowed claim, the Disbursing Agent shall distribute to the holder of such claim, such holder's pro rata portion of the property distributable with respect to the Class in which such claim belongs.  To the extent that all or a portion of a disputed claim is disallowed, the holder of such claim shall not receive any distribution on account of the portion of such claim that is disallowed and any property withheld pending the resolution of such claim shall be reallocated pro rata to the holders of allowed claims in the same class.

(iii)    Distributions after Allowance.

To the extent that a disputed claim becomes an allowed claim after the Effective Date, a distribution shall be made to the holder of such allowed claim in accordance with the

provisions of the Plan of Reorganization.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any disputed claim becomes a final order of the Bankruptcy Court, the Disbursing Agent shall provide to the holder of such claim, the distribution to which such holder is entitled hereunder.

(iv)    <u>Estimation of Claims.</u>

The Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or disputed claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any claim at any time during litigation concerning any objection to any claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or disputed claim, the amount so estimated shall constitute either the allowed amount of such claim or a maximum limitation on such claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such claim.  All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

(v)    <u>Objections to Claims.</u>

The Reorganized Debtors shall be entitled to object to claims other than claims that are expressly allowed pursuant to the Plan or allowed by a final order subsequent to the Effective Date.  Any objections to claims shall be served and filed on or before the later of (i) one hundred twenty (120) days after the Effective Date and (ii) such date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (i) above.

(vi)    <u>Payments and Distributions with Respect to Disputed Claims.</u>

Notwithstanding any other provision hereof, if any portion of a claim is a disputed claim, no payment or distribution provided hereunder shall be made on account of such claim unless and until such disputed claim becomes an allowed claim.

(vii)    <u>Preservation of  Rights to Settle Claims.</u>

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their estates may hold against any person or entity without the approval of the Bankruptcy Court, subject to the terms of the Plan, the Confirmation Order, the Purchase Agreement, the Amended and Restated Credit Agreement and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  The Reorganized Debtors or their successor(s) may pursue such retained claims, rights, or causes of action, suits, or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

(viii)   Disallowed Claims.

All claims held by persons or entities against whom or which any Debtor or Reorganized Debtor has commenced a proceeding asserting a cause of action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code shall be deemed "disallowed" claims pursuant to section 502(d) of the Bankruptcy Code and holders of such claims shall not be entitled to vote to accept or reject the Plan of Reorganization. Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by final order of the Bankruptcy Court and any sums due to the Debtors or the Reorganized Debtors from such party have been paid.

## C.   Treatment of Executory Contracts and Unexpired Leases

### 1.   Contracts and Leases Not Expressly Rejected Are Assumed.

All executory contracts and unexpired leases (including, in each case, any related amendments, supplements, consents, estoppels or ancillary agreements) to which any of the Debtors are parties are being assumed pursuant to the Plan, except for an executory contract or unexpired lease that (i) previously has been assumed or rejected pursuant to final order of the Bankruptcy Court of the Bankruptcy Court, (ii) is specifically designated by the Plan Investors or the Debtors, with the consent of the Plan Investors, as a contract or lease to be rejected on the Schedule of Rejected Contracts attached to the Plan as Exhibit A, or (iii) is the subject of a separate (a) assumption motion filed by the Debtors, or (b) rejection motion filed by the Debtors under section 365 of the Bankruptcy Code prior to the Confirmation Date.

### 2.   Cure of Defaults.

Except to the extent that different treatment has been agreed to by the nondebtor party or parties to any executory contract or unexpired lease to be assumed pursuant to section 8.1 of the Plan, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within twenty (20) days prior to the commencement of the confirmation hearing, file and serve a schedule with the Bankruptcy Court listing the cure amounts of all executory contracts or unexpired leases to be assumed. Any party that fails to object to the applicable cure amount shall be forever barred, estopped and enjoined from disputing the cure amount and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth in the schedule of cure amounts. If there are any objections filed, the cure payments, if any, required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a final order of the Bankruptcy Court resolving such dispute. The Debtors shall retain their right to reject any of their executory contracts or unexpired leases that are subject to a dispute, including contracts or leases that are subject to a dispute concerning amounts necessary to cure any defaults, until the entry of a final order resolving such dispute is entered by the Bankruptcy Court.

### 3.   Rejection Claims.

In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan of Reorganization results in damages to the other party or parties to such contract or lease, a claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective properties or interests in property as agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the

Reorganized Debtors on or before the date that is thirty (30) days after the Confirmation Date or such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults.

4.      *Assignment.*

Any executory contract or unexpired lease so assumed or and assigned shall remain in full force and effect for the benefit of the Reorganized Debtor or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type described in sections 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such assumption, transfer or assignment.  Any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

5.      *Survival of the Debtors' Indemnification Claims.*

Any obligations of the Debtors pursuant to their corporate charters and bylaws or other organizational documents to indemnify current and former officers and directors of the Debtors with respect to all present and future actions, suits and proceedings against the Debtors or such directors and/or officers, based upon any act or omission for or on behalf of the Debtors shall not be discharged or impaired by confirmation of the Plan, provided that the Reorganized Debtors shall not indemnify directors of the Debtors for any matters that are excluded from the releases in sections 10.5 and 10.6.  To the extent provided in section 8.5 of the Plan, such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors hereunder and shall continue as obligations of the Reorganized Debtors; provided, however, that prepetition indemnification obligations not expressly assumed under section 8.5 of the Plan shall be rejected on the Effective Date.

No officer or director has asserted any claims against the Debtors based upon indemnification rights they may have as officers or directors; however, Mr. Trump and Ivanka Trump have reserved their rights to assert such claims for indemnification if claims are asserted against them.

6.      *Insurance Policies*.

All insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan of Reorganization and shall be assumed by the respective Debtors and Reorganized Debtors and shall continue in full force and effect.  All other insurance policies shall revest in the Reorganized Debtors.

7.      *Casino Property Leases*.

The Casino Property Leases (as defined in the Plan) shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and Reorganized Debtors and shall continue in full force and effect.

**D.**     **Effect of Confirmation**

**1.**     *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' estates shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided in the Plan and other than the Prepetition First Priority Liens (as defined in the Final Cash Collateral Order) or any other liens or security interests granted to secure any indebtedness and obligations under the Amended and Restated Credit Agreement or any other "Loan Documents" as defined therein.  The Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided in the Plan including, without limitation, section 4.3 of the Plan.  On the Effective Date, except as provided in the Plan and except for the Prepetition First Priority Liens (as defined in the Final Cash Collateral Order) or any other liens or security interests granted to secure any indebtedness and obligations under the Amended and Restated Credit Agreement or any other "Loan Documents" as defined therein, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Debtors or their estates shall be fully released, terminated and discharged without further notice or action by the Debtors, Reorganized Debtors, holders of any such mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Debtors or their estates, the Bankruptcy Court or any applicable federal, state or local governmental agency or department.

