| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY | |
| **Caption in compliance with D.N.J. LBR 9004-2(c)**<br><br>**McCARTER & ENGLISH, LLP**<br>Charles A. Stanziale, Jr.<br>Joseph Lubertazzi, Jr.<br>Lisa S. Bonsall<br>Jeffrey T. Testa<br>Four Gateway Center<br>100 Mulberry Street<br>Newark, NJ 07102<br>Tel: (973) 622-4444/Fax:  (973) 624-7070<br>*Counsel for Debtors and*<br>*Debtors in Possession*<br><br>**WEIL, GOTSHAL & MANGES LLP**<br>Michael F. Walsh<br>Ted S. Waksman<br>J. Philip Rosen<br>767 Fifth Avenue<br>New York, NY 10153<br>Tel: (212) 310-8000/Fax:  (212) 310-8007<br>*Co-Counsel for Debtors and*<br>*Debtors in Possession* | Chapter 11<br>Case No.: 09-13654 (JHW)<br><br>(Jointly Administered) |
| In re:<br><br>TCI 2 HOLDINGS, LLC, <u>et al.</u>,[1]<br><br>                     Debtors. | **Hearing Date: TBD**<br>**Objection Deadline: TBD** |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I)
AUTHORIZING BORROWING WITH PRIORITY OVER ADMINISTRATIVE
EXPENSES AND SECURED BY LIENS ON PROPERTY OF THE ESTATES
PURSUANT TO SECTIONS 364(c) AND (d) OF THE BANKRUPTCY CODE, (II)
CONTINUING ADEQUATE PROTECTION THEREFOR PURSUANT TO SECTIONS 361 AND
363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 4001, (III) MODIFYING
<u>THE AUTOMATIC STAY, AND (IV) AMENDING THE CASH COLLATERAL ORDER</u>**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: TCI 2 Holdings, LLC (0526); Trump Entertainment Resorts, Inc. (8402); Trump Entertainment Resorts Holdings, L.P. (8407); Trump Entertainment Resorts Funding, Inc. (8405); Trump Entertainment Resorts Development Company, LLC (2230); Trump Taj Mahal Associates, LLC, d/b/a Trump Taj Mahal Casino Resort (6368); Trump Plaza Associates, LLC, d/b/a Trump Plaza Hotel and Casino (1643); Trump Marina Associates, LLC, d/b/a Trump Marina Hotel Casino (8426); TER Management Co., LLC (0648); and TER Development Co., LLC (0425)

TO THE HONORABLE JUDITH H. WIZMUR,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

TCI 2 Holdings, LLC ("<u>TCI 2</u>") and its debtor affiliates (collectively the

"<u>Debtors</u>"), as debtors and debtors in possession in the above-captioned chapter 11 cases

(the "<u>Chapter 11 Cases</u>"), by and through their undersigned counsel, respectfully

represent:

## **<u>RELIEF REQUESTED</u>**

1.       Proceedings are currently underway in connection with the Court's

consideration of two competing plans, one submitted jointly by the Debtors and certain

holders (the "<u>Ad Hoc Committee</u>") of the 8.5% Senior Secured Notes due 2015 (the

"<u>AHC/Debtor Plan</u>")[2], and the other submitted by Icahn Partners ("<u>Icahn</u>"), Beal Bank

and Beal Bank Nevada (the "<u>Icahn/Beal Plan</u>").  The competing plan process and the

prolonged stay in bankruptcy, coupled with excessive adequate protection payments to

the First Lien Lenders under the *Final Order (I) Authorizing Use of Cash Collateral*

*Pursuant to Section 363 of Bankruptcy Code and (II) Providing Adequate Protection to*

*Prepetition Secured Parties Pursuant to Sections 361, 362, 363, and 364 of Bankruptcy*

*Code* (the "<u>Cash Collateral Order</u>"), have placed a strain on the Debtors' short-term

liquidity.  To date, the Debtors have operated without debtor in possession financing, but

now find themselves in a seasonal low (exacerbated by record snow storms).

2.       As Mr. Marc Lasry testified last week at the confirmation hearing, the Ad

Hoc Committee has indeed committed to provide $45 million in bridge liquidity from the

confirmation date through the effective date of the AHC/Debtor Plan (should the Court

---

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the
AHC/Debtor Plan.

determine to confirm that plan), as reflected in the commitment letter dated March 2, 2010 attached hereto as Exhibit A (the "Commitment Letter").  Importantly, the Commitment Letter contains no financing or commitment fees and no payments of principal or interest are due until maturity.  This financing will enable the Debtors to meet all anticipated expenses through the effective date and enable the Debtors to emerge from bankruptcy.

3.    By separate motion (the "Recharacterization Motion"), the Debtors will be seeking an amendment of the Cash Collateral Order to eliminate further adequate protection payment requirements until further order of the Court.  The Debtors believe that the over $52 million of adequate protection cash payments previously made to or for the benefit of the First Lien Lenders, are more than sufficient to adequately protect Icahn and Beal Bank, and the cessation of further payment obligations will enable the Debtors to meet all its current payment obligations.  However, the Debtors believe that it is prudent to seek approval of debtor in possession financing to augment their liquidity in the event that the Court does not grant such relief and to otherwise provide for standby liquidity between entry of the confirmation order (the "Confirmation Order") and the effective date of the AHC/Debtor Plan (assuming the Court confirms such plan).[3]

4.    Accordingly, by this Motion (the "Motion") the Debtors respectfully request entry of an order (the "Order"):

(i)    authorizing the Debtors to incur postpetition indebtedness with priority over administrative expenses and secured by liens on property of the

---

[3] The Debtors are not seeking approval of the debtor in possession financing or this Motion as a part of the confirmation hearings.

estates pursuant to the debtor in possession financing and with the relative

rank and priorities described below (the "DIP Facility"),

(ii)    modifying the automatic stay to permit the exercise of remedies under the

DIP Facility under certain circumstances, and

(iii)    amending the Cash Collateral Order to provide for the continued use of

cash collateral, in a manner consistent with the relief requested by this

Motion and as set forth in the Recharacterization Motion.

The Debtors request the relief hereunder pursuant to sections 105, 361, 362, 363, 364,

503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 4001

and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## SUMMARY OF THE DIP FACILITY

5.    In accordance with Rule 4001 of the Bankruptcy Rules and the General

Order Adopting Guidelines for Financing Requests, D.N.J., the following is a summary

of the terms of the DIP Facility (this summary is qualified in its entirety by the terms of

the Commitment Letter):

(a)    **DIP Facility Borrowers**:  Trump Entertainment Resorts, Inc. ("TER") and Trump Entertainment Resorts Holdings, L.P. ("TERH"), as borrowers (each, a "Borrower"); TCI 2 Holdings, LLC, Trump Entertainment Resorts Funding, Inc., Trump Entertainment Resorts Development Company, LLC, Trump Taj Mahal Associates, LLC d/b/a Trump Taj Mahal Casino Resort, Trump Plaza Associates, LLC d/b/a Trump Plaza Hotel and Casino, Trump Marina Associates, LLC d/b/a Trump Marina Hotel Casino, TER Management Co., LLC, and TER Development Co., LLC, as guarantors (each a, "Guarantor").

(b)    **DIP Facility Lenders**:  Avenue Capital Management II, L.P.; Contrarian Funds, LLC; Continental Casualty Company; GoldenTree Asset Management, LP; MFC Global Investment Management U.S. LLC; Northeast Investors Trust; Polygon Global Opportunities Master Fund;

Interstate 15 Holdings, Ltd., or affiliates of one or more of the foregoing (collectively, the "Note Purchasers").

(c)    DIP Facility Amount:  up to $45,000,000.

(d)    Type of DIP Facility:  A non-amortizing, multiple issuance secured term notes facility.

(e)    Administrative Agent:  Wilmington Trust FSB or another entity to be appointed with the consent of the Commitment Parties (the "Administrative Agent").

(f)    Availability Period:  From the Closing Date[4] through the DIP Termination Date (defined below).

(g)    DIP Termination Date:  The earliest of (i) the date which is six months after the Closing Date (or five months after the Closing Date if the Backstop Agreement is not amended to extend Section 9 thereof), (ii) the Effective Date of the AHC/Debtor Plan, (iii) the date of confirmation of any plan of reorganization in the Chapter 11 Cases other than the AHC/Debtor Plan and (iv) the acceleration of the DIP Notes and the termination of the Commitments (as defined in the Commitment Letter) upon the occurrence of an Event of Default (as defined in the Commitment Letter).

(h)    Interest Rate: 10.0% per annum, payable on the DIP Termination Date or on the date on which an Event of Default occurs.

(i)    Fees:  None.

(j)    Priority of Claims:  Superpriority over any and all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) or 507(b) or any other provisions of the Bankruptcy Code, subject only to the Carve-Out (described below), provided however, that such administrative claims will be *pari passu* with the superpriority adequate protection claims arising under the Cash Collateral Order.

(k)    Collateral:  First priority liens on unencumbered property (if any) and junior and *pari passu* liens on property securing the prepetition and adequate protection claims of Icahn and Beal Bank, in each case, subject to the Carve-Out (described below).

---

[4] The "Closing Date" shall be a date no later than April 30, 2010, but in any event, no earlier that the date on which the Confirmation Order is entered by the Bankruptcy Court.

(l) <u>Carve-Out</u>:  (i) Any unpaid fees, costs and expenses that were accrued or incurred prior to the Carve-Out Event (as defined in the Commitment Letter) by the professionals retained by the Debtors (collectively, the "<u>Professionals</u>") to the extent subsequently allowed by an order of the Bankruptcy Court plus (ii) those fees, costs and expenses incurred by the Professionals and any subsequent trustee of the Debtors' estates after the Carve-Out Event and subsequently allowed by order of the Bankruptcy Court (provided, that the amount of such fees, costs and expenses included in this clause (ii) shall not exceed $1,000,000 in the aggregate) and (y) fees pursuant to 28 U.S.C. § 1930 and any fees payable to the Clerk of the Bankruptcy Court.

(m) <u>Events of Default</u>: The Note Purchase Agreement will contain events of default (subject in certain cases to cure periods as may be agreed) deemed by the Note Purchasers appropriate to the Transactions (as defined in the Commitment Letter) (which will be applicable to the Borrowers and their subsidiaries), including, without limitation: (1) failure to make payments when due; (2) noncompliance with covenants; (3) breaches of representations and warranties; (4) breaches of negative or affirmative covenants; (5) failure to satisfy or stay execution of judgments in excess of specified amounts; (6) the existence of certain materially adverse employee benefit or environmental liabilities; (7) impairment of Note Documents; (8) entry of an order without the prior consent of the Required Note Purchasers (as defined in the Commitment Letter) amending, supplementing or otherwise modifying the Order; (9) dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code; (10) appointment of a Chapter 11 trustee; (11) appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of the Borrowers or any Guarantor; (12) entry of an order from the Bankruptcy Court confirming a plan of reorganization (other than the AHC/Debtor Plan) that is not satisfactory to the Note Purchasers; (13) the Confirmation Order shall have been reversed or vacated or shall have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent and the Note Purchasers, or the Debtors shall have filed an application seeking to reverse, vacate or stay the Confirmation Order or to amend, supplement or otherwise modify the Confirmation Order, without the prior written consent of the Administrative Agent and the Note Purchasers; (14) entry of an order or orders granting relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on assets on any of the Debtors worth in excess of $2,000,000 in the aggregate since the Closing Date; (15) non-compliance with covenants contained in the Backstop Agreement or termination of the Backstop Agreement in accordance with its terms; (16) an application is filed by any Debtor for the approval of any superpriority

claim or any lien in the Chapter 11 Cases which is *pari passu* with or senior to the adequate protection liens or claims contemplated in the Commitment Letter (except as contemplated in the Commitment Letter) without the prior written consent of the Required Note Purchasers; (17) payment of or granting adequate protection with respect to pre-petition debt (other than as provided in the Commitment Letter or as approved by the Required Note Purchasers and the Bankruptcy Court); (18) an application is filed by the Debtors seeking to amend, modify, supplement or extend the Order or the date of entry of any order reversing, amending, supplementing, staying, vacating or otherwise modifying the Order, without the prior written consent of the Administrative Agent and the Note Purchasers; (19) any material provision of the Orders shall for any reason cease to be valid and binding or any Debtor shall so assert in any pleading filed in any court; and (20) cessation of liens or super-priority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects.

(n)     Termination/Acceleration: Upon the occurrence and during the continuance of an Event of Default (as defined in the Commitment Letter), the Administrative Agent may, and at the direction of the Required Note Purchasers shall, by written notice to the Borrowers, its counsel, and the office of the United States Trustee for the District of New Jersey (the "U.S. Trustee"), terminate the DIP Facility, declare the obligations in respect thereof to be immediately due and payable and, subject to the remedies set forth in the Commitment Letter, exercise all rights and remedies under the Note Documents and the Order.  Certain Events of Default shall result in immediate termination and acceleration of the DIP Facility.

(o)     Remedies: The Administrative Agent and the Note Purchasers shall have appropriate remedies, including, without limitation, with respect to the DIP Facility the right (after providing three (3) business days' prior notice to the Debtors and the U.S. Trustee of the occurrence of an Event of Default) to realize on all or a portion of DIP Collateral in accordance with the Note Documents, without the need for further notice, hearing or order from the Bankruptcy Court.  In the event the Debtors requests a hearing seeking to prevent the Administrative Agent or the Note Purchasers from exercising any of their rights and remedies that arise after an Event of Default, the sole issue before the Bankruptcy Court at such hearing will be whether an Event of Default has occurred.  No other issue or argument will be relevant to any opposition to enforcement of the Administrative Agent's and the Note Purchasers' rights.

(p)     Expenses:  The Debtors will be obligated to pay the Administrative Agent fees and all reasonable, out-of-pocket costs and expenses of the Administrative Agent and the Note Purchasers (including all reasonable,

out-of-pocket fees, expenses and disbursements of counsel to the Administrative Agent and Stroock & Stroock & Lavan LLP (as counsel to all of the Note Purchasers and Commitment Parties) and/or any other outside counsel, including local, bankruptcy and regulatory counsel, and other agents and professional advisors hired by the Administrative Agent and/or Note Purchasers or their counsel) in connection with (i) the preparation, execution and delivery of the Note Documents and the funding of all DIP Notes under the DIP Facility, including, without limitation, all due diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal and consultant costs and expenses, and all search, filing, and recording fees, incurred or sustained by the Administrative Agent and the Note Purchasers in connection with the DIP Facility, the Note Documents or the transaction contemplated thereby, the administration of the DIP Facility, and any amendment or waiver of any provision of the Note Documents and (ii) the enforcement of any of their rights and remedies under the Note Documents.

(q)     <u>Indemnification</u>:  As described in more detail in the attached Commitment Letter, subject to Bankruptcy Court approval, the Borrowers shall jointly and severally indemnify the Administrative Agent, each Note Purchaser, and each of their respective affiliates, officers, directors, employees, controlling persons, agents, advisors, attorneys, and representatives from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsels, agents and professional advisors) arising out of or in connection with the DIP Facility, except to the extent such claim, etc. is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such indemnified party's gross negligence or willful misconduct.  No such indemnified party will have any liability to any party in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from gross negligence or willful misconduct.  In no event, however, shall any such indemnified party be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

(r)     <u>Documentation</u>: The DIP Facility will be evidenced by a note purchase agreement (the "<u>Note Purchase Agreement</u>"), the Commitment Letter, and security documents, guarantees, and other legal documentation (collectively, together with the Note Purchase Agreement, the "<u>Note Documents</u>") in form and substance satisfactory to the Note Purchasers.

(s)     <u>Conditions Precedent</u>: See Annex III to the Commitment Letter

## **BACKGROUND**

6.      On February 17, 2009 (the "Commencement Date"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

7.      The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules.

The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[5]

8.      On January 5, 2010, the Debtors and the Ad Hoc Committee filed the Modified Sixth Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "AHC/Debtor Plan") [Docket No. 1075] and disclosure statement in support thereof [Docket No. 1076].

9.      That same day, Beal Bank, together with Icahn, filed their Fourth Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (as thereafter amended on February 23, 2010, the "Icahn/Beal Plan") [Docket No. 1071] and disclosure statement in support thereof [Docket No. 1072].[6]

---

[5] Additional information regarding the Debtors and the events leading up to the Commencement Date are set forth in the Declaration of John P. Burke in Support of First Day Motions dated February 16, 2009 [Docket No. 19].

[6] The Icahn/Beal Plan stated that Icahn would provide the Debtors with a $45 million debtor in possession loan. Neither the Icahn/Beal Plan nor the supporting disclosure statement provided any further details or terms for this alleged financing. Thereafter, on February 22, 2010, on the eve of the Confirmation Hearing and some three months after filing the first iteration of the Icahn/Beal Plan, Icahn filed notice of the terms of its proposed debtor in possession financing [Docket No. 1250].

## JURISDICTION

10.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2).

## PREPETITION INDEBTEDNESS

11.     The Debtors' prepetition indebtedness is set forth in the Cash Collateral

Order.  Cash Collateral Order, at ¶¶ E, F.

## NEED FOR POSTPETITION FINANCING.

12.     The Debtors, operating as debtors in possession, have been financing the

operation of their three casino hotels in Atlantic City throughout this lengthy chapter 11

process solely from the use of cash collateral which was authorized pursuant to the Cash

Collateral Order.  At the time the Court approved the Cash Collateral Order, the Debtors

anticipated that their Chapter 11 Cases would be resolved in short order.

13.     However, the Debtors have been in chapter 11 for over a year.  Due to this

prolonged stay in bankruptcy and the significant seasonality of the Debtors' businesses,

the Debtors now face short term liquidity constraints.  First, the two-plan process has

entailed significant litigation over the last several months.  There have been at least ten

hearings/conference calls relating to approval of the disclosure statements for the various

plan proposed.  Just the cost of solicitation for the two competing plans (which the

Debtors paid) exceeded $500,000.  The litigation concerning the competing plans has

involved extensive document discovery and depositions and is resulting in a multi-week

contested confirmation hearing.

14.     Second, the Debtors did not anticipate that they would have to continue to
make adequate protection payments under the Cash Collateral Order for such an extended
period.  To date, the Debtors have paid the First Lien Lenders over $52 million under that
order.  Another $11 million payment is due on March 31, 2010, that will significantly and
adversely affect the Debtors' cash balances.  Inasmuch as the amounts paid to the First
Lien Lenders exceed any diminution in the value of the collateral securing the prepetition
claims of Beal Bank and Icahn, any further payments are unnecessary to protect the
interests of such parties.[7]

15.     Third, winter is the Debtors' weakest business season.  As an example,
cash flows from January and February typically represent only 4% of the Debtors' annual
EBITDA.  Moreover, the Debtors' business operations have been adversely impacted by
the occurrence of major winter storms on weekends during this winter season.  Inasmuch
as Atlantic City customers travel significant distances, inclement weather can have and
has had an adverse effect on business for all Atlantic City casinos including the Debtors.
In addition, the simple continuation of these Chapter 11 Cases, makes it difficult for the
Debtors to implement new marketing and other measures that would increase cash flows.
Finally, the continuing weak economy is exacerbating all the issues discussed above.

16.     Although the Debtors project that liquidity would be substantially
benefitted if they did not have to make the March 31, 2010 adequate protection payment,
the Debtors believe that it is prudent to arrange for debtor in possession financing in the

---

[7]     The Debtors will be filing the Recharacterization Motion seeking termination of the obligation to
make further payments under the Cash Collateral Order.

event such payment is required or if unanticipated events put more pressure on the

Debtors' cash flows.

## THE PROPOSED POSTPETITION FINANCING ARRANGEMENT

17.     The Debtors and the Ad Hoc Committee have engaged in extensive, arms'

length negotiations with respect to the terms and conditions of the DIP Facility.  The

material terms and conditions of the DIP Facility are set forth in paragraphs 5(a) through

(s) of this Motion.  Among other things, the debtor in possession financing proposed by

the Ad Hoc Committee contains no financing or commitment fees, and no payments of

principal or interest are due until maturity.  This financing will enable the Debtors to

meet all anticipated expenses during their seasonally slow period.  The proceeds of the

DIP Facility will be used for (i) working capital and other general corporate needs of the

Debtors in the ordinary course of business, (ii) solely to the extent required, payments

providing for adequate protection in favor of the Prepetition First Lien Lenders and the

Prepetition Second Lien Lenders, (iii) the payment of fees and expenses, including

professional fees and fees of counsel to the Administrative Agent and the Note

Purchasers, including bankruptcy counsel, local counsel and regulatory counsel, in each

case, in accordance with the Note Documents, and (v) such other purposes as permitted

under the Note Purchase Agreement.

18.     As security for the DIP Facility, the Debtors request that the Note

Purchasers be secured pursuant to Section 364(c)(2) of the Bankruptcy Code, subject to

the Carve-Out, by a first priority perfected lien on, and security interest in, all present and

after acquired property of the Debtors not subject to a lien or security interest on the

Commencement Date.

19.     In addition, the Debtors request that the Note Purchasers be secured pursuant to Section 364(c)(3), subject to the Carve-Out, by a junior perfected lien on, and security interest in, all property of the Debtors that is subject to (i) a perfected lien or security interest on the Commencement Date or (ii) a valid lien or security interest on the Commencement  Date that is subsequently perfected as permitted by section 546(b) of the Bankruptcy Code;

20.     The Debtors further request that the Note Purchasers be secured, pursuant to Section 364(d)(1), subject to the Carve-Out, by (i) a first priority perfected lien on, and security interest in, all property of the Debtors that is subject to a perfected lien or security interest on the Commencement Date that is a Prepetition First Priority Lien on a *pari passu* basis with such Prepetition First Priority Liens, and (ii) a first priority perfected senior priming lien on, and security interest in, all property of the Debtors that is subject to a perfected lien or security interest on the Commencement Date (other than Prepetition First Priority Liens and any liens with a priority senior to the Prepetition First Priority Liens).

21.     Lastly, pursuant to section 364(c)(1) of the Bankruptcy Code, the Debtors request that the Note Purchasers be entitled to Super Priority Claims over any and all administrative expenses of the kind that are specified in Sections 503(b) and 507 (b) the Bankruptcy Code or any other provisions of the Bankruptcy Code, provided that such claims shall rank *pari passu* with the adequate protection priority claims related to the Prepetition First Lien Financing Documents.

## **EXTRAORDINARY PROVISIONS**

22.     The following terms of the proposed DIP Facility are considered

"Extraordinary Provisions" under the General Order Adopting Guidelines for Financing

Requests for the District of New Jersey:

(a)     Carve-Out:  (i) Any unpaid fees, costs and expenses that were accrued or incurred prior to the Carve-Out Event (as defined in the Commitment Letter) by the Professionals to the extent subsequently allowed by an order of the Bankruptcy Court plus (ii) those fees, costs and expenses incurred by the Professionals and any subsequent trustee of the Debtors' estates after the Carve-Out Event and subsequently allowed by order of the Bankruptcy Court (provided, that the amount of such fees, costs and expenses included in this clause (ii) shall not exceed $1,000,000 in the aggregate) and (y) fees pursuant to 28 U.S.C. § 1930 and any fees payable to the Clerk of the Bankruptcy Court.

(b)     Termination/Acceleration:  Upon the occurrence and during the continuance of an Event of Default (as defined in the Commitment Letter), the Administrative Agent may, and at the direction of the Required Note Purchasers shall, by written notice to the Borrowers, its counsel, and the U.S. Trustee, terminate the DIP Facility, declare the obligations in respect thereof to be immediately due and payable and, subject to the remedies set forth in the Commitment Letter, exercise all rights and remedies under the Note Documents and the Order.  Certain Events of Default shall result in immediate termination and acceleration of the DIP Facility.

(c)     Events of Default:  The Note Purchase Agreement will contain events of default (subject in certain cases to cure periods as may be agreed) deemed by the Note Purchasers appropriate to the Transactions (as defined in the Commitment Letter) (which will be applicable to the Borrowers and their subsidiaries), including, without limitation: (1) failure to make payments when due; (2) noncompliance with covenants; (3) breaches of representations and warranties; (4) breaches of negative or affirmative covenants; (5) failure to satisfy or stay execution of judgments in excess of specified amounts; (6) the existence of certain materially adverse employee benefit or environmental liabilities; (7) impairment of Note Documents; (8) entry of an order without the prior consent of the Required Note Purchasers (as defined in the Commitment Letter) amending, supplementing or otherwise modifying the Order; (9) dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code; (10) appointment of a Chapter 11 trustee; (11) appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of the Borrowers

or any Guarantor; (12) entry of an order from the Bankruptcy Court confirming a plan of reorganization (other than the AHC/Debtor Plan) that is not satisfactory to the Note Purchasers; (13) the Confirmation Order shall have been reversed or vacated or shall have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent and the Note Purchasers, or the Debtors shall have filed an application seeking to reverse, vacate or stay the Confirmation Order or to amend, supplement or otherwise modify the Confirmation Order, without the prior written consent of the Administrative Agent and the Note Purchasers; (14) entry of an order or orders granting relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on assets on any of the Debtors worth in excess of $2,000,000 in the aggregate since the Closing Date; (15) non-compliance with covenants contained in the Backstop Agreement or termination of the Backstop Agreement in accordance with its terms; (16) an application is filed by any Debtor for the approval of any superpriority claim or any lien in the Chapter 11 Cases which is *pari passu* with or senior to the adequate protection liens or claims contemplated in the Commitment Letter (except as contemplated in the Commitment Letter) without the prior written consent of the Required Note Purchasers; (17) payment of or granting adequate protection with respect to pre-petition debt (other than as provided in the Commitment Letter or as approved by the Required Note Purchasers and the Bankruptcy Court); (18) an application is filed by the Debtors seeking to amend, modify, supplement or extend the Order or the date of entry of any order reversing, amending, supplementing, staying, vacating or otherwise modifying the Order, without the prior written consent of the Administrative Agent and the Note Purchasers; (19) any material provision of the Orders shall for any reason cease to be valid and binding or any Debtor shall so assert in any pleading filed in any court; and (20) cessation of liens or super-priority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects.

(d)    <u>Remedies</u>:  The Administrative Agent and the Note Purchasers shall have appropriate remedies, including, without limitation, with respect to the DIP Facility the right (after providing three (3) business days' prior notice to the Debtors and the U.S. Trustee of the occurrence of an Event of Default) to realize on all or a portion of DIP Collateral in accordance with the Note Documents, without the need for further notice, hearing or order from the Bankruptcy Court.  In the event the Debtors requests a hearing seeking to prevent the Administrative Agent or the Note Purchasers from exercising any of their rights and remedies that arise after an Event of Default, the sole issue before the Bankruptcy Court at such hearing will be whether an Event of Default has occurred.  No other issue or argument

will be relevant to any opposition to enforcement of the Administrative Agent's and the Note Purchasers' rights.

## ALTERNATIVE DIP FINANCING

23.    With confirmation hearings on the two competing plans already underway, it is only logical that the source of financing would come from the plan sponsors of the competing plans and not a third party lender, who naturally would tie the funds to an alternative and undiscovered plan of reorganization.  Moreover, the Debtors do not believe that any third parties would provide debtor in possession financing in the face of the ongoing, significant litigation among the parties.  Accordingly, the only two logical candidates to provide the Debtors with debtor in possession financing are Icahn and the Ad Hoc Committee.

24.    Icahn has offered to provide debtor in possession financing in connection with, and subject to confirmation of, the Icahn/Beal Plan (the "Proposed Icahn DIP"). The Debtors have not pursued that proposal because they strongly oppose confirmation of the Icahn/Beal Plan.  The Debtors do not believe that such financing would be available in the event of confirmation of the AHC/Debtor Plan.  In addition, the Debtors believe that, the terms of the facility proposed by Icahn are inferior to those proposed by the Ad Hoc Committee insofar as the Proposed Icahn DIP is tied to a plan that effectively forecloses on the Debtors' assets and offers no recovery to creditors.

## THE DIP FACILITY SHOULD BE AUTHORIZED

25.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the Court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as

specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on

property of the estate that is not otherwise subject to a lien.  Furthermore, Section 364(d)

authorizes a Court to allow the Debtor to obtain credit secured by a senior or equal lien

on property of the estate that is subject to a lien.

26.     As discussed above, additional unsecured credit allowable under

section 503(b)(1) or as an administrative expense under section 364(a) or (b) is not

available.  The financing proposed by Icahn would not be available under circumstances

acceptable to the Debtors.  Therefore, the Debtors propose to obtain the financing set

forth in the Commitment Letter, which will be formally memorialized in the Note

Purchase Agreement, by providing, *inter alia*, super-priority claims, security interests,

and liens pursuant to sections 364(c)(1), (2), and (d)(1) of the Bankruptcy Code.

27.     Here, the Debtors have determined, in the exercise of their business

judgment, that the DIP Facility is in the best interests of the Debtors' estates and courts

grant a debtor considerable deference in acting in accordance therewith.  *See, e.g., Bray v.*

*Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir.

1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases

consistently reflect that the court's discretion under section 364 is to be utilized on

grounds that permit reasonable business judgment to be exercised so long as the

financing agreement does not contain terms that leverage the bankruptcy process and

powers or its purpose is not so much to benefit the estate as it is to benefit parties in

interest."); *see also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87, 88 (Bankr. W.D.

Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re*

*Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985).

28.    The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties at arms' length and in good faith, pursuant to section 364(e) of the Bankruptcy Code.  The ability of the Debtors to continue to operate their businesses and reorganize under chapter 11 of the Bankruptcy Code depends upon their ability to obtain the financing memorialized in the Note Purchase Agreement to ensure they have sufficient liquidity to carry the Debtors from confirmation through the Effective Date of the AHC/Debtor Plan.

29.    The credit provided under the DIP Facility will enable the Debtors to continue to, among other things, satisfy their business needs, pay their employees, and operate their businesses in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all parties in interest. The availability of credit under the DIP Facility will provide confidence to the Debtors' vendors that will enable and encourage them to continue their relationships with the Debtors.  Finally, the implementation of the Note Purchase Agreement will be viewed favorably by the Debtors' employees and creditors thereby promoting a successful reorganization.  Accordingly, the timely approval of the relief requested herein is imperative.

## ADEQUATE PROTECTION OF BEAL BANK AND ICAHN

30.    As part of the DIP Facility, the Debtors propose to grant liens on their assets that are *pari passu* with the liens securing the pre-petition claims of Beal Bank and Icahn under their prepetition loan agreements and under the Cash Collateral Order.  The Debtors submit that Beal Bank and Icahn are already adequately protected, and will

continue to be adequately protected as set forth below and in the Recharacterization

Motion, and that no further adequate protection payments are necessary.

31.    First, Beal Bank and Icahn are entitled to adequate protection solely to the

extent there is risk of a diminution in the value of their lien.  The DIP Facility does not

provide for senior priming liens, rather it grants liens to the Note Purchasers on a *pari*

*passu* basis.  As the First Lien Lenders are admittedly only marginally undersecured, they

cannot, in good faith, assert that there is a risk of diminution to their liens.  Thus, in the

unlikely event of the exercise of remedies, proceeds from the collateral would be shared

*pro rata* between the claims of Beal Bank and Icahn on the one hand and the DIP Note

Purchasers, on the other hand.

32.    The secured claims of Beal Bank and Icahn are either $482.5 million

(based on the valuation observation in the expert report submitted by Icahn in connection

with the confirmation of the Icahn/Beal Plan) or $459 million (based on the valuation for

the AHC/Debtor Plan).  Because the claims under the DIP Facility cannot exceed $45

million, the vast majority of the proceeds from the collateral will be distributed to Beal

Bank and Icahn.  *See In re Yellowstone Mountain Club, LLC*, 2008 WL 5875547, *16-18

(Bankr. D. Mont. 2008.) (holding that a prepetition lender was adequately secured even

where the DIP lender was granted liens senior to and priming the prepetition secured

parties' liens).

33.    Second, Beal Bank has already received over $51 million of adequate

protection payments under the Cash Collateral Order.  Based on Icahn's own valuation of

the collateral, there has been a diminution of value since the Commencement Date of

only $6.3 million.  That means that the First Lien Lenders are holding an "advance

deposit" of over $45 million of cash which more than adequately protects the First Lien

Lenders against the risk of any further decline in the value of such collateral.  Moreover,

such cushion is more than sufficient to protect against any diminution of its interest in the

collateral due to the granting of *pari passu* liens with respect to the DIP Facility.[8]  *See*

*Baybank-Middlesex v. Ralar Distributors, Inc.*, 69 F.3d 1200, 1203 (1st Cir. 1995) ("A

sufficient equity cushion is itself a recognized form of adequate protection, thus collateral

valuation is a logical step in making an adequate protection determination.").

34.     Third, the Debtors' use of the funds available under the DIP Facility will

be to continue operating their businesses after confirmation of the AHC/Debtor Plan

(assuming the Court grants such relief).  The use of such funds benefits Beal Bank and

Icahn because it avoids the likelihood of a liquidation of the collateral.  Borrowings under

the DIP Facility actually preserve the value of the collateral, which in and of itself

constitutes adequate protection.  *In re General Growth Properties, Inc,* 2010 WL 532504

*8 (S.D.N.Y. 2010.) (holding that the DIP loan ensured continuous business operations of

the Debtors which benefited the holder of certain equity interests arising under a

Contingent Stock Agreement, who objected to the DIP Loan.); *In re Yellowstone*

*Mountain Club,* 2008 WL 5875547 at  *17-18 (holding that the proceeds of the DIP Loan

---

[8] Further, after the AHC/Debtor Plan becomes effective, the First Lien Lenders will have the benefit of a
significant equity cushion.  After applying the $125 million pay down of the First Lien Obligations from
Rights Offering Proceeds and the recharacterization of excess postpetition adequate assurance payments in
the approximate amount of $45.8 million, the remaining amount of outstanding First Lien Lender
Obligations will be in the aggregate amount of approximately $312 million ($482.5 million First Lien
Lender Obligations less $125 million in Rights Offering Proceeds less $45.8 million in recharacerized
postpetition payments).  Accordingly, based upon Icahn's own  $482.5 million valuation, and after giving
effect to the $100 million in excess cash from the Rights Offering, the Reorganized Debtors will have an
equity cushion of approximately $271 million to adequately protect the First Lien Lenders post-effective
date ($482.559 TEV plus $100 million in Rights Offering Proceeds less $312 million in outstanding  First
Lien Lender Obligation).

would be used to preserve the value of the collateral which was a net economic benefit to

all parties including the prepetition lenders and constituted sufficient adequate

protection.).

## **LIMITED MODIFICATION OF THE AUTOMATIC STAY**

35.     The relief requested herein contemplates a modification of the automatic

stay (to the extent applicable) under Section 362(d) of the Bankruptcy Code to permit the

Debtors to (a) grant the liens and claims described herein, (b) perform such acts as the

Note Purchasers may request in its reasonable discretion to assure the perfection and

priority of the liens granted in order approving the Motion, (c) permit the Debtors to incur

all liabilities and obligations contemplated in the Note Purchase Agreement, (d) authorize

the Debtors to deposit all cash, checks, or other collections or proceeds from the

collateral received by the Debtors to be deposited in accordance with the requirements of

the Note Purchase Agreement and to apply any amounts so deposited and other amounts

paid to or received by the Note Purchasers, under the Note Purchase Agreement, in

accordance with the requirements of the Note Purchase Agreement, and (e) authorize and

permit the Note Purchasers to exercise their remedies under the Note Purchase

Agreement and related documentation.

36.     Stay modifications of this kind are ordinary and standard features of

postpetition debtor financing facilities and, in the Debtors' business judgment, are

reasonable and fair under the present circumstances.

## **AMENDMENT OF CASH COLLATERAL ORDER**

37.     As previously noted, on March 23, 2009, the Court entered into the Cash

Collateral Order authorizing the Debtor to continue to use cash collateral.  The Cash

Collateral Order prevents the Debtor from granting any liens superior to or *pari passu*

with the Prepetition First Lien Lender Liens.  Specifically, Paragraph 9(d) states:

> Subject to the Carve-Out, the Adequate Protection Liens shall not be: (i) subject or junior to any lien that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; or (ii) subordinated to or made *pari passu* with any other lien, whether under section 364(d) of the Bankruptcy Code or otherwise. No claim or lien having a priority superior to or *pari passu* with those granted by the Orders with respect to the Adequate Protection Obligations shall be granted or allowed until the indefeasible payment in full in cash and satisfaction in the manner provided in the Orders of the Adequate Protection Obligations and Prepetition First Lien Obligations occurs.

Cash Collateral Order, at ¶9(d).

38.     It is undisputed that a bankruptcy court, as a court of equity, has the right

to modify or amend its previous orders.  *See In re Lebanon Steel Foundry*, 48 B.R. 520,

524 (Bankr. M.D. Pa. 1985) ("[i]t is now well settled that a bankruptcy judge has the

power to reexamine and revise an order which he entered during the pendency of

bankruptcy proceedings.").  In addition, not only does the Bankruptcy Court have the

power to vacate a final judgment but also may exercise this power very liberally. The

only criteria necessary is to "accomplish justice."  *Id.*  Courts have also held that

modifying a previous order may be particularly appropriate where the factual

circumstances before the court have changed.  *See In re Keystone Camera Products

Corp.*, 126 B.R. 177, 182 (Bankr. D.N.J 1991); *see also Johnson and Morgan,* 29 B.R.

372, 374 (Bankr. M.D. Pa. 1983) (holding that equitable power of bankruptcy courts to

amend final orders should be exercised very broadly and that "such an approach is

particularly necessary and important when reviewing orders issued in a Chapter 11 case

which require continuing conduct of the Debtor In Possession and on which the success

or failure of the rehabilitation might depend.").

39.     In the current status of the case, the DIP Facility is necessary and the Cash

Collateral Order should be amended in a manner consistent with the relief requested in

this Motion and the Recharacterization Motion.  As stated above, the Debtors have been

unable to obtain sufficient funding on an unsecured or junior basis to provide them with

sufficient liquidity between the period of entry of the Confirmation Order and the

Effective Date.

40.     Although the Cash Collateral Order provides that the Debtors are

prohibited from borrowing additional debt on a *pari passu* basis with the First Lien

Obligations, the Debtors submit that any risk to the First Lien Lenders or their collateral

is minimal.  The Debtors require the DIP Facility only to bridge the gap between

confirmation and the effective date of the AHC/Debtor Plan.  Under the terms of the

Commitment Letter, the Debtors will be entitled to borrow under the DIP Facility only if

the AHC/Debtor Plan is confirmed.  In addition, the Debtors request a modification of the

Cash Collateral Order to extend the Debtors' right to use cash collateral thereunder until

the effective date of the AHC/Debtor Plan for the reasons set forth herein and as shall be

further demonstrated in the Recharacterization Motion.  The Debtors submit that such

relief is consistent with the other relief sought hereunder, the relief sought by the

Recharacterization Motion, and the competing plan process that is currently before the

Court.

41.     Accordingly, the Debtors request the Cash Collateral Order be modified,

in a manner consistent with the relief requested by this Motion and as set forth in the

Recharacterization Motion, so as to allow the Debtors to grant liens and security interests to the Note Purchasers on a *pari passu* basis with the First Lien Lenders and to provide for the continued use of cash collateral.

## WAIVER OF MEMORANDUM OF LAW

42.     This Motion does not raise any novel issues of law and, accordingly, the Debtors respectively request that the Court waive the requirement contained in the District of New Jersey Local Bankruptcy Rules, D.N.J. LBR 9013-2, that a separate memorandum of law be submitted.

## NOTICE

43.     Notice of this Motion has been provided to (i) the U.S. Trustee; (ii) counsel to U.S. Bank National Association, as Noteholder Collateral Agent; (iii) counsel to the Ad Hoc Committee; (iv) counsel to Beal Bank; (v) counsel to Icahn; (vi) the twenty (20) largest unsecured creditors of the Debtors; (vii) the United States Securities and Exchange Commission; (viii) the United States Attorney's Office  for the State of New Jersey; (ix) the Attorney General's Office for the State of New Jersey; (x) the Internal revenue Service and other government agencies to the extent required by the Bankruptcy Rules and the Local Rules of the United States Bankruptcy Court for the District of New Jersey, including applicable gaming authorities, and (xi) to any parties specifically effected by the relief sought herein.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  March 2, 2010

*/s/Charles A. Stanziale, Jr..*
Michael F. Walsh
Ted S. Waksman
J. Philip Rosen
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Co-Counsel for Debtors and*
*Debtors in Possession*

-and-

Charles A. Stanziale, Jr.
Joseph Lubertazzi, Jr.
Lisa S. Bonsall
Jeffrey T. Testa
McCARTER & ENGLISH, LLP
Four Gateway Center, 100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444
Facsimile: (973) 624-7070

*Counsel for Debtors and Debtors in*
*Possession*

**EXHIBIT A**

**COMMITMENT LETTER**