March 2, 2010

Trump Entertainment Resorts, Inc.
Trump Entertainment Resorts Holdings, L.P.
15 South Pennsylvania Avenue
Atlantic City, New Jersey 08401

Attn: Mark Juliano, Chief Executive Officer

## COMMITMENT LETTER

## $45,000,000 SECURED
## DEBTOR-IN-POSSESSION FACILITY

Ladies and Gentlemen:

Reference is made to those certain Chapter 11 cases (collectively, the "***Case***") in the United States Bankruptcy Court for the District of New Jersey (the "***Bankruptcy Court***") of Trump Entertainment Resorts, Inc., a Delaware corporation, and Trump Entertainment Resorts Holdings, L.P., a Delaware limited partnership (each a "***Company***" and together, the "***Companies***"), and certain of their direct and indirect subsidiaries (such subsidiaries, together with the Companies, each a "***Debtor***" and collectively, the "***Debtors***"). In connection with the Case, the Commitment Parties (as defined below) wish to advise you of their interest in participating in a secured debtor-in-possession facility in an aggregate principal amount of up to $45,000,000 (the "***DIP Facility***"), and their agreement to severally but not jointly commit to provide the entire principal amount of the DIP Facility. The Commitment Parties and/or their respective affiliates have previously entered into that certain Amended and Restated Backstop Agreement, dated as of December 11, 2009, among each Company and the Noteholders signatory thereto (as may be amended, supplemented or otherwise modified in accordance with the terms thereof, the "***Backstop Agreement***") and the DIP Facility is related to the commitments that the Commitment Parties or their respective affiliates have made to contribute capital in connection with the Rights Offering (as defined in the Backstop Agreement) under the Backstop Agreement.

For purposes hereof (i) a "***Commitment Party***" shall mean each of the individual entities named on <u>Annex I</u> (where applicable, in such entity's capacity as investment advisor or manager with respect to certain managed accounts) and/or one or more affiliates designated by such

entities and (ii) the "***Commitment Parties***" shall be a collective reference to each Commitment Party.

Subject to the terms and conditions described in this commitment letter (the "***Commitment Letter***") and the Summary of Terms and Conditions attached hereto as <u>Annex II</u> (the "***DIP Term Sheet***") and the Conditions Precedent attached hereto as <u>Annex III</u> (the "***Conditions Precedent***"), each Commitment Party is pleased to inform you of its several and not joint commitment to provide the principal amount of the DIP Facility as set forth next to its name on <u>Annex I</u>. The Companies' obligations in respect of the DIP Facility, as the borrowers thereunder, shall be guaranteed by the direct and indirect subsidiaries of each of the Companies that are Debtors, and the Debtors' obligations in respect of the DIP Facility shall constitute super-priority claims under Bankruptcy Code section 364(c)(1) and be entitled to security interests under Bankruptcy Code sections 364(c)(2) and (d)(1), in each case, as described in the DIP Term Sheet.

The sole administrative agent for the DIP Facility (in such capacity, the "***Administrative Agent***") shall be Wilmington Trust FSB or another entity approved by the Commitment Parties. The Administrative Agent shall act in such capacity on the terms and subject to the conditions set forth in this Commitment Letter and the DIP Term Sheet, as more fully reflected in the definitive Note Documents (as defined in the DIP Term Sheet). No arrangers, bookrunners, or other agents or co-agents will be appointed, or other titles conferred, and no Note Purchaser (as defined in the DIP Term Sheet) will receive any payment of any kind for its participation in the DIP Facility, except as expressly provided in the DIP Term Sheet, in each case, without the prior written consent of the Companies and the Commitment Parties hereunder.

1.   <u>Conditions Precedent</u>.  The several and not joint commitment of each of the Commitment Parties hereunder and the several and not joint agreements of each of the Commitment Parties to perform the services described herein are subject to the conditions set forth in <u>Part A</u> of <u>Annex III</u>. Please note that the terms and conditions of each of the Commitment Parties' commitments hereunder are not limited to those set forth in this Commitment Letter, <u>Annex III</u> and the DIP Term Sheet and that those matters that are not covered or made clear in this Commitment Letter, <u>Annex III</u> or the DIP Term Sheet are subject to mutual agreement of the parties.

2.   <u>Commitment Termination</u>.  The Commitment Parties may terminate this Commitment Letter if any event occurs or information becomes available that, in their sole judgment, results or is likely to result in the failure to satisfy any condition set forth in <u>Annex III</u>. In addition, each Commitment Party's commitment set forth in this Commitment Letter is subject to termination pursuant to the last paragraph of this Commitment Letter.

3.   <u>Indemnification</u>.  The Debtors agree, jointly and severally, to indemnify and hold harmless the Administrative Agent, each Commitment Party, each Note Purchaser and each of their respective affiliates, members, partners, and each of their respective officers, directors, employees, agents, advisors and representatives (each, an "***Indemnified Person***") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel, including bankruptcy and regulatory counsel, and other agents and professional advisors), joint or several, that may be incurred by or asserted or awarded against any Indemnified Person (including, without limitation, in connection

-2-

with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), in each case arising out of or in connection with or by reason of this Commitment Letter, the DIP Term Sheet or the Note Documents or the transactions contemplated hereby or thereby, or any use made or proposed to be made with the proceeds of the DIP Facility, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.  In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective, whether or not such investigation, litigation or proceeding is brought by any Debtor, any securityholder or creditor of any Debtor, an Indemnified Person or any other person, or an Indemnified Person is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor, or any of its securityholders or creditors for or in connection with the transactions contemplated hereby, except for direct damages (as opposed to special, indirect, consequential or punitive damages including, without limitation, any loss of profits, business or anticipated savings) determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.

4.      Costs and Expenses.  Each Debtor agrees to pay or reimburse the Administrative Agent, the Note Purchasers and the Commitment Parties on demand for all fees of the Administrative Agent, as agreed in writing (the "***Administrative Agent Fees***"), out-of-pocket costs and expenses incurred by the Administrative Agent, the Note Purchasers and the Commitment Parties in connection with the DIP Facility and the preparation, negotiation, execution and delivery of this Commitment Letter, the DIP Term Sheet, the Note Documents, the administration, amendment, modification or waiver thereof and any security arrangements in connection therewith, including, without limitation, the reasonable fees and disbursements of Stroock & Stroock & Lavan LLP (as counsel to all of the Note Purchasers and Commitment Parties) and/or any other counsel to the Administrative Agent, the Note Purchasers or the Commitment Parties including bankruptcy counsel, local counsel and regulatory counsel and other agents and professional advisors (whether incurred before or after the date hereof), whether or not any of the transactions contemplated hereby are consummated.  Each Debtor further agrees, jointly and severally, to pay all costs and expenses of the Administrative Agent, the Note Purchasers and the Commitment Parties (including, without limitation, reasonable fees and disbursements of counsel, including bankruptcy counsel, local counsel and regulatory counsel, and other agents and professional advisors retained by each of the Administrative Agent, the Note Purchasers and the Commitment Parties) incurred in connection with the enforcement of any of their rights and remedies hereunder.

5.      Confidentiality.  By accepting delivery of this Commitment Letter, each Debtor agrees that this Commitment Letter and the DIP Term Sheet are for its confidential use only and that neither their existence nor the terms thereof will be disclosed by it to any person or entity (whether legal or other entity), other than officers, directors, employees, accountants, attorneys and other advisors of the Debtors, and then only on a confidential and "need to know" basis in connection with the transactions contemplated hereby. Notwithstanding the foregoing, following

each Debtor's acceptance of the provisions hereof and its return of an executed counterpart of this Commitment Letter, each Debtor may disclose this Commitment Letter (excluding Annex I hereto) and the DIP Term Sheet (i) as compelled in a judicial or administrative proceeding or required by the Federal securities laws or any other laws or regulations to which the Companies are subject (in which case each Company agrees to use good faith efforts to inform the Commitment Parties of such disclosure prior thereto and in any event promptly after such disclosure),(ii) to the agent under the Prepetition Credit Agreement (as defined in the DIP Term Sheet), and (iii) in filings with the Bankruptcy Court.

6.    Representations and Warranties.    Each Debtor represents and warrants that (i) all information (other than financial projections) that has been or will hereafter be made available to the Administrative Agent, any Commitment Party, any Note Purchaser or any potential Note Purchaser by or on behalf of the Debtors or any of their respective affiliates or representatives in connection with the transactions contemplated hereby is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements were or are made, and (ii) all financial projections, if any, that have been or will be prepared by or on behalf of the Debtors or any of their respective representatives and made available to the Administrative Agent, any Commitment Party, any Note Purchaser or any potential Note Purchaser have been or will be prepared in good faith based upon assumptions that are reasonable at the time made and at the time the related financial projections are made available to the Administrative Agent and the Commitment Parties.  If at any time from the date hereof until the effectiveness of the Note Documents any of the representations and warranties in the preceding sentence would be incorrect if the information or financial projections were being furnished, and such representations and warranties were being made, at such time, then the Debtors will promptly supplement the information and the financial projections so that such representations and warranties contained in this paragraph will be correct.

In issuing this Commitment Letter and in arranging the DIP Facility (including any potential syndication of the DIP Facility), the Commitment Parties will be entitled to use, and to rely on the accuracy of, the information furnished to them by or on behalf of the Debtors and their respective affiliates or otherwise publicly disclosed by the Debtors without responsibility for independent verification thereof.

7.    No Third Party Reliance, Etc.  This Commitment Letter, and any agreements made herein, are solely for the benefit of the Companies and may not be relied upon or enforced by any other person.

8.    Absence of Fiduciary Relationship.  Each Debtor acknowledges that the Administrative Agent and/or one or more of its affiliates may provide financing, equity capital or other services (including financial advisory services) to, and each Commitment Party and/or one or more of their respective affiliates may own the debt or equity of or make other investments in, parties whose interests may conflict with the interests of the Debtors.

Each Debtor further acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Debtors, on the one hand, and any of the Commitment Parties, on the

other hand, has been or will be created in respect of any of the transactions contemplated by this Commitment Letter or the DIP Term Sheet, irrespective of whether the Commitment Parties or their respective affiliates have advised or are advising you on other matters, (b) no fiduciary or advisory relationship between the Debtors, on the one hand, and the Administrative Agent on the other hand, has been or will be created in respect of any of the transactions contemplated by this Commitment Letter or the DIP Term Sheet, irrespective of whether the Administrative Agent or its affiliates have advised or are advising you on other matters, and (c) the Debtors will not bring or otherwise assert any claim against the Administrative Agent or any of the Commitment Parties for breach of fiduciary duty or alleged breach of fiduciary duty and none of the Administrative Agent and the Commitment Parties shall have any liability (whether direct or indirect) to the Debtors in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of the Debtors, including each Debtor's stockholders, employees or creditors.

9.      Assignments.  The Debtors may not assign this Commitment Letter (including the DIP Term Sheet) or the Commitment Parties' commitments hereunder without the prior written consent of each Commitment Party, and any attempted assignment without such consent shall be void.  Each Commitment Party may assign its commitment hereunder, in whole or in part, without the consent of the Debtors or any other party, to any Eligible Assignee (as defined in the DIP Term Sheet), subject to compliance with applicable securities laws.

10.     Amendments.  This Commitment Letter and the DIP Term Sheet may not be amended or any provision hereof waived or modified except by written agreement signed by each party hereto.

11.     Governing Law, Etc.  This Commitment Letter (including the DIP Term Sheet and the other annexes hereto) shall be governed by, and construed in accordance with, the laws of the State of New York. This Commitment Letter and the DIP Term Sheet set forth the entire agreement among the parties with respect to the matters addressed herein and supersede all prior communications, written or oral, with respect hereto.  This Commitment Letter and the DIP Term Sheet may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original and all of which, taken together, shall constitute one and the same Commitment Letter.  Delivery of an executed counterpart of a signature page to this Commitment Letter by facsimile or electronic transmission (e.g., "pdf") shall be as effective as delivery of a manually executed counterpart of this Commitment Letter. Sections 3 through 5 and 11 and 12 shall survive the expiration or termination of this Commitment Letter whether or not the Note Documents shall be executed and delivered.  The Company acknowledges that information and documents relating to the DIP Facility may be transmitted through Intralinks, the internet or similar electronic transmission systems.

12.     **Waiver of Jury Trial.  Each party hereto irrevocably and expressly waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating or incidental to this Commitment Letter (including the DIP Term Sheet and the other annexes hereto) or the transaction contemplated hereby or the actions of the parties hereto in the negotiation, performance or enforcement hereof.**

13.    <u>Termination</u>.  The Companies may terminate this Commitment Letter upon written notice to the Administrative Agent and the Commitment Parties at any time prior to execution of the Note Documents, <u>provided</u> that all obligations of the Debtors with respect to (i) the payment and reimbursement of all costs and expenses incurred by the Administrative Agent and the Commitment Parties to the extent payable pursuant to this Commitment Letter and (ii) Sections 3 through 5 (except payment of the Administrative Agent Fees) and Sections 11 and 12 hereof, shall survive the termination of this Commitment Letter.

14.    <u>PATRIOT Act Notification</u>.  The Administrative Agent and the Commitment Parties hereby notify each Debtor that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "***PATRIOT Act***"), the Administrative Agent, the Commitment Parties and each Note Purchaser may be required to obtain, verify and record information that identifies the borrower and each guarantor under the DIP Facility, which information includes the name, address, tax identification number and other information regarding the borrower and each guarantor that will allow the Administrative Agent, the Commitment Parties or such Note Purchaser to identify the borrower and each guarantor in accordance with the PATRIOT Act and is effective as to each Administrative Agent, Commitment Party and each Note Purchaser.

Please indicate your acceptance of the provisions hereof by signing the enclosed copy of this Commitment Letter and returning it to Stroock & Stroock & Lavan LLP, as counsel to the Commitment Parties, 180 Maiden Lane, New York, NY 10038, Attn:  Erez Gilad (fax: 212-806-6006), at or before 5 p.m. (New York City time) on April 15, 2010. In addition, the commitments and agreements of the Commitment Parties hereunder shall expire at 5:00 p.m., New York City time, on April 30, 2010, unless, prior to that time, the definitive Note Documents have been executed and delivered by the parties thereto and the Bankruptcy Court shall have entered the Order and Confirmation Order (each as defined in the Conditions Precedent).  If the Company elects to deliver this Commitment Letter by telecopier or e-mail (.pdf), please arrange for the executed original to follow by next-day courier.  This Commitment Letter shall be effective upon the execution thereof by the Commitment Parties and the Companies.

[*Remainder of page intentionally left blank.*]

The Commitment Parties are pleased to have been given the opportunity to assist you in connection with this financing.

Very truly yours,

Avenue Capital Management II, L.P., solely in its capacity as investment advisor to Avenue Investments, L.P., Avenue International Master, L.P., Avenue Special Situations Fund IV, L.P., Avenue Special Situations Fund V, L.P., and Avenue CDP-Global Opportunities Fund, L.P, as a Commitment Party

By: _____

Name: Sonia Gardner
Title:

NY 72569008v2

Contrarian Funds, LLC, as a Commitment Party

By: Contrarian Capital Management, LLC, as manager

By: _____

Name: Jon Bauer

Title: Managing Member

[*Signature Page to DIP Commitment Letter*]

Continental Casualty Company, as a Commitment
Party

By: _____

Name:
Title:   **Dennis R. Hemme**
         **Senior Vice President and Treasurer**


Approved by
Law Dept.
By: _____
Date: 2/04/10

GoldenTree Asset Management, LP as Investment
Advisor on behalf of one or more domestic
Accounts, as a Commitment Party

By: _____

Name:  Barry Ritholz

Title:  Vice President

*[Signature Page to DIP Commitment Letter]*

MFC Global Investment Management (U.S.) LLC,
as a Commitment Party

By: _____

Name: BARRY H. GANS

Title: PRESIDENT / Chief INVESTMENT
Officer

*[Signature Page to DIP Commitment Letter]*

Northeast Investors Trust, as a Commitment Party

By: _____

Name: Bruce MONRAD

Title: trustee , not individually

Polygon Global Opportunities Master Fund, as a Commitment Party

By: Polygon Investment Partners LLP, as investment manager

By: _____

Name: Mike Moore

Title: Authorized Signatory

*[Signature Page to DIP Commitment Letter]*

Interstate 15 Holdings Ltd., as a Commitment Party

By: Oaktree Capital Management, L.P., its director

By: _____

Name: **DAVID M. KIRCHHEIMER**

Title: **PRINCIPAL**
**CHIEF FINANCIAL AND**
**ADMINISTRATIVE OFFICER**

By: _____

Name: Kaj Vazales

Title: Assistant Vice President

ACCEPTED AND AGREED on March __, 2010:

**TRUMP ENTERTAINMENT RESORTS, INC.**

By: _____

    Name: John P Burke

    Title: CFO


**TRUMP ENTERTAINMENT RESORTS
HOLDINGS, L.P.**

By: _____

    Name: John P Burke

    Title: CFO

*[Signature Page to DIP Commitment Letter]*

<u>**Annex I**</u>

**Each Commitment Party and their Commitment Amounts**

| Commitment Party | Commitment Amount |
|---|---|
| Avenue Capital Management II, L.P. | ▮ |
| Contrarian Funds, LLC | ▮ |
| Continental Casualty Company | ▮ |
| GoldenTree Asset Management, LP | ▮ |
| MFC Global Investment Management U.S. LLC | ▮ |
| Northeast Investors Trust | ▮ |
| Polygon Global Opportunities Master Fund | ▮ |
| Interstate 15 Holdings Ltd. | ▮ |
| **TOTAL** | **$45,000,000.00** |

NY 72569008v2

## ANNEX II
## $45,000,000 SECURED
## DEBTOR-IN-POSSESSION NOTES FACILITY

### Summary of Terms and Conditions

Reference is made to (i) that certain Credit Agreement dated as of December 21, 2007 (the **"Prepetition Credit Agreement"**), among Trump Entertainment Resorts Holdings, L.P., a Delaware limited partnership, as borrower ("**TERH**"), Trump Entertainment Resorts, Inc., a Delaware corporation ("**TER**"), as a guarantor, the subsidiary guarantors named therein, Beal Bank and Beal Bank Nevada, as lenders (each, together with its successor and assigns, a **"Prepetition Lender"** and, collectively, the **"Prepetition Lenders"**), and Beal Bank, as administrative agent and collateral agent (in such capacity, together with any successors thereto in such capacity, the **"Prepetition Agent"** and, together with the Prepetition Lenders, the **"Prepetition First Lien Parties"**), as amended by that certain First Amendment to Credit Agreement dated as of December 21, 2007, Second Amendment to Credit Agreement dated as of May 29, 2008, and Third Amendment to Credit Agreement dated as of October 28, 2008, and together with all Loan Documentation (as defined in the Prepetition Credit Agreement) and any other agreements and documents delivered pursuant thereto or in connection therewith (collectively, the **"Prepetition First Lien Financing Documents.**"); the assets in which liens and security interests were granted (the "**Prepetition First Priority Liens**") pursuant to the Prepetition First Lien Financing Documents are referred to herein as "**Prepetition First Lien Lender Collateral**" and (ii) that certain indenture dated as of May 20, 2005 (the "**Indenture**"), by and among TERH, Trump Entertainment Resorts Funding, Inc., each Guarantor (as defined in the Indenture), and U.S. Bank National Association, a national banking association, as trustee and collateral agent or any successor thereto (the "**Noteholder Collateral Agent**"), in respect of the $1,250,000,000 in aggregate principal amount of 8½% Senior Secured Notes due 2015 (the "**Secured Notes**," and each holder thereof, a "**Noteholder**," together with the Noteholder Collateral Agent, the "**Prepetition Second Lien Parties**"), and together with all Collateral Documents (as defined in the Indenture) and any other agreements and documents delivered pursuant thereto or in connection therewith (collectively, the "**Prepetition Second Lien Financing Documents**," and together with the Prepetition First Lien Financing Documents, the "**Prepetition Financing Documents**"); the assets in which liens and security interests were granted (the "**Prepetition Second Priority Liens**") pursuant to the Prepetition Second Lien Financing Documents are referred to herein as "**Prepetition Noteholder Collateral**" and collectively with the Prepetition First Lien Lender Collateral, the "**Prepetition Collateral**".

This Summary of Terms and Conditions outlines certain terms of the DIP Facility referred to in the Commitment Letter, dated March 2, 2010, addressed to TER and TERH from the Commitment Parties named therein (the "**Commitment Letter**"). This Summary of Terms and Conditions is part of, and subject to, the Commitment Letter (including Annex III attached thereto). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Commitment Letter or Annex III attached thereto.

| | |
|---|---|
| **DIP Notes**: | 10.0% Senior Secured DIP Notes due 2010 (the "**DIP Notes**"). |
| **Issuers:** | TER and TERH, each a "**Borrower**" and together, the "**Borrowers**"), in their capacity as debtors and debtors-in-possession in a case (together with the cases of their affiliated debtors and debtors-in-possession, the "**Case**") filed under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"). |
| **Principal Amount:** | Up to $45,000,000. |
| **Guarantors:** | Each of the Borrower's direct and indirect subsidiaries that are debtors and |

debtors-in-possession in the Case (collectively, the "***Guarantors***"; collectively with the Borrowers, individually a "***Debtor***" and collectively, the "***Debtors***").

**Administrative Agent:**    Wilmington Trust FSB or another entity to be appointed with the consent of the Commitment Parties (the "***Administrative Agent***").

**Purchasers**:    The Commitment Parties (and together with their successors and permitted assigns, collectively, the "***Note Purchasers***").

**Type and Amount of the DIP Facility:**    A non-amortizing multiple issuance secured term notes facility (the "***DIP Facility***") in an aggregate principal amount not to exceed $45,000,000 (the Note Purchasers' commitments to purchase DIP Notes under the DIP Facility, the "***Commitments***" and the transactions contemplated hereby, the "***Transactions***"). The DIP Notes under the DIP Facility may be issued and purchased during the Availability Period (as defined below) upon five (5) business days prior written notice (the date of each issuance being, a "***Draw Date***"), each in a principal amount not less than $5,000,000 and, in the aggregate for all such issuances, in a principal amount not to exceed $45,000,000. Once repaid, the DIP Notes issued under the DIP Facility cannot be reissued. A maximum of two (2) issuances of DIP Notes shall be allowed per calendar month. The amount of each issuance requested shall be limited to the excess of the disbursements in the 13-week rolling forecast for the succeeding two (2) weeks *less* cash on hand (excluding cash on hand constituting "cage cash" that is required by the CCC to remain at the Debtors in such aggregate amount not to exceed the amount required by the CCC to remain at the Debtors).

**Availability Period:**    The DIP Notes under the DIP Facility may be issued during the period from and including the Closing Date up to but excluding the DIP Termination Date (as defined below) (such period, the "***Availability Period***"). The Commitments will expire at the end of the Availability Period.

**Closing Date:**    A date no later than April 30, 2010, but in any event, no earlier that the date on which the Confirmation Order is entered by the Bankruptcy Court (the "***Closing Date***").

**Maturity:**    All obligations under the DIP Facility will be due and payable in full in cash (subject to the last sentence of this paragraph) on the date (the "***DIP Termination Date***") that is the earliest of (i) the date which is six months after the Closing Date (or five months after the Closing Date if the Backstop Agreement is not amended to extend Section 9 thereof) (such date, the "***Scheduled Termination Date***"), (ii) the effective date (the "***Effective Date***") of a plan of reorganization in the Case reflecting the terms and conditions set forth in the Debtors' and the Ad Hoc Committee's Plan of Reorganization filed on January 5, 2010, as the same may be modified after the date hereof only with the approval of the Required Note Purchasers (as defined below) and the Debtors, and otherwise in form and substance satisfactory to the Note Purchasers and the Debtors (the "***AHC/Debtor Plan***"), (iii) the date of confirmation of any plan of reorganization in the Case other than the AHC/Debtor Plan and (iv) the acceleration of the DIP

AII-2

Notes and the termination of the Commitments upon the occurrence of an event referred to below under "Termination". Principal of, and accrued interest on, the DIP Notes and all other amounts owing to the Administrative Agent and the Note Purchasers under the DIP Facility shall be payable on the DIP Termination Date. If the Effective Date of the AHC/Debtor Plan occurs, then on the Effective Date, at the option of each Note Purchaser, either (i) the DIP Notes held by such Note Purchaser shall be payable in cash out of the proceeds of the Rights Offering (as defined in the Backstop Agreement) or (ii) solely in the case of a Note Purchaser that is (or is an affiliate of) a party to the Backstop Agreement, the DIP Notes purchased by such Note Purchaser pursuant to the DIP Facility shall be treated as an advance on capital under the commitment of such Note Purchaser (or its affiliate(s)) under the Backstop Agreement, and the outstanding DIP Notes held by such Note Purchaser shall be deemed exchanged into equity pursuant to the Backstop Agreement.

| | |
|---|---|
| **Purpose:** | Proceeds of the DIP Notes under the DIP Facility will be used only for the following purposes: (i) working capital and other general corporate needs of the Borrowers and the Guarantors in the ordinary course of business, (ii) payments providing for adequate protection in favor of the Prepetition First Lien Parties and the Prepetition Second Lien Parties as set forth under "Adequate Protection" below; and (iii) the payment of fees and expenses, including professional fees and fees of counsel to the Administrative Agent and the Note Purchasers, including bankruptcy counsel, local counsel and regulatory counsel, in each case, in accordance with the Note Documents. No portion or proceeds of the DIP Notes, the Carve-Out (as defined below) or the DIP Collateral (as defined below) may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Note Purchasers, the Administrative Agent or the Prepetition Second Lien Parties. |
| **Documentation** | The DIP Facility shall be evidenced by a note purchase agreement (the "***Note Purchase Agreement***"), security documents, guarantees and other legal documentation (collectively, together with the Note Purchase Agreement, the "***Note Documents***") in form and substance satisfactory to the Note Purchasers. |
| **Interest:** | The DIP Notes shall bear interest, at 10.0% per annum payable upon the earlier of the DIP Termination Date or the date on which an Event of Default occurs. |
| | Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year. |
| **Default Interest:** | Upon the occurrence and during the continuance of an Event of Default (as defined in the Note Purchase Agreement), DIP Notes will bear interest at an additional 2.00% *per annum* and shall be payable on demand. |
| **Mandatory Prepayments:** | The Note Purchase Agreement shall contain mandatory prepayment events deemed by the Note Purchasers to be appropriate to the Transactions, |

NY 72569008v2

including, without limitation, to the extent not required to prepay the obligations outstanding under the Prepetition First Lien Financing Documents, prepayments from proceeds of (i) asset sales, (ii) insurance and condemnation proceeds and (iii) equity or debt issuances including, without limitation, from the Rights Offering to be consummated in accordance with AHC/Debtor Plan on the Effective Date, in each case, received by the Borrowers or any of the Guarantors and subject to exceptions and reinvestment rights to be agreed.

Mandatory Prepayments (to the extent not required to prepay the obligations outstanding under the Prepetition First Lien Financing Documents) will be applied to prepay outstanding DIP Notes.

|  |  |
|---|---|
| **Priority and Security under DIP Facility:** | All obligations of the Borrowers and the Guarantors to the Note Purchasers and to the Administrative Agent, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees and expenses (including, without limitation, reasonable fees and disbursements of counsel, including bankruptcy and regulatory counsel, and other agents and professional advisors) or any exposure of a Note Purchaser or any of its affiliates in respect of cash management or hedging transactions incurred on behalf of the Borrowers or any Guarantor, shall be: |

(a)      Secured pursuant to Bankruptcy Code §364(c)(2), subject to the Carve-Out, by a first priority perfected lien on, and security interest in, all present and after acquired property of the Debtors not subject to a lien or security interest on the date of commencement of the Debtors' Case (the "***Petition Date***"), including, without limitation, a pledge of any such property that is stock (or equivalent equity interest) of a foreign subsidiary of a Debtor;

(b)      Secured pursuant to section 364(c)(3), subject to the Carve-Out, by a junior perfected lien on, and security interest in, all property of the Debtors that is subject to a valid, perfected and unavoidable lien or security interest in existence as of the Petition Date or subject to a valid and unavoidable lien or security interest in existence as of the Petition Date that is perfected subsequent thereto as expressly permitted by section 546(b) of the Bankruptcy Code;

(c)      Secured pursuant to Bankruptcy Code §364(d)(1), subject to the Carve-Out, by (i) a first priority perfected lien on, and security interest in, all property of the Debtors that is subject to a perfected lien or security interest on the Petition Date that is a Prepetition First Priority Lien on a *pari passu* basis with such Prepetition First Priority Liens, and (ii) a first priority perfected senior priming lien on, and security interest in, all property of the Debtors that is subject to a perfected lien or security interest on the Petition Date (other than Prepetition First Priority Liens and any liens with a priority senior to the Prepetition First Priority Liens); and,

(d)      Claims entitled to the benefits of Bankruptcy Code §364(c)(1), having a super-priority over any and all administrative expenses of the kind that are specified in Bankruptcy Code §§ 503(b) or 507(b) or any other

provisions of the Bankruptcy Code ("***Superpriority Claims***"), subject only to the Carve-Out and which Superpriority Claims shall rank on a *pari passu* basis with the adequate protection priority claims related to the Prepetition First Lien Financing Documents.  The "***Carve-Out***" shall mean: following the occurrence of an Event of Default, with respect to which Event of Default the Administrative Agent provides notice to the Borrowers (at the written direction of the Required Note Purchasers) of the occurrence of such Event of Default (the "***Carve-Out Event***"), to the extent unencumbered funds are not available to pay administrative expenses in full, (x)(i) any unpaid fees, costs and expenses that were accrued or incurred prior to the Carve-Out Event by the professionals retained by the Debtors (collectively, the "***Professionals***") to the extent subsequently allowed by an order of the Bankruptcy Court plus (ii) those fees, costs and expenses incurred by the Professionals and any subsequent trustee of the Debtors' estates after the Carve-Out Event and subsequently allowed by order of the Bankruptcy Court (provided, that the amount of such fees, costs and expenses included in this clause (ii) shall not exceed $1,000,000 in the aggregate) and (y) fees pursuant to 28 U.S.C. § 1930 and any fees payable to the Clerk of the Bankruptcy Court.

Notwithstanding anything to the contrary herein, no portion of the Carve-Out may be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of actions against the Administrative Agent or the Note Purchasers and/or challenging or raising any defenses to the pre-petition obligations under the Secured Notes, the obligations under the Prepetition Second Lien Financing Documents or the liens of the Noteholder Collateral Agent on behalf of the Noteholders, or the obligations under the Note Documents or the liens of the Administrative Agent for its benefit and the benefit of the Note Purchasers.

The property referred to in the preceding clauses (a), (b) and (c) is collectively referred to as the "***DIP Collateral***" and shall include, without limitation, all assets (whether tangible, intangible, real, personal or mixed) of the Borrowers and the Guarantors, whether now owned or hereafter acquired, including, without limitation, all cash, cage cash, rents, accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof.

| | |
|---|---|
| **Conditions Precedent to the Closing of the DIP Facility:** | The Note Purchase Agreement will contain conditions, deemed by the Note Purchasers appropriate to the Transactions and in any event including, without limitation, those conditions set forth in Part A of Annex III of the Commitment Letter. |
| **Conditions Precedent to DIP Notes on Each Draw** | In addition to the satisfaction of the conditions on the Closing Date, the Note Purchase Agreement will contain appropriate additional conditions for |

**Date:**                                  the issuance of DIP Notes on each Draw Date, as determined by the Note Purchasers, including, without limitation, those conditions set forth in Part B of Annex III of the Commitment Letter.

**Representations and Warranties:**        The Note Purchase Agreement will contain representations and warranties for financings deemed by the Note Purchasers appropriate to the Transactions (which will be applicable to the Borrowers and their subsidiaries) to be made as of (x) the date the Borrowers and the Guarantors execute the Note Documents and (y) each Draw Date, in each case, including, without limitation, representations and warranties regarding valid existence, requisite power, due authorization, no conflict with agreements, orders or applicable law, governmental consent, enforceability of Note Documents, accuracy of financial statements, projections, budgets and all other information provided, compliance with law, absence of Material Adverse Change, no default under the Note Documents, absence of material litigation and contingent obligations, taxes, subsidiaries, ERISA, pension, benefit plans, absence of liens on assets, ownership of properties and necessary rights to intellectual property, insurance, no burdensome restrictions, inapplicability of Investment Company Act or Public Utility Holding Company Act of 2005, continued accuracy of representations and continued effectiveness of the applicable Order and each other order of the Bankruptcy Court with respect to the DIP Facility.

**Affirmative and Negative Covenants:**    The Note Purchase Agreement will contain affirmative and negative covenants for financings determined to be appropriate by the Note Purchasers (which will be applicable to the Borrowers and their subsidiaries), including, without limitation, the following:

- Deliver to the Administrative Agent and the Note Purchasers and their counsel for review and comment prior to filing all material pleadings, motions and other documents (provided that any of the foregoing relating to the DIP Facility shall be deemed material) to be filed on behalf of the Debtors with the Bankruptcy Court.

- Comply in all material respects with laws (including without limitation, the Bankruptcy Code, ERISA, and environmental laws), pay taxes, maintain all necessary licenses and permits, including gaming licenses, and trade names, trademarks, patents, preserve corporate existence, maintain appropriate and adequate insurance coverage and permit inspection of properties, books and records.

- Conduct all transactions with affiliates on terms equivalent to those obtainable in arm's length transactions, including, without limitation, restrictions on management fees to affiliates.

- Maintain a cash management system substantially as in effect on the date hereof.

- Maximum capital expenditures.

AII-6

- Comply with the operating budget setting forth the projected financial operations of the Borrowers and their subsidiaries for the period from the Closing Date to the Scheduled Termination Date, which budget shall be in form and substance satisfactory to the Note Purchasers in their sole discretion (the "***Budget***") (subject to a 15% variance in the aggregate and not on a line by line basis).

- Not make or commit to make payments in respect of pre-petition claims during the term of the DIP Facility in excess of the amount (if any) contemplated by the Budget.

- Not incur or assume any additional debt or contingent obligations, give any guaranties, create any liens, charges or encumbrances or incur additional lease obligations, in each case, beyond agreed upon limits; not merge or consolidate with any other person, change the nature of business or corporate structure or create or acquire new subsidiaries, in each case, beyond agreed upon limits or amend its formation and organizational documents; not sell, lease or otherwise dispose of assets (including, without limitation, in connection with a sale leaseback transaction) beyond agreed upon limits; not give a negative pledge on any assets in favor of any person other than the Administrative Agent and the Note Purchasers; and not permit to exist any consensual encumbrance on the ability of any subsidiary to pay dividends or other distributions to the Borrowers; in each case, subject to customary exceptions or baskets as may be agreed.

- Not prepay, redeem, purchase, defease, exchange or repurchase any debt or amend or modify any of the terms of any such debt or other similar agreements entered into by the Borrowers or their subsidiaries, subject to certain exceptions to be agreed.

- Not make any loans, advances, capital contributions or acquisitions, form any joint ventures or partnerships or make any other investments in subsidiaries or any other person, subject to certain exceptions to be agreed.

- Not make or commit to make any payments in respect of warrants, options, repurchase of stock, dividends or any other distributions.

- Not make, commit to make, or permit to be made any bonus payments to executive officers of the Borrowers contrary to, or in excess of the amounts set forth in, the Budget.

- Not permit any change in ownership or control of the Borrowers or any of their subsidiaries or any change in accounting treatment or reporting practices, except as required by GAAP and as permitted by the Note Purchase Agreement.

- Not make asset sales over agreed thresholds.

AII-7

- Not (i) propose, support, assist, engage in negotiations in connection with or participate in the formulation of, any restructuring or reorganization of the Debtors (or any plan or proposal in respect of the same) other than the AHC/Debtor Plan, (ii) withdraw or revoke the AHC/Debtor Plan, adopt a resolution of the Board of Directors of any Debtor not to pursue the AHC/Debtor Plan or to pursue another plan of reorganization, or publicly announce its intention not to pursue the AHC/Debtor Plan and (iii) file any motion or pleading with the Bankruptcy Court (including any modifications or amendments thereof) that is, in whole or in part, not consistent in any material respect with the AHC/Debtor Plan and is not otherwise reasonably satisfactory in all respects to the Note Purchasers.

- Without the prior written consent of the Administrative Agent (at the written direction of the Required Note Purchasers in their sole discretion), not make or permit to be made any change to the Order or any other order of the Bankruptcy Court with respect to the DIP Facility.

- Not permit the existence of any claims other than that of the Administrative Agent and the Note Purchasers entitled to a super-priority under Bankruptcy Code §364(c)(1)(except as expressly contemplated herein).

| | |
|---|---|
| **Financial Reporting Requirements:** | The Borrowers shall provide: (i) monthly consolidated financial statements of the Borrowers and their subsidiaries, including balance sheet, income statement and cash flow statement within thirty (30) days of month-end, certified by each Borrower's chief financial officer; (ii) quarterly consolidated financial statements of the Borrowers and their subsidiaries within forty-five (45) days of quarter-end, certified by each Borrower's chief financial officer; (iii) annual audited consolidated financial statements of the Borrowers and their subsidiaries within ninety (90) days of year-end, certified with respect to such consolidated statements by independent certified public accountants; (iv) copies of all reports of the Borrowers filed with the Securities and Exchange Commission; and (v) on a weekly basis, an updated rolling 13-week cash flow statement setting forth all receipts and disbursements for the next succeeding 13-week period, including a line item specifying the projected amount of cash and outstanding DIP Notes as of the end of each week covered thereby, and the related variance report. The Borrowers will notify, in writing, the Administrative Agent and each Note Purchaser of any material change in the Debtors' business. |
| **Other Reporting Requirements:** | The Note Purchase Agreement will contain other reporting requirements deemed by the Note Purchasers appropriate to the Transactions, including, without limitation, with respect to litigation, contingent liabilities, ERISA or environmental events (collectively with the financial reporting information described above, the "***Information***"). |
| **Public Information:** | Notwithstanding any of the foregoing, any Note Purchaser may elect in writing not to receive any of the Information. If any Note Purchaser makes |

such an election, the Administrative Agent will refrain from delivering the Information to such Note Purchaser until such Note Purchaser requests, in writing, to be provided with the Information.

**Events of Default:**    The Note Purchase Agreement will contain events of default (subject in certain cases to cure periods as may be agreed) deemed by the Note Purchasers appropriate to the Transactions (which will be applicable to the Borrowers and their subsidiaries), including, without limitation:

- failure to make payments when due;

- noncompliance with covenants;

- breaches of representations and warranties;

- breaches of negative or affirmative covenants;

- failure to satisfy or stay execution of judgments in excess of specified amounts;

- the existence of certain materially adverse employee benefit or environmental liabilities;

- impairment of Note Documents;

- entry of an order without the prior consent of the Required Note Purchasers amending, supplementing or otherwise modifying the Order;

- dismissal of the Case or conversion of the Case to a case under Chapter 7 of the Bankruptcy Code;

- appointment of a Chapter 11 trustee;

- appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of the Borrowers or any Guarantor;

- entry of an order from the Bankruptcy Court confirming a plan of reorganization (other than the AHC/Debtor Plan) that is not satisfactory to the Note Purchasers;

- the Confirmation Order shall have been reversed or vacated or shall have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent and the Note Purchasers, or the Debtors shall have filed an application seeking to reverse, vacate or stay the Confirmation Order or to amend, supplement or otherwise modify the Confirmation Order, without the prior written consent of the Administrative Agent and the Note Purchasers;

- entry of an order or orders granting relief from the automatic stay in the Case to permit foreclosure or enforcement on assets on any of the

NY 72569008v2

Debtors worth in excess of $2,000,000 in the aggregate since the Closing Date;

- non-compliance with covenants contained in the Backstop Agreement or termination of the Backstop Agreement in accordance with its terms;

- an application is filed by any Debtor for the approval of any superpriority claim or any lien in the Case which is *pari passu* with or senior to the adequate protection liens or claims contemplated herein (except as contemplated herein) without the prior written consent of the Required Note Purchasers;

- payment of or granting adequate protection with respect to pre-petition debt (other than as provided herein or as approved by the Required Note Purchasers and the Bankruptcy Court);

- an application is filed by the Debtors seeking to amend, modify, supplement or extend the Order or the date of entry of any order reversing, amending, supplementing, staying, vacating or otherwise modifying the Order, without the prior written consent of the Administrative Agent and the Note Purchasers;

- any material provision of the Orders shall for any reason cease to be valid and binding or any Debtor shall so assert in any pleading filed in any court; and

- cessation of liens or super-priority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects.

**Termination:** Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and at the direction of the Required Note Purchasers shall, by written notice to the Borrowers, its counsel and the Office of the United States Trustee, terminate the DIP Facility, declare the obligations in respect thereof to be immediately due and payable and, subject to the immediately following paragraph, exercise all rights and remedies under the Note Documents and the Order. Certain Events of Default shall result in immediate termination and acceleration of the DIP Facility.

**Remedies:** The Administrative Agent and the Note Purchasers shall have appropriate remedies, including, without limitation, with respect to the DIP Facility the right (after providing three (3) business days' prior notice to the Debtors and the Office of the United States Trustee of the occurrence of the DIP Termination Date) to realize on all DIP Collateral in accordance with the Note Documents, without the need for further notice, hearing or order of the Bankruptcy Court.

In the event any party requests a hearing seeking to prevent the Administrative Agent or the Note Purchasers from exercising any of their rights and remedies that arise after an Event of Default, the sole issue before

AII-10

the Bankruptcy Court at such hearing shall be whether an Event of Default has occurred and has not been cured.  No other issue or argument shall be relevant to any opposition to enforcement of the Administrative Agent's and the Note Purchasers' rights.

**Adequate Protection**     Adequate protection for the use of the collateral securing the Prepetition Credit Agreement and the Indenture (including cash collateral), during the pendency of the Case shall be as provided in the existing Final Order (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of Bankruptcy Code and (II) Providing Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 362, 363, and 364 of Bankruptcy Code, entered on March 23, 2009 and no additional adequate protection shall be provided, subject to further order of the Bankruptcy Court.

*Financial Reporting and Inspection Rights:*

Debtors will provide a weekly report of receipts, disbursements, and a reconciliation of actual expenditures and disbursements with those set forth in the Budget, on a line-by-line basis showing any variance to the proposed corresponding line item of the Budget (the "***Budget Reconciliation***").  Such Budget Reconciliation shall be provided to the Noteholder Collateral Agent and the Ad Hoc Committee so as actually to be received within three (3) business days following the end of each prior week.

The Debtors shall also provide the following information: (i) within four business days after the end of each week, an updated rolling 13-week forecast of receipts and disbursements for the Debtors for the next succeeding 13-week period, substantially in the form of the Budget, (ii) within four business days after the end of each week, a certificate signed by the Borrowers' chief financial officer certifying that the Termination Date has not occurred, (iii) an updated business plan through the end of the calendar year, including a projected monthly balance sheet and income statement of cash flows, (iv) not later than ten business days prior to the expiration of the Budget, an updated Budget for the following 13-week period, (v) by no later than the end of each calendar month, a summary of the preceding month's operating results, and (vi) all additional information required to be delivered under the Prepetition Financing Documents.

The foregoing shall be without prejudice to the Prepetition First Lien Parties' and the Prepetition Second Lien Parties' right to later request or otherwise seek additional forms of adequate protection, including, without limitation, cash adequate protection payments; provided, however, that the Debtors shall have the right to object to any such request.

**Indemnification:**     Subject to Bankruptcy Court approval, the Borrowers shall, jointly and severally, indemnify and hold harmless the Administrative Agent, each Note Purchaser and each of their affiliates and each of the respective officers, directors, employees, controlling persons, agents, advisors, attorneys and representatives of each (each, an "***Indemnified Party***") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsels, agents

AII-11

and professional advisors), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, in each case arising out of or in connection with or relating to the DIP Facility, the Note Documents or the transactions contemplated thereby, or any use made or proposed to be made with the proceeds of the DIP Facility, whether or not such investigation, litigation or proceeding is brought by either Borrower or any of their subsidiaries, any shareholders or creditors of the foregoing, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or under the Note Documents are consummated, except to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Borrowers or any of their subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.   In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.

**Expenses**:

Each Borrower and each Guarantor shall jointly and severally pay all (i) the Administrative Agent Fees and reasonable, out-of-pocket costs and expenses of the Administrative Agent and the Note Purchasers (including all reasonable, out-of-pocket fees, expenses and disbursements of counsel to the Administrative Agent and Stroock & Stroock & Lavan LLP (as counsel to all of the Note Purchasers and Commitment Parties) and/or any other outside counsel, including local, bankruptcy and regulatory counsel, and other professional advisors hired by the Note Purchasers or their counsel) in connection with the preparation, execution and delivery of the Note Documents and the funding of all DIP Notes under the DIP Facility, including, without limitation, all due diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the Administrative Agent and the Note Purchasers in connection with the DIP Facility, the Note Documents or the transaction contemplated thereby, the administration of the DIP Facility and any amendment or waiver of any provision of the Note Documents and (ii) costs and expenses of the Administrative Agent and the Note Purchasers (including fees, expenses and disbursements of counsel, including local and regulatory counsel, and other agents and professional advisors hired by the Administrative Agent and/or the Note Purchasers) in connection with the enforcement of any of their rights and remedies under the Note Documents.

**Assignments and
Participations:**

The DIP Notes shall be freely transferable to (a) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act

of 1933, as amended) that (i) extends credit, invests in bank loans or purchases commercial paper as one of its businesses, and (ii) has obtained any necessary approvals or consents and is eligible to become a Note Purchaser pursuant to the rules promulgated by the CCC and any other applicable regulatory or governmental authority, (b) an affiliate of such Note Purchaser that is eligible to become a Note Purchaser pursuant to the rules promulgated by the CCC and any other applicable regulatory or governmental authority (an "***Eligible Assignee***") or, (c) with the consent of the Borrowers, any entity eligible to become a Note Purchaser pursuant to the rules promulgated by the CCC and any other applicable regulatory or governmental authority, subject to compliance with applicable securities laws.

**Required Note Purchasers:**    Note Purchasers holding more than 50% of the outstanding Commitments and/or DIP Notes under the DIP Facility (the "***Required Note Purchasers***") except as to matters requiring unanimity under the Note Purchase Agreement (e.g., the reduction of interest rates, the extension of interest payment dates, the reduction of fees, the extension of the maturity of either Borrower's obligations, the super-priority status of each Borrower's and Guarantors' obligations and the release of all or substantially all of the DIP Collateral).

**Miscellaneous:**    The Note Purchase Agreement will include standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes).

**Governing Law:**    Except as governed by the Bankruptcy Code, the State of New York.

**Counsel to the Note Purchasers:**    Stroock & Stroock & Lavan LLP

<u>**Annex III**</u>

**Conditions Precedent**

Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Commitment Letter or the DIP Term Sheet attached thereto as <u>Annex II</u>.

<u>***A.   Conditions Precedent to the Commitment and the Closing of the DIP Facility***</u>

1.   All definitive documentation relating to the DIP Facility (collectively, the "***Note Documents***") shall be in form and substance satisfactory to the Administrative Agent and its counsel and the Note Purchasers and their counsel and executed and delivered on or before April 30, 2010.

2.   The Debtors shall have fully complied with the terms of the Commitment Letter.

3.   The representations and warranties made by each Borrower and each Guarantor to the Administrative Agent and the Note Purchasers in the Note Documentation shall be true and correct in all material respects as of the Closing Date.

4.   There shall exist no default or event of default (or event that, with notice or passage of time would become an event of default) under the Note Documents.

5.   All fees, costs and expenses (including fees, costs and expenses of counsel, local counsel, regulatory counsel and other agents and professional advisors) required to be paid to the Administrative Agent and its counsel and the Note Purchasers' counsel on or before the Closing Date shall have been paid.

6.   The Administrative Agent and the Note Purchasers shall have received the Budget.

7.   All motions, pleadings and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Facility and the Bankruptcy Court's approval thereof shall be in form and substance reasonably satisfactory to the Note Purchasers and the Administrative Agent, and the Note Purchasers shall be reasonably satisfied with the form and amount of any adequate protection provided to any pre-petition party.

8.   There shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that, in the reasonable judgment of the Note Purchasers, prohibits, restricts or imposes materially adverse conditions on the Borrowers or the Guarantors, the DIP Facility or the exercise by the Administrative Agent or the Note Purchasers of their rights as secured parties with respect to the DIP Collateral.

9.   The Administrative Agent and the Note Purchasers shall have received opinions in form and substance satisfactory to the Note Purchasers of independent counsel to the Debtors, addressing such matters as the Note Purchasers may reasonably request, including, without limitation, the enforceability of all Note Documents, compliance with all laws and regulations (including, without limitation, Regulations T, U and X of the Board of Governors of the Federal Reserve System), approval of the DIP Facility by the Bankruptcy Court, and the absence of conflicts with material agreements.

10.  There shall have occurred no material adverse effect (i) on the business, results of operations, property, condition (financial or otherwise) or prospects of the Debtors taken as a whole, other than an effect (1) resulting from general economic or business conditions (except to the extent such conditions have a significantly disproportionate adverse effect on the Debtors taken as a whole); (2) affecting companies in the Debtors' industry generally or such industry in Atlantic City, New Jersey (except to the extent such

AIII-1

conditions have a significantly disproportionate adverse effect on the Debtors taken as a whole); (3) resulting from any changes in any applicable law, or in generally accepted accounting principles; (4) that is fully cured before the earlier of the date of any termination of the Commitment Letter and the Closing Date; (5) resulting from the negotiation, announcement or performance of the Commitment Letter or the transactions contemplated hereby, including by reason of the identity of the Commitment Parties or communication by a Commitment Party or its affiliates of its plans or intentions regarding operation of the Debtors' business; (6) resulting from any act or omission of the Debtors taken with the prior written consent of the Commitment Parties; (7) directly resulting from the filing of the Case or from any action approved by the Bankruptcy Court; or (8) resulting from acts of war or terrorism, whether or not directed at the Debtors or (ii) on the ability of the Debtors, subject to the approvals and other authorizations set forth in the Backstop Agreement or in the Note Documents, to consummate the transactions contemplated by the AHC/Debtor Plan or the Note Documents (each, a "***Material Adverse Change***").

11. Other than the Case, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that (i) could reasonably be expected to result in a Material Adverse Change or, except as disclosed, if adversely determined, could reasonably be expected to result in a Material Adverse Change or (ii) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon the DIP Facility, the DIP Collateral or the transactions contemplated thereby.

12. Any necessary governmental and third party consents and approvals (other than the State of New Jersey Casino Control Commission (the "***CCC***")) necessary in connection with the DIP Facility and the transactions contemplated thereby shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the Administrative Agent and the Note Purchasers) and shall remain in effect; and no law or regulation shall be applicable in the judgment of the Note Purchasers that restrains, prevents or imposes materially adverse conditions upon the DIP Facility or the transactions contemplated thereby.

13. Subject to the next succeeding paragraph, all necessary applications to and, subject to any additional time to obtain such consents, approvals and rulings from the CCC and all necessary consents, approvals and favorable rulings of the CCC (collectively, the "***CCC DIP Approvals***:") to (i) the pledge of the equity interests of the Borrowers, the Guarantors and their respective subsidiaries, as applicable, pursuant to the DIP Documentation, (ii) the restrictions against the pledge of, or restriction upon the hypothecation or transfer of, the equity securities of such entities and (iii) the entry by the Borrowers, the Guarantors and the Note Purchasers into the transactions contemplated by the Note Documents, shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the Note Purchasers or in any way adverse to the Administrative Agent and the Note Purchasers) and shall remain in effect.

14. In the event that the Borrowers have not obtained all required approvals of the CCC to the Note Documents prior to the Closing Date, Borrowers shall use commercially reasonable efforts to promptly obtain, and shall in any event receive, such approvals within fifteen (15) days (which date may be extended in the sole discretion of the Note Purchasers) following the Closing Date (or, if applicable, at such date on which a subsidiary becomes a Guarantor or grants a lien under the Note Documents) or such later date as the Note Purchasers shall determine in their sole discretion.

15. Nothing contained in any public disclosure made by the Borrowers or any of their subsidiaries after the date hereof, or in any information disclosed to the Note Purchasers by the Borrowers or any of their subsidiaries after such date, shall lead any Note Purchaser to determine that, and no Note Purchaser shall have become aware of any fact or condition not disclosed to them prior to the date hereof which shall lead any Note Purchaser to determine that, the condition (financial or otherwise), operations, performance or properties of the Borrowers' and their subsidiaries, taken as a whole, are different in any material adverse respect from

that derived by such Note Purchaser from the public filings of the Borrowers or any of their subsidiaries prior to such date.

16. The Administrative Agent, for its benefit and the benefit of the Note Purchasers, shall have a valid and perfected lien on and security interest in the DIP Collateral as set forth herein.

17. The Administrative Agent shall have received endorsements naming the Administrative Agent, on behalf of itself and the Note Purchasers, as an additional insured or loss payee, as applicable, under all insurance policies to be maintained with respect to the properties of the Borrowers and their subsidiaries forming part of the Note Purchasers' collateral.

18. The Bankruptcy Court shall have entered an order (the "**Confirmation Order**"), in form and substance satisfactory to the Administrative Agent, the Note Purchasers and the Debtors, confirming the AHC/Debtor Plan.

19. The Bankruptcy Court shall have entered an order (the "**Order**") no later than the Closing Date, in form and substance satisfactory to the Note Purchasers and the Administrative Agent, entered on notice to such parties as may be reasonably satisfactory to the Note Purchasers, the Administrative Agent and the Debtors, (i) authorizing and approving the DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the super-priority status, security interests, certain priming liens, certain first priority liens on a *pari passu* basis with those liens of the Prepetition First Lien Parties, and the payment of all fees, referred to herein; (ii) lifting or modifying the automatic stay to permit the Borrowers and the Guarantors to perform their obligations and the Administrative Agent and Note Purchasers to exercise their rights and remedies with respect to the DIP Facility, and (iii) authorizing the Debtors' use of cash collateral and providing for adequate protection in favor of the Prepetition First Lien Parties and the Prepetition Second Lien Parties as and to the extent set forth under "Adequate Protection" in the DIP Term Sheet, which Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Note Purchasers, the Administrative Agent and the Debtors.  The Order shall also include terms and conditions otherwise satisfactory to the Note Purchasers and the Administrative Agent.

20. There shall exist no default or Event of Default under the Backstop Agreement and the Backstop Agreement shall not have been terminated in accordance with its terms.

**B.   *Conditions to DIP Notes on Each Draw Date***

1. There shall exist no default or event of default under the Note Documents.

2. The representations and warranties made by each Borrower and each Guarantor in the Note Documentation shall be true and correct in all material respects immediately prior to, and after giving effect to, the sale and purchase of the DIP Notes.

3. The issuance of such DIP Notes shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

4. No Material Adverse Change shall have occurred.

5. All outstanding and unpaid fees, costs and expenses (including fees, costs and expenses of counsel, local counsel, regulatory counsel and other professional advisors) required to be paid to the Administrative Agent's counsel and the Note Purchasers' counsel shall have been paid.

6.  The Confirmation Order shall be in full force and effect, shall not have been reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent, the Note Purchasers and the Debtors.

7.  The Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Note Purchasers or in any way adverse to the Administrative Agent.

8.  The Administrative Agent and the Note Purchasers shall have received a certificate from a responsible officer of the Borrowers (a "***Draw Date Certificate***") certifying that (i) the requested DIP Notes comply with the liquidity needs set forth in the latest updated 13-week forecast delivered to the Administrative Agent and the Note Purchasers, (ii) the purchase and sale of the DIP Notes is necessary to fund expenditures becoming due in the following two (2) weeks in the Budget and (iii) the conditions precedent to such draw have been satisfied.

9.  Subject to any extensions of deadlines described in number 14 in Section A above, the CCC DIP Approvals shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the Note Purchasers or in any way adverse to the Administrative Agent) and shall remain in effect.

10. There shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that, in the reasonable judgment of the Note Purchasers, prohibits, restricts or imposes materially adverse conditions on the Debtors, the DIP Facility or the exercise by the Administrative Agent or the Note Purchasers of their rights as secured parties with respect to the DIP Collateral.

11. There shall exist no default or Event of Default under the Backstop Agreement and the Backstop Agreement shall not have been terminated in accordance with its terms.