**2.**     *Discharge.*

Except as otherwise provided in the Plan or contemplated hereby, the rights afforded in the Plan and the payments and distributions to be made thereunder shall (i) discharge all existing debts and Claims other than the First Lien Lender Claims which will be treated in accordance with section 4.3 of the Plan, and (ii) terminate all Equity Interests of any kind, nature or description whatsoever against or in TER and the Debtor Subsidiaries, to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as otherwise provided in the Plan or in the Confirmation Order, all persons or entities who have held, now hold, or may hold Claims against any of the Debtors or Equity Interests in TER, and all other parties in interest, along with their respective present and former employees, agents, officers, directors, principals and affiliates, are permanently enjoined from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to such Claim against the Debtors or the Reorganized Debtors or Equity Interest in TER, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors or the Reorganized Debtors, (iii) creating, perfecting or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors, or (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or the Reorganized Debtors, with respect to such Claim against any of the Debtors or Equity Interest in TER.  Such injunction shall extend to any successors of the Debtors and Reorganized Debtors and their respective properties and interest in properties.

**3.**     *Term of Injunctions or Stays*.

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

4.      *Exculpation*.

As of the Effective Date, the following parties, entities, and individuals shall have no liability for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to the Chapter 11 Cases or formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, the Disclosure Statement, the Purchase Agreement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors except for any express contractual or financial obligations owed to the Debtors, the Reorganized Debtors or the Non-Debtor Released Parties or any right or obligation arising under or that is part of the Plan or an agreement entered into pursuant to, in connection with or contemplated by, the Plan, including without limitation, the obligations under the Purchase Agreement, the Amended Organizational Documents, the Amended and Restated Credit Agreement and all ancillary and related documents thereto: (i) the current and former directors, officers and employees of the Debtors and the Reorganized Debtors; (ii) the affiliates, agents, financial advisors, investment bankers, professionals, accountants and attorneys of the Debtors and the Reorganized Debtors and their respective partners, owners and members; (iii) BNAC, the First Lien Lenders and the Agents and their respective members, agents, financial advisors, investment bankers, professionals, accountants and attorneys (including partners, owners and members thereof); and (iv) each Plan Investor and their respective affiliates, agents, financial advisors, investment bankers, professionals, accountants and attorneys (including partners, owners and members thereof).   Such parties, entities and individuals shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan and the ancillary documents hereto.   Notwithstanding the foregoing, the provisions of section 10.6 of the Plan shall not limit any liability on the part of the aforementioned parties that is determined by a final order of a court of competent jurisdiction for actions or failure to act amounting to willful misconduct, intentional fraud or criminal conduct.

5.      *Mutual Releases.*

On the Effective Date, in accordance with the Plan, the Released Parties shall be deemed to unconditionally and irrevocably release each other from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or thereafter arising, in law, equity or otherwise, that such entity or person would have been legally entitled to assert (whether individually or collectively), relating to any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganization Cases, or the Plan, except that (i) no Released Party shall be released from any act or omission that constitutes gross negligence, willful misconduct or fraud as determined by final order of a court of competent jurisdiction, and (ii) the foregoing release shall not apply to any express contractual or financial obligations owed to the Debtors or the Reorganized Debtors or any right or obligation arising under or that is part of the Plan or an agreement entered into pursuant to, in connection with or contemplated by, the Plan, including without limitation, the obligations under the Purchase Agreement, the Amended Organizational Documents, the Beal Commitment Letter, the Amended and Restated Credit Agreement and all ancillary and related documents thereto.

6.      *Injunction Related to Releases.*

Upon the Effective Date, the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities (a) released pursuant to this Plan, including but

not limited to the Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in sections 10.5 and 10.6 of the Plan, or (b) subject to indemnification by the Debtors or Reorganized Debtors pursuant to section 8.5 of the Plan, shall be enjoined.

As set forth above, the Plan includes standard mutual releases by the Debtors of its officers and directors, the holders of the First Lien Lender Claims, Mr. Trump, and their respective agents and representatives. The Plan does not provide for the release of third party claims. As is common practice, however, the Plan also provides for the assumption by the Debtors of existing indemnification obligations owed to its officers and directors and an injunction prohibiting the assertion by third parties of Claims against those persons related to their roles as officers and directors of the Debtors. The reason for these provisions is to protect the officers and directors for the decisions they have made and the actions they have taken in connection with the Debtors and the restructuring. Without the continued indemnification, parties that are not satisfied with their treatment under the Plan could attempt to disrupt the operations of the Reorganized Debtors by commencing frivolous suits against officers and directors who acted in good faith in their efforts to restructure the Debtors. The injunction is necessary to avoid collateral attacks on the Reorganized Debtors through those indemnification provisions.

As described in the Debtors' most recent Form 10-K, Mr. Trump has provided a Guaranty of up to $250,000,000 of the Second Lien Notes under certain terms and conditions. The provisions in the Plan relating to releases (Section 10.5), exculpation (Section 10.6), indemnification (Section 8.5), and injunctions (Section 10.7) neither release nor otherwise affect claims, if any, that may be asserted by the Noteholders against Mr. Trump under the Guaranty. The Debtors are not a party to the Guaranty and take no position with respect thereto. The Debtors have been informed by Mr. Trump and his counsel that it is their position that, under the applicable facts and circumstances, there is no basis for liability under the Guaranty. The Debtors understand that the Ad Hoc Committee disagree with that position.

The Debtors are providing releases to their officers and directors, as are typically provided by restructuring debtors, in recognition of the services that such officers and directors have provided to maintain the operations of the Debtors in the current difficult economic environment and assisting the Debtors in the negotiation, preparation, and eventual implementation of the Plan. As detailed above, the First Lien Lenders and Mr. Trump are providing significant value to the Debtors, in the form of their $113.9 million investment in the Debtors, as well as their other concessions to the Debtors, and therefore the releases of such parties included in the Plan are justified. The Ad Hoc Committee and other parties have suggested that the release and exculpatory provisions of the Plan are improper, but the Debtors do not believe further disclosure regarding these issues is necessary, nor do the Debtors agree with their assessment or that they create issues regarding confirmability.

7.    *Survival of Indemnification.*

As is common practice, the Plan provides for the assumption by the Debtors of existing indemnification obligations owed to its current and former officers and directors and an injunction prohibiting the assertion by third parties of Claims against those persons related to their roles as officers and directors of the Debtors. Without continued indemnification, parties that are not satisfied with their treatment under the Plan could attempt to disrupt the operations of the Reorganized Debtors by commencing frivolous suits against current and former officers and directors who acted in good faith in their efforts. The injunction is necessary to avoid collateral attacks on the Reorganized Debtors through those indemnification provisions.

8.      *Retention of Causes of Action/Reservation of Rights*.

Nothing contained in the Plan or in the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors or the Reorganized Debtors may have or which the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law or rule, common law, equitable principle or other source of right or obligation, including, without limitation, (i) any and all claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors, or representatives; (ii) the turnover of any property of the Debtors' estates; and (iii) the Retained Claims; *provided, however,* that this shall not apply to any claims released in section 10.5 of the Plan.

Nothing contained in the Plan or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any claim left unimpaired by the Plan of Reorganization.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Commencement Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any claim left unimpaired by the Plan of Reorganization may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

E.      **Miscellaneous Provisions**

The Plan also contains provisions relating, but not limited to, vesting of assets, injunction against interference with the Plan, payment of statutory fees, substantial consummation, compliance with tax requirements, severability, revocation and amendment of the Plan, governing law, and timing.  For more information regarding these items, see the Plan attached hereto as Exhibit A.

## IX.

## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF ALLOWED FIRST LIEN LENDER CLAIMS AND ALLOWED SECOND LIEN NOTE CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.      **Certain Bankruptcy Considerations**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.  Although the Debtors believe that the Effective Date will occur soon after the Confirmation

Date, there can be no assurance as to such timing.  In the event the conditions precedent described in section 9.1 of the Plan have not been satisfied or waived (to the extent possible) by the Debtors or applicable party (as provided for in the Plan) as of the Effective Date, then the Confirmation Order will be vacated, no distributions under the Plan will be made, and the Debtors and all holders of claims and equity interests will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though such Confirmation Date had never occurred.

The Plan provides for no distribution to Classes 5A-5J, 7, 8, 9, and 10.  The Bankruptcy Code conclusively deems these Classes to have rejected the Plan.  Notwithstanding the fact that these Classes are deemed to have rejected the Plan, the Bankruptcy Court may confirm the Plan if at least one impaired class votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class).  Thus, for the Plan to be confirmed with respect to each Debtor, either Class 3A-3J or Class 4A-4E must vote to accept the Plan.  As to each impaired class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these classes.  The Debtors believe that the Plan satisfies these requirements.  For more information, see Section X below.

## B.      Risks to Recovery By Holders of First Lien Lender Claims and Second Lien Note Claims

The ultimate recoveries under the Plan to holders of allowed First Lien Lender Claims and Second Lien Note Claims are subject to a number of material risks, including, but not limited to, those specified below.

### 1.      *Variances from Projections.*

The Projections for the Reorganized Debtors included herein are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Factors that could cause actual results to differ materially include, but are not limited to, the Reorganized Debtors' ability to operate their business consistent with the Projections, comply with the covenants of their financing agreements, comply with the terms of their existing contracts and leases, and respond to adverse regulatory actions taken by the federal and state governments.  In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may affect the actual financial results of the Reorganized Debtors.  Although the Debtors believe that the Projections are reasonably attainable, variations between the actual financial results and those projected will occur and these variances may be material.

### 2.      *Unforeseen Events.*

Future performance of the Reorganized Debtors is, to a certain extent, subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond their control.  While no assurance can be provided, based upon the current level of operations and anticipated increases in revenues and cash flows described in the Projections, the Debtors believe that cash flow from operations and available cash will be adequate to fund the Plan and meet their future liquidity needs.

### 3.      *Other Risks.*

A discussion of TER's business risks are set forth in greater detail in the 2008 Form 10-K and the Second Quarter Form 10-Q, each of which is attached hereto as Exhibit D and Exhibit E, respectively.

## C.      Reorganized TER May Fail to Meet All Conditions Precedent to the Purchase Agreement and the Amended and Restated Credit Agreement

The Purchase Agreement, the Amended and Restated Credit Agreement and the Beal Commitment Letter are subject to certain conditions precedent, including those set forth in Section III.B of this Disclosure Statement.   Among such conditions precedent is a condition that the order confirming the Plan be entered and final by January 15, 2010.   There is no guarantee that Reorganized TER will be able to satisfy such conditions precedent, but expeditious pursuit of confirmation of the Plan by all parties in interest will assist the Debtors in their efforts to consummate the restructuring transactions proposed herein.    If the Reorganized Debtors fail to consummate the Purchase Agreement or the Amended and Restated Credit Agreement, the feasibility of the Plan may be adversely affected.

## X.

## Confirmation of the Plan

## A.      Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a Plan.   On, or as promptly as practicable after the Commencement Date, the Debtors will request that the Bankruptcy Code schedule the confirmation hearing.   Notice of the confirmation hearing will be provided to all known creditors, equity holders or their representatives.   The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a Plan.   Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of claims or interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Michael F. Walsh, Esq. and Ted S. Waksman, Esq.) and McCarter & English, LLP, Four Gateway Center, 100 Mulberry Street, Newark, New Jersey 07102 (Attn: Charles A. Stanziale, Jr., Esq. and Joseph Lubertazzi, Jr., Esq.), attorneys for the Debtors, (ii) the Office of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, New Jersey 07102 (Attn: Jeffrey M. Sponder, Esq.),, (iii) Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201 (Attn: Charles R. Gibbs, Esq.) and White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036 (Attn: Thomas E. Lauria, Esq., Gerard H. Uzzi, Esq. and Andrew Ambruoso, Esq.), attorneys for the Administrative Agent for the First Lien Lenders, (iv) Kasowitz, Benson, Torres & Friedman LLP, 1633 Broadway New York, New York 10019 (Attn: David M. Friedman, Esq. and Adam L. Shiff, Esq.), attorneys for Mr. Trump, (v) Stroock & Stroock & Lavan LLP, 180 Maiden

Lane, New York, New York 10038 (Attn: Kristopher M. Hansen, Esq.), attorneys for the Ad Hoc Committee, and (v) such other parties as the Bankruptcy Court may order.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**B.      General Requirements of Section 1129**

At the confirmation hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied.

**C.      Best Interests Test**

The Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage.  Other liquidation costs include the expenses incurred during the Chapter 11 Cases allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals for the Debtors.  In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims.  The Debtors believe that in a chapter 7 liquidation, no prepetition claims or equity interests would receive any distribution of property.

The Debtors' liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the Debtors.  The analysis is based on a number of significant assumptions which are described below.  The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.

**D.      Liquidation Analysis**

As noted above, the Debtors believe that under the Plan all holders of impaired claims and equity interests will receive property with a value not less than the value such holder would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired claims and equity interests, including (a) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee and professional advisors to the trustee, (b) the erosion in value of assets in a chapter 7 case in the context of the rapid liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, (c) the adverse effects on the Debtors' business as a

result of the likely departure of key employees, artists, account representatives, and the probable loss of customers, (d) the substantial increases in claims, such as estimated contingent claims, which would be satisfied on a priority basis or on parity with the holders of impaired claims and equity interests of the chapter 11 cases, (e) the reduction of value associated with a chapter 7 trustee's operation of the Debtors' businesses, and (f) the substantial delay in distributions to the holders of impaired claims and equity interests that would likely ensue in a chapter 7 liquidation and (ii) the liquidation analysis prepared by the Debtors, which is attached hereto as Exhibit F.

The Debtors believe that any liquidation analysis is speculative, as such an analysis necessarily is premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  Thus, there can be no assurance as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

For example, the liquidation analysis necessarily contains an estimate of the amount of claims which will ultimately become allowed claims.  This estimate is based solely upon the Debtors' review of its books and records and the Debtors' estimates as to additional claims that may be filed in the Chapter 11 Cases or that would arise in the event of a conversion of the case from chapter 11 to chapter 7.  No order or finding has been entered by the Bankruptcy Court or any other court estimating or otherwise fixing the amount of claims at the projected amounts of allowed claims set forth in the liquidation analysis.  In preparing the liquidation analysis, the Debtors have projected an amount of allowed claims that is at the lower end of a range of reasonableness such that, for purposes of the liquidation analysis, the largest possible liquidation dividend to holders of allowed claims can be assessed.  The estimate of the amount of allowed claims set forth in the liquidation analysis should not be relied on for any other purpose, including any determination of the value of any distribution to be made on account of allowed claims under the Plan.

To the extent that confirmation of the Plan requires the establishment of amounts for the chapter 7 liquidation value of the Debtors, funds available to pay claims, and the reorganization value of the Debtors, the Bankruptcy Court will determine those amounts at the confirmation hearing. Accordingly, the attached liquidation analysis is provided solely to disclose to holders the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.

**E.      Feasibility**

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the Projections described in Section V above.  Based upon such Projections, the Debtors believe that they will be able to make all payments required pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

**F.      Section 1129(b)**

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan of reorganization by a class of claims or equity interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

1.      *No Unfair Discrimination.*

        This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the plan of reorganization.  The test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

2.      *Fair and Equitable Test.*

        This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards, depending on the type of claims or equity interests in such class:

- *Secured Creditors*.  Each holder of an impaired secured claim either (i) retains its liens on the property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the Effective Date, of at least the allowed amount of such claim, or (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof) or (iii) receives the "indubitable equivalent" of its allowed secured claim.

- *Unsecured Creditors*.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan or reorganization property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization.

- *Equity Interests*.  Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of equity interests that are junior to the equity interests of the dissenting class will not receive any property under the plan of reorganization.

        The Debtors believe the Plan will satisfy the "fair and equitable" requirement notwithstanding that Classes 5A-5J, 7, 8, 9, and 10 are deemed to reject the Plan because no Class that is junior to such Class will receive or retain any property on account of the equity interests in such Class.

## XI.

### Alternatives to Confirmation and Consummation of this Plan

A.      **Liquidation Under Chapter 7**

        If no chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.   A discussion of the effect that a chapter 7 liquidation would have on the recoveries of holders of claims is set forth in Section X.D of this Disclosure Statement.  The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors

than those provided for in the Plan because (a) the likelihood that other assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion, (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, (c) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.  In a chapter 7 liquidation, the Debtors believe that there would be no distribution to holders of allowed claims in Classes 4A-4J, 5A-5J, 6, 7, 8, 9, and 10 and the distribution to holders of allowed claims in Class 3A-3J would be materially less.

## B.    Alternative Plan

The Debtors have determined that their long term success is dependent on receiving significant new investment of capital, as well as a material de-leveraging of their capital structure.  As described in Section V.D, the only proposals for investing in the Debtors that were received or discussed with the Debtors prior to the filing of the Disclosure Statement were from Beal and Mr. Trump, on which the Plan is based, and from the Ad Hoc Committee.

On August 11, 2009, the Ad Hoc Committee filed a Motion for an Order Terminating the Debtors' Exclusivity Periods in which to File a Plan of Reorganization and Solicit Acceptances thereto (the "***Motion to Terminate Exclusivity***").  The Debtors subsequently filed their Objection to the Motion to Terminate Exclusivity and a hearing was held before the Bankruptcy Court on August 27, 2009.  At that hearing, the Court sustained the Ad Hoc Committee's objection and, by order dated August 31, 2009, the Debtors' exclusive periods to file and solicit a plan of reorganization were terminated thereby authorizing the Ad Hoc Committee and any other party in interest to file an alternative plan of reorganization (the "***Termination Order***").

That same day, the Ad Hoc Committee filed the AHC Plan and AHC Disclosure Statement, which were thereafter amended on September 23, 2009.  The key terms of the AHC Plan, as amended, which the Debtors have concluded to be highly conditional, unlikely to be consummated because of its reliance on the consummation of the Coastal transaction, and inferior to the proposal from Beal and Mr. Trump, are as follows:

- $175 million in new equity capital (rather than $150 million of debt and equity, as proposed in the Ad Hoc Committee's prior proposal);

- Sale of the Trump Marina Casino (as a shut down facility; although possibly as a going concern) pursuant to a sale under section 363 of the Bankruptcy Code for purported net proceeds (after prior deposits) of $58 million and dismissal of all pending litigation against Coastal Marina, LLC and other interested parties; and

- No recovery for old equity and the Second Lien Noteholders explicitly retain full recourse against Mr. Trump on his $250 million Guaranty, which is subject to certain terms and conditions.

The Debtors selected the proposal from Beal and Mr. Trump under the last proposal made by the Ad Hoc Committee to the Debtors for a variety of reasons, including that (i) the Beal/Trump proposal provides more capital for the Debtors business operations after giving effect to paydowns of the senior secured debt and interest payment provisions, (ii) the Beal/Trump proposal provides significantly better payment terms and interest rate for the remaining senior secured debt,

including a significantly better than market term (until 2020), (iii) the Valuation Analysis prepared by Lazard shows that the enterprise value of the Debtors is less than the amount of First Lien Lender Claims and (iv) the Beal/Trump proposal provides licensing rights to use certain "Trump" trademarks and Mr. Trump's likeness, as well as provides for agreements under which Mr. Trump would provide marketing and promotional services, and present certain business opportunities, to the Debtors and would refrain from engaging in certain activities that are competitive with the Debtors' businesses. On September 23, 2009, the Ad Hoc Committee filed the AHC Plan which included terms that are better than the proposal made by the AHC to the Debtors at the time they were choosing between the two proposals.  In essence, the newly-filed AHC Plan matches the amount of capital available for use in the Debtors' business operations ($100 million), after giving effect to a $75 million repayment of the First Lien Lender Claims.  Although there would be less long term debt under the AHC Plan, the Debtors believe that their Plan is still superior for the other reasons stated above, including the fact that the minimum cash interest payment required under the Debtors' Plan are likely to be significantly less than the payments that would be required under a cram down of the First Lien Lender Claims.

After months of analysis and negotiation, the Debtors have concluded that the Plan enables creditors to realize the most value under the circumstances and, as described above, is superior to the proposal set forth by the Ad Hoc Committee as set forth in the AHC Plan.  In addition, the AHC Plan is highly conditional, including its reliance on a sale of the Trump Marina Casino to Coastal, which is, in the Debtors' opinion, highly suspect.

Moreover, on September 10, 2009, Beal filed a notice of appeal of the Court's order terminating the Debtors' exclusivity periods.  Beal has also filed a motion for a stay of the effect of the Termination Order during the pendency of its appeal.  The Debtors believe that Beal's pending appeal and stay motion add further conditionality and even greater uncertainty to the already highly conditional AHC Plan.

If no restructuring plan is confirmable, the Debtors could consider a liquidation under chapter 11.  In a liquidation, the Debtors would incur the expenses associated with closing or transferring its casino properties to new operators.  The process would be carried out in a more orderly fashion over a greater period of time than a liquidation under chapter 7 of the Bankruptcy Code.  Further, if a trustee were not appointed, because such appointment is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case.  Although preferable to a chapter 7 liquidation, the Debtors believe that liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because of the greater return provided by the Plan.

## XII.

### Certain United States Federal Income Tax Consequences of the Plan

The following discussion summarizes certain material U.S. federal income tax consequences expected to result to (i) the Debtors and the Reorganized Debtors and (ii) the First Lien Lenders and the holders of Second Lien Note Claims (the "**Holders**").  The following summary does not address the U.S. federal income tax consequences to holders whose claims are not impaired (e.g., Other Priority Claims and Other Secured Claims) or to Mr. Trump or ACE Entertainment Holdings, Inc.  In addition, the following does not address the U.S. federal income tax consequences to holders of TER Equity Interests, holders of TER Holdings Equity Interests and holders of General Unsecured Claims as they are deemed to reject the Plan.  This discussion is based on current provisions of the Tax Code, applicable Treasury regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "**Service**").  There can be no assurance that the

Service will not take a contrary view.  No ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein.  Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to the Holders, the Debtors and the Reorganized Debtors.  It cannot be predicted whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to the Holders, the Debtors or the Reorganized Debtors.

The following discussion is for general information only, and does not address the tax consequences to holders of Claims who are not Holders (as defined above).  The tax treatment of a Holder may vary depending upon such Holder's particular situation.  In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, real estate investment trusts, U.S. persons whose functional currency is not the U.S. dollar, traders that mark-to-market their securities, taxpayers subject to the alternative minimum tax, tax-exempt organizations (including, without limitation, certain pension funds), persons holding an equity interest as part of an integrated constructive sale, hedge, conversion transaction or straddle, pass-through entities and investors in pass-through entities).  Furthermore, this summary does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires loans governed by the Amended and Restated Credit Agreement ("*__Modified First Lien Loans__*") in the secondary market.  This discussion assumes that the First Lien Lender Claims, the Second Lien Note Claims and the Modified First Lien Loans are held as "capital assets" (generally, held for investment) within the meaning of Section 1221 of the Tax Code and that TER Holdings has been and will be treated and taxed as a partnership for U.S. federal income tax purposes.  The Debtors have not independently valued the potential tax benefits of the Plan with respect to Mr. Trump or any other party-in-interest in the Chapter 11 Cases.  EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR AS TO THE PARTICULAR TAX CONSEQUENCES TO IT OF THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX LAWS.

INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    **U.S. Federal Income Tax Consequences to the Debtors**

1.    *Cancellation of Indebtedness and Reduction of Tax Attributes.*

The cancellation of the Second Lien Note Claims (and possibly some or all of the General Unsecured Claims) will result in cancellation of indebtedness ("***COD***") income and the modification of the First Lien Lender Claims pursuant to the Amended and Restated Credit Agreement may result in COD income if the issue price of the Modified First Lien Loans is less than the adjusted issue price of the First Lien Lender Claims prior to being modified.  *See* "—U.S. Federal Income Tax Consequences to U.S. Holders—Modification of First Lien Lender Claims," below.

Under Section 108 of the Tax Code, COD income is excluded from income if it occurs in a case brought under the Bankruptcy Code, provided the taxpayer is under the jurisdiction of a court in such case and the cancellation of indebtedness is granted by the court or is pursuant to a plan approved by the court (the "***Bankruptcy Exception***").  Generally, under Section 108(b) of the Tax Code, any COD income excluded from income under the Bankruptcy Exception must be applied against and reduce certain tax attributes of the taxpayer.  Unless the taxpayer elects to have such reduction apply first against the basis of its depreciable property, such reduction is first applied against net operating losses ("***NOLs***") of the taxpayer (including NOLs from the taxable year of discharge and any NOL carryover to such taxable year), and then to certain tax credits, capital loss and capital loss carryovers, and tax basis.  Any reduction in tax attributes in respect of excluded COD income does not occur until after the determination of the taxpayer's income or loss for the taxable year in which the COD income is realized.

Under Section 108(d)(6) of the Tax Code, when an entity (like TER Holdings) that is taxed as a partnership realizes COD income, its partners are treated as receiving their allocable share of such COD income and the Bankruptcy Exception (and related attribute reduction) is applied at the partner level rather than at the entity level.  Accordingly, TER will be treated as receiving its allocable share of the COD income realized by TER Holdings.  However, because the cancellation of indebtedness will occur in a case brought under the Bankruptcy Code and TER will qualify for the Bankruptcy Exception, TER will not be required to include in its income any COD income generated by and allocated to it as a result of the implementation of the Plan.  TER will be required to reduce its tax attributes in an amount equal to the amount of COD income excluded from income under the Bankruptcy Exception.  TER currently expects, subject to the discussion in the next paragraph, that COD income resulting from the Plan and allocated to it will be excluded from its income under the Bankruptcy Exception, and, as a result, it will reduce its NOLs by the amount of such COD income.  TER does not expect to have sufficient NOLs to fully offset its COD income, and accordingly expects to be required under Section 108(b) of the Tax Code to reduce other tax attributes.  Specifically, TER currently expects that its tax basis in its partnership interest in TER Holdings will be reduced by the amount of its remaining COD income. However, TER's tax basis in its partnership interest also will be increased by the amount of COD income allocated to it, so any reduction in such tax basis is not expected to have any meaningful tax impact.

Changes to the Tax Code as a result of the American Recovery and Reinvestment Act of 2009 would permit TER Holdings to elect to defer its partners' inclusion of COD income resulting from the Plan if the plan is consummated in 2009 or 2010.  Subject to certain circumstances where the recognition of COD income is accelerated, the amount of COD income would under that election be includible in the partners' income ratably over a five-taxable year period beginning with the fifth taxable year after the COD income arises (assuming the Plan is consummated in 2009).  The election to defer COD income would be in lieu of excluding it and reducing NOLs and certain tax attributes as

described above.  The collateral tax consequences of making such election are complex.  The Debtors currently are analyzing whether the deferral election would be advantageous.

**2.**     ***Section 382 Limitations on NOLs.***

The Plan will trigger an "ownership change" of TER on the Effective Date for purposes of Section 382 of the Tax Code.  Consequently, following the Effective Date, any remaining NOL carryforwards and certain other tax attributes (including current year NOLs) of TER allocable under the tax law to periods prior to the Effective Date (collectively, "pre-change losses") will be subject to limitation under Section 382, subject to the following discussion regarding special rules in the context of certain bankruptcy proceedings.  Any Section 382 limitations apply in addition to, and not in lieu of, the attribute reduction that results from the COD arising in connection with the Plan.

Under Section 382 of the Tax Code, if a corporation undergoes an ownership change and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation.  In general, the amount of the annual limitation is equal to the product of (i) the fair market value of the stock of the corporation *immediately before* the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 4.48% for ownership changes occurring in October, 2009).  For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change after giving effect to the surrender of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.  An exception to the foregoing annual limitation rules generally applies where qualified creditors and stockholders of a debtor corporation receive, in respect of their claims or shares, at least 50% of both the voting power and the value of the stock of the reorganized debtor pursuant to a confirmed Chapter 11 plan.  However, the Debtors do not expect that this exception will be applicable to the ownership change resulting from the Plan.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.  However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, or if certain shareholders claim worthless stock deductions and continue to hold their stock in the corporation at the end of the taxable year, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below.  Generally, NOL carryforwards expire 20 years after they first arise.

Section 382 of the Tax Code also limits the deduction of certain built-in losses recognized subsequent to the date of the ownership change.  If a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and will be subject to the annual Section 382 limitation.  Conversely, if the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to a Service notice, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual Section 382 limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.

Accordingly, the impact of any future ownership change depends upon, among other things, the amount of pre-change losses remaining after the use or reduction of attributes due to the COD, the value of both the stock and assets of TER at such time, the continuation of its business and the amount and timing of future taxable income.

**3.     *Alternative Minimum Tax.***

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation undergoes an ownership change and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets is generally reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Thus, for tax periods after the Effective Date, Reorganized TER may have to pay AMT regardless of whether it generates a NOL or has sufficient NOL carryforwards to offset regular taxable income for such periods.  Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

**B.     U.S. Federal Income Tax Consequences to U.S. Holders**

For purposes of the following discussion, a U.S. Holder is a Holder who or that is or is treated for U.S. federal income tax purposes as (1) an individual that is a citizen or resident of the United States, (2) a corporation or other entity taxable as a corporation created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (3) an estate, the income of which is subject to U.S. federal income tax regardless of its source, or (4) a trust, if a U.S. court can exercise primary supervision over the administration of the trust and one or more U.S. persons can control all substantial trust decisions, or, if the trust was in existence on August 20, 1996, and it has validly elected to continue to be treated as a U.S. person.

**1.     *Modification of First Lien Lender Claims.***

The modification of the terms of a debt instrument will be treated, for U.S. federal income tax purposes, as a "deemed" exchange of the old debt instrument for a new debt instrument if such modification is a "significant modification" under applicable Treasury regulations.  In general, a modification is a "significant modification" if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered are economically significant.  Under the Treasury Regulations, a modification that adds, deletes or alters customary accounting or financial covenants is, without more, not a significant modification.

Treasury regulations provide that a change in the yield of a debt instrument is a significant modification if the yield on the modified instrument varies from the annual yield on the unmodified instrument (determined as of the date of the modification) by more than the greater of 25

basis points or five percent of the annual yield of the unmodified instrument.  Also, a modification that changes the timing of payments due under a debt instrument is a significant modification if it results in the material deferral of scheduled payments.  The materiality of the deferral depends on all the facts and circumstances, including the length of the deferral, the original term of the instrument, the amounts of the payments that are deferred and the time period between the modification and the actual deferral of payments.

      The Debtors intend to take the position, and the remainder of this discussion assumes, that the modification of the First Lien Lender Claims pursuant to the Amended and Restated Credit Agreement constitutes a "significant modification" and thus results in a deemed exchange of the First Lien Lender Claims.  If a contrary position is successfully asserted by the Service, the U.S. federal income tax consequences of the modification of the First Lien Lender Claims could materially differ from those described below.  Each U.S. Holder should consult its own tax advisor with respect to the correctness of the Debtors' position and the tax consequences of the modification of the First Lien Lender Claims if that position is not correct.

      ***Fully Taxable Exchange.***  The deemed exchange of the First Lien Lender Claims will be treated as a fully taxable transaction.  Accordingly, the exchanging U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (i) the "issue price" of the Modified First Lien Loans received (other than in respect of accrued but unpaid interest) (*see* "—Ownership and Disposition of the Modified First Lien Loans—Stated Interest, OID and Issue Price," below) and (ii) the U.S. Holder's adjusted tax basis in the First Lien Lender Claims exchanged (other than any basis attributable to accrued but unpaid interest).  *See* "—Character of Gain or Loss," below. In addition, a U.S. Holder will have interest income to the extent of any Modified First Lien Loans allocable to accrued but unpaid interest not previously included in income.  *See* "—Payment of Accrued Interest," below.

      U.S. Holders of First Lien Lender Claims are urged to consult their own tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting any gain that may be recognized by such holders in respect of such Claims, due to the receipt of Modified First Lien Loans.

      Generally, assuming no prior bad debt deduction has been claimed, a U.S. Holder's adjusted tax basis in a First Lien Lender Claim will be equal to the cost of the Claim to such U.S. Holder, increased by any original issue discount ("***OID***") previously included in income.  If applicable, a U.S. Holder's tax basis in a First Lien Lender Claim will also be (i) increased by any market discount previously included in income by such U.S. Holder pursuant to an election to include market discount in gross income currently as it accrues, and (ii) reduced by any cash payments received on the First Lien Lender Claim other than payments of "qualified stated interest," and by any amortizable bond premium that the U.S. Holder has previously deducted.

      A U.S. Holder's tax basis in the Modified First Lien Loans received will equal the issue price of such instruments.  The U.S. Holder's holding period in the Modified First Lien Loans should begin on the day following the exchange date.

      **2.**    ***Satisfaction of Second Lien Note Claims.***

      In general, each U.S. Holder of a Second Lien Note Claim should recognize gain or loss in respect of its Claim in an amount equal to the difference, if any, between (i) the amount of cash received in satisfaction of its Claim (other than in respect of accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid

interest).  *See* "—Character of Gain or Loss," below.  In addition, a U.S. Holder will have interest income to the extent of any cash allocable to accrued but unpaid interest not previously included in income.  *See* "—Payment of Accrued Interest," below.

Generally, assuming no prior bad debt deduction has been claimed, a U.S. Holder's adjusted tax basis in a Second Lien Note Claim will be equal to the cost of the Claim to such U.S. Holder, increased by any OID previously included in income.  If applicable, a U.S. Holder's tax basis in a Second Lien Note Claim will also be (i) increased by any market discount previously included in income by such U.S. Holder pursuant to an election to include market discount in gross income currently as it accrues, and (ii) reduced by any cash payments received on such Claim other than payments of "qualified stated interest," and by any amortizable bond premium that the U.S. Holder has previously deducted.

### 3.    *Character of Gain or Loss.*

Where gain or loss is recognized by a U.S. Holder in respect of the deemed exchange of the First Lien Lender Claims or the satisfaction of the Second Lien Note Claims, unless the U.S. Holder previously claimed a bad debt deduction with respect to such Claim and subject to the discussion below in "—Payment of Accrued Interest," such gain or loss generally will be capital gain or loss except to the extent any gain is recharacterized as ordinary income pursuant to the market discount rules discussed below.  A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders.  The deductibility of capital loss is subject to significant limitations.

A U.S. Holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code.  In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount.  The *de minimis* amount is equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity.  Generally, qualified stated interest is a stated amount of interest payable in cash at least annually.

Under these market discount rules, any gain recognized on the deemed exchange of First Lien Lender Claims or the satisfaction of the Second Lien Note Claims generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. Holder, on a constant interest basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued.  If a U.S. Holder did not elect to include market discount in income as it accrued and thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become fully deductible at the time of the exchange or satisfaction, as applicable.

### 4.    *Payment of Accrued Interest.*

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income).  Conversely, a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest or OID was previously included in its gross income and is not paid in full. However, the Service has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID.  Accordingly it is also

unclear whether, by analogy, a U.S. Holder would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that consideration received in respect of a Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest (in contrast, for example, to a pro rata allocation of a portion of the consideration received between principal and interest, or an allocation first to accrued but unpaid interest). *See* Section 6.10 of the Plan. There is no assurance that the Service will respect such allocation for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest and accrued OID for U.S. federal income tax purposes.

### 5. *Ownership and Disposition of the Modified First Lien Loans.*

*Stated Interest, OID and Issue Price.* A U.S. Holder of Modified First Lien Loans will be required to include stated interest on the Modified First Lien Loans in income in accordance with the U.S. Holder's regular method of accounting to the extent such stated interest is "qualified stated interest." Stated interest generally is "qualified stated interest" if it is unconditionally payable in cash at least annually. Subject to the application of the option rule discussed below, the stated interest payable on the Modified First Lien Loans should be qualified stated interest.

A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than qualified stated interest.

The "issue price" of the Modified First Lien Loans depends on whether, at any time during the 60-day period ending 30 days after the exchange date, the Modified First Lien Loans are traded on an "established market" or the First Lien Lender Claims exchanged for the Modified First Lien Loans are traded on an established market. Pursuant to applicable Treasury regulations, an "established market" need not be a formal market. It is sufficient that the Modified First Lien Loans or First Lien Lender Claims appear on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions. Also, under certain circumstances, debt is considered to be traded on an established market when price quotations for such debt are readily available from dealers, brokers or traders.

If the Modified First Lien Loans or the First Lien Lender Claims are treated for U.S. federal income tax purposes as traded on an established market, the issue price of the Modified First Lien Loans will equal the fair market value of such loans on the Effective Date. In such event, a Modified First Lien Loan will be treated as issued with OID to the extent that its issue price is less than its stated redemption price at maturity (subject to a *de minimis* exception). Depending on the fair market value of the Modified First Lien Loans, the total amount of OID could be substantial.

If neither the Modified First Lien Loans nor the First Lien Lender Claims are traded on an established market, the issue price for the Modified First Lien Loans should be the stated redemption price at maturity of the Modified First Lien Loans.

It is uncertain whether the First Lien Lender Claims are, or whether the Modified First Lien Loans will be, traded on an established market. TER Holdings, however, intends to treat

the Modified First Lien Loans as having an issue price equal to their stated redemption price at maturity.  In general, TER Holding's determination of issue price will be binding on all holders of Claims, other than a holder that explicitly discloses its inconsistent treatment in a statement attached to its timely filed tax return for the taxable year in which the deemed exchange occurs.  There can be no assurance, however, that the IRS will not successfully assert a contrary position.  If, contrary to TER Holding's intended treatment, the Modified First Lien Loans are treated as issued with OID, a U.S. Holder of a Modified First Lien Loan will be subject to the rules governing OID.  Unless otherwise indicated, the remainder of this discussion assumes that the Modified First Lien Loans are not issued with OID.

The terms of the Modified First Lien Loans provide for certain deferrals of principal and interest payments based on available cash flow, which deferred amounts would accrue interest at a higher interest rate than the regular interest rate on the Modified First Lien Loans.  Additionally, Reorganized TER Holdings generally has the unconditional option to prepay the Modified First Lien Loans at any time without premium or penalty.  For purposes of initially determining the yield and maturity of the Modified First Lien Loans under applicable Treasury Regulations, Reorganized TER Holdings should be deemed to exercise or not exercise this option in a manner that minimizes the yield on the Modified First Lien Loans.  Accordingly, Reorganized TER Holdings should be deemed for these purposes to exercise its option to prepay the Modified First Lien Loans in full immediately before any deferral of a principal or interest payment on the Modified First Lien Loans, and not to exercise its option to prepay the Modified First Lien Loans in part or in full on earlier dates.  If Reorganized TER Holdings does not in fact exercise its option to prepay the Modified First Lien Loans in full at that time, a U.S. Holder's OID calculation for future periods should be adjusted by treating the Modified First Lien Loans as if they had been retired and then reissued for an amount equal to their adjusted issue price at that time and re-calculating the total amount of OID and yield to maturity of the reissued Modified First Lien Loans (taking into account the application of the option rule under the applicable Treasury regulations discussed above).

The rules regarding the determination of issue price and OID are complex, and the OID rules described above may not apply in all cases.  **Additionally, it is possible that the option rule discussed above may not be applicable to the Modified First Lien Loans, in which case the Modified First Lien Loans might be subject to special rules governing contingent payment debt instruments ("*CPDI*").**  While TER Holdings intends to take the position that the Modified First Lien Loans are not subject to the CPDI rules, the IRS may successfully assert a contrary conclusion.  Accordingly, you should consult your own tax advisor regarding the determination of the issue price of the Modified First Lien Loans and the possible application of the OID and CPDI rules.

*Sale, Redemption or Repurchase.*  U.S. Holders generally will recognize capital gain or loss upon the sale, redemption or other taxable disposition of Modified First Lien Loans in an amount equal to the difference between the U.S. Holder's adjusted tax basis in the Modified First Lien Loans and the sum of the cash plus the fair market value of any property received from such disposition (other than amounts attributable to accrued but unpaid stated interest on the Modified First Lien Loans, which will be taxable as ordinary income for U.S. federal income tax purposes to the extent not previously so taxed).  Generally, a U.S. Holder's adjusted tax basis in a Modified First Lien Loan will be equal to its initial tax basis (as determined above), increased by any OID previously included in income, and reduced by any cash payments received on the Modified First Lien Loan other than payments of "qualified stated interest."

The gain or loss generally will be treated as capital gain or loss.  Any capital gain or loss generally should be long-term if the U.S. Holder's holding period for its Modified First Lien Loans is more than one year at the time of disposition.  A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders.  The deductibility of capital loss is subject to significant

limitations.  If the Modified First Lien Loans were treated as CPDI, any gain would be ordinary income and not capital gain, and in certain circumstances all or a portion of any loss may be treated as ordinary loss.

      **6.**     *Backup Withholding and Information Reporting.*

      A U.S. Holder may be subject to backup withholding at the applicable tax rate (currently 28%) with respect to payments of interest (including accruals of OID) and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the Modified First Lien Loans, unless such U.S. Holder (x) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact or (y) provides a correct taxpayer identification number ("*TIN*") on Service Form W-9 (or a suitable substitute form), certifies as to no loss of exemption from backup withholding and complies with applicable requirements of the backup withholding rules.  An otherwise exempt U.S. Holder may be subject to backup withholding if, among other things, the U.S. Holder (i) fails to properly report payments of interest and dividends or (ii) in certain circumstances, has failed to certify, under penalty of perjury, that such U.S. Holder has furnished a correct TIN.  U.S. Holders that do not provide a correct TIN may also be subject to penalties imposed by the Service.

      Backup withholding is not an additional tax.  Rather, the amount of tax withheld will be credited against the U.S. federal income tax liability of persons subject to backup withholding.  If withholding results in an overpayment of U.S. federal income taxes, a U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for refund with the Service.

      The Reorganized Debtors (or their paying agent) may be obligated to provide information statements to the Service and to U.S. Holders who receive payments (except with respect to U.S. Holders that are exempt from the information reporting rules, such as corporations).  Each U.S. Holder should consult its own tax advisor regarding its qualification for exemption from backup withholding and information reporting and the procedures for obtaining such exemption.

      **7.**     *Reportable Transactions.*

      Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds.  Each U.S. Holder is urged to consult its own tax advisor regarding these regulations and whether the transactions occurring pursuant to the Plan would be subject to these regulations and require disclosure on its tax return.

      THE FOREGOING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  ACCORDINGLY, EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN AND THE APPLICATION OF U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS.

**Conclusion**

The Debtors believe the Plan is in the best interests of all creditors and urges the holders of impaired claims in Class 3A-3J and Class 4A-4E to vote to accept the Plan and to evidence such acceptance by returning their Ballots.

Dated:   October 5, 2009
         Atlantic City, New Jersey

Respectfully submitted,
TCI 2 HOLDINGS, LLC
TRUMP ENTERTAINMENT RESORTS, INC.
TRUMP ENTERTAINMENT RESORTS HOLDINGS,
        L.P.
TRUMP ENTERTAINMENT RESORTS FUNDING,
        INC.
TRUMP ENTERTAINMENT RESORTS
        DEVELOPMENT COMPANY, LLC
TRUMP TAJ MAHAL ASSOCIATES, LLC d/b/a
        TRUMP TAJ MAHAL CASINO RESORT
TRUMP PLAZA ASSOCIATES, LLC d/b/a TRUMP
        PLAZA HOTEL AND CASINO
TRUMP MARINA ASSOCIATES, LLC d/b/a TRUMP
        MARINA HOTEL CASINO
TER DEVELOPMENT CO., LLC


By:     /s/  Mark Juliano
        Name:  Mark Juliano
        Title:  Chief Executive Officer