FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

In the matter of                    :          Case No. 09-13654/JHW

TCI 2 Holdings, LLC, et al.         :

                                               **OPINION ON CONFIRMATION**

                        Debtors      :

_____

APPEARANCES:        Michael F. Walsh, Esq.
                    J. Philip Rosen, Esq.
                    Ted S. Waksman, Esq.
                    Weil, Gotshal & Manges, LLP
                    767 Fifth Avenue
                    New York, New York 10153
                    Counsel for the Debtors

                    Charles A. Stanziale, Jr., Esq.
                    Jeffrey T. Testa, Esq.
                    Lisa A. Bonsall, Esq.
                    McCarter & English, LLP

                    Four Gateway Center
                    100 Mulberry Street
                    Newark, New Jersey 07102
                    Counsel for the Debtors

                    Kristopher M. Hansen, Esq.
                    Curtis C. Mechling, Esq.
                    Erez E. Gilad, Esq.
                    Stroock & Stroock & Lavan LLP
                    180 Maiden Lane
                    New York, New York 10038
                    Counsel for the Ad Hoc Committee

                    Kenneth A. Rosen, Esq.
                    Jeffrey D. Prol, Esq.
                    Lowenstein Sandler PC
                    65 Livingston Avenue
                    Roseland, New Jersey 07068
                    Counsel for the Ad Hoc Committee

> **FILED**
>
> JAMES J. WALDRON, CLERK
>
> **April 12, 2010**
>
> U.S. BANKRUPTCY COURT
> CAMDEN, N.J.
> BY: <u>Theresa O'Brien</u>, Judicial
> Assistant to Chief Judge Wizmur

Thomas E. Lauria, Esq.
Gerald Uzzi, Esq.
Andrew C. Ambruoso, Esq.
White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Counsel for Beal Bank

Brian W. Hofmeister, Esq.
Teich Groh
691 State Highway 33
Trenton, New Jersey 08619
Counsel for Beal Bank

Jeffrey L. Jonas, Esq.
Edward S. Weisfelner, Esq.
Emilio Galvan, Esq.
Daniel J. Saval, Esq.
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
Counsel for the Icahn Partners

Gilbert Brooks, Esq.
Duane Morris LLP
1940 East Route 70
Cherry Hill, New Jersey 08003
Counsel for the Icahn Partners

Paul R. DeFilippo, Esq.
Wollmuth Maher & Deutsch LLP
One Gateway Center, 9th Floor
Newark, New Jersey 07102
Counsel for Donald J. Trump and Ivanka Trump

David M. Friedman, Esq.
Robert M. Novick, Esq.
Daniel N. Zinman, Esq.
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Counsel for Donald J. Trump and Ivanka Trump

Martha Hildebrandt, Esq.
Jeffrey M. Sponder, Esq.
United States Department of Justice
Office of the United States Trustee
One Newark Center, Suite 2100
Newark, New Jersey 07102
Counsel for the United States Trustee

## Table of Contents

| | | Page |
|---|---|---|
| I. | Facts and Procedural History | 6 |
| II. | Overview of Reorganization Plans | 9 |
| | A. The AHC/Debtor Plan | 9 |
| | B. The Beal/Icahn Plan | 12 |
| III. | Confirmation Requirements | 13 |
| IV. | The AHC/Debtor Plan | 14 |
| | A. Section 1129(a)(1) | 15 |
| |    1. Classification | 15 |
| |    2. Releases, Exculpation Clauses and Indemnification | 17 |
| |       a. The DJT Settlement Agreement | 18 |
| |       b. Intercreditor Agreement Releases | 28 |
| |          (i) Alleged Section 510(a) Violation | 28 |
| |          (ii) Release of Breach of Contract Claims | 33 |
| |       c. Indemnification of the Backstop Parties | 34 |
| | B. Section 1129(a)(3) | 35 |
| | C. Section 1129(a)(4) | 40 |

|  |  | 1. | Authorization for Payment of Fees | 42 |
|  |  | 2. | Reasonableness | 44 |
|  |  | 3. | Backstop Stock | 34 |
| D. | Section 1129(a)(11) |  |  | 46 |
|  | 1. |  | Servicing the New Term Loan | 47 |
|  |  | a. | Debtors' Projected EBITDA | 47 |
|  |  |  | (i)   Capex Spending Reduction | 49 |
|  |  |  | (ii)  Competitive Forces, including Pennsylvania Table Games | 51 |
|  |  |  | (iii) Historical Performance of the Debtors | 53 |
|  |  | b. | Ability to Service the New Term Loan | 55 |
|  | 2. |  | Debt Capacity | 57 |
|  | 3. |  | Compliance With Regulatory Framework | 58 |
|  | 4. |  | General Feasibility Considerations | 63 |
| E. | Section 1129(b) |  |  | 64 |
|  | 1. |  | Unfair Discrimination | 65 |
|  | 2. |  | Fair and Equitable | 67 |
|  |  | a. | Retention of Liens by the First Lien Lender | 68 |
|  |  | b. | Value of the Lender's Secured Interest in the Collateral | 71 |
|  |  | c. | Present Value | 75 |
|  |  |  | (i)   Market Rate of Interest | 76 |
|  |  |  | (ii)  New Term Loan Covenants | 83 |
|  |  | d. | Is the Plan Otherwise "Fair and Equitable"? | 86 |
| V. | The Beal/Icahn Plan |  |  | 89 |
| A. | Section 1129(a)(1) |  |  | 89 |
|  | 1. |  | Exculpation | 90 |
|  | 2. |  | Indemnification | 90 |

B.   Section 1129(a)(2) ............................................................................... 91

C.   Section 1129(a)(3) ............................................................................... 92

D.   Section 1129(a)(4) ............................................................................... 95

E.   Section 1129(a)(9) ............................................................................... 97

F.   Section 1129(a)(11) ............................................................................. 99

   1.   Commitment to Plan and Business Operations ............................. 100

   2.   Trademark License and Serving Agreements ............................... 101

   3.   Regulatory Approval ..................................................................... 102

      a.   Undue Economic Concentration ............................................ 102

      b.   Anti-Trust Concerns .............................................................. 106

G.   Section 1129(b) ................................................................................... 108

H.   Indenture Trustee Objection ................................................................ 109

VI.   Other Joint Objections .............................................................................. 111

A.   Former Shareholder Objections .......................................................... 111

B.   Kahn Objection .................................................................................... 114

VII.   Competing Plans ........................................................................................ 115

Before the court for consideration are two competing Chapter 11 plans of reorganization,

the Ad Hoc Committee/Debtors' Supplemental Modified Sixth Amended Plan ("AHC/Debtor

Plan") and the Beal Bank/Icahn Partners Fifth Amended Joint Plan ("Beal/Icahn Plan").  For the

reasons expressed below, I conclude that both plans are confirmable, with certain modifications,

and that the AHC/Debtor Plan will be confirmed.


I.    Facts and Procedural History.


Faced with declining gaming revenues and a failure to make a required interest payment

due on December 1, 2008 on certain Second Lien Notes, TCI 2 Holdings, LLC and nine

subsidiary and other affiliated entities[1] (referred to jointly as the "debtors" or "TER") each filed

voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on February 17, 2009.  An

order jointly administering the cases was entered on February 18, 2009.  The debtors continue to

operate as debtors-in-possession.


The debtors own or manage three hotel casino properties in Atlantic City, New Jersey

known as the Trump Taj Mahal Casino Resort, the Trump Plaza Hotel and Casino and the Trump

---

[1]      The other debtor entities include:  Trump Entertainment Resorts, Inc. (TER),
Trump Entertainment Resorts Holdings, L.P., Trump Entertainment Resorts Funding, Inc.,
Trump Entertainment Resorts Development Co., LLC, Trump Taj Mahal Associates LLC d/b/a
Trump Taj Mahal Casino Resort, Trump Plaza Associates, LLC d/b/a Trump Plaza Hotel and
Casino, Trump Marina Associates, LLC d/b/a Trump Marina Hotel Casino, TER Management
Co., LLC, and TER Development Co., LLC.

Marina Hotel.[2]  The Taj Mahal offers 2,027 guest rooms, 200 table games and 3,160 slot

machines.  It is one of the largest facilities in Atlantic City.  The Trump Plaza includes 900 hotel

rooms, 95 table games and 2,115 slot machines.  The Trump Marina has 728 guest rooms, 70

table games and 1,980 slot machines.  The three casinos comprise approximately 21% of the

gaming positions, hotel rooms and gaming revenues in the Atlantic City market.

As of the date of filing, debtors owed approximately $488 million on the First Lien debt

held by Beal Bank ("First Lien Lender Claims"),[3] $1.25 billion in Second Lien Notes bearing

interest at 8.5% per year, and approximately $39.3 million in general unsecured claims.[4]  The

First Lien Credit Facility was executed on December 21, 2007, has a first priority security

interest on substantially all of the debtors' assets, and matures on December 21, 2012.

On August 3, 2009, during the debtors' extended exclusivity period, 11 U.S.C. §1121(b),

the debtors filed a proposed Chapter 11 reorganization plan and disclosure statement.  The plan,

supported by the First Lien Lender and Donald J. Trump, proposed a revised debt structure for

---

[2]    Trump Entertainment Resorts, Inc. ("TER") is a publicly held company and general partner of TER Holdings, which owns the three casinos.  The predecessor entity to TER was Trump Hotels & Casino Resorts, Inc. ("THCR").  THCR, along with its various affiliates and subsidiaries, filed voluntary petitions under Chapter 11 of the Bankruptcy Code on November 21, 2004, jointly administered under case number 04-46898/JHW, and emerged with a confirmed plan on April 5, 2005, with an Effective Date of May 20, 2005.

[3]    Beal Bank refers to Beal Bank, S.S.B. and Beal Bank Nevada collectively.

[4]    A critical vendor program which paid approximately $21 million to various trade creditors under certain conditions was approved by the court by an amended order entered June 16, 2009.

the First Lien Lender, and afforded Trump, former Chairman of the debtors' Board of Directors,[5]

and Beal Bank the exclusive right to acquire 100% of the equity in exchange for a financial

contribution of $100 million to the Reorganized Debtors.

On August 11, 2009, the Ad Hoc Committee of Second Lien Note Holders ("AHC")[6]

moved to terminate the debtors' exclusivity period.[7]  The motion terminating exclusivity was

granted by an order entered August 31, 2009, and the AHC filed its first plan of reorganization.

Trump elected to terminate his earlier arrangement with Beal Bank on November 16, 2009,

whereupon he entered into an agreement with the AHC (the "DJT Settlement Agreement") to

support the AHC's proposed plan.  The DJT Settlement Agreement provided Trump and his

daughter, Ivanka, the Trump Organization, LLC, Ace Entertainment Holdings, Inc. and other

associated affiliates (the "DJT Parties") with 5% of the Reorganized Debtors' New Common

---

[5]     By letter dated February 13, 2009, Trump resigned from the debtors' Board of
Directors and notified TER that he was abandoning his 23.5% direct limited partnership interest
in TER Holdings and relinquishing his limited partnership rights.

[6]     Following the debtors' default on the interest payment due on December 1, 2008
on the Second Lien Notes, an Ad Hoc Committee of Second Lien Note Holders was formed to
review and negotiate a possible restructuring of the TER liabilities and equity interests.  The
Committee represented holders of approximately 61% of the principal amount of the outstanding
Second Lien Notes.  The Ad Hoc Committee includes Avenue Capital Management, Brigade
Capital Management, Continental Casualty Company, Contrarian Capital Management, LLC,
Gold Tree Asset Management, LP, MFC Global Investment Management, LLC, Northeast
Investors Trust, Oaktree Capital Management, LP, and Polygon Investment Partners.

[7]     AHC also sought the appointment of an examiner.  On September 15, 2009, the
court entered an order appointing an examiner to "investigate the negotiating process on the
selection of the Beal/Trump plan, the considerations of the Debtors in terms of the desirability of
that plan over the Ad Hoc Committee's plan, how that process went forward and the role of Mr.
Trump in that context."

Stock, warrants for an additional 5% and certain releases.  In exchange, the DJT Parties agreed to

enter into an Amended Trademark License Agreement and an Amended Services Agreement

with the debtors, and agreed to waive their claims against the debtors' estates.  On December 3,

2009, the debtors announced their support of the AHC/Trump plan, and became a joint

proponent.

On December 4, 2009, Beal Bank filed an independent disclosure statement and proposed

plan of reorganization.  Less than a week later, on December 10, 2009, Icahn Partners[8] purchased

51% of the First Lien Lenders' claims from Beal Bank.  The funds to purchase the remainder of

the claims were placed in escrow pending activation of a put/call agreement between Icahn and

Beal Bank, whereby Icahn would become the sole owner of the First Lien Lender claims.  Icahn

agreed to become a co-proponent with Beal Bank to advance their joint reorganization plan.

Over the last three months, the plans proposed by both groups have undergone extensive

revision.  The AHC/Debtors' proposed plan is now in its sixth supplemental amended version

and the Beal Bank/Icahn plan is in its fifth modified version.  An overview of each plan follows.

II.      <u>Overview of Reorganization Plans</u>.

A.      <u>The AHC/Debtor Plan</u>.

---

[8]      Icahn Partners refers jointly to Icahn Partners LP, Icahn Partners Master Fund LP,
Icahn Partners Master Fund II LP, and Icahn Partners Master Fund III LP.

The Ad Hoc Committee and the debtors filed a Supplemental Modified Sixth Amended

Plan on March 9, 2010.  The plan proposes to contribute $225 million in new equity capital from

a "Rights Offering",[9] representing 70% of the New Common Stock, backstopped by certain

Second Lien Noteholders who will receive 20% of the New Common Stock as a "Backstop Fee"

in consideration for the Backstop Agreement.

Under the AHC/Debtor Plan, in exchange for the $488 million in currently outstanding

First Lien Lender claims,[10] the First Lien Lenders will receive:  (a) $125 million from the Rights

Offering as a loan repayment; (b) a New Term Loan in the principal amount of the debtors'

valuation of the enterprise, $459 million, minus the $125 million from the Rights Offering,

payable at a market rate of interest (now asserted to be 11%) in accordance with the terms and

conditions contained in the Amended and Restated Credit Agreement; (c) 100% of the net

proceeds from any sale of the Trump Marina, or the right to credit bid, and (d) 100% of the

equity interests in TCI 2 (unless the First Lien Lenders determine not to accept that distribution).

The Second Lien Noteholders will receive an equity distribution equal to their pro rata share of

5% of the New Common Stock.  The General Unsecured Creditors will receive cash in an

amount equivalent to the pro rata share of New Common Stock received by the Noteholders.  In

---

[9]     The "Rights Offering" is defined in the AHC/Debtor Plan to mean "the offering of
Subscription Rights to purchase 7,500,000 shares of New Common Stock to be issued by
Reorganized TER pursuant to the Plan to the Rights Offering Participants, for an aggregate
purchase price equal to" $225,000,000.  AHC/Debtor Plan, ¶¶ 1.105 and 1.106.

[10]     Since the commencement of the case, some adequate protection payments made
by the debtors have been applied to the principal of the First Lien Lender claims, reducing the
principal to approximately $483 million at the time of confirmation.

addition, accredited investors who hold either General Unsecured claims or Second Lien Note

claims will receive a pro rata share of subscription rights to acquire up to 70% of the New

Common Stock in the Reorganized Debtors, or the cash equivalent of such subscription rights.

The convenience class receives a cash recovery equal to a pro rata share of $500,000.

The plan also provides the DJT Parties with stock, warrants, releases and the

reimbursement of certain professional fees in exchange for their waiver and settlement of all

claims and interests against the debtors and the AHC,[11] and their agreement to enter into an

Amended Trademark License Agreement and an Amended Services Agreement.

By separate motion, the debtors have proposed to enter into debtor-in-possession ("DIP")

financing with certain members of the Ad Hoc Committee if the AHC/Debtor Plan is confirmed.

The DIP facility would total $45 million, with no fees, a 10% interest rate and a maturity date no

later than five months after confirmation.  When the plan becomes effective, the remaining $100

million from the Rights Offering (after payment of $125 million to the First Lien Lenders) will

be available to the Reorganized Debtors for payment of administrative claims and working

capital.

The AHC/Debtor Plan requires the filing of professional fee applications in the normal

course with review by the bankruptcy court.  The plan seeks to exempt certain fees from this

---

[11]     Donald and Ivanka Trump have filed proofs of claim asserting at least $100
million in damages for alleged breaches of the Trademark License Agreement and damage to the
Trump trademarks, brand and reputation.

-11-

review process by providing that the debtors shall pay on the effective date the reasonable and

documented fees and expenses of the AHC Advisors, the Backstop fees and expenses, and the

Second Lien Indenture Trustee's fees and expenses without application to or review by the

bankruptcy court, unless the parties are unable to agree on the amount to be paid.  The plan also

provides for certain injunctions, releases and indemnification, as discussed below.


       B.      <u>The Beal/Icahn Plan</u>.


Beal Bank and Icahn Partners filed a Fifth Modified Joint Plan of Reorganization on

February 23, 2010.  The plan is premised upon the complete deleveraging of the debtors' debt by

the conversion of the entire amount of the First Lien debt into equity.  The Second Lien Note

claims and the General Unsecured Creditors will not receive a distribution.[12]  The plan sets aside

$500,000 for a class of convenience claims comprised of general unsecured claims other than the

Second Lien deficiency claims.


In addition, the Beal/Icahn Plan provides for a $45 million DIP loan to bridge the debtors'

liquidity needs between confirmation and the effective date of the plan.  The loan converts to

equity on the effective date of the plan.  The plan also provides for an additional contribution of

---

[12]     The plan proposed to pay to the Second Lien Noteholders and the allowed General
Unsecured Creditors a pro rata share of $13,937,300 in cash, along with certain subscription
rights, but only if the AHC/Debtor Plan was withdrawn or otherwise failed before a contested
confirmation hearing was held.  Because contested hearings were held to consider both plans,
this provision was triggered to deny the Second Lien Note claims and General Unsecured
Creditors any recovery under the Beal/Icahn Plan.

$80 million in equity to be made by Icahn Partners on the effective date of the plan.  Beyond

these cash outlays, the proponents have committed $50 million in escrow, to be forfeited to the

debtors' estates if regulatory approvals are not obtained within 270 days of the confirmation date.

As does the AHC/Debtor Plan, the Beal/Icahn Plan provides for certain injunctions, releases and

indemnification provisions, as discussed further below.


III.    Confirmation Requirements.


"To decide which reorganization plan to confirm, a court must first determine whether

one or more of the proposed plans is confirmable."  Mercury Capital Corp. v. Milford Connect.

Assoc., L.P., 354 B.R. 1, 6 (D. Conn. 2006).  The requirements for confirmation of a proposed

Chapter 11 plan of reorganization are listed in 11 U.S.C. § 1129.  The proponent of each plan

bears the burden of establishing their plan's compliance with each of these requirements.  See In

re Danny Thomas Properties II L.P., 241 F.3d 959, 963 (8th Cir. 2001); In re Charter

Communications, 419 B.R. 221, 243 (Bankr. S.D.N.Y. 2009); In re Hurricane Memphis, LLC,

405 B.R. 616, 624 (Bankr. W.D.Tenn. 2009).  The court has an independent duty under the

Bankruptcy Code to determine whether a plan satisfies each element of section 1129, even in the

absence of objections to confirmation.  In re H.H. Distributions, L.P., 400 B.R. 44, 50 (Bankr.

E.D.Pa. 2009); In re MJ Metal Products, Inc., 292 B.R. 702, 704 (Bankr. D.Wyo. 2003).


If the proponent can demonstrate that its plan satisfies all of the elements of section

1129(a), as applicable, the court must confirm the consensual plan.  In re Armstrong World

-13-

Industries, Inc., 432 F.3d 507, 511 (3d Cir. 2005).  A nonconsensual plan requires the proponent

to satisfy all but one of the sixteen elements, that all classes consent or are unimpaired, 11 U.S.C.

§ 1129(a)(8), plus the additional requirements of section 1129(b), including that the plan does not

unfairly discriminate against dissenting classes and that the dissenting classes are treated fairly

and equitably.  Id. at 511-12.  Both plans in this case are nonconsensual.

We will address each of the contested elements of section 1129(a) and (b) with respect to

each plan.  As a threshold matter, we note that subsections 1129(a)(6) (approval of rate changes),

(14) (domestic support obligations), (a)(15) (individual debtors) and (a)(16) (nonprofit entities)

do not apply here, and that there is no challenge to the compliance by both plans with subsections

1129(a)(5) (directors and officers), (a)(7) (best interest of creditor), (a)(10) (acceptance by

impaired class), (a)(12) (28 U.S.C. § 1930 fees) and (a)(13) (retiree benefits).  I can readily

conclude that each plan satisfies these requirements.

IV.    The AHC/Debtor Plan.

As to the AHC/Debtor Plan, the disputed section 1129 elements include 1129(a)(1),

(a)(3), (a)(4), (a)(11) and 1129(b).[13]

---

[13]      Sections 1129(a)(2) (compliance by plan proponents) and (a)(9) (payment of
priority claims) have not been challenged and are established on this record.

A.    Section 1129(a)(1).


The first requirement of section 1129(a) is that the plan must comply with "the applicable

provisions of this title."  11 U.S.C. § 1129(a)(1).  The legislative history reflects that "the

applicable provisions of chapter 11 [include sections] such as section 1122 and 1123, governing

classification and contents of plan."  H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S. Rep.

No. 989, 95th Cong., 2d Sess. 126 (1978).  See In re G-1 Holdings Inc., 420 B.R. 216 (D.N.J.

2009) (applicable provisions includes section 1122 and 1123); In re Burns and Roe Enterprises,

Inc., No. 08-4191, 2009 WL 438694, *23 (D.N.J. Feb. 23, 2009); In re Journal Register Co., 407

B.R. 520, 531-32 (Bankr. S.D.N.Y. 2009).  Release and exculpation clauses have also been

found to be subject to review pursuant to section 1129(a)(1).  See, e.g., In re Whispering Pines

Estates, Inc., 370 B.R. 452, 459 (1st Cir. BAP 2007); In re Wool Growers Cent. Storage Co., 371

B.R. 768,774 (Bankr. N.D.Tex. 2007).  Our focus here is drawn to the classification schemes and

the non-debtor third party releases provided for under the AHC/Debtor Plan.


1.    Classification.


Section 4.4 of the AHC/Debtor Plan classifies holders of allowed Second Lien Note

claims in Class 4.  Section 5.4(h) offers a group of Second Lien Noteholders, in consideration for

their agreement to backstop the Rights Offering contained in the plan, the receipt of 20% of the

equity in the Reorganized Debtors.  The Backstop Parties are all holders of Second Lien Note

claims, and are all members of the Ad Hoc Committee.  The Icahn parties, who not only hold

-15-

First Lien Lender claims, but also hold Second Lien Note claims, contend that the plan proposes

disparate treatment of claim holders in the same class, in violation of the equality of treatment

required in section 1123(a)(4), because the AHC/Debtor Plan affords only certain Second Lien

Noteholders the opportunity to serve as Backstop Parties to the Rights Offering and to receive

20% of the New Common Stock of the Reorganized Debtors.

Section 1123 requires, in pertinent part, that "a plan shall – designate, subject to section

1122 of this title, classes of claims," and shall "provide the same treatment for each claim or

interest of a particular class, unless the holder of a particular claim or interest agrees to a less

favorable treatment."  11 U.S.C. § 1123(a)(1), (a)(4).[14]  The contention of the Icahn parties that

the AHC/Debtors' plan classification scheme unfairly discriminates against certain noteholders

depends upon the designation of the Backstop Fee connected with the plan's Rights Offering as a

distribution on account of the Backstop Parties' status as holders of Second Lien Note claims.

Here, all holders of allowed Second Lien Note claims are classified together, and receive

the same treatment on account of their claims.  The Backstop Fee proposed to be paid to the

Backstop Parties is not a distribution to the Second Lien Noteholders on account of their Second

Lien Note claims.  Rather, the Backstop Fee is offered as consideration for the $225 million

commitment made by the Backstop Parties, which will be paid only if the $225 million is funded.

There is no violation of the classification mandate of §1123(a)(4).

---

[14]     Section 1122(a) allows a claim or interest to be placed in a particular class "only if
such claim or interest is substantially similar to the other claims or interests of such class."  11
U.S.C. § 1122(a).

2.    <u>Releases, Exculpation Clauses and Indemnification</u>.


The AHC/Debtor Plan contains various releases, exculpation clauses and indemnification

provisions, three of which have generated objections.[15]  First, the debtors seek approval, pursuant

to Rule 9019, of the "DJT Settlement Agreement",[16] which includes various releases in favor of

the DJT Parties, the cancellation of any claims associated with the Trump Personal Guaranty, and

a waiver and release by the DJT Parties of any claims that they might have arising from the

license and service agreements dated May 20, 2005.  <u>See</u> AHC/Debtor Plan, § 5.9 Waiver of

Claims by the DJT Parties; § 5.11 Cancellation of Existing Securities and Agreements.  Second,

the AHC/Debtor Plan provides for the settlement and release of all contractual, legal and

equitable subordination claims, presumably impacting upon the Intercreditor Agreement between

the First Lien Lenders and the Second Lien Noteholders.  <u>See</u> § 5.2 Settlement of Certain

Claims.[17]  Finally, the AHC/Debtor Plan provides for an indemnification provision for the

Backstop Parties.  <u>See</u> § 5.4(n) Indemnification of Backstop Parties.

---

[15]    The releases specified in ¶ 10.5 of the AHC/Debtor Plan were not objected to by any party, and appear to be consistent with applicable law.  <u>See</u>, <u>e.g.</u>, <u>In re PWS Holding Corp.</u>, 228 F.3d 224, 246-47 (3d Cir. 2000).  The objection by the UST to ¶ 10.6 of the AHC/Debtor Plan has been resolved.

[16]    The "DJT Settlement Agreement" is also referred to in the plan as the "Plan Support Agreement."

[17]    <u>See</u> Beal Bank/Icahn Exh. 24 "Amended and Restated Intercreditor Agreement."

a.      The DJT Settlement Agreement.

On November 16, 2009, the Ad Hoc Committee and the DJT Parties entered into the

"DJT Settlement Agreement."  Pursuant to this Agreement, the DJT Parties agreed to promote

the approval of the AHC Disclosure Statement and to vote for and support the AHC Plan.

Shortly after the Agreement between the AHC and the DJT Parties was entered into, the debtors

determined to become co-proponents of the AHC plan.  The Agreement was incorporated into

and made part of the plan.[18]

As provided in Schedule A of the Agreement, the DJT Parties specifically agreed to:

(1) enter into an Amended and Restated License Agreement (with respect to Donald and
Ivanka Trump) and an Amended and Restated Services Agreement (with respect to
Donald Trump);

(2) immediately suspend all discovery and litigation against the AHC in connection with
the plan;

(3) waive entitlement to any additional consideration or indemnification from the debtors
on account of any existing agreements with the debtors, except to the extent of any
Directors and Officers' Insurance, and

(4) cancel and release any and all claims, including Administrative Expense claims,
against or equity interest in the debtors as of the effective date of the AHC/Debtor Plan.

Debtors' Exh. 6 at A-1.  In exchange, the DJT Parties are to receive:

(1) 5% of the New Common Stock;

---

[18]      See Paragraphs 5.2, 10.5 and 10.6 of the AHC/Debtor Plan.

(2) warrants to purchase up to an additional 5% of the New Common Stock, exercisable for a 5 year period;

(3) releases in the Agreement and in the AHC/Debtor Plan of Donald J. Trump from all personal liabilities or obligations in connection with the Trump Personal Guaranty;

(4) mutual releases by and among the DJT Parties and by the debtors, and

(5) the payment of the reasonable professional fees of the DJT Parties, as specified.

Id. at A-1-2.  In the event that the court determines that the AHC/Debtor Plan containing the terms of the DJT Settlement Agreement is not confirmable, the AHC has agreed to assign to Trump all of the rights associated with the claims against any of the DJT Parties that would have been released had the terms of the Agreement and plan been approved, and to direct the Indenture Trustee to release the Trump Personal Guaranty.  In addition, the DJT Parties agreed to cooperate with the debtors in connection with the Florida litigation,[19] in exchange for the reimbursement of their reasonable fees and costs generated from their involvement.  Id. at A-3.

The Trump Personal Guaranty ("Guaranty") refers to the guaranty executed on December 22, 2005 by Trump in favor of the holders of the 8½% Senior Secured Notes due 2015, now referred to as the Second Lien Noteholders.  Trump agreed to guaranty the collection of $250 million in outstanding principal due under the Notes in the event of the foreclosure on the collateral, the transfer of a deed in lieu of foreclosure or sale of the collateral, after exhaustion of

---

[19]    The Florida litigation refers to the lawsuit entitled Trump Hotels & Casino Resorts Dev. Co., LLC v. Richard T. Fields, Coastal Dev., LLC, Power Plant Enter., LLC, Native American Dev., LLC, Joseph S. Weinberg and the Cordish Co., case number 04-20291, pending in the Circuit Court for Seventh Judicial Circuit in Broward County, Florida.

all remedies against the issuers and Indenture Guarantors.[20]   The Guaranty provides that the

Required Noteholders[21] and the Indenture Trustee, on behalf of the Guaranteed Parties, have the

authority to "settle, release, compromise . . . the Guaranteed Obligations" and to "release . . . any

one or more other guarantors . . . as such Guarantied Parties or the Trustee (as applicable) may

elect in their or its sole discretion," id. at ¶ 3(a)(v, vi), "without discharging or otherwise

affecting the enforceability of the obligations of Guarantor hereunder." Id. at ¶ 3(a).


The Beal/Icahn parties challenge the debtors' business judgment that the DJT Settlement

Agreement is in the best interests of the debtors' estate and that it survives a Rule 9019 review.

They also contend that the releases proposed in the Agreement fail to satisfy the test for non-

debtor third party releases articulated by the Third Circuit in In re Continental Airlines, 203 F.3d

203 (3d Cir. 2000).  They assert that the DJT Parties are unfairly receiving substantial

consideration in exchange for limited trademark licensing and service agreements and the release

of questionable claims against the debtors' bankruptcy estates.  They maintain that the original

Trump licensing agreement has not terminated, and that it is fully assumable by the debtors.

Therefore, the proposed new agreements are not only insufficient but also unnecessary.  They

also highlight the provisions for the payment of all DJT Parties' legal fees, and for releases to the

DJT Parties from claims relating to (1) adverse tax consequences resulting from abandoning their

---

[20]        Debtors' Exh. 13 at 2, ¶ 1.

[21]        "Required Noteholders" is a term defined under the Indenture to mean:  "(A) prior
to May 20, 2006, Holders of more than 66-2/3% of the principal amount of Notes then
outstanding and (B) on or after May 20, 2006, Holders of more than 50% of the principal amount
of Notes then outstanding."  Beal Bank/Icahn Exh. 7 at 21.

-20-

partnership interests; (2) alleged fraudulent conveyances; (3) recovery under the Trump Personal

Guaranty, and (4) termination of the existing licensing and services agreements.  In their opinion,

the proposed settlement agreement is not a fair arrangement for the debtors' estate.


Section 1123(b)(3)(A) expressly states that a plan may "provide for the settlement or

adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. §

1123(b)(3)(A).  See In re Arden, 176 F.3d 1226, 1228 (9th Cir. 1999) (section 1123(b)(3)(A)

allows a court to approve a claim compromise as part of a plan); In re G-1 Holdings Inc., 420

B.R. 216, 256 (D.N.J. 2009).  "[T]he standards for approving settlements as part of a plan of

reorganization are the same as the standards for approving settlements under Fed.R.Bankr.P.

9019."  In re Nutritional Sourcing Corp., 398 B.R. 816, 832 (Bankr. D.Del. 2008).  See also In re

Heritage Organization, L.L.C., 375 B.R. 230, 308 (Bankr. N.D.Tex. 2007) (court has authority to

approve a plan that includes settlement of a claim against the estate).


Rule 9019 authorizes the court, on motion, and after notice and a hearing, "to approve a

compromise or settlement."  Fed.R.Bankr.P. 9019.  "Settlements are favored, but the unique

nature of the bankruptcy process means that judges must carefully examine settlements before

approving them."  In re Nutraquest, Inc., 434 F.3d 639, 644 (3d Cir. 2006).  Ultimately, the court

must determine whether the settlement falls within the lowest range of reasonableness.  See, e.g.,

In re G-1 Holdings Inc., 420 B.R. 216, 256 (D.N.J. 2009).  To approve a settlement pursuant to

Rule 9019, the court must balance:  "'(1) the probability of success in litigation; (2) the likely

difficulties in collection; (3) the complexity of the litigation involved, and the expense,

inconvenience and delay necessarily attending it; and (4) the paramount interest of the

creditors.'" In re WebSci Technologies, Inc., 234 Fed.Appx. 26, 29 (3d Cir. 2007) (quoting In re

Martin, 91 F.3d 389, 393 (3d Cir. 1996)).  In addition, the court must determine whether the

proposed settlement is fair and equitable, and in the best interests of the estate.  See, e.g.,

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414,

424, 88 S. Ct. 1157, 20 L.Ed.2d 1 (1968).  "Under the 'fair and equitable' standard, we look to

the fairness of the settlement to other persons, i.e., the parties who did not settle." Nutraquest,

434 F.3d at 645.  The burden is on the proponent to establish that the settlement may be

approved.  See In re Grand Prix Associates Inc., No. 09-16545, 2009 WL 1850966, *5 (Bankr.

D.N.J. June 26, 2009).


It is certainly true that the DJT Parties are receiving substantial consideration in exchange

for the release of their claims against the debtors, and for their willingness to enter into a new

Trademark License Agreement and new Services Agreement.  The value of the 5% of the new

equity and the warrants to acquire an additional 5% of the equity is not clear.  The release by the

DJT Parties of their claims against the debtors is not meaningful to the estates, since prepetition

claims and interest would be treated as other such claims and interests under the plan, receiving a

nominal pro rata distribution with other claimants.  The DJT Parties have asserted administrative

claims, which are also being released, but the full extent of these claims has not been established

on this record.[22]

---

[22]      Among other claims, Mr. Trump has asserted claims: (1) of $100 million for
breach of the License Agreement; (2) for unpaid fees related to the Service Agreement; (3) for
unpaid amounts related to his former position as Chairman of the Board of TER; (4) for unpaid

The critical component of the DJT Settlement Agreement is the resolution of the issues regarding the Trademark License Agreement and the Services Agreement. While the Beal/Icahn parties contend that the agreements are assumable by the debtors, there is legitimate debate about whether the agreements terminated, and whether the contracts may be assumed. There is significant value to the debtors and to the AHC proponents of the plan in the certainty of the retention of the Trump brand for the benefit of the Reorganized Debtors. Most significantly, the proponents of the AHC/Debtor Plan established at confirmation hearings that the Trump brand is worth millions of dollars to the debtors. The Trump Organization operates prominently worldwide. The debtors' identification with the Trump Organization raises its profile in the gaming industry. While certain aspects of the new agreement are less favorable to the debtors than the original agreements, the perpetual, royalty-free license of the continued use of the name and likeness of Donald Trump, the newly established right to use the name and likeness of Ivanka Trump, and the restrictive covenant imposed on the Trump Parties to prohibit the use of the Trump brand in connection with casino or gaming activities in New Jersey and six adjacent states all tilt the balance in favor of approving the settlement as being in the paramount interest of the Reorganized Debtors. When we examine the fairness of the settlement to other persons, i.e., the parties who did not settle, we see no unfairness in the willingness of the AHC members to carve out a piece of the reorganized equity in exchange for the anticipated benefits of the modified agreements with the Trump Parties. I conclude that, with the exception of the releases offered to the DJT Parties discussed below, the settlement as proposed falls within the

---

tax distributions as a limited partner of TER; (5) for indemnification, subrogation, reimbursement and contribution pursuant to the Agreements, and (6) for reimbursement and contribution pursuant to the Directors and Officers' Insurance under the Agreements.

permissible range of reasonableness established by Rule 9019 jurisprudence.

The Beal/Icahn parties validly express concern that certain releases contained in the DJT

Settlement Agreement and incorporated in the AHC/Debtor Plan do not meet confirmation

requirements.  Utilizing the Rule 9019 procedure, which entitles the debtors to some deference to

their business judgment, does not immunize the settlement provisions from meeting confirmation

requirements, and cannot serve as an "end run around the Bankruptcy Code." In re Congoleum

Corp., No. 03-51524, 2009 WL 499262, *8 (Bankr. D.N.J. Feb. 26, 2009), aff'd in part, rev'd in

part, 414 B.R. 44 (D.N.J. 2009) ("Parties may not do an end run around the Bankruptcy Code by

calling something a settlement."). See also In re Iridium Operating LLC, 478 F.3d 452, 463 (2d

Cir. 2007); In re Whispering Pines Estates, Inc., 370 B.R. 452, 460 (1st Cir. BAP 2007) (a broad

release of the plan proponent included as an "implicit" settlement in the plan was reviewed as

both a settlement and as a plan provision for a non-debtor release).

The release primarily implicated here is the release of the Guaranty.  The DJT Parties

offer arguments to support the contention that Trump is not actually liable to the Second Lien

Noteholders on the Guaranty,[23] and that the AHC is empowered to settle and release the Guaranty

on behalf of the all Second Lien Noteholders.  I need not resolve these contentions here.  Clearly,

---

[23]     Among the arguments offered to support the contention that Trump has no
liability on the Guaranty are that the Guaranty does not apply where, as here, the debtors' assets
are encumbered by a lien senior to the lien of the Second Lien Noteholders.  In addition, the
Guaranty is triggered upon a completed foreclosure on the debtors' assets by the Indenture
Trustee.  Because both competing plans propose to eliminate the Second Lien Notes and their
liens, a foreclosure would not be possible.

the AHC members can settle with Trump to relieve him of personal liability to them.  If Trump is

not actually liable on the Guaranty otherwise, or if the AHC can settle and release him on behalf

of all Noteholders, these proceedings will not impede the effectuation of the contract terms as

between the AHC and Mr. Trump.  The question is whether the plan provision offering Mr.

Trump a release from the Guaranty, not on the basis of the contractual terms between the parties,

but on the grounds necessary to support a non-debtor release of third party liability, is sustainable

here.

Under § 524(e) of the Code, the "discharge of a debt of the debtor does not affect the

liability of any other entity on . . . such debt."  11 U.S.C. § 524(e).  The circuits are split on

whether § 524(e) proscribes a Chapter 11 plan provision which offers releases and permanent

injunctions to non-debtors from third party liability.[24]

Addressing the issue in In re Continental Airlines, 203 F.3d 203, 211 (3d Cir. 2000), the

Third Circuit noted that there is no explicit authorization for the release and permanent

---

[24]    The Fifth, Ninth and Tenth Circuits conclude that, with the exception of sections
524(g) and 1103(c), section 524(c) prohibits all non-debtor third party releases and permanent
injunctions.  See, e.g., In re Pacific Lumber Co., 584 F.3d 229, 252 (5th Cir. 2009); In re
Lowenschuss, 67 F.3d 1394, 1401 (9th Cir. 1995), cert. denied, 517 U.S. 1243, 116 S. Ct. 2497,
135 L.Ed.2d 189 (1996); In re Western Real Estate Fund, Inc., 922 F.2d 592, 600 (10th Cir.
1990), modified by, Abel v. West, 932 F.2d 898 (10th Cir. 1991).  The Second, Fourth and Sixth
Circuits permit non-debtor releases in unique or "truly unusual" cases, considering, among other
things, whether creditors received consideration in exchange for the non-debtor releases.  See,
e.g., In re Metromedia Fiber Network, Inc., 416 F.3d 136, 143 (2d Cir. 2005); In re Dow Corning
Corp., 280 F.3d 648, 658 (6th Cir.), cert. denied, 537 U.S. 816, 123 S. Ct. 85, 154 L.Ed.2d 21
(2002); In re A.H. Robins Co., 880 F.2d 694, 702 (4th Cir.), cert. denied, 493 U.S. 959, 110 S. Ct.
376, 107 L.Ed.2d 362 (1989).

injunction of claims against non-debtors in the Code. Id.[25]  Without establishing a "blanket rule"

on the validity of third-party releases and injunctions, the court reflected that even "the most

flexible tests for the validity of non-debtor releases" look to certain "hallmarks of permissible

non-consensual releases--fairness, necessity to the reorganization, and specific factual findings to

support these conclusions," 203 F.3d at 214, as well as whether reasonable consideration had

been given in exchange for the releases and the injunction. Id.  The Continental court concluded

that the plan before it could "not pass muster under even the most flexible tests for the validity of

non-debtor releases," Id. at 214, because the record below contained no findings that the release

and permanent injunction were fair to the parties whose claims were being released, and no

findings that the releases were given in exchange for reasonable consideration.  Nor was the

necessity of the release and permanent injunction established, since the court found nothing in

the record "to even imply that the success of the Continental Debtors' reorganization bore any

relationship to the release and permanent injunction" sought.  Id. at 215.  The parties being

released had not "provided a critical financial contribution to the Continental Debtors' plan that

was necessary to make the plan feasible in exchange for receiving a release of liability."  Id. at

215.  See also United Artists Theatre Co. v. Walton, 315 F.3d 217, 227 (3d Cir. 2003) (in

addition to a demonstration of fairness, necessity to the reorganization, and specific factual

findings to support these conclusions, there must be evidence that the releases "'were given in

exchange for fair consideration.'").  Lacking sufficient evidentiary and legal basis, "the release

and permanent injunction amounted to nothing more than a lockstep discharge of non-debtor

liability and fall squarely into the section 524(e) prohibition." 203 F.3d at 217.  See also In re

---

[25]    The exception is the procedure for resolving asbestos claims.  11 U.S.C. § 524(g).

<u>PWS Holding Corp.</u>, 228 F.3d 224, 246 (3d Cir. 2000) (release of debtors, creditors committee

and professionals for acts connected with the Chapter 11 cases was permissible, except for

willful misconduct or gross negligence).

On this record, the AHC/Debtors have failed to establish sufficient facts to demonstrate

that the release of the Guaranty is fair and necessary to the debtors' reorganization, or that fair

consideration has been tendered in exchange for the release.  The fairness of the release depends

upon a showing of fairness to the third parties whose claims would be enjoined by operation of

the release.  There are no channeling injunctions offered here as part of the plan, whereby the

third parties whose potential claims are being released would achieve some benefit, and no other

exceptional circumstances to warrant such relief.  The fairness of the release has not been shown.

Nor has there been a demonstration of necessity for the release in connection with the

debtors' reorganization.  In fact, by the terms of the DJT Settlement Agreement, the release

provisions are severable from the other provisions of the Agreement.  The Agreement provides

that if the release is not approved, then the AHC will assign its members' rights under the

Personal Guaranty to Trump, and will direct the Indenture Trustee to release the Guaranty.  As

well, it must be noted that the release of the Guaranty is not necessary for the debtors'

reorganization, because another potentially confirmable plan has been proposed which does not

contain the release.

Most notably, Trump is not making a separate cash contribution to the debtors' estate or

to its creditors in exchange for the release.  Non-consenting Second Lien Noteholders cannot be

bound to a release of the Guaranty on the basis of the plan provision providing for the release.

The AHC/Debtor Plan is confirmable only if the release of the Trump Personal Guaranty is

deleted from the plan.


        b.       <u>Intercreditor Agreement Releases</u>.


An Amended and Restated Intercreditor Agreement, dated December 21, 2007 (the

"Intercreditor Agreement") was entered into between the First Lien Lenders and the Second Lien

Noteholders.  The Beal/Icahn parties contend that the AHC/Debtor Plan cannot be confirmed

because it violates the Intercreditor Agreement and is therefore inconsistent with section 510(a)

of the Bankruptcy Code, and because the plan seeks to release, on a nonconsensual basis, all of

the First Lien Lenders' rights under the Intercreditor Agreement.


        (i)       <u>Alleged Section 510(a) Violation</u>.


The Beal/Icahn parties contend that the AHC/Debtor Plan violates the Intercreditor

Agreement in at least two ways, causing the plan to be unconfirmable as violative of section

510(a).  First, the Intercreditor Agreement provides that until the First Lien Obligations have

been paid in full, in cash, no proceeds of the shared collateral shall be payable to the Second Lien

Parties.  If received by the Second Lien Parties, the proceeds must be turned over to the First Lien

Lenders.[26]  The Beal/Icahn parties contend that because the AHC/Debtor Plan proposes to make

deferred cash payments to the First Lien Lenders, the First Lien Lenders are not being paid in full

in cash.  As a consequence, the receipt by the Second Lien Noteholders of cash, rights and other

property under the plan violates the Agreement.


        Second, the Intercreditor Agreement prohibits any Second Lien Noteholder from

objecting to or contesting the payment of any adequate protection payments to the First Lien

Lender, or contesting the status of its secured claims.[27]  The AHC/Debtor Plan provides for the

recharacterization of adequate protection payments made to the First Lien Lenders as payment of

principal, which recharacterization would violate the Agreement.  Any benefit received by the

Second Lien Noteholders from such recharacterization would violate the priority position to

which the parties agreed.[28]


        Section 510(a) provides that "[a] subordination agreement is enforceable in a case under

this title to the same extent that such agreement is enforceable under applicable nonbankruptcy

law."  11 U.S.C. § 510(a).  See, e.g., In re Ion Media Networks, Inc., 419 B.R. 585, 595 (Bankr.

S.D.N.Y. 2009) (Intercreditor agreements are enforceable contracts under §510(a), "and the

Court will not disturb the bargained-for rights and restrictions governing the second lien debt".).

---

[26]        Intercreditor Agreement at 10, § 4.01.

[27]        Intercreditor Agreement at 11-12, §§ 5.01, 5.03.

[28]        The quest by the proponents of the AHC/Debtor Plan for recharacterization of
adequate protection payments made to the First Lien Lender will be resolved as of the Effective
Date of the Plan.

The Second Lien Noteholders offer various defenses to the Beal/Icahn contention that the Intercreditor Agreement is being violated by the terms of the reorganization plan, including an express reservation of rights to the Noteholders to vote their claims for or against any plan of reorganization, and the right to "exercise rights and remedies as unsecured creditors against the Credit Parties."[29]  They highlight the fact that nothing in the Intercreditor Agreement proscribes the filing by the Second Lien Noteholders, acting as unsecured creditors, of a plan of reorganization.

Several days before the start of confirmation hearings in this matter, in February 2010, the First Lien Lenders filed a New York state court law suit against members of the AHC, seeking a declaratory judgment and damages for alleged breach by the AHC members of the Intercreditor Agreement.  The AHC members removed the action to United States District Court for the Southern District of New York.  Beal Bank has moved to remand the action to state court, and the AHC members have moved to transfer venue to this court.  The AHC members invite this court to determine whether the Intercreditor Agreement was breached by the AHC actions taken in this case.

Given the context in which the issue is presented, i.e., the confirmability of the AHC/Debtor Plan under § 1129(b)(1), I need not accept the AHC invitation.  My attention is properly called by the AHC to the introductory phrase of § 1129(b)(1), "notwithstanding section

---

[29]        Intercreditor Agreement at 9-10, § 3.07.

510(a) of this title." 11 U.S.C. §1129(b)(1).[30]  We have not found cases analyzing the import of this phrase upon a cramdown plan which arguably subverts a pre-petition subordination agreement between creditors.  See 4 Lawrence P. King, Collier on Bankruptcy, ¶ 510.03[3] at 510-10 n. 20 (16th Ed. 2009) ("[t]he courts have not yet resolved whether a plan may modify a subordination agreement through the cram-down mechanism of section 1129(b).").  In a 1995 article detailing recommendations for amendments to the Bankruptcy Code, Kenneth N. Klee noted that there is a lack of certainty under current law about whether a consensual plan under § 1129(a) can override a contractual subordination provision and permit a majority within a class to compel the minority in the class to waive subordination rights.  Section 1129(a)(1) requires a plan to conform to the provisions of Title 11, including § 510(a), which makes subordination agreements enforceable in bankruptcy to the same extent such agreements are enforceable outside of bankruptcy.  Klee suggests that § 1123(b) be amended to permit a consensual plan to override § 510(a).  Turning to § 1129(b)(1), he notes:

> § 1129(b), by virtue of its reference to § 510(a) in cramdown, appears to have the anomalous result of overriding  § 510(a) and eliminating the enforcement of subordination agreements in cases in which the class rejects the plan.  The Commission should recommend to Congress that the reference to § 510(a) in § 1129(b)(1) of the Bankruptcy Code be deleted.

---

[30]      In its entirety, section 1129(b)(1) provides:

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).

Kenneth N. Klee, Adjusting Chapter 11:  Fine Tuning the Plan Process, 69 AM. BANKR. L.J. 551,

561 (1995).  While Klee's comments criticizing the "anomalous result" occasioned by the clause

are understood, Congress has neither amended § 1123(b) to specifically permit a consensual plan

to override § 510(a), nor deleted the reference to § 510(a) in § 1129(b)(1).  The phrase must be

given meaning.


The term "notwithstanding" is "one of the most frequently used and misunderstood words

in the legal vocabulary."  Goody's Family Clothing, Inc., 392 B.R. 604, 606 (Bankr. D.Del.

2008), aff'd, 401 B.R. 656 (D.Del. 2009).  The only logical reading of the term

"notwithstanding" in section 1129(b)(1) seems to be: "Even though section 510(a) requires the

enforceability of subordination agreement in a bankruptcy case to the same extent that the

agreement is enforceable under nonbankruptcy law, if a nonconsensual plan meets all of the

§1129(a) and (b) requirements, the court 'shall confirm the plan.'"  The phrase

"[n]otwithstanding section 510(a) of this title" removes section 510(a) from the scope of

1129(a)(1), which requires compliance with "the applicable provisions of this title."  11 U.S.C. §

1129(b)(1).


I do not decide here whether the Second Lien Noteholders have violated the Intercreditor

Agreement, but even if such a violation occurred, it would not impede the confirmation of the

AHC/Debtor Plan as proposed.

(ii)      Release of Breach of Contract Claims.

The Beal/Icahn parties complain not only that the alleged breach by the AHC members

causes their plan to be unconfirmable because it violates section 510(a) of the Bankruptcy Code,

but they also complain that section 5.2 of the AHC/Debtor Plan seeks to release, on a

nonconsensual basis, all of the First Lien Lenders' rights under the Intercreditor Agreement,

including the claims the First Lien Lenders have asserted against the AHC members in the law

suit pending before the District Court in the Southern District of New York.[31]  The objectors

correctly reflect that the non-consensual release of claims against the AHC members is not

permissible under Third Circuit law.

---

[31]      Section 5.2 provides in relevant part:

Notwithstanding anything contained herein to the contrary, all Plan distributions made to
creditors holding Allowed Claims in any Class take into account the relative priority and
rights of the Claims and the Equity Interests in each Class in connection with any
contractual, legal and equitable subordination rights relating thereto whether arising under
general principles of equitable subordination, section 510 of the Bankruptcy Code or
otherwise, and are intended to be and shall be final, and no Plan distribution to the holder
of a Claim in one Class shall be subject to being shared with or reallocated to the holders
of any Claim in another Class by virtue of any prepetition collateral trust agreement,
shared collateral agreement, subordination agreement or other similar intercreditor
arrangement. As of the Effective Date, any and all contractual, legal and equitable
subordination rights, whether arising under general principles of equitable subordination,
section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification
and treatment of all Allowed Claims and their respective distributions and treatments
hereunder are settled, compromised, terminated and released pursuant hereto; provided,
however, that nothing contained herein shall preclude any person or entity from
exercising their rights pursuant to and consistent with the terms of this Plan and the
contracts, instruments, releases, indentures, and other agreements or documents delivered
under or in connection with this Plan.

As reflected above, at a minimum, a plan proponent who seeks a non-debtor third party release in the Third Circuit must show fairness, necessity to the debtor's reorganization, and consideration for the release.  Even if the fairness of the proposal and the consideration to be offered are demonstrated, the necessity for the release is called into question by the circumstances of this case.  While the cash infusion to be provided by the AHC members is necessary for the AHC/Debtor Plan, it is not necessary for the reorganization of the debtors, because an alternative to reorganize the debtors, i.e., the Beal/Icahn Plan, exists.  The release of liability in connection with any violations of the Intercreditor Agreement is not sustainable on this record.

c.    <u>Indemnification of the Backstop Parties</u>.

The United States Trustee ("UST") objects to § 5.4(n) of the AHC/Debtor Plan.  In § 5.4(n) the Reorganized Debtors agree to indemnify and hold harmless the Backstop Parties against any and all losses and claims arising out of or in connection with the Rights Offering, the Backstop Agreement, the Plan or any transactions contemplated thereby.  In response to the UST's concern, the proponents of the AHC/Debtor Plan have deleted "the Plan" from this section, leaving for indemnification any claim arising out of or in connection with "the Rights Offering, the Backstop Agreement, or the transactions contemplated hereby or thereby or in connection therewith."  The debtors and the AHC believe that the adjustment adequately addresses the United States Trustee's concern in this regard.  I agree, with the caveat and clarification that the proposed indemnification would encompass the types of transactions

-34-

described, including "distribution of the Backstop Stock and the payment of the Backstop Fees

and expenses, if any, distribution of the Subscription Rights, the purchase and sale of New

Common Stock in the Rights Offering, and purchase and sale of unsubscribed shares pursuant to

the Backstop Agreement." Indemnification would not include, for instance, any liability the

AHC members might have to the First Lien Lenders if it were found that the Intercreditor

Agreement between them had been breached.

      B.     Section 1129(a)(3).

Section 1129(a)(3) requires that the plan be "proposed in good faith and not by any means

forbidden by law." 11 U.S.C. § 1129(a)(3). The burden to establish good faith is on the plan

proponent. In re PPI Enterprises, Inc., 324 F.3d 197, 211 (3d Cir. 2003). The totality of the

circumstances must be considered in the course of a "fact-intensive, case-by-case inquiry." 324

F.3d at 211. "'[T]he important point of inquiry is the plan itself and whether such a plan will

fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" In

re PWS Holding Corp., 228 F.3d 224, 242 (3d Cir. 2000) (quoting In re Abbotts Dairies of

Pennsylvania, Inc., 788 F.2d 143, 150 n. 5 (3d Cir. 1986)). See also In re SGL Carbon Corp.,

200 F.3d 154 (3d Cir. 1999) (case that lacks valid reorganizational purpose should be dismissed);

Baron & Budd, P.C. v. Unsecured Asbestos Claimants Committee, 321 B.R. 147, 163 (D.N.J.

2005) (following Combustion Engineering); In re Lernout & Hauspie Speech Products N.V., 308

B.R. 672, 675 (D.Del. 2004) (Good faith has been described alternatively as requiring that: "(1)

the plan be consistent with the objectives of the Bankruptcy Code; (2) the plan be proposed with

-35-

honesty and good intentions and with a basis for expecting that reorganization can be achieved;

or (3) there was fundamental fairness in dealing with the creditors") (footnotes omitted).

The Icahn parties contend that the AHC and the debtors have failed to demonstrate that

their plan has been proposed in good faith, offering several bases for their contention.  The

objectors charge the officers and directors of the debtor with a breach of their fiduciary duties by:

(1) failing to evaluate the fairness of the DJT Settlement Agreement with the AHC before

binding the debtors to the plan,[32] (2) contractually binding the debtors to the AHC/Debtor Plan,

through the Noteholders Backstop Agreement, thereby jeopardizing the debtors' ability to

continue to use cash collateral, preventing the debtors from accessing necessary financing, and

forcing the debtors to "slash critical capital expenditures in order to compensate for the liquidity

strain under that plan."  Obj. to Confirm. of AHC/Debtors' Sixth Plan, Dkt. #1238 at 73,[33] and

(3) ceding their fiduciary duties to the AHC.[34]  As well, the objectors contend that the debtors

---

[32]     Relying partially on an SEC filing in March 2009, the objectors hypothesize that
the officers and directors of the debtors conspired with Donald Trump, from as early as March
2009, to carry out "Mr. Trump's goals to capture for himself the worldwide right - now held by
the Debtors - to license his name to other gaming enterprises."  Obj. to Confirm. of
AHC/Debtors' Sixth Plan at 43.

[33]     For instance, the Final Cash Collateral Order entered March 23, 2009 provides
that the debtors' use of cash collateral shall be terminated if "any Debtor files a proposed plan of
reorganization in the Chapter 11 cases which does not provide for the payment in full in cash of
the Prepetition First Lien Obligations."  ¶3(b)(ii).

[34]     The objectors cite to testimony by Mark Juliano, the debtors' Chief Executive
Officer, and Edward D'Alelio, a member of the debtors' Board of Directors, during the
confirmation hearing, neither of whom could recite details about proposed DIP financing to be
provided by the AHC.  This was in contrast to the testimony of Mark Lasry of Avenue Capital, a
member of the Ad Hoc Committee who recited specific terms of the DIP financing proposal
during his testimony.  As well, Mr. Juliano testified that he was aware that AHC had been

and the AHC have pursued a bad faith litigation strategy, filing amendments to the New Term

Loan and to the Plan even after testimony at the confirmation hearing has been concluded, and

filing a motion to approve an AHC DIP financing facility during the confirmation hearing, which

was amended shortly before the deadline for the submission of the First Lien Lenders' objection.

According to the Icahn Parties, these actions demonstrate "unabashed gamesmanship" which

should defeat the AHC/Debtor Plan.


The focus of the good faith requirement is on the plan itself, and whether the plan

achieves a reorganization objective that is consistent with the Bankruptcy Code.  Nevertheless, a

demonstration of a breach of fiduciary duty by officers or directors of a debtor may certainly

defeat the confirmability of the debtors' plan on lack of good faith grounds.  For instance, in In re

Coram Healthcare Corp., 271 B.R. 228 (Bankr. D.Del. 2001), the debtor's plan of reorganization

was rejected on good faith grounds where the debtor's chief executive officer and president had

been receiving almost $1 million per year under a separate employment agreement with one of

the debtor's largest creditors, without the debtor's knowledge.  This arrangement tainted the

debtor's entire reorganization effort, and prevented the court from confirming the plan.


No such demonstration of breach of fiduciary duty is presented here.  The actions of the

debtors and their respective officers and directors must be understood in the context of the

sequence and timing of events in this case.  At the time that the decision was made by the Board

---

negotiating with the Coastal parties regarding the sale of the Trump Marina and the settlement of
the Florida litigation, with no specific authority from the debtors to do so.

to support the AHC plan and the DJT Settlement Agreement in early December 2009, there was

substantial prospect of a consensual arrangement with the First Lien Lender at the time, Beal

Bank.  Several witnesses testified that discussions with Beal were on the "one yard line."

According to Mr. Juliano and others, the Board, expecting the treatment of the First Lien Lender

to resolve, reached its decision to support the AHC plan and the DJT Settlement Agreement

because the plan offered a substantial capital infusion, and also afforded an opportunity for

unsecured creditors (including Second Lien Noteholders) to invest in the Reorganized Debtors.

Consultation with the debtors' financial advisor, Lazard and Company, confirmed to the Board

that the plan as proposed by the Ad Hoc Committee was feasible.  The restrictions of the Final

Cash Collateral Order did not appear to be impediments, because the First Lien Lender had not

asserted any violations as of that time, and the prospect of a consensual plan seemed likely.

After the Icahn partners acquired a portion of the First Lien Lender claim and joined the Beal

Bank plan, the Board determined that the Beal/Icahn plan did not offer as broad a distribution to

creditors, did not offer an operating plan, and did not explain how the Trump casinos would co-

exist with the Tropicana and the Fountainbleau, other casino holdings of the Icahn parties.

Following the Board's decision to support the AHC plan, the debtors' officers and directors

relied heavily on their attorneys and other professional advisors, and worked closely with the

plan's co-proponent, the AHC, to further the progress of the plan.

        As to the objectors' hypothesis that the debtors conspired with Trump to permit him to

expand the opportunity to license his name to other gaming enterprises worldwide, the theory

does not hold up under scrutiny.  Notably, the objectors failed to question either Robert Pickus,

the debtors' general counsel, Mr. Trump, Mr. Juliano, the debtors' CEO, or Edward D'Alelio, a

member of the debtors' Board of Directors, about the SEC filing upon which the theory is

premised.  The objectors' theory in this regard is purely speculative.


    The objectors are correct to express concern about the agreement by the debtors' Board,

contained in the Noteholders Backstop Agreement, to bind and commit the debtors to the

AHC/Debtor Plan.  While all restrictions on a debtor's ability to market its assets are not per se

illegal, it has been held that "any such clauses must be subject to the strictest scrutiny by a

Bankruptcy Court."  In re Big Rivers Elec. Corp., 233 B.R. 726, 738 (Bankr. W.D.Ky.), aff'd,

233 B.R. 739 (W.D.Ky. 1998).   I have afforded such scrutiny to the facts presented, and

conclude that the actions of the officers and directors of the debtors, and the manner in which the

case has proceeded[35] do not constitute the sort of breach of fiduciary duty that would defeat the

confirmation of the AHC/Debtor Plan.[36]

---

[35]    The "gamesmanship" by the plan proponents that the objectors complain about, focusing on filings to amend the New Term Loan proposed under the plan and to provide DIP financing to the debtors upon confirmation, actually served not to detract from the Beal/Icahn plan, but to meet the objections to the AHC/Debtor Plan (i.e., that the new Term Loan failed to contain market covenants, and that the debtors' liquidity between confirmation and the Effective Date of the plan was questionable) and to improve upon the plan.

[36]    Other cases cited by the objectors are inapposite here.  In In re Tenney Village Co., 104 B.R. 562 (Bankr. D.N.H. 1989), a Chapter 11 financing agreement between the debtor and its primary lender was disapproved on the ground that the terms were overreaching, and would unduly prejudice other lenders and junior creditors in the case.  The case did not implicate the section 1129 requirement of good faith.  And in In re The Cara Corp., No. 90-15379S, 1992 WL 88189 (Bankr. E.D.Pa. Apr. 27, 1992), a plan of reorganization proposed by an official unsecured creditors committee was rejected where the unsecured creditors voted against the plan. The court determined that the committee's decision to "press on" in the face of the negative pronouncement from its constituency constituted bad faith, particularly where the plan clearly benefitted the committee's counsel, but may not have benefitted the creditor body itself.

The focus of the good faith requirement is whether the plan under consideration advances

the reorganization objectives of Chapter 11 of the Bankruptcy Code, in a manner that can be

effected and is otherwise supportable.  The AHC/Debtor Plan proposes to reduce the debt carried

by the debtors by upwards of $1.4 billion, infuses the debtor with $225 million, and offers some

otherwise "out of the money" creditors the chance to benefit from the potentially successful

reorganization of the debtors.  On this record, I conclude that the AHC/Debtor Plan is in

conformance with Chapter 11 reorganization goals, is proposed in good faith and not by any

means forbidden by law.


    C.    <u>Section 1129(a)(4)</u>.


Section 1129(a)(4) requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a person
> issuing securities or acquiring property under the plan, for services or for costs
> and expenses in or in connection with the case, or in connection with the plan and
> incident to the case, has been approved by, or is subject to the approval of, the
> court as reasonable.

11 U.S.C. § 1129(a)(4).  Under its clear terms, "any payment" made or to be made by the plan

proponent or the debtor for services "in or in connection with" the plan or the case must be

approved by or "subject to the approval of" the bankruptcy court as "reasonable."  <u>See</u> <u>In re</u>

<u>Congoleum Corp.</u>, 414 B.R. 44, 59 (D.N.J. 2009) (pre-petition settlement payments and

facilitation fees were subject to court review); <u>In re Idearc Inc.</u>, No. 09-31828, 2009 WL

5205346, *20 (Bankr. N.D.Tex. Dec. 22, 2009) ("Section 1129(a)(4) of the Bankruptcy Code has

been construed to require that all payments of professional fees made from estate assets be

subject to review and approval by the Bankruptcy Court as to their reasonableness."); In re

Sentinel Management Group, Inc., 398 B.R. 281, 316 (Bankr. N.D.Ill. 2008) ("Section

1129(a)(4) requires that the court exercise substantive control over fees and costs related to

confirmation and the Chapter 11 case."). "'Section 1129(a)(4) is designed to insure compliance

with the policies of the Code that (1) the bankruptcy court should police the awarding of fees in

title 11 cases and (2) holders of claims and interests should have the benefit of such information

as might affect the claimants' decision to accept or reject the plan.'" In re Journal Register Co.,

407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009) (quoting In re Future Energy Corp., 83 B.R. 470, 488

(Bankr. S.D.Ohio 1988)). "While a strong argument might be made that payments that are not

made to fiduciaries and that do not deplete the bankruptcy estate need not be subject to court

approval, this is simply not the decision that Congress has chosen to make." In re Cajun Electric

Power Coop., Inc., 150 F.3d 503, 514 (5th Cir. 1998), cert. denied, 526 U.S. 1144, 119 S. Ct.

2019, 143 L.Ed.2d 1031 (1999).  By its terms, section 1129(a)(4) does not require pre-payment

approval by the court, but it does subject such payment to disgorgement in the event that the

court finds the payment not to be reasonable.


The UST objects to the provisions of the AHC/Debtor Plan which require the

reorganization debtors to pay the Ad Hoc Committee's advisors, including counsel and financial

advisors, the Second Lien Indenture Trustee's fees and expenses, and the Backstop Parties' fees

and expenses, all without application by or on behalf of any such parties, without notice and a

hearing, and without court approval.  See §§ 2.2, 9.1(e) and 12.2 of the AHC/Debtor Plan.  In

their Joint Post-Confirmation Memorandum, the Ad Hoc Committee and the debtors reflect that

the accrued professional fees for the AHC advisors and the Backstop fees and expenses amount

to approximately $10.9 million.  There is no estimation of the fees and expenses to be sought by

the Indenture Trustee.  The UST also contends that the proponents of the AHC/Debtor Plan have

failed to establish legal authority for by-passing the requirements of section 503(b) in providing

for the payment of fees and expenses to the non-debtor entities proposed to receive such

payments.

The provisions of the plan that contemplate the payment of fees to the Ad Hoc

Committee, the Backstop Parties, and the Indenture Trustee are violative of the provisions of

section 1129(a)(4).  Court approval of the fees is required to determine that each of the entities'

fees and expenses to be paid by the debtors are authorized to be paid under the Code, and are

reasonable.

       1.     <u>Authorization for Payment of Fees</u>.

Sections 503(b)(3) and (4) authorize the court, after notice and a hearing, to allow as

administrative expenses reasonable compensation for professional services rendered by attorneys

or accountants for "a creditor, an indenture trustee, an equity security holder, or a committee

representing creditors or equity security holders other than a committee appointed under section

1102 of this title" for making "a substantial contribution" to a Chapter 11 case.  11 U.S.C. §

503(b)(3)(D) and (4).  Section 503(b)(5) authorizes payment of reasonable compensation for

services rendered by an indenture trustee in making a substantial contribution in a case.  11

U.S.C. § 503(b)(5).  Section 1129(a)(4) makes no reference to § 503(b).  However, § 1129(a)(1)

mandates compliance with the applicable provisions of Title 11.  The question is whether §

503(b) controls here, requiring a showing of substantial contribution by the prospective payees,

or whether the payments can be made on some other grounds, as the proponents suggest.[37]

 

In the context of determining whether a breakup fee to an unsuccessful bidder at a

bankruptcy auction could be sustained, the Third Circuit has stated that courts may not "create a

right to recover from the bankruptcy estate where no such right exists under the Bankruptcy

Code."  In re O'Brien Environmental Energy, Inc., 181 F.3d 527, 532 (3d Cir. 1999).  In

considering whether any provision of the Bankruptcy Code authorizes such a payment, the court

found the "most likely source of authority" to be 11 U.S.C. § 503.  In focusing on § 503(b), the

O'Brien court rejected § 363(b), and its accompanying business judgment test, as a basis for

approving the right to recover from the bankruptcy estate for a breakup fee.[38]  While

authorization for payment of professional expenses during a Chapter 11 case has been granted

---

[37]     The proponents of the AHC/Debtor Plan do not cite to any other Code authority
for the payments, but contend that "it is common practice in large and complex chapter 11 cases,
such as these, for the Debtors' estates to be responsible for the fees and expenses of the plan
sponsor, but for whose equity commitment the Debtors could not reorganize."  Joint Post-Conf.
Hearing Memo at 59.

[38]     In a more recent expression about breakup fees by the Third Circuit, the court
explained that its comment in O'Brien about the applicability of the business judgment rule in a
bankruptcy case did not obviate the role of the business judgment rule in the § 363(b) context,
but "was limited to the circumstance of a party seeking an alternative to § 503(b) as a basis for
awarding the expenses from the bankruptcy estate."  In re Reliant Energy Channel View, LP, 594
F.3d 200, 209 n.13 (3d Cir. 2010).

elsewhere in unique circumstances, see, e.g., In re Bethlehem Steel Corp., No. 02 CIV. 2854,

2003 WL 21738964 (S.D.N.Y. July 28, 2003), the O'Brien decision suggests strongly that §

503(b) is the only source for approval of the payment of fees such as the fees proposed to be paid

to the AHC, the Backstop Parties and the Indenture Trustee.

The AHC, the Backstop Parties, and the Indenture Trustee must apply under § 503(b) for

payment of their fees and expenses.

      2.    Reasonableness.

What is meant by "reasonable" is not defined in section 1129(a)(4).  While section 330

also uses the "reasonable" standard, we know of no court that has applied the standards and rules

developed under section 330 to the interpretation of section 1129(a)(4).  7 Lawrence P. King,

Collier on Bankruptcy, ¶ 1129.02[4] at 1129-30 (16th Ed. 2009).  The Ad Hoc Committee has

offered to present copies of its invoices to the court for in camera review to satisfy the (a)(4)

requirement.  That offer is accepted, with the caveat that the invoices must be shared under

appropriate confidentiality provisions with the United State Trustee, and counsel for the debtors,

the Icahn parties and Beal Bank.  The Backstop Parties must also comply in the same way, by

providing invoices reflecting fees and expenses to the court, with copies to the named entities, to

enable the court to determine the reasonableness of the charges.  As to the Indenture Trustee,

because § 503(b)(5) specifies that reasonable compensation for services rendered by an indenture

trustee must be "based on the time, the nature, the extent and the value of such services, and the

cost of comparable services other than in a case under this title," an appropriate application from the Indenture Trustee is required.

       3.      <u>Backstop Stock</u>.

As to the Backstop Stock fee of 20% of the equity of the Reorganized Debtors, no further application or documentation is required.

The UST likens the awarding of the Backstop Stock fee to a breakup fee, which must be treated as an administrative expense claim under 11 U.S.C. § 503(b)(1)(A). <u>In re O'Brien Environmental Energy, Inc.</u>, 181 F.3d at 536. If the AHC/Debtor Plan is confirmed and goes effective, the only circumstance under which the Backstop Stock would be awarded, the Backstop Stock could readily be characterized as "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Here, the awarding of stock is more akin to an underwriting fee for agreeing to provide funding for the reorganization of the debtors, regardless of the outcome of the Rights Offering to all qualified creditors in the case. In fact, other than the Backstop Parties, the only exercise of Subscription Rights by other qualified investors was in the approximate amount of $27,000. The remainder of the $225 million of equity is coming from the Backstop Parties. Whether the award of Backstop Stock is characterized as an actual and necessary administrative expense, or whether the Backstop Parties are deemed to have made a substantial contribution to the case, the award of Backstop Stock may be sustained without further application.

D.      Section 1129(a)(11).

Section 1129(a)(11) codifies the feasibility requirement and requires a demonstration by

the proponent of the plan that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the
> need for further financial reorganization, of the debtor or any successor to the
> debtor under the plan, unless such liquidation or reorganization is proposed in the
> plan.

11 U.S.C. § 1129(a)(11).  The plan proponent bears the burden to show by a preponderance of

the evidence that the proposed Chapter 11 "plan 'has a reasonable probability of success,' and is

more than a 'visionary scheme[ ].'"  In re Wiersma, 227 Fed.Appx. 603, 606 (9th Cir. 2007)

(quoting In re Acequia, Inc., 787 F.2d 1352, 1364 (9th Cir. 1986) and In re Pizza of Haw., Inc.,

761 F.2d 1374, 1382 (9th Cir.1985)).  See also In re T-H New Orleans L.P., 116 F.3d 790, 801

(5th Cir. 1997) ("The standard of proof required by the debtor to prove a Chapter 11 plan's

feasibility is by a preponderance of the evidence."); In re Surfango, Inc., No. 09-30972, 2009 WL

5184221, *11 (Bankr. D.N.J. Dec. 18, 2009) (preponderance standard).  In other words, "as a

practical matter it requires the court to find that the plan is 'workable' before it may be

confirmed."  In re Danny Thomas Properties II L.P., 241 F.3d 959, 962 (8th Cir. 2001).  This

determination is necessarily case-by-case and requires a "'relatively low threshold of proof.'"  In

re DBSD North America, Inc., 419 B.R. 179, 202 (Bankr. S.D.N.Y. 2009), aff'd, 2010 WL

1223109 (S.D.N.Y. Mar. 24, 2010).  See also In re G-1 Holdings Inc., 420 B.R. 216, 267 (D.N.J.

2009) (the "key element of feasibility is whether there is a reasonable probability the provisions

-46-

of the Plan can be performed"); In re Griswold Bldg., LLC, 420 B.R. 666, 697 (Bankr. E.D.Mich.

2009) (ultimately, the plan must be "doable").  That is not to say that the proponents must

"guarantee" their financial future.  It simply means that the "'mere potential for failure of the

plan is insufficient to disprove feasibility.'" Wiersma, 227 Fed.Appx. at 606 (quoting In re

Patrician St. Joseph Partners L.P., 169 B.R. 669, 674 (D.Ariz.1994)).  It is enough for the

proponents to provide "'a reasonable assurance of commercial viability .'" T-H New Orleans

L.P., 116 F.3d at 801 (quoting In re Briscoe Enter., Ltd., II, 994 F.2d 1160, 1166 (5th Cir.1993)).

See also In re South Canaan Cellular Investments, Inc., 2010 WL 1257747 at *12.

        The key components of the feasibility assessment of the AHC/Debtor Plan are the ability

of the Reorganized Debtors to service the debt, whether the proposed New Term Loan exceeds

the Reorganized Debtors' debt capacity, and the prospect of obtaining the necessary regulatory

approvals.

        1.    Servicing the New Term Loan.

            a.    Debtors' Projected EBITDA.

        The starting point for assessing the ability of the Reorganized Debtors to service the New

Term Loan is the debtors' projected EBITDA[39] for 2010 through 2013.  At the end of December

_____

        [39]    EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization) is
defined as "[a] company's income without deductions for interest expenses, taxes, depreciation
expenses, or amortization expenses, used as an indicator of a company's profitability and ability

2009, as is customarily done, the debtors' management revised budgeted EBITDA for 2009 and

2010, but did not revise projections for 2011 through 2013, except for minor corporate expenses.

The following chart reflects the adjustments made, with reorganization expenses included (in

millions):

|      | Prior to Adjustment | Adjustment as of January 5, 2010 |
|------|---------------------|----------------------------------|
| 2009 | $68,292 | $56,527 |
| 2010 | $86,674 | $64,118 |
| 2011 | $96,460 | $94,388 |
| 2012 | $77,709 | $75,605 |
| 2013 | $94,777 | $92,641 |

The primary EBITDA adjustment made by the debtors was the reduction of capital

expenditures ("capex") from the EBITDA projections in 2009 of $8.3 million ($35.1 million to

$26.8 million) and a reduction of $44.3 million in 2010 ($54.3 million to $10 million).  The

Beal/Icahn parties challenge the debtors' projections on several grounds, including the failure to

adjust future earnings projections to account for the capex spending reductions, the failure of the

projections to adequately consider competitive forces, particularly the introduction of table

games in Pennsylvania, the unsubstantiated jump in EBITDA projected from 2010 to 2011, and

the negative historical performance of the debtors over the last ten years.

---

to service its debt."  Black's Law Dictionary at 585 (9th Ed. 2009).

(i)    Capex Spending Reduction.

Historically, the debtors have targeted a 20% return on investment in individual capital projects.  The reduction in capex for 2009 and 2010 to arrive at the adjusted EBITDA numbers contemplates a reduction in both maintenance capex and project capex.  Certain anticipated projects, including the improvement of the spa and pool areas and the relocation of an upscale steak restaurant at the Taj Mahal, have been deferred.

The debtors offered several plausible reasons to justify the fact that they made no adjustments to future projections on the basis of the capex reductions.  First, because of the drop in consumer spending caused by the economic slowdown, the normally expected 20% return on investment could not be achieved.  Second, during the last four years, the debtors have outspent their Atlantic City competitors in capex by almost $400 million, building a new tower of hotel rooms at the Taj, and adding amenities at each of the casinos.  All of the debtors' immediate Atlantic City competitors have reduced substantially their capex expenditures in 2009.[40]  Based on the large capex expenditures by the debtors in recent years, and the comparable rates of capex expenses by other Atlantic City casinos in 2009, the debtors do not expect that the reduction of capex in 2010 will impact on their Atlantic City market share going forward.

_____

[40]    Capex expenditures by all of the Atlantic City casinos for the last three years are noted as follows:

> 2007 - $963 million
> 2008 - $626 million
> 2009 - $ 85 million (on an annualized basis as of September 2009).

Testifying on behalf of the Beal/Icahn parties in opposition to the AHC/Debtor Plan was

Neil Augustine, Managing Director and Head of the North American Restructuring Group of

Rothschild, Inc., an international provider of debt advisory and restructuring services.  Mr.

Augustine is highly qualified and experienced in advising financially troubled companies and

their creditors, but has had little experience with gaming companies, and no previous exposure to

the casino market in the Northeast Region, including Atlantic City.  In opining on the lack of

achievability of the debtors' projections, Mr. Augustine considered the historic 20% return

expected by the debtors in a stable economic environment and the reductions in project capex

made by the debtors in budgeted EBITDA for 2009 and 2010 to impose an across the board

reduction of the debtors' budgeted EBITDA for 2011 through 2013 in the amount of $10.5

million each year.[41]  This rather arbitrary and substantial reduction in EBITDA was largely

discredited both during his cross-examination, and by the expert witnesses who testified on

behalf of the AHC/Debtor Plan.[42]  In his analysis, Mr. Augustine did not differentiate between

project capex and maintenance capex, and did not know which capex was being deferred.[43]  He

also failed to factor into his opinion the general reduction in consumer discretionary spending

occasioned by the current economic downturn, which curtails the achievement by gaming

---

[41]    He also reduced the 2010 EBITDA projection by $5.1 million for the 6 months
commencing July 1, 2010.

[42]    The expert witnesses who testified about the debtors' projections included
William H. Hardie, III of Houlihan Lokey Howard & Zukin, and Andrew Yearly of Lazard Freres
& Co.

[43]    Mr. Augustine opined that if maintenance capex is not expended, there may be an
expected degregation in future EBITDA.  However, his assessment of a 20% degregation each
year, from 2011 on, was not plausible.

companies like the debtors of their historical expectation of a 20% rate of return on project

capex.  Nor did Mr. Augustine recognize in his analysis the dramatic decrease in capex by all of

the other Atlantic City casinos over the last three years.


It is undeniable that, in the long-term, a reduction in capex spending may impact on

EBITDA.  However, a sufficient basis has been offered to establish that a deferral of some

project capex in this market will not materially impact upon the debtors' projected EBITDA

going forward.


        (ii)       <u>Competitive Forces, including Pennsylvania Table Games</u>.


Although the debtors incorporated in their projections consideration of various

competitive forces, including the anticipated opening of the new Revel Casino in Atlantic City,

the debtors did not make adjustments to EBITDA projections based on the passage of legislation

in Pennsylvania, in January 2010, authorizing table gaming at Pennsylvania slot parlors and

casinos.  During Mr. Augustine's one-day meeting with the debtors' management in January

2010, in apparently casual response to Mr. Augustine's inquiry regarding the impact of

Pennsylvania table gaming on the debtors' projected EBITDA, a member of the management

team opined that the impact might be in the range of $7 million to $10 million.  Following the

meeting, upon Mr. Augustine's request, the debtors provided to Rothschild a mathematical

calculation of the potential range of reduction of EBITDA that might be occasioned by

Pennsylvania table gaming, between 5% and 20%.  The calculation was conveyed with the caveat

that the chart was not intended to reflect management's projection of the impact of Pennsylvania

table gaming.  Notwithstanding the caveat, Mr. Augustine chose a so-called mid-point of the

mathematical calculation to reduce the debtors' EBITDA projections for 2011, 2012 and 2013 by

$10.2 million each year.

The deductions imposed by Mr. Augustine on the debtors' projections, which he based on

the anticipated advent of Pennsylvania table games, were largely discredited.[44]  Mr. Augustine

acknowledged that he had no knowledge of the status of particular gaming ventures in

Pennsylvania, that final regulations governing Pennsylvania table games had not yet been

promulgated, and that various factors, including the lack of hotel rooms and other amenities

connected to the Pennsylvania gaming establishments, might ameliorate the impact of

Pennsylvania table games on the debtors' operations.

The debtors recognize that there will be some negative impact on their operations as

Pennsylvania table gaming is established.  However, no adjustments can be made at this point

because such adjustments would be speculative, particularly in the absence of permanent

regulations and fixed time frames for the commencement of Pennsylvania operations.  During the

confirmation hearings, the substantial delays in the various Pennsylvania projects were outlined.

Delays in the Atlantic City projects, including the opening of the Revel Casino, and delays in

---

[44]     The presentation by Mr. Augustine in his report of the debtors' mathematical
calculations, noted as "Management's 'EBITDA's flowthrough scenarios'", without the caveats
imposed upon those calculations by debtors' management, shed negative light on the
methodology used by Mr. Augustine to arrive at his opinions regarding management's
projections.

other regional gaming facilities, including the Aqueduct project in New York, were also noted.

Many of these projects had already been factored into the projections.  Because both positive and

negative developments in the competitive gambling environment were occurring, all of which are

fluid and speculative, management's decision not to reopen the EBITDA projections for 2011,

2012 and 2013 on this ground should not be disturbed on the basis of the objectors' challenge.


(iii)    Historical Performance of the Debtors.


The Beal/Icahn parties correctly reflect that the historical performance of a company is a

significant predictor of the achievability of their projections going forward.  The Beal/Icahn

parties note that during the last ten years, the debtors have missed their EBITDA projections 9

out of 10 times.  In that light, they question the opportunity of the debtors to achieve the

projected EBITDA numbers for 2011 and on, particularly because the budgeted EBITDA of

$94.4 million in 2011 represents a 47% increase over the EBITDA projection of $64.1 million

for 2010.


The debtors support their projections by reflecting upon the fact that the 2011 through

2013 projections are well below the EBITDA numbers achieved in 2005 ($166.3 million), 2006

($180.6 million) and 2007 ($144.4 million).  The numbers projected for the three years, $96

million, $77 million and $94 million, respectively, represent a very conservative expectation of a

gradual rebound in cash flow, signifying, at its high point in 2011, approximately 50% of the

level reached by the debtors in 2006.  The $19 million decline in EBITDA in 2012 was forecast

in anticipation of the opening of the Revel Casino next to the Taj Mahal in December 2011, an

opening that is highly unlikely to occur.[45]

As to missed projections in earlier years, the current management team has been with the

debtors since 2006.  Since then, all of the casinos in Atlantic City have experienced serious

setbacks.[46]  Nevertheless, the debtors have managed to retain their market share in the Atlantic

City market.

Also noted was the fact that in January and February 2010, the debtors missed their

revised EBITDA projections due to the severe weather conditions experienced by the region on

key weekends during that time.  Debtors' management noted, however, that only approximately

4% of the annual budgeted EBITDA numbers is earned during January and February, and that the

debtors were meeting projections on days when the weather was not a factor.

On this record, I am able to conclude that the projections advanced by the debtors, as

revised in the January 5, 2010 Disclosure Statement, are reasonable and attainable.

---

[45]      It appears that construction on the Revel Casino has ceased, and that
approximately $1 billion of financing is needed to complete the project, which is not yet
available.

[46]      In 2007, the smoking ban and increases in gas prices impacted revenues.  More
significantly, in 2008 and 2009, the economic downturn had substantial negative impact on all of
the Atlantic City casinos.

b.      Ability to Service the New Term Loan.

Assuming that the Reorganized Debtors meet their projections for 2010 through 2013, and assuming further that the New Term Loan interest rate is determined to be 12%,[47] the AHC/Debtor Plan has been shown to be serviceable, with sufficient cash flow to meet the debtors' operational needs.  William H. Hardy, III of Houlihan Lokey Howard & Zukin ("Houlihan Lokey"), a well qualified financial consultant with significant experience with gaming companies, testified on behalf of the AHC/Debtor Plan.  He produced analyses reflecting that the projected ending cash balances for 2010 through 2013, based on the debtors' projected EBITDA, would support the required principal and interest payments.  As well, he performed sensitivity analyses upon the projections, which assume that the debtors will miss their EBITDA projections for 2011, 2012 and 2013 by 10% and 20% respectively.  The only adjustment made by Mr. Hardy to the 20% miss analysis was the elimination of project capex, but not maintenance capex, during the years in questions.  In his worst case analysis, he did not take into account the likely sale of the Trump Marina, with its expected elimination of negative cash flows, maintenance capex requirements and additional corporate expenses.  Nor did he consider the prospect that if there were significant EBITDA reductions, a host of potential management responses to mitigate the impact of the reductions would be employed.  Even in the worst case scenario of a 20% miss of EBITDA projections, Mr. Hardy concluded that the New Term Loan would be serviceable through to maturity, and that the Reorganized Debtors would be able to meet their operational needs.

---

[47]      See pages 76-83, infra.

In his cash flow analysis, Mr. Augustine predicts that the debtors will run out of cash
before the maturity date of the New Term Loan in 2015. However, he uses an interest rate of
15.25% as the market interest rate on the New Term Loan, and applies the reduced EBITDA
numbers contained in his report, which were largely discredited, to calculate his projections. Mr.
Augustine's predictions cannot be sustained on this record.

Another critical aspect of feasibility for the AHC/Debtor Plan is a demonstration that the
New Term Loan, which will mature on December 31, 2015, may be refinanced at that time. Mr.
Hardy testified that, assuming the debtors have the same EBITDA that they are projected to have
in 2013, the company will be less leveraged, the $334 million loan will have been reduced by
amortization to approximately $310 million to $320 million, and the EBITDA will be nearly $30
million higher than in 2010, all of which would contribute to the ability of the company to
refinance the debt in 2015.

Serious and legitimate concern is raised by the Beal/Icahn parties as to the short term
liquidity of the debtors. At a hearing held following confirmation hearings on various motions,
Mr. Juliano, the debtors' Chief Executive Officer, testified that without debtor-in-possession
financing, the debtors will run out of cash in May 2010. A group of investors from the Ad Hoc
Committee have offered a $45 million DIP facility. The debtors' motion to approve the DIP
facility is now scheduled to be heard on April 15, 2010, if the AHC/Debtor Plan is confirmed.
Because the short term liquidity of the debtors would require a DIP facility to bridge the debtors'
liquidity needs from confirmation to the effective date of the plan, confirmation of the

AHC/Debtor Plan must be conditioned upon approval of the proposed DIP facility.

        2.      <u>Debt Capacity</u>.

Utilizing a total leverage approach and an interest coverage approach, Mr. Hardy from Houlihan Lokey concluded that the debt capacity for the post-reorganization debtors would be in the range of $305 million to $390 million. The funded debt level of $334 million proposed in the AHC/Debtor Plan is well within the mid-point of that range, and would be supportable by the Reorganized Debtors' financial structure.[48]

The Rothschild report disagrees with Houlihan Lokey's analysis, opining that the $334 million New Term Loan would leave the debtors dramatically overleveraged. Mr. Augustine's assessment that the Reorganized Debtors' debt capacity would be in the range of $158 million to $212 million was reached by using a high interest rate and a high debt base. The high debt base was premised upon a valuation of the debtors' Total Enterprise Value ("TEV") of $482.5 million.[49] As well, Mr. Augustine utilized more highly rated companies than the debtors as

---

[48]     On the interest coverage approach analysis, the interest levels used were in the range of 10.5% to 11.5%. If the ranges for an interest rate at 12% were used, the new term loan of $334 million proposed by the AHC/Debtor Plan would not exceed the debtors' implied aggregate debt capacity based upon a combined analysis of the total leverage approach and the income coverage approach.

[49]     In the Disclosure Statement of the Beal/Ichan parties, reliance was placed on the valuation contained in the AHC/Debtor Plan of $459 million. During confirmation hearings, Mr. Augustine offered certain "Valuation Observations," aimed primarily at the value attributed to the Trump Marina. During summations, counsel for the Icahn parties confirmed that reliance was now being placed on a revision of the debtors' TEV, in the amount of $482.5 million, based

comparables for his debt capacity analysis, causing him to arrive at a debt capacity range that is

significantly lower than the $334 million proposed to be incurred by the AHC/Debtor Plan.  Mr.

Augustine used different gaming company comparables for his debt capacity analysis than he did

for his analysis regarding the appropriate market rate of interest for the New Term Loan,

explaining that in determining debt capacity, he was not restricted to comparing only companies

with high levels of debt, as proposed under the AHC plan.  Rather, he could review the cash

flows of a range of other gaming companies, some of whom presented far better financial profiles

than the debtors.  However, Mr. Augustine's choice of high performing companies with

relatively low debt ratios to arrive at a relatively low debt capacity number for the debtors was

suspect.

I readily conclude that the debt level of $334 million proposed in the AHC/Debtor Plan is

within the debt capacity of the Reorganized Debtor.

3.      Compliance with Regulatory Framework.

To establish the feasibility of their plan, in addition to demonstrating that the projected

cash flow of the Reorganized Debtors will be sufficient to meet debt service and operational

needs, and that the New Term Loan is within the Reorganized Debtors' debt capacity, the

---

on Mr. Augustine's observations.  As noted below, in the context of determining the amount of
the First Lien Lenders' allowed secured claim, I have determined that as of confirmation, the
TEV of the debtors is $459 million.

proponents of the AHC/Debtor Plan must also show that the new owners of the Reorganized

Debtors will not face material hurdles to achieve the necessary regulatory approvals from the

New Jersey Casino Control Commission ("CCC").  The Beal/Icahn parties argue that there is

substantial uncertainty about whether the AHC members will obtain licensure, or waiver of

licensure or qualification requirements, from the Casino Control Commission.


Under the New Jersey Casino Control Act, N.J.S.A. § 5:12-1 et seq., persons holding 5%

or more of the voting equity securities of a holding company (as defined in the Act) are presumed

to have the ability to control the company, or to elect one or more directors, and will be required

to obtain qualification from the CCC, unless the presumption is rebutted, or unless the

qualification requirement is otherwise waived.  N.J.S.A. § 5:12-105(d).  Holders of publicly

traded securities of a casino licensee, entity qualifier, subsidiary or holding company, may also be

required to qualify as financial sources.  Institutional investors who are holders of publicly traded

securities may receive a waiver from the CCC from financial source or other qualification, if they

purchased their holding for investment purposes only, and exercise no control over the affairs of

the issuer.  N.J.S.A. § 5:12-85.  An institutional investor holding under 10% of the equity

securities of a casino licensee's holding or intermediate companies "shall be granted a waiver of

qualification if such securities are those of a publicly traded corporation and its holdings of such

securities were purchased for investment purposes only and upon request by the commission it

files with the commission a certified statement to the effect that it has no intention of influencing

or affecting the affairs of the issuer, the casino licensee or its holding or intermediary

companies."  N.J.S.A. § 5:12-85(f).  A waiver of qualification may be granted to an institutional

investor holding a higher percentage of such securities, between 10% and 15%, "upon a showing

of good cause and if the conditions specified above are met." Id.


Here, all but three of the members of the Ad Hoc Committee will have holdings of less

than 10% of the equity securities of the Reorganized Debtors, and will apply for a waiver of

qualification as institutional investors.  Two other members of the Ad Hoc Committee,

Contrarian and Polygon, who will hold positions of 13.5% and 14.4%, respectively, will seek

waiver "for good cause".


Testifying on behalf of the AHC, Gary Ehrlich, the former deputy director of New Jersey

Division of Gaming and Enforcement ("DGE") reflected that the CCC has historically been

permissive in granting institutional investor waivers from financial source qualification.  In fact,

Mr. Ehrlich noted he was not aware that the CCC has ever denied a request for such a waiver for

any institutional investor that held less than 15% ownership in a casino.  He opined that all of the

AHC members who would hold less than 15% ownership in the Reorganized Entity would

qualify as "institutional investors" within the statutory definition, and would likely receive

waivers.  In Mr. Ehrlich's opinion, the fact that AHC members may appoint a director to the

Board of the Reorganized Debtors will not affect their quest for an institutional waiver, because

the authority to appoint a director is different than the opportunity to exert continuing control

over the licensee.


As to Avenue Capital, who will hold 21% of the Reorganized Entity, Mr. Ehrlich opined

that the amended petition filed by Avenue, seeking a waiver of financial source qualification for

some of its investors, and establishing a corporate structure that contemplates a separation of

interests between voting members without control and non-voting members with control, is

likely to be approved by the CCC.  But if the Avenue petition is not granted, Avenue has agreed

to subject all of its investors to financial source qualification, which simply means providing

contact information about each of them to enable the DGE to conduct a passive investigation, or

record search, of the entities.  Mr. Ehrlich described the financial source qualification process as

'not onerous at all," and could take place in "a matter of days."

Mr. James Hurley, a former Commissioner and Chair of the New Jersey Casino Control

Commission, who testified on behalf of the Icahn Parties, opined that the CCC would be unlikely

to grant institutional investor waiver to all of the AHC members who would own less than 15%

of the Reorganized Entity and would be unlikely to grant Avenue's amended petition for waiver

of financial source qualification, because inadequate documentation had been provided.  As to

the availability of an institutional investor waiver, Mr. Hurley expressed concern about the

opportunity of certain AHC members to appoint a director to the Board, opining that the

authority to appoint a director may be viewed as "influencing or affecting the affairs of the

issuer," N.J.S.A. § 5:12-85(f), which would preclude a waiver.

On this record, I conclude that there is a reasonable prospect of success for the AHC

members to obtain regulatory approval.  Mr. Ehrlich, who has 28 years of experience with the

DGE, testified convincingly that all but one of the AHC members, each of whom would own less

than 15% of the Reorganized Equity, would likely be granted institutional investor waivers by the

CCC.  The fact that Mr. Ehrlich was not aware of any denial of such requests, even where good

cause is required for ownership in the range of 10% to 15%, was convincing.  Mr. Hurley's

opinion that such waivers would not be granted was premised upon the notion that the applicants

had not provided sufficient information or documentation to support the waiver request.

However, all that is required is the submission of a form certification.  Only later in his testimony

was the issue of the authority of the AHC members to appoint a member of the Board of

Directors raised.  While Mr. Ehrlich proposed that the appointment authority would not be

dispositive of the waiver issue, a legitimate issue is raised regarding the "influence" or "affect"

on the affairs of the Reorganized Debtor that the appointment of a member of the Board by AHC

members would have.  Nevertheless, even if institutional investor waivers are not granted,

qualification otherwise for the AHC members is not unlikely.  As to Avenue Capital, because it

has agreed to subject all of its investors to financial source qualification if its amended petition to

waive such qualification is denied, I can readily conclude that the likely outcome of the process

will be approval of Avenue and its investors for financial source qualification.


    In addition to financial source qualification, where any property relating to an ongoing

casino operation is transferred, including a security holding in a casino licensee, holding

company or intermediary, under circumstances that require licensure or qualification, the acquirer

must seek "interim casino authorization" ("ICA").  N.J.S.A. § 5:12-95.12 through 95.16.  Upon

the filing of an application for ICA, the CCC must hold a hearing on the application and render a

decision not later than 120 days after the filing.  Avenue Capital will be applying for the ICA,

and there is no basis in this record to believe that the ICA would be rejected.

I conclude that there is reasonable prospect that regulatory approvals for the proponents will be obtained.

4.     <u>General Feasibility Considerations</u>.

To underscore the feasibility of the AHC/Debtor Plan, the proponents persuasively focus upon the willingness of the Ad Hoc Committee, a group of highly sophisticated investors, to invest $225 million in the debtors' enterprise.  The investors appear to know the business and industry, have had frequent interaction with the debtors management, and believe in the achievability of the projections advanced by the management team.  The debtors citation to Judge Peck's decision in the case of <u>In re Iridium Operating, LLC</u>, 373 B.R. 283, 348 (Bankr. S.D.N.Y. 2007) is apt.

> Courts further recognize that "[a] powerful indication of contemporary, informed opinion as to value" comes from private investors who "[w]ith their finances and time at stake, and with access to substantial professional expertise, . . . concluded at the time . . . that the business was indeed one that could be profitably pursued." <u>In re Longview Aluminum</u>, 2005 WL 3021173, at *7; <u>see also</u> <u>Davidoff v. Farina</u>, No. 04 Civ. 7617, 2005 WL 2030501, at *10, *11, n. 19 (S.D.N.Y. Aug. 22, 2005) (finding it important that "sophisticated investors with the most intimate knowledge of [the debtor's] business plan and capitalization had confidence in the company's future and certainly did not think that the company was 'undercapitalized'" since it makes "no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail."); <u>Metlyn Realty Corp. v. Esmark, Inc.</u>, 763 F.2d at 835 ("The price at which people actually buy and sell, putting their money where their mouths are, is apt to be more accurate than the conclusions of any one analyst.").

Id.

      E.     Section 1129(b).

Confirmation of a consensual plan requires the proponent to satisfy each of the

subsections of section 1129(a). If the plan satisfies all of the section 1129(a) elements except for

section 1129(a)(8), which requires each impaired class of creditors to accept the plan, the plan

proponent may seek confirmation notwithstanding the objection of a dissenting class by utilizing

§ 1129(b) to "cramdown" the claim. Bank of America Nat. Trust and Sav. Ass'n v. 203 North

LaSalle Street Partnership, 526 U.S. 434, 441, 119 S. Ct. 1411, 1415, 143 L.Ed.2d 607 (1999); In

re Philadelphia Newspapers, LLC, No. 09-4266, 2010 WL 1006647, *4 (3d Cir. Mar. 22, 2010)

("Section 1129(b) provides circumstances under which a reorganization plan can be confirmed

over the objection of secured creditors-a process referred to as a 'cramdown' because the secured

claims are reduced to the present value of the collateral, while the remainder of the debt becomes

unsecured, forcing the secured creditor to accept less than the full value of its claim and thereby

allowing the plan to be 'crammed down the throats of objecting creditors.'"). Section 1129(b)

provides an alternate path for confirmation "if the plan does not discriminate unfairly, and is fair

and equitable" with respect to each impaired non-consenting class. 11 U.S.C. § 1129(b)(1).

Here, Class 3 of the AHC/Debtor Plan, comprised of the First Lien Lenders, voted to reject the

plan. The alternate path of cramdown pursued by the proponents must be reviewed.

-64-

1.      <u>Unfair Discrimination</u>.

Section 1129(b) allows a plan to discriminate, so long as it "does not discriminate

unfairly."  Various standards have been developed by the courts to test whether a plan unfairly

discriminates.  Generally, a plan will not be found to have unfairly discriminated if:

(a) the discrimination is supported by a reasonable basis,

(b) the discrimination is necessary for reorganization,

(c) the discrimination is proposed in good faith, and

(d) the degree of the discrimination is directly related to the basis or rationale for
the discrimination.

<u>In re Hawaiian Telcom Communications, Inc.</u>, No. 08-02005, 2009 WL 5386130, *31 (Bankr.

D.Hawaii  Dec. 30, 2009) (citing to <u>In re Ambanc La Mesa L.P.</u>, 115 F.3d 650, 656 (9th Cir.

1997), <u>cert</u>. denied, 522 U.S. 1110, 118 S. Ct. 1039, 140 L.Ed.2d 105 (1998)).  <u>See also In re</u>

<u>American Trailer and Storage, Inc.</u>, 419 B.R. 412, 443 (Bankr. W.D.Mo. 2009); <u>In re Snyders</u>

<u>Drug Stores, Inc.</u>, 307 B.R. 889, 894-95 (Bankr. N.D.Ohio 2004); <u>In re Internet Navigator Inc.</u>,

289 B.R. 128, 132 (Bankr. N.D.Iowa 2003).

Other courts have articulated the test for determining whether a plan unfairly

discriminates against a nonconsensual class by giving rise to a rebuttable presumption that a plan

unfairly discriminates where there is:

(1) a dissenting class; (2) another class of the same priority; and (3) a difference in
the plan's treatment of the two classes that results in either (a) a materially lower
percentage recovery for the dissenting class (measured in terms of the net present

> value of all payments), or (b) regardless of percentage recovery, an allocation
> under the plan of materially greater risk to the dissenting class in connection with
> its proposed distribution.

In re Armstrong World Industries, Inc., 348 B.R. 111, 121 (D.Del. 2006) (quoting In re Dow

Corning Corp., 244 B.R. 696, 702 (Bankr. E.D.Mich. 1999) (adopting the test proposed in Bruce

A. Markell, "A New Perspective on Unfair Discrimination in Chapter 11", 72 AM.BANKR.L.J.

227 (1998))).  See also In re Lernout & Hauspie Speech Products, N.V., 301 B.R. 651, 661

(Bankr. D.Del. 2003), aff'd, 308 B.R. 672 (D.Del. 2004); In re Greate Bay Hotel & Casino, Inc.,

251 B.R. 213, 228-29 (Bankr.D.N.J. 2000).

The Icahn parties contend that the AHC/Debtor Plan unfairly discriminates among

holders of Second Lien Note claims in Class 4 by affording special treatment to a select group of

such holders.  The plan affords only certain Second Lien Noteholders the opportunity to serve as

Backstop Parties to the Rights Offering, and thereby receive 20% of the New Common Stock.

As such, the plan is not confirmable because it proposes disparate treatment of claim holders in

the same class in violation of the equality of treatment requirement prescribed by section

1123(a)(4).

The objection of the Icahn parties in this regard does not relate to the proscription against

unfair discrimination contained in section 1129(b).  Class 4 of the AHC/Debtor Plan has

accepted the plan.  The concerns expressed by the Icahn parties in this regard relate to the

classification issue of allegedly providing different treatment for each claim in Class 4.  This

classification issue was reviewed and resolved in the discussion on section 1129(a)(1), supra.

2.      Fair and Equitable.

Unlike the concept of unfair discrimination, the Code at least partly defines the phrase

"fair and equitable."  Section 1129(b)(2) offers illustrative ways to satisfy the fair and equitable

standard for classes of secured and unsecured creditors, as well as for a class of interests.

As to secured claims, the plan will be fair and equitable if it provides:

(i)(I) that the holders of such claims retain the liens securing such claims, whether
the property subject to such liens is retained by the debtor or transferred to another
entity, to the extent of the allowed amount of such claims; and

  (II) that each holder of a claim of such class receive on account of such claim
deferred cash payments totaling at least the allowed amount of such claim, of a
value, as of the effective date of the plan, of at least the value of such holder's
interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is
subject to the liens securing such claims, free and clear of such liens, with such
liens to attach to the proceeds of such sale, and the treatment of such liens on
proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such
claims.

11 U.S.C. § 1129(b)(2)(A).  "The three subsections of § 1129(b)(2)(A) each propose means of

satisfying a lender's lien against assets of the bankruptcy estate."  In re Philadelphia Newspapers,

LLC, No. 09-4266, 2010 WL 1006647, *5 (3d Cir. Mar. 22, 2010).

Subsection (i) provides for the transfer of assets with the liens intact and deferred
cash payments equal to the present value of the lender's secured interest in the
collateral.  Subsection (ii) provides for the sale of the collateral that secures a
lender free and clear of liens so long as the lender has the opportunity to "credit
bid" at the sale ( i.e., offset its bid with the value of its secured interest in the

collateral) with the liens to attach to the proceeds of the sale. Subsection (iii) provides for the realization of the claim by any means that provides the lender with the "indubitable equivalent" of its claim.

Id.

The AHC/Debtor Plan proposes to satisfy the First Lien Lenders' security interest in the debtors' assets by transferring ownership of the assets to the Ad Hoc Committee members with the liens intact, and providing deferred cash payments equal to the present value of the lender's secured interest in the collateral. The issues presented include the retention of liens by the First Lien Lenders, the value of the lender's secured interest in the collateral, the present value of the claim, and whether the plan otherwise comports with the "fair and equitable" standard of § 1129(b).

a.    Retention of Liens by the First Lien Lender.

The AHC/Debtor Plan provides that the New Term Loan shall be secured by substantially all of the assets of the debtors, consistent with the terms of the pre-petition security agreement. The First Lien Lenders contend that their security interest may be diluted in two ways, by the amendment of the Trademark License Agreement with Trump, and by the restrictions on the rights afforded to the First Lien Lenders regarding the contemplated sale of the Trump Marina.

The Amended and Restated Trademark License Agreement ("new TLA") is pledged to the First Lien Lenders in connection with the New Term Loan. The objectors complain that the

package of trademarks licensed to the Reorganized Debtors by the Trump parties will shrink

from 12 U.S. registered trademarks, 1 UK registered trademark and 7 common law trademarks to

6 U.S. registered trademarks[50] and no UK registered trademarks or common law trademarks.  In

addition, the trademark "Trump Casino" is no longer part of the package.  In response, the

proponents of the plan suggest that the rights of the Reorganized Debtors at the three casinos are

substantially the same as they were pre-petition, and have been expanded in some respects.   The

exclusive, royalty-free license to use the Trump name now includes the right to use Ivanka

Trump's image and likeness.  The Trump brand may not be used throughout New Jersey, New

York, Connecticut, Pennsylvania, Maryland and Delaware, and Donald and Ivanka Trump have

agreed to a new services agreement to participate in promotional, marketing and advertising

activities.


As to the sale of the Trump Marina, the objectors complain that "the debtors retain the

right to sell the Trump Marina at any price and on any terms".  Beal/Icahn Obj. to Confirm. of

the Modified Sixth Amended Joint Plan at 32.  The proponents note that the First Lien Lenders

retain their lien on the Marina, and that, assuming a sale of the Marina takes place outside of

bankruptcy, the First Lien Lenders will have a right of first refusal and will receive 100% of the

net sale proceeds.


The AHC/Debtor Plan proponents rely on both § 1129(b)(2)(A)(i) and (iii) to support

---

[50]      The AHC/Debtor Plan proponents assert that the package includes 10 registered
trademarks.  Joint Post-Confirmation Hearing Memo, Ex. G.

their treatment of the First Lien Lenders claims.  As to (i), particularly with regard to the

retention of liens, it has been noted that "[t]here is no requirement that the lender's prepetition

security agreement or mortgage, with all its various terms and obligations, be used in order for

the lender to retain its lien."  7 Lawrence P. King, Collier on Bankruptcy, ¶ 1129.04[2][a][iii]

(16th Ed. 2009).  On the issue of the retention of liens, the Court of Appeals for the Fifth Circuit

noted that "[w]e interpret the plan as ensuring [retention of a lien] if the debtor fails to comply

with its debt service obligations, [the secured creditor] would have the right to foreclose."  In re

Briscoe Enters., Ltd., II, 994 F.2d 1160, 1169 (5th Cir.), cert. denied, 510 U.S. 992, 114 S. Ct.

550, 126 L.Ed.2d 451 (1993).  As to (iii), the proponents' reliance on the "indubitable

equivalent" option, the plan must:  (1) protect the creditor's principal, and (2) provide for the

present value of the creditor's claim.  See, e.g., In re Sparks, 171 B.R. 860, 866 (Bankr. N.D. Ill.

1994).  The Third Circuit recently explained in the Philadelphia Newspapers case:

> Though broad, the phrase "indubitable equivalent" is not unclear.  Indubitable
> means "not open to question or doubt," Webster's Third New Int'l Dictionary 1154
> (1971), while equivalent means one that is "equal in force or amount" or "equal in
> value," id. at 769.  The Code fixes the relevant "value" as that of the collateral.
> See 11 U.S.C. § 1129(b)(2)(A)(iii) (requiring the "indubitable equivalent" of the
> secured claim); id. § 506(a) (defining a secured claim as "the extent of the value
> of such creditor's interest in the estate's interest in such property").  Thus the
> "indubitable equivalent" under subsection (iii) is the unquestionable value of a
> lender's secured interest in the collateral.

In re Philadelphia Newspapers, LLC, No. 09-4266, 2010 WL 1006647, *9 (3d Cir. March 22,

2010).


Under either formulation, the debtors have complied in this regard with the requirements

of § 1129(b)(2)(A).  The creditor's principal is protected by replacement liens on all of its assets,

in favor of the First Lien Lenders, and by an equity cushion created by the reorganization process.

The secured creditor can foreclose in the event that the debtors default in their obligations.  As

well, the plan provides for the present value of the First Lien Lenders' claim.  The adjustments in

the collateral retained by the First Lien Lenders are nominal and inconsequential.  The

requirement in § 1129(b)(2)(A)(i) that the secured creditor must retain its liens has been met.


b.      Value of the Lender's Secured Interest in the Collateral.

As noted, under 11 U.S.C. § 1129(b)(2)(A)(i)(II), a secured creditor must receive

"deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the

effective date of the plan, of at least the value of such holder's interest in the estate's interest in

such property."  Here, the contest between the Icahn parties and the AHC/Debtors on the issue of

the value of the First Lien Lenders' collateral, i.e., the "Total Enterprise Value" ("TEV") of the

debtors, is limited in scope, focusing exclusively on the value to be attributed to the Trump

Marina, which is contemplated to be sold at some point following the confirmation of the

AHC/Debtor Plan, and to the related Florida litigation, in which the debtors are plaintiffs.


The TEV valuation offered on behalf of the AHC/Debtors plan by Houlihan Lokey

reflects a range of $400 million to $470 million for the Trump Taj Mahal and the Trump Plaza,

and a $24 million valuation for the Trump Marina.  The valuation of the Taj and the Plaza was

conducted by using three methodologies, including the Market Multiple Approach, the

Comparable Transaction Approach and the Discounted Cash Flow Approach, all of which

produced a mid-point valuation of $434 million.  Mr. Hardy adopted Lazard's valuation for the

Trump Marina, at $24 million, based on the prospect that the Marina would be sold by December

2011, but factored in the lack of certainty regarding the sale, and the negative impact of the

Marina on the debtors' operations going forward.  The last written offer received by the debtors

from a prospective purchaser, Coastal Industries, on July 28, 2009, was for $75 million, minus a

$17 million deposit and other costs, with an anticipated net recovery of $48 million to the

debtors.[51]  Because neither the time frame nor the actual occurrence of the sale are certain, Lazard

discounted the potential value of the Marina to the debtors by half, arriving at the $24 million

valuation.  When added to the mid-point valuation of $435 million for the Taj and Plaza, the

TEV arrived at for the debtors' enterprise was $459 million.  Mr. Hardy acknowledged that the

$459 million valuation did not include the pending Florida litigation, the Trump brand, or any

potential claims against the DJT Parties.


The First Lien Lenders do not challenge the Houlihan Lokey valuation of the Taj and the

Plaza.  However, although Mr. Augustine did not have time to complete a "full blown" valuation

analysis,[52] he criticized the adjustment made to the value of the Trump Marina, opining that the

---

[51]       The original Asset Purchase Agreement to sell Trump Marina to Coastal Marina,
LLC executed on or about May 28, 2008 provided for a purchase price of $316 million.  A $15
million deposit was escrowed.  The Agreement was amended on October 28, 2008, reducing the
purchase price to $270 million.  An additional $2 million deposit was placed into escrow.  On
June 1, 2009, debtors terminated the agreement.  On July 28, 2009, Coastal filed an adversary
complaint against the debtors seeking the return of their deposit.  The last proposal received from
Coastal to purchase the property was for $75 million, minus the $17 million deposit.  The
proposal required the dismissal of the Florida litigation being prosecuted by the debtors against
Coastal and others.

[52]       Rothschild entered the case approximately six weeks prior to confirmation, and
had only one day of meetings with debtors' managements.

value to be added to the TEV of the other two casinos to account for the value of the Marina

should be $47 million.  Therefore, according to Mr. Augustine, the debtors' TEV for § 1129(b)

purposes should be $482 million.


Mr. Augustine supported his opinion, based partly on the assessment of value of the

pending Florida litigation by Robert Pickus, General Counsel to the debtors, and Donald Trump,

both of whom testified that the Florida litigation, which named Coastal as a defendant, is worth

more than $50 million to the debtors.  Mr. Augustine acknowledged, however, that he did not

have personal knowledge about the litigation, and had not reviewed any documents pertaining to

the litigation.  He also acknowledged that the $47 million attributed to the value of the Trump

Marina should have been "discounted back" to present value, particularly in light of the fact that

the sale of the Marina was uncertain, and that the Marina was generating a negative cash flow for

the enterprise, increasing the debtors' incentive to sell.


On this record, I accept the opinion offered by Houlihan on behalf of the AHC/Debtor

Plan, establishing a TEV of $459 million.  The degree to which the value of the Marina should be

discounted is a matter of discreet and expert judgment.  The combined and extensive experience

in the gaming industry of Mr. Yearly from Lazard and Mr. Hardy from Houlihan Lokey in

arriving at the valuation of $24 million as the discounted value of the Trump Marina is more

credible than the judgment of the Rothschild team, none of whom has had previous experience in

valuing a gaming company.  In arriving at its conclusions regarding the Marina valuation,

Houlihan Lokey properly considered the fact that the Marina is losing money, causing the debtors

to be incentivised to sell quickly.  That Mr. Pickus and Mr. Trump have high hopes for the

ultimate outcome of the Florida litigation is noted, but the outcome of that litigation is

speculative, and the omission from the analysis of the debtors' TEV is justified.  As well, in light

of the uncertainty regarding the debtors' right to continue to use the Trump brand, the omission

of value in that regard is also justified.  For purposes of section 1129(b)(2)(A)(ii), the value of

the lenders' secured interest in the collateral is determined to be $459 million.


It should be noted here that because the First Lien Lenders have made the § 1111(b)(2)

election, the AHC/Debtor Plan must provide that the sum of the payments to be received by the

First Lien Lenders will be equal to the First Lien Lenders' total claim.  The Bankruptcy Appellate

Panel for the Ninth Circuit has explained the impact of the § 1111(b)(2) election on a cramdown

under § 1129(b)(2) as follows:

> In order for a reorganization to now comply with the cram down requirements of §
> 1129(b)(2)(A)(i)(I), the electing creditor must retain a lien equal to the total
> amount of its claim.  The lien is not stripped down by § 506(d).  Subsection (II) of
> § 1129(b)(2)(A)(i) guarantees an electing creditor a stream of payments equal to
> its total claim.  However, the stream of payments need only have a present value
> "of at least the value of such holder's interest in the estate's interest in such
> property," i.e., the value of the collateral.  11 U.S.C. §1129(b)(2)(A)(i)(II).  In
> other words, the present value of the electing creditor's stream of payments need
> only equal the present value of the collateral, which is the same amount that must
> be received by the nonelecting creditor, but the sum of the payments must be in an
> amount equal [to] at least the creditor's total claim.

In re Weinstein, 227 B.R. 284, 294 (9th Cir. BAP 1998) (citations omitted).  See also In re Brice

Road Developments, LLC, 392 B.R. 274, 284-86 (6th Cir. BAP 2008).


Applying these principles here, in order for the plan to be confirmed, it must provide for

the retention of the lien held by the First Lien Lenders on the debtors' collateral to the extent of

the entire allowed amount of the lender's claim, which is estimated to be approximately $483

million, after applying a portion of adequate protection payments to the principal of the claim.[53]

Deferred cash payments must be made to the First Lien Lender totaling at least the allowed

amount of the total claim of $483 million.  The First Lien Lenders, having made the § 1111(b)(2)

election, receive a stream of payments equal to the total claim, thereby benefitting if there is an

appreciation in the value of the collateral from a sale of the collateral or if the debtors default on

the plan payments.  However, the First Lien Lenders are entitled to interest payments only on the

value of the collateral at the time of confirmation.  In re Weinstein, 227 B.R. at 295, n.13.  The

New Term Loan must be modified to include a section 1111(b) premium, which will provide the

First Lien Lenders payments totaling the full amount of their claim, while paying interest only on

the value of the New Term Loan at the value of the collateral at confirmation.


c.    Present Value.


The requirement of section 1129(b)(2)(A)(i)(II) that the secured creditor must receive

"value, as of the effective date of the plan" of at least the value of the lender's collateral means

that if the plan provides for deferred cash payments, those payments must bear interest to account

for the delay in the payment of the claim.  See Rake v. Wade, 508 U.S. 464, 472 n.8, 113 S. Ct.

2187, 2192 n.8, 124 L.Ed.2d 424 (1993) ("When a claim is paid off pursuant to a stream of

---

[53]    The ultimate allowed amount of the claim may be impacted by the motion for recharacterization of adequate protection payments presently pending and to be resolved upon the effective date of the debtors' plan.

future payments, a creditor receives the 'present value' of its claim only if the total amount of the

deferred payments includes the amount of the underlying claim plus an appropriate amount of

interest to compensate the creditor for the decreased value of the claim caused by the delayed

payments."); In re Airadigm Communications, Inc., 547 F.3d 763, 769 (7th Cir. 2008) ("Section

1129(b)(2)(A)(i)(II) thus requires interest if the claim is to be paid over time.").  As well, the

treatment of the secured creditor must be fair and equitable, meaning that the terms under which

the deferred cash payments are made must not unduly shift the risk of failure to the secured

creditor.


(i)      Market Rate of Interest.


A critical issue to be determined here is the appropriate rate of interest to be imposed

upon the New Term Loan that would be issued to the First Lien Lenders.  Section 1129(b)

provides no guidance for calculating the cramdown interest rate required to be paid to confirm a

plan of reorganization over a dissenting class of secured claims.  In re Griswald Building, LLC,

420 B.R. 666, 692 (Bankr. E.D. Mich. 2009).  In Till v. SCS Credit Corporation, 541 U.S. 465,

124 S. Ct. 1951, 158 L.Ed.2d 787 (2004), the Supreme Court determined, in a Chapter 13 case,

that the appropriate interest rate to be paid to an objecting secured creditor is calculated in a

formulaic way, by starting with the national prime rate and adjusting that rate by the risk of

nonpayment posed by the new loan.  In dictum, the Court noted that the determination of a

cramdown interest rate is not necessarily the same in the Chapter 11 context.  "[W]hen picking a

cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market

-76-

would produce." Id. at 477 n.14, 124 S. Ct. at 1960 n.14.  See also In re American HomePatient,

Inc., 420 F.3d 559, 568 (6th Cir. 2005), cert. denied, 549 U.S. 942, 127 S. Ct. 55, 166 L.Ed.2d

251 (2006) (Footnote 14 in the Till opinion "means that the market rate should be applied in

Chapter 11 cases where there exists an efficient market.  But where no efficient market exists for

a Chapter 11 debtor, then the bankruptcy court should employ the formula approach endorsed by

the Till plurality."); In re Brice Road Developments, LLC, 392 B.R. 274, 280-281 (6th Cir. BAP

2008) (an efficient market approach may be utilized where an open, well developed market for

loans of the kind between the debtor and secured creditor is shown to exist.).

        Here, the parties agree that an efficient market exists for the loan of the kind proposed by

the AHC/Debtor Plan.  The task is to identify the rate the market would produce for a loan of this

type.  At trial, the three financial experts each offered their opinions on the market rate of interest

for the New Term Loan, including Andrew Yearley of Lazard for the debtors, William Hardy of

Houlihan Lokey for the AHC, and Neil Augustine of Rothschild Inc., for the Beal/Icahn parties.

A range of interest rates was offered, from the 10% to 12% range opined by Mr. Hardy, to the

12% rate offered by Mr. Yearley, to the 14% to 16½% rate presented by Mr. Augustine.  The

primary determinant utilized by all three experts was the rate of interest paid by comparable

gaming companies.

        The choice of gaming comparables offered by each of the experts was vulnerable to

criticism.  As to the Lazard analysis, Mr. Yearly focused on 11 gaming companies with 15 debt

issuances.  He selected companies with a similar number of properties (between 1 and 4),

operating, for the most part, in one or two markets, with EBITDA averages somewhat comparable to that of the debtors.  He included several local competitors with similar characteristics to the debtors.  The interest rates paid by these companies ranged from 5.42% to 17.47%, with an average yield of 11.8%.  Mr. Yearly acknowledged that including in his report an implied credit rating for the debtors may have been helpful in comparing the debtors to other gaming companies.  In his choice of comparables, he selected several comparables above a "B" rating, although he also utilized several comparables with CCC and CCC + ratings.

Testifying on behalf of the ACH, Mr. Hardy utilized nine comparable gaming companies to arrive at a mean of 9.6% and a median of 8.5% as the weighted average cost of debt for the comparable companies.  To arrive at the range of 10% to 12% for his assessment of an appropriate market rate of interest, he imposed a risk factor on the mean of 9.6% to account for the competitive forces in Atlantic City and the region, the low risk ratings of the debtors in most categories of comparison with his comparables, and the relatively weak financial covenants contained in the New Term Loan.[54]

Several of Mr. Hardy's comparables were correctly criticized as substantially larger, more diversified issuers, whose yields were generally lower than those of small, less diversified issuers.  For instance, the Isle of Capri, which has 13 casino gaming facilities in 6 jurisdictions, and has international holdings, is carrying $1.2 billion of debt, with a weighted average yield of

---

[54]     After the close of testimony at confirmation hearings, the New Term Loan proposed in the AHC/Debtor Plan was modified to include a more robust covenant package.

6.8% on its debt issue.  Ameristar Casinos, Inc., which has 8 properties in 7 jurisdictions, is

carrying $1.6 billion of debt.  The weighted average cost of its debt is 8.3%.

The Rothschild report used only six gaming comparables, funneling its selection process

by choosing regional operators without significant diversification or international operations, and

selecting single B corporate credit rating comparables or lower.  Included among the six

comparables was the Golden Nugget, an admittedly distressed property that is highly leveraged,

with a debt to EBITDA ratio of 10.4X, a ratio that is significantly higher than the debtors' ratio

will be at emergence from Chapter 11.  The Golden Nugget presented a weighted average yield

of 15.7%.  It was also observed that the comparables selected in the Rothschild report to establish

market rate of interest concentrated on Nevada gaming companies, which were particularly hard

hit by the recent economic downturn.

It is readily apparent that any comparable selected by a financial expert will differ in

some respects from the applicable characteristics of the debtors' financial picture.  Notably, there

is substantial overlap in the comparables selected by the experts.  Of the six comparables selected

by Mr. Augustine, two comparables, with interest rates of 13% and 15%, were utilized in Mr.

Yearly's report.  Four other gaming comparables used by Mr. Augustine for his debt capacity

analysis, but not for a calculation of the market rate of interest, were used in the Houlihan Lokey

report.  These debt issuances had interest rates ranging from 5.9% to 8.7%.  As well, three of the

gaming comparables used in the Lazard report, with interest rates of 11.9%, 14.6% and 16.8%,

were used in the Rothschild report for debt capacity analysis only.  Other gaming comparables

used by Lazard with lower interest rates were not selected in the Rothschild report. As well, the use by Rothschild of the Golden Nugget, with a very high debt/EBITDA ratio, appears to have been inappropriate.

Two interesting compilations of the various gaming comparables utilized by the experts were presented. If the Rothschild analysis of gaming comparables for determination of market rate of interest is supplemented with the comparables used in the Rothschild report to determine debt capacity, the resulting mean and median yields are 11.4% and 11.6%, respectively (compared to the 14.3% and 14.8% mean and median relied upon in the Rothschild report). A second compilation of the market yield of all of the comparable companies used by Lazard, Rothschild and Houlihan Lokey in each of their respective expert reports produced a weighted average market yield of approximately 11%. While many factors might differentiate these companies, the market yield suggested by the compilations are consistent with the ranges proposed in the Lazard and Houlihan reports.

The choice of comparables is a difficult task, performed best by professionals with gaming industry experience. Both Messrs. Yearly and Hardy have such extensive experience. In contrast, Mr. Augustine, who is managing director and the head of Rothschild's North American restructuring group, with extensive experience in financing issues in and out of bankruptcy courts across many industries, has had minimal exposure to the gaming industry, and has never prepared an expert report on the pricing of debt. Mr. Augustine's insights and criticisms of the analysis of the other experts were important. However, his choice of comparables, and the application of the

methodologies he used, seemed to reflect a "cherry picking" process, which slanted his

conclusions in favor of a higher interest rate.


In addition to reviewing the rate of interest paid by comparable gaming companies,

Rothschild's report utilized two additional methodologies, including comparable exit financings

and a comparison of debt issuances from companies with similar risk profiles, based on an

implied credit rating of CCC to be achieved by the debtors upon emergence from bankruptcy.

However, each of these approaches was somewhat discredited.  For instance, as to the

comparable exit financings, of the seven exit financings selected (among hundreds of others,

including exit financings with lower rates), five of the comparables used were obtained by

companies other than gaming companies, which shed some doubt about the true comparability of

the selections.  Mr. Augustine acknowledged that exit financings may not be reflective of market

rates, particularly because such financings are sometimes provided by incumbent creditors.  In

one of the two gaming companies used as comparables, such was actually the case.  As to

Rothschild's rating-based analysis, an implied rating of CCC was developed by Rothschild, using

three of the nine Standard & Poor metrics, while ignoring other salient metrics.  Additional

problems with the analysis were noted, including an inflated debt balance, and an unexplained

differentiation between the use of a "normalized" capital expenditure number but not a

"normalized" EBITDA number.  Most notably, Mr. Augustine's conclusion that the current

market rating for CCC loans is 13.48% was substantially discredited.  The actual interest rate on

CCC borrowings is a LIBOR rate[55] (currently 25 basis points) plus 1098 basis points, or an

interest rate of 11.23%.  Mr. Augustine arbitrarily added a LIBOR floor of 2.5% to the actual

interest rates charged on CCC borrowings, which was not justified.[56] He explained the addition

by reference to "swap adjusted rates" and the LIBOR "curve", but his report did not contain this

explanation.  He also acknowledged that the "swap adjusted rate" would impact on traders in the

secondary market rather than on the cost of debt to the borrower, which is the subject of our

focus here.


I am not swayed by the arguments advanced by Rothschild and the Beal/Icahn parties that

the result of efforts made by the AHC during the case to explore financing opportunities for the

debtors is reflective of the appropriate rate of interest to employ here.  In October 2009, as the

two plans under consideration at that time were progressing, Mr. Hardy ran a two-week process

to explore interest in debtor-in-possession or exit financing.  He contacted approximately 10

institutions.  The only interested party at the time was Wells Fargo, who offered, several months

later, a $225 million facility that would have had an "all-in cost" of capital of 12.8%.  The

testimony presented confirmed that the proposal from Wells Fargo did not represent the outcome

of a broadly marketed effort at attracting financing.  Mr. Hardy noted that in a successful

---

[55]     LIBOR or "London Interbank Offered Rate" is defined as "A daily compilation by
the British Bankers Association of the rates that major international banks charge each other for
large-volume, short-term loans of Eurodollars, with monthly maturity rates calculated out to one
year. • These daily rates are used as the underlying interest rates for derivative contracts in
currencies other than the euro."  Black's Law Dictionary at 1027 (9th Ed. 2009).

[56]     Mr. Augustine did not contest Mr. Hardy's research that only 7 of the 95 loans in
the CCC loan index referenced by Mr. Augustine had any LIBOR floor.

marketing campaign for another Chapter 11 debtor he recently conducted, he contacted 43

institutions.  Similarly, Mr. Augustine acknowledged that in a recent bankruptcy case in which he

was involved, he contacted 86 institutions to achieve financing.  There was no "full blown

financing syndication process" conducted here, by which a meaningful reflection of the

appropriate market rate of interest could be ascertained.


Based on the proofs presented, I conclude that a 12% rate of interest represents the

effective market for the New Term Loan proposed in the AHC/Debtor Plan.  In reaching my

conclusion that the appropriate market rate of interest is 12%, I am cognizant of the fact that the

debtors fare poorly on the various risk factor metrics displayed in the Houlihan report.  The

debtors' poor ratings influence my assessment that the higher end of the Houlihan Lokey

conclusion should control.


(ii)      <u>New Term Loan Covenants</u>.


The Beal/Icahn parties contend that the proponents of the AHC/Debtor Plan have failed to

demonstrate that the non-interest rate terms for the New Term Loan are market standard at the

present time.  An Amended Credit Agreement was filed by the AHC and the debtors after the

close of testimony.  However, the Beal/Icahn parties contend that many customary creditor

protections, such as leverage or interest coverage maintenance covenants, deprive the First Lien

Lenders of key market-standard protections, and the added provisions are below-market.


-83-

The AHC/Debtor Plan proponents respond that their plan extends maturity by only three

years (from December 31, 2012 to December 31, 2015), but nearly doubles the interest rate and

provides the lenders with additional covenants not present in the pre-petition loan.  Among the

lender protections added are "(i) a 50% free cash flow sweep; (ii) a pre-payment premium of 2%

for the first six months and 1% for the next 12 months,[57] (iii) the fixing of maximum capital

expenditures to 8% of gross gaming revenues, and (iv) a right of first refusal before the Trump

Marina can be sold."[58]  The amortization rate proposed in the New Term Loan of quarterly

payments of 0.25% is the same as in the original Credit Agreement.


While the focus of § 1129(b)(2)(A)(i) is on the price terms and retention of liens

contained in the New Term Loan, courts generally agree that the cramdown of secured debt must

also "insure the safety of the principal" by other appropriate means that must be dictated by the

circumstances of each case.  In re Kellogg Square Partnership, 160 B.R. 343, 368, n.47 (Bankr.

D.Minn. 1993) (citing to In re Monnier Bros., 755 F.2d 1336, 1339 (8th Cir. 1985)).  The "other

appropriate means" refer to the covenants to be included in the loan documents to be issued to a

nonconsenting secured creditor.  The covenants must serve to protect the lenders' security

position.  In re American Trailer and Storage, Inc., 419 B.R. 412, 440-42 (Bankr. W.D. Mo.

2009).  However, the loan documents need not track precisely the covenants in the parties'

existing loan agreement.  Id.  Nor must the post-confirmation loan documents be consistent with

---

[57]     The original loan basically provided for a 2% pre-payment premium through the fourth year of the loan, with no premium required thereafter.

[58]     Joint Post-Confirm. Hearing Memo at 22.

what the market would require for a new loan.  Id.  See also In re P.J. Keating Co., 168 B.R. 464,

473 (Bankr. D. Mass. 1994).


The objectors cite to the Kellogg Square case for the proposition that a creditor is

"entitled to insist on the execution of new security instruments, with content equivalent to what

the parties would reasonably negotiate on a loan origination at the present time".  In re Kellogg

Square Partnership, 160 B.R. at 368 (emphasis added).  Further, the secured lender is "entitled to

demand market-standard terms." Id. at 369.  The pronouncements of the Kellogg Square court

must be understood in the context of the circumstances of that case.  The original credit

agreement that was being crammed down was entered into in 1977, sixteen years before the

debtor's reorganization.  The court was impressed with the significant changes in industry

standards for covenants during that time frame.  The court noted that "[s]ince 1977, changes in

the economy, business practices, and law have created or materially increased risks that were not

previously anticipated by the parties, were not covered under the parties' pre-petition contract or

perhaps were not even in existence then." Id. at 368.  The court recognized that the proposed

credit agreement must be "sufficient to shelter [the creditor] from the risks inherent in the

Debtor's proposal." Id.


It must be recalled that the cramdown provision of § 1129(b)(2)(A)(i) provides some

flexibility to a proponent in the treatment of the claim of a secured creditor.  The proposed New

Term Loan is not a negotiated agreement between the parties.  Nevertheless, the most

fundamental aspect of the New Term Loan is that it must not unduly shift the risk relating to the

operations and financial performance of the reorganized debtor, and must be fair and equitable to

the secured creditor.  In re D & F Const. Inc., 865 F.2d 673 (5th Cir. 1989).  Here, approximately

two and a half years after the inception of the original creditor agreement, the proponents present

a New Term Loan that has terms nearly identical to the original agreement, with some

enhancements.  The maturity date is extended by three years, but the amount outstanding is paid

down by about 25%, and the interest rate on the obligation is nearly doubled.  The total debt

carried by the debtors' enterprise is reduced by nearly $1.4 billion.  There are sufficient

protections included in the covenants to safeguard the First Lien Lenders against the risk of plan

failure.


        d.      Is The Plan Otherwise "Fair and Equitable"?


     The Icahn parties correctly contend that mere technical compliance with all the

requirements in § 1129(b)(2) does not assure that the plan is "fair and equitable".  See In re D &

F Constr., Inc., 865 F.2d 673, 675 (5th Cir. 1989).  To be confirmed, a plan may not treat a

dissenting class unfairly, and must not unduly shift the risk of reorganization.  In re Montgomery

Court Apartments of Ingham County, Ltd., 141 B.R. 324, 346 (Bank. S.D. Ohio 1992).  To

determine whether the proposed arrangement imposes impermissible risk shifting upon the

primary secured creditor, a court will consider:  (i) the debtors' demonstration of feasibility; (ii)

the protections and risks to the secured creditor, and (iii) the general reasonableness of the

proposals in light of the circumstances.  See In re Kennedy, 158 B.R. 589, 599 (Bankr. D.N.J.

1993).  See also In re EFH Grove Tower Associates, 105 B.R. 310, 313 (Bankr. E.D.N.C. 1989).

The objectors argue that here, significant risks are being placed on the secured creditors, while all upside potential in the debtors is reserved for the Second Lien Noteholders, who are acting as new money investors.[59]

The risks imposed upon the First Lien Lenders are not substantial or unfair.  On the effective date, the allowed secured claim of $459 million will be paid down by $125 million, nearly two years before the current maturity date of the debt.  The First Lien Lenders will be paid a market rate of interest, with somewhat improved covenants, as compared to the original terms of the loan.  As undersecured creditors, the First Lien Lenders are entitled to share in the potential upside of the debtor's continued operations under the § 1111(b) option, which they have selected, but would not otherwise have that opportunity.  Contrary to their assertion, the First Lien Lenders are not funding the reorganization.  Rather, the AHC members are infusing the debtor with substantial capital, and undertaking the risks associated with this restructuring in the event of failure.  As to the First Lien Lenders, the plan is generally fair and equitable.

A corollary to the Icahn parties' "fair and equitable" argument is that the AHC/Debtor Plan violates the absolute priority rule because the First Lien Lenders will not receive payment in

---

[59]      The objectors also contend that the AHC/Debtor Plan does not provide fair and equitable treatment to the First Lien Lenders because it denies them the right to credit bid their debt for the debtor's assets.  They argue that the equity acquisition by the AHC constitutes a sale of the assets under § 1129(b)(2)(A)(ii), whereby a secured creditor must have the right to credit bid for those assets under § 363(k).  But the AHC/Debtor Plan is not a sale under the second option of § 1129(b)(2)(A).  Rather, it proposes a plan, with the debtors as joint proponents, to make deferred cash payments to the First Lien Lenders at present value.  No credit bid opportunity is available in this context.  See In re Philadelphia Newspapers, LLC, No. 09-4266, 2010 WL 1006647 (3d Cir. Mar. 22, 2010).

full on account of their secured claims, while junior creditors are receiving some distribution

under the plan.  The objectors' contention in this regard must also be rejected.

The structure of § 1129(b)(2)(A), (B) and (C) supports the proposition that the absolute

priority rule, which proscribes junior claims or interest from receiving or retaining property under

a plan unless senior claims or interest have been satisfied in full, does not apply to secured

claims.  See, e.g., Mercury Capital Corporation v. Milford Connect. Assocs., L.P., 354 B.R. 1, 14

(D.Conn. 2006).  Each subsection of § 1129(b)(2) describes the "fair and equitable" requirements

for a separate class of claims or interests.  Subparagraph (A) describes secured claims;

subparagraph (B) pertains to unsecured claims and subparagraph (C) pertains to a class of

interests.  The absolute priority rule is articulated in subparagraphs (B) and (C), but not (A).  See

also In re Arden Properties, Inc., 248 B.R. 164, 173-74 (Bankr. D. Ariz. 2000).  But see In re

Miami Center Associates, Ltd., 144 B.R. 937, 941 (Bankr. S.D. Fla. 1992) (the absolute priority

rule applies to secured creditors).  Nevertheless, even if the absolute priority rule may be asserted

by secured creditors, the application of the rule "'does not require sequential distributions (i.e.,

cash payment in full to senior creditors before any distribution is made to junior creditors), but

merely that the values represented by the higher-ranking claims are fully satisfied by the values

distributed under the Plan.'"  Mercury Capital Corp. v. Milford Connect. Assoc., 354 B.R. at 14

(quoting In re Penn Cent. Transp. Co., 458 F. Supp. 1234, 1283 (E.D.Pa. 1978)).

Here, the values represented by the First Lien Lenders' claims are fully satisfied by the

values distributed under the plan.  No absolute priority rule violation exists.

I conclude that the AHC/Debtor Plan meets the requirements of section 1129(a) and (b),

and is confirmable, subject to the following modifications:

(A)    The plan provision releasing Trump from the Trump Personal Guaranty must be deleted from the plan.

(B)    The plan provision releasing the Second Lien Noteholders from liability for any alleged violations of the Intercreditor Agreement must be deleted from the plan.

(C)    The plan provision offering the Backstop Parties indemnification must be clarified and limited, per the discussion supra.

(D)    The AHC, the Backstop Parties and the Indenture Trustee must apply under section 503(b) for reimbursement of fees and expenses as substantial contributors to the case.

(E)    The New Term Loan must be modified to afford the First Lien Lenders a 12% rate of interest, and an 1111(b) premium.

(F)    The plan is confirmable subject to approval of DIP financing.

V.    The Beal/Icahn Plan.

The Beal/Icahn Plan is challenged as unconfirmable on various grounds, including

sections 1129(a)(1), (a)(2), (a)(3), (a)(4), (a)(9), (a)(11) and 1129(b).

A.    Section 1129(a)(1).

The plan provisions challenged here as violative of "applicable provisions of this title,"

11 U.S.C. § 1129(a)(1), include the exculpation and indemnification provisions in the

Bank/Icahn Plan.

-89-

1.    <u>Exculpation</u>.

The UST objects to language included in Section 10.6 - Exculpation of the Beal/Icahn

Plan as overly broad.[60]  The UST notes that only acts "amounting to willful misconduct,

intentional fraud or criminal conduct" are excluded, whereas the exclusions should also cite

"gross negligence."  <u>PWS Holding</u>, 228 F.3d at 246-47.  Beal Bank/Icahn acknowledges the

objection and states that it is "prepared to modify the carve-out of that provision so that it applies

to acts or omissions constituting 'gross negligence, willful misconduct or fraud,' consistent with

the UST's objection papers."  Beal Bank/Icahn Post-Trial Brief at 60, ¶ 92.

Subject to the contemplated modification, the exculpation provision does not violate §

1129(a)(1).

2.    <u>Indemnification</u>.

The UST also contends that the proposed indemnification provision in Section 5.3(p) of

the Beal Bank/Icahn Plan is too broad and too vague.  The proposed indemnification applies only

to Backstop Parties who are signatories to the Backstop Agreement.  That agreement to provide

funding for the anticipated Rights Offering will never be implemented, because the Rights

---

[60]     The releases specified in ¶ 10.5 of the Beal Bank/Icahn plan are similar to those
provided for in the AHC/Debtors' plan, and likewise, were not objected to by any party and
appear to be consistent with applicable law.  <u>See</u>, <u>e.g.</u>, <u>In re PWS Holding Corp.</u>, 228 F.3d 224,
246-47 (3d Cir. 2000).

Offering was conditioned upon the contemplation that "a hearing to consider confirmation of the

AHC/Debtor Plan does not occur." Beal/Icahn Plan, § 5.3(q). The confirmation hearing

occurred. The indemnification clause complained of will not be activated. The objection is

overruled.


      B.      <u>Section 1129(a)(2)</u>.


      Section 1129(a)(2) requires that "[t]he proponent of the plan compl[y] with the applicable

provisions of this title." 11 U.S.C. § 1129(a)(2). The legislative history refers to section 1125,

regarding disclosure, as an example of one of those "applicable provisions." H.R. Rep. No. 595,

95th Cong., 1st Sess. 412 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978). The Third

Circuit has held that "§ 1129(a)(2) requires that the plan proponent comply with the adequate

disclosure requirements of § 1125." <u>In re PWS Holding Corp.</u>, 228 F.3d 224, 248 (3d Cir. 2000).

<u>In re Cypresswood Land Partners, I</u>, 409 B.R. 396, 424 (Bankr. S.D.Tex. 2009) ("Bankruptcy

courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied

with the solicitation and disclosure requirements of § 1125.").


      AHC/Debtors contend that the Beal/Icahn Plan misrepresented the operational and

management experience of the Icahn Parties in the gaming industry, misrepresented Icahn's

proposed personal involvement, and adopted conflicting positions on the value of the Trump

brand. The objectors contend that neither Icahn nor Icahn Partners has any real "operating

experience", and that by stating in their disclosure statement that "Icahn Partners has extensive

-91-

experience with the ownership and operation of gaming assets generally and in Atlantic City

[and] has a strong interest in owning and operating the Trump casinos," Beal/Icahn has "blatantly

misrepresent[ed]" its management experience.  Debtors contend that confusing "investment"

experience with operating experience is misleading.  In addition, the debtors contend that the

Beal/Icahn parties misrepresented the debtors' ability to service debt and the amount of debt that

the debtors will have post confirmation.


Notwithstanding the approval of the Beal/Icahn disclosure statement, the issue of

adequate disclosure may be revisited at the confirmation hearing.  In re Crowthers McCall

Pattern, Inc., 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).  Here, the highlighted statements do not

rise to a level that is violative of the disclosure requirements under § 1125 or § 1129(a)(2).  The

statements simply reflect the Icahn Partners' ownership and pending interests in other casinos

and gaming facilities, like the Sands and the Tropicana, without unduly focusing on operational

experience.  There is no evidence here to suggest that any voters were improperly swayed to vote

in favor of the Beal/Icahn Plan, or against the AHC/Debtors Plan, as a consequence of these

statements.  The objection is overruled, and I conclude that the requirements of § 1129(a)(2) have

been satisfied.


     C.     Section 1129(a)(3).


Section 1129(a)(3) requires that the plan be "proposed in good faith and not by any means

forbidden by law."  11 U.S.C. § 1129(a)(3).  See discussion, supra at 35.

The objectors contend that the Beal/Icahn Plan seeks to improperly manipulate the

bankruptcy process in an attempt to gain control and ownership of the debtors.  They point to

various inconsistencies in the positions asserted by the First Lien Lenders, first claiming to be

undersecured and then asserting that their claim is oversecured.  They claim that the proposed

distribution to the Second Lien Claims and general unsecured creditors has always been illusory.


The cases cited by the objectors to support their position that the Beal/Icahn Plan fails on

good faith grounds are inapposite here.  In In re Koelbl, 751 F.2d 137 (2d Cir. 1984), the court

declined to find bad faith where an employee proposed a reorganization plan that transferred

ownership of the debtor to the employee, but there was no evidence of breach of confidentiality,

or breach of the duty of loyalty, or dishonesty by the employee.  And in In re Allegheny Intern.,

Inc., 118 B.R. 282 (Bankr. W.D.Pa. 1990), the court denied confirmation on bad faith grounds

where an alternative plan proponent selectively purchased claims to block voting in certain

classes, improperly sought to take control of the debtors, and improperly used insider

information.  The Allegheny case was awash with facts and allegations of wrongdoing by the

competing proponent to manipulate both the process and the debtor's operations.


Here, the focus is the fairness and viability of the plan proposed by the First Lien Lenders,

not their "ulterior motives" to protect their claims and their collateral, and to make a profit, all of

which are proper and not violative of good faith.  In initially offering a plan, Beal Bank merely

acted to preserve its collateral and to ensure that it would recover on its claim.  Thereafter, it

determined to accept Icahn's offer for 51% of the debt plus the put/call agreement, which

contemplated the Icahn takeover of the claim.

The Icahn parties purchased a portion of the Beal Bank debt and became a co-proponent of a competing plan. There are no creditors in any class that are unfairly discriminated against. There are no allegations of insider trading or fraudulent activities. Neither Icahn nor Beal Bank sought to take any improper control over the debtor. Icahn purchased the debt at 92.5% of par with the intent to make a profit. That, in and of itself, is not improper or illegal. Both the buyer and seller were informed and noticed. There was no delay or pressure to sell. The purchase of those shares did not change the vote against the AHC/Debtors' plan for that class. It only changed the name on the debt. As to changes in positions during the case, all parties in this case, including the AHC, have taken conflicting positions in the case as alliances shifted and circumstances evolved. There is no evidence to suggest manipulation of the process or wrongdoing by the Beal/Icahn parties or on their behalf.

Lastly, the AHC/Debtor parties contend that the approximately $13.9 million in cash and subscription rights offered to the Second Lien Note Holders and the General Unsecured claims in the Beal/Icahn Plan was always illusory. because it was conditioned on at least 50% participation and the absence of a contested confirmation hearing. From the time the Beal/Icahn Plan was first proposed, a competing plan had been submitted and the proponent of that plan, AHC, held more than 61% of the Second Lien Notes and was obviously committed to its own plan.

There is no requirement that claim holders in a junior position receive value in a

-94-

reorganization plan, where there is no value to reach that position.  The Code requires only that

the proposal be in good faith, not result in unfair discrimination, and be fair and equitable.  The

absolute priority rule is not challenged here.  The First Lien Lenders are undersecured, and no

recovery is offered to junior interests.  The fact that the proposed plan provided for a de minimis

recovery in the unlikely event that the Second Lien Noteholders chose to abandon the

AHC/Debtor Plan is of no moment.


I conclude that the Beal/Icahn Plan is in conformance with Chapter 11 reorganization

goals, is proposed in good faith and not by any means forbidden by law.


D.      Section 1129(a)(4).


Section 1129(a)(4) requires that "any payment" made or to be made by the plan proponent

or the debtor for services "in or in connection with" the plan or the case be approved by or

"subject to the approval of" the bankruptcy court as "reasonable."  See In re Congoleum Corp.,

414 B.R. 44, 59 (D.N.J. 2009).  See discussion, supra at 40.


Under the Beal/Icahn Plan, New Co. will offer one year salary severance packages to

certain officers and directors of TER, triggered upon "a termination by the employer without

cause."  Fifth Amended Joint Plan of Reorganization, ¶ 5.9(c).  The UST contends that these

severance packages are violative of section 503(c)(2), which proscribes severance payments to

insiders, unless the payment is part of a program that is generally applicable to all full-time

employees, and the amount of the payment is not greater than 10 times the amount of the mean

severance pay given to non-management employees during the calendar year.[61]

The Beal/Icahn parties respond that the severance package objection should be overruled

because any such obligation would be incurred and paid by the Reorganized Debtors after the

effective date of the Beal/Icahn Plan, making section 503(c) inapplicable.

I must conclude that the severance payments contained in the Beal/Icahn Plan are

violative of section 503(c)(2) because they do not meet the requirements of that section. The

provision is presently incorporated into the plan. The plan proposes to retain the debtors'

officers through the Effective Date of the plan, at which time they "will be offered one year

severance arrangements." Plan, ¶5.09(c). Of course, the Plan's provisions that the officers of

New Co will be determined by New Co's board of directors is valid. If any of the officers is

either offered a contract to continue or terminated at that point or thereafter, business judgments

can be made about severance arrangements without reference to section 503(c)(2). But the plan

provision providing for severance packages must be stricken from the plan.

---

[61]    The UST also objects to the payment of the Backstop Parties' fees without court
approval, and the payment of fees and expenses incurred by the proponent during the case. As to
the former, the issue is moot, because no Rights Offering occurred. As to the latter, provision for
such payment is made in this court's Final Cash Collateral Order, and will be revisited in
connection with the quest by the AHC/Debtor parties for recharacterization.

E.      Section 1129(a)(9).

The Beal/Icahn plan imposes, as a "Condition Precedent to the Effective Date", a "cap"

on the administrative expenses sought through the plan.  Section 9.1(h) of the Beal/Icahn plan

provides that "the occurrence of the Effective Date" will be subject to the "satisfaction or

waiver" of certain conditions precedent, including the circumstance that the aggregate amount of

the section 9.1(h) expenses exceeds $15 million or exceeds legal or other professional fees of $10

million.[62]  Those expenses include the individual and aggregate amounts of the administrative

expenses claims allowed by the court, § 503(b)(2-5) expenses, allowed priority tax claims in

excess of $5,862,000, any other allowed priority claims and any allowed secured claims that do

not arise under capitalized leases.  The allowed amount of the 9.1(h) expenses "shall be

---

[62]      Section 9.1(h) provides:

The occurrence of the Effective Date (except as set forth in Section 5.4 hereof
(and then as of the time set forth therein)) of the Plan is subject to the satisfaction
or waiver of the following conditions precedent:
. . .
(h) the individual and aggregate amounts of each of the items covered by clauses
(i) through (v) below (the "Section 9.1(h) Expenses"), as determined by the
Bankruptcy Court, shall be acceptable to Icahn Partners in its sole discretion, if
and only if the aggregate amounts of all Section 9.1(h) Expenses (A) exceed
$15,000,000.00 or (B) include legal or other professional fees exceeding
$10,000,000.00: (i) any Allowed Administrative Expense Claims pursuant to
Section 2.1 of the Plan; (ii) any claims for compensation and reimbursement of
expenses allowed pursuant to Section 2.2 of the Plan; (iii) that portion (if any) of
the amount of any Allowed Priority Tax Claims pursuant to Section 2.3 of the
Plan in excess of $5,862,000 (and only to the extent of such excess); (iv) any
Allowed Other Priority Claims; and (v) any Allowed Other Secured Claims that
do not arise under capitalized leases.

5th Amended Joint Plan at § 9.1(h) at 31-32.

acceptable to Icahn Partners in its sole discretion."  In effect, this provision imposes a cap or

limitation on the amount of fees to be paid for 1129(a)(9) expenses, and is therefore violative of

the (a)(9) confirmation requirement.

Section 1129(a)(9)(A) requires holders of administrative claims to be paid "cash equal to

the allowed amount of such clam," unless the claimant agrees to different treatment.[63]  The Code

clearly requires the full payment of all allowed administrative expenses.  See In re Hechinger Inv.

Co. of Del., 298 F.3d 219, 224 (3d Cir. 2002) ("In a Chapter 11 case, a court cannot confirm a

distribution plan unless the plan provides full cash payment of all § 503(b) administrative

expense claims or the claim holder agrees to different treatment."); In re Christopher, 28 F.3d

512, 516 (5th Cir. 1994) ("[T]he plan of reorganization cannot be confirmed under §

1129(a)(9)(A) unless the plan provides for the payment in cash and in full of persons holding

"claims" for administrative expenses under §§ 503 and 507."); In re Goody's Family Clothing,

Inc., 401 B.R. 656, 662 n.6 (D.Del. 2009).  The Code does not permit a plan to cap the amount to

be paid toward administrative expenses without the consent of the claimants.

---

[63]      Section 1129 provides in relevant part:

(9) Except to the extent that the holder of a particular claim has agreed to a
different treatment of such claim, the plan provides that--

(A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of
this title, on the effective date of the plan, the holder of such claim will receive on
account of such claim cash equal to the allowed amount of such claim.

11 U.S.C. § 1129(a)(9)(A).

Similarly, the cap on allowed priority tax claims contained in section 9.1(h) violates

section 1129(a)(9)(C).  Section 1129(a)(9)(C) provides that allowed unsecured priority tax

claims, of a kind specified in § 507(a)(8), will receive regular installment payments in cash "of a

total value, as of the effective date of the plan, equal to the allowed amount of such claim."  11

U.S.C. § 1129(a)(9)(C).  A Chapter 11 plan cannot be confirmed unless it provides for the full

payment of all priority tax claims.  See In re Ribs-R-Us, Inc., 828 F.2d 199, 202 (3d Cir. 1987);

In re G-1 Holdings Inc., 420 B.R. 216, 266 (D.N.J. 2009) ("Section 1129(a)(9)(C) requires that

payment of priority tax claims shall be made in the full amount as of the Effective Date of the

Plan.").  The Beal/Icahn Plan may be confirmed only if the cap on administrative and priority

expenses is removed from the plan.


      F.      Section 1129(a)(11).


The ACH/Debtor Parties contend that the Beal/Icahn Plan is not feasible on various

grounds.  First, certain provisions in the plan offer escape clauses by which the proponents may

be relieved of the obligations they have undertaken.  For instance, the "Icahn Penalty Payment",

whereby the proponents agree to escrow $50 million and to forfeit that amount if regulatory

approvals are not achieved within 270 days of the Confirmation date, will not be forfeited if the

proponents, in their sole discretion, determine not to close for other reasons.  Similarly, the

proposed DIP financing has not been documented, and presumably may be withdrawn at will.  As

further evidence of the illusory nature of the plan, the objectors maintain that the Beal/Icahn

parties lack a business plan for future operations and that Icahn lacks management and

operational experience.  They point to the poor performance record that Icahn Partners has had in

other endeavors.  Second, they contend that Icahn does not have rights to the Trump brand,

insisting that the license and servicing agreements have terminated and are not assumable.  Third,

the objectors highlight the delay and uncertainty anticipated to obtain the necessary regulatory

approvals for the Icahn Parties, particularly because of undue economic concentration concerns

and anti-trust issues.  Debtors contend that all of these factors combine to defeat the feasibility of

the Beal/Icahn Plan.


        1.      <u>Commitment to Plan and Business Operations</u>.


The AHC/Debtor parties are correct that the Beal/Icahn Plan provides opportunities to

withdraw the Plan for various reasons.  For example, a condition precedent to the plan is the

acceptance by the proponents of determinations by the bankruptcy court regarding allowed

administrative, priority and secured claims.  Plan § 9.1(h).  That provision cannot be sustained.

Any subsequent rulings by the court to determine claims, as necessary, must serve to bind the

proponents, and cannot be a basis to withdraw the plan.  The proponents' only recourse in that

circumstance would be to appeal any determination in the normal course.  To approve such a

provision would create havoc in the process of confirming a plan, only to see it withdrawn if the

proponent is dissatisfied with a post-confirmation ruling by the bankruptcy court.  Section 9.1(h)

must be deleted from the plan.


As to the general commitment of the Beal/Icahn parties to go effective, I am convinced

that they intend to do just that.  It is true that the proponents have not come forward with a

specific business plan regarding the future operations of the debtors' casino and properties.

Nevertheless, the proponents' commitment has been demonstrated by their continued

involvement in this intense and protracted litigation, and by the expressions of Carl Icahn, during

his deposition, and Vincent J. Intrieri, Senior Managing Director of Icahn Parties, during his

testimony at trial, both of whom expressed unequivocal intention to proceed with the plan.

Beyond § 9.1(a) mentioned above, the opportunities to withdraw the plan do not defeat a finding

of feasibility for the Beal/Icahn Plan.


2.      <u>Trademark License and Servicing Agreements</u>.


The Beal/Icahn Plan proponents contend that the prepetition Trademark Licensing

Agreement authorizing the debtors to use the Trump brand, and the Trump Servicing Agreement,

have not terminated, and are assumable and assignable.  Even if we accept the proposition that

the agreements have terminated, or that the agreements are not assumable and assignable, the

Icahn parties contend that the casinos can readily be re-branded.  At trial, Vincent Intrieri, Senior

Managing Director of Icahn Partners, testified that the cost of re-branding the casinos has been

estimated at $15 million.  The proponents maintain that there is no credible evidence to suggest

that the debtors' casinos could not be operated successfully without the Trump brand.


Substantial issues are presented regarding whether the agreements in question have

terminated, and whether they may be assumed and assigned.  I need not resolve these issues here,

because I am convinced that the Beal/Icahn Plan is feasible even without the benefit of the

Trump brand.  The anticipated cost of the rebranding would be easily absorbed by the

Reorganized Debtors' available cash on the Effective Date.  While there might be a temporary

disruption to the debtors' operations, there can be no question that the casinos could operate

successfully without the Trump brand, particularly on a platform of a debt-free enterprise.  If the

Beal/Icahn Plan is confirmed, and the proponents seek to continue to use the Trump brand, they

may move for a resolution of the issue.  The prospect that the contracts may not be assumable is

not an impediment to a finding of feasibility here.


      3.     <u>Regulatory Approval</u>.


The feasibility of the Beal/Icahn Plan depends upon the prospect that the plan proponents

can achieve licensure for the Reorganized Debtors from the New Jersey Casino Control

Commission ("CCC"), and can withstand antitrust scrutiny by the Federal Trade Commission.


      a.     <u>Undue Economic Concentration</u>.


The issue for the plan proponents is whether the acquisition of the Trump Casinos by the

Icahn parties, who now own the Tropicana in Atlantic City, will cause undue economic

concentration in the Atlantic City marketplace, causing the licensure of the Icahn Parties to be

jeopardized.

New Jersey law provides, in relevant part, that:

No person shall be issued or be the holder of a casino license if the issuance or the holding results in undue economic concentration in Atlantic City casino operations by that person.

N.J.S.A. 5:12-82(e).  Section 19:43-3.1(b) of the New Jersey Administrative Code, in turn,

provides as follows:

For purposes of N.J.S.A. 5:12-82e and this section, "undue economic concentration" means that a person would have such actual or potential domination of the casino gaming market in Atlantic City as to substantially impede or suppress competition among casino licensees or adversely impact the economic stability of the casino industry in Atlantic City.

N.J. Admin. Code § 19:43-3.1(b).  Section 19:43-3.1(c) of the New Jersey Administrative Code

delineates a host of criteria to be considered by the CCC in determining whether the issuance or

holding of a casino license will result in undue economic concentration.  In its Opinion and Order

approving the Harrah's acquisition of Caesar's Entertainment in 2005 (the "Harrah's Decision"),

the CCC described its task in analyzing the issue as follows:

Beyond market share, section 82e analysis involves broad scrutiny of factors that include current and projected financial condition of the casino industry; market conditions and characteristics, e.g. level of competition, consumer demand and market concentration; potential impact on the development of the casino industry and Atlantic City; barriers to entry, and impact on consumer interests.

See Opinion and Order on Amended Petition of Harrah's Entertainment, Inc. and Harrah's

Operating Company, Inc. Seeking Declaratory Rulings Relating to the Acquisition of Caesars

Entertainment, Inc. (N.J. Casino Control Commission May 24, 2005).

When Harrah's applied in 2005 for approval to acquire a casino license for the operations

of two Caesars properties in Atlantic City, the focus of the CCC was whether the issuance of the additional casino licenses for the Caesars' properties to Harrah's would constitute undue economic concentration under N.J.S.A. 5:12-82(e).  The Herfindahl-Hirschman Index ("HHI"), an anti-trust tool adopted by the United States Justice Department and the Federal Trade Commission ("FTC") to measure economic concentration in those markets where mergers are occurring, was referenced by the CCC.  In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 241 (Bankr. D.N.J. 2000).  The federal merger guidelines urge extreme caution if a merger even in a moderately concentrated market causes a 100 point increase in the HHI.  Id.  In its opinion, issued on May 24, 2005, the CCC indicated that after the Caesars' acquisition by Harrah's, the HHI for Atlantic City would be in the "highly concentrated range" and the casino space HHI would rise by over 200 points.  Nevertheless, the CCC reflected that numerical figures are not determinative, and that other factors existed, including the qualitative observation that "vigorous competition currently exists in Atlantic City," and that "due to the very nature of the casino industry, any attempt at non-competitive behavior quickly becomes unprofitable and thus is unlikely to occur".  Id. at 9.  Additionally, in both the Harrah's Decision and in an earlier opinion in regarding the proposed licensure of Park Place in its acquisition of Sands Hotel and Casino in 1999, the CCC reflected that encouraging new capital investment and development in Atlantic City is an important legislative policy which must be balanced against competing policies, such as the fostering of economic competition in the market place.  N.J.S.A. 5:12-1(b)(13), see Harrah's Decision at 13.  See also Greate Bay at 241.  The licenses for Harrah's were approved, with a cautious note that "further expansion by all market players, especially those with multiple properties, will warrant close Commission scrutiny."  Harrah's Decision at 14.

-104-

In this case, several experts testified on the issue of undue economic concentration.  Mr. James Hurley, a former Commissioner and Chair of the New Jersey Casino Control Commission, testifying on behalf of the Beal/Icahn Plan, opined that the acquisition of the Trump properties by the Icahn Parties would not result in a finding by the Commission of undue economic concentration.  Dr William Hall, an economist who also testified on behalf of Icahn, acknowledged that the Atlantic City casino industry was already highly concentrated, and that the level of concentration as measured by the HHI index would go up by approximately 400 points post-acquisition.  Nevertheless, he too opined that the acquisition would not result in undue economic concentration because a highly competitive post-merger environment would still prevent anti-competitive acts.  Dr Martin Perry, an economist who testified on behalf of the AHC/Debtor parties, did not offer an opinion on whether the acquisition would result in a Commission finding of undue economic concentration, but noted that the post-acquisition HHI index would be a red flag for the CCC, and that it was his opinion that if such an acquisition were proposed, there would be a hearing conducted on undue economic influence that would raise "serious concerns" and would "very likely take several months."

The task here is to determine whether there is a reasonable prospect for licensure by the Beal/Icahn parties in connection with the proposed acquisition of the Trump casinos.  Both parties agree that the market is already highly concentrated and that the acquisition under the Icahn/Beal plan would send the HHI index for this industry in Atlantic City soaring to record high levels.  But the numbers and statistics alone have not proven to be determinative to the CCC in the past.  The Beal/Icahn parties contend that if their plan is confirmed by the bankruptcy

court, the CCC will not reject licensure in light of the significant economic opportunity for the

Trump casinos to reorganize and maintain their economic viability.  The CCC's earlier opinions

reflect their position that encouraging new capital investment in Atlantic City is a highly valued

legislative policy which must be balanced against competing policies such as the fostering of

economic competition in the market place.  See N.J.S.A. 5:12-1(b)(13).  All parties agree that the

acquisition contemplated under the Icahn/Beal plan would require an in depth hearing by the

CCC before a licensee could be issued.


I conclude that for section 1129(a)(11) purposes, there is a reasonable prospect of success

for Icahn/Beal to achieve licensure to own and operate the Trump casinos in the event of the

confirmation of the Icahn/Beal plan, but that such licensure would likely be delayed by a CCC

hearing on undue economic concentration that would at a minimum take several months to

complete.


        b.      <u>Anti-Trust Concerns</u>.


Additional concerns were raised by the AHC/Debtor parties regarding the feasibility of

the Beal/Icahn Plan in light of federal antitrust regulations, including whether the plan would

withstand antitrust scrutiny under the Hart-Scott-Rodino Antitrust Improvements Act of 1976

("HSR"), 15 U.S.C. § 18a, 90 Stat. 1383, 1390, and whether the notification requirements and

waiting periods required by HSR will cause lengthy delays that could frustrate the consummation

of the plan.

-106-

With respect to the plan's ability to withstand general antitrust scrutiny, when an acquisition such as the one proposed in the Beal/Icahn Plan is presented, the FTC is required to assess the likelihood that the acquisition may confer market power on the merging parties or among the remaining participants in the market, and relies on the HHI Index of market concentration as a starting point to interpret market share data.[64]  In a transaction such as the one contemplated in the Beal/Icahn Plan, there will be a waiting period of at least 30 days while the FTC investigates potential anticompetitive effects before such a transaction can be completed, and that waiting period might be extended if additional information is sought.  See 15 U.S.C. § 18a(b)(1) and (c).

Here, Dr. Hall touching on antitrust concerns, opined that the Icahn acquisition of the Trump Casinos would not be deemed violative of antitrust regulations by the FTC.  According to Dr. Hall, the FTC would most likely consider not only competition within the Atlantic City gaming market, but would also consider competition from outside Atlantic City in its review, and would likely reach its conclusion within the initial 30 day waiting period without requesting an extension of time.  Dr. Hall recounted that the last merger transaction in Atlantic City, the Harrah's-Caesars transaction, took approximately eleven months to complete, because the FTC extended its investigation, and the CCC waited to begin their consideration until after the FTC completed its investigation.

---

[64]    The FTC follows the analytical framework and standards outlined in the Horizontal Merger Guidelines (the "Guidelines") to evaluate the likelihood that anti-competitive effects will result from a merger.  See Horizontal Merger Guidelines, U.S. Dept. Justice and Fed. Trade Comm'n, Apr. 2, 1992 (revised Apr. 8, 1997).

I conclude on this record that a confirmation of the Beal/Icahn Plan would likely be followed by a thirty-day FTC investigation, which would likely be followed in turn by hearings before the CCC on the issue of undue economic concentration, but that neither agency would ultimately impede the Beal/Icahn Plan from being implemented.

Most notable on the issue of the feasibility of the Beal/Icahn Plan is the fact that the enterprise will be debt-free going forward, with a $45 million DIP facility and an $80 million cash infusion to enhance its liquidity and to meet its operational needs.  The conclusion is inescapable that the Beal/Icahn plan is not likely to be followed by a liquidation, or the need for further financial reorganization of the debtors.

G.    Section 1129(b).

The AHC/Debtor parties challenge the Beal/Icahn Plan on § 1129(b) grounds, claiming that the plan is not fair and equitable to creditors junior to the First Lien Lenders.  In particular, they claim that under the Beal/Icahn Plan, which contemplates that all of the debtors' equity would be conveyed to the First Lien Lenders, the First lien Lenders would receive a greater than 100% recovery on their claims, a result proscribed by § 1129(b)(2)(B)(ii).  See, e.g., In re Genesis Health Ventures, Inc., 266 B.R. 591, 612-16 (Bankr. D.Del. 2001); In re MCorp Financial Inc., 137 B.R. 219, 225 (Bank. S.D. Tex. 1992).  The objectors' challenge in this regard must be overruled.

In support of their own plan, the AHC/Debtor objectors have put forth a TEV for the debtors of less than the value of the First Lien Lender claim, and have omitted a value for the Florida litigation on the basis of its speculative nature.  The objectors cannot persuasively contend that the debtors' TEV is $459 million for purposes of their plan, but something higher for purposes of the Beal/Icahn Plan.  It is true that if the Beal/Icahn Plan is confirmed, other creditors will receive nothing, and Icahn Partners will receive 100% of the equity in the Reorganized Debtors, in addition to any accompanying upside if the company succeeds.  But they also hold the risk.  Obtaining all of the equity in exchange for debt equitization, equity contribution and DIP financing does not constitute a violation of the absolute priority rule, or the fair and equitable requirement otherwise.

H.   Indenture Trustee Objection.

The Indenture Trustee objects to the lack of a provision in the Beal/Icahn plan that provides for the continuation of the payment of the Indenture Trustee's fees and expenses, designated as adequate protection payments under the Final Cash Collateral Order dated March 23, 2009, until the Effective Date of the Beal/Icahn Plan, if that plan is confirmed.  The Trustee also objects to the cancellation of the Indenture, as provided for in § 5.7 of the Beal/Icahn plan, without the preservation of the right to a charging lien and the right to a priority in the payment of fees upon any distribution to the Noteholders.  The Trustee contends that this provision improperly cancels the Indenture as to non-debtor parties.  Finally, the Trustee objects to the bar date for administrative claims that is set for 7 days after the date of confirmation.  The Trustee

requests that the date be extended to 30 days.

If the Beal/Icahn Plan is confirmed, the Final Cash Collateral Order will be enforced.  As to the charging lien and priority payment references by the Indenture Trustee, these concerns are moot, because there will be no distribution to the AHC or to other noteholders under the Beal/Icahn Plan.

The Indenture Trustee correctly reflects that the Beal/Icahn Plan should provide in section 5.7 that the cancellation of the Indenture applies only to the debtors' obligations and does not affect the relationship between the Indenture Trustee and the Noteholders and guarantors otherwise.  In addition, the bar date for the filing of administrative expense claims should be extended to thirty (30) days after the date of confirmation.

I conclude that the Beal/Icahn Plan meets the requirements of section 1129(a) and (b), and is confirmable, subject to the following modifications:

(A)    The plan provision for exculpation must be modified to provide for acts or omissions constituting gross negligence, willful misconduct or fraud.

(B)    The plan provision providing for a severance payment to certain employees must be stricken.

(C)    The plan provision placing a cap on administrative and priority expenses, and requiring acceptance of post-confirmation claims determinations of the bankruptcy court by the proponents, must be stricken.

(D)    The plan provision cancelling the Indenture dated May 20, 2005, applies only to the debtors' obligations, and does not affect the relationship between the Indenture Trustee and the Noteholders and guarantors.

(E)    The bar date for filing administrative claims must be extended to thirty (30) days
after the date of confirmation.


VI.    <u>Other Joint Objections</u>.


Various other parties have come forward with objections that apply to both the

AHC/Debtor Plan and the Beal/Icahn plan, including former shareholders and a personal injury

claimant.[65]


A.    <u>Former Shareholder Objections</u>.


A group of former shareholders of the debtors, who are now general unsecured creditors,

objects to the confirmation of both plans.  They assert that the plans provide disparate treatment

to the unsecured creditor class.  Specifically, they point to the proposed administrative expense

treatment of prepetition holders of unredeemed chips and tokens, and the prior orders of the court

authorizing the payment of critical vendors at the outset of the case.  They claim that pre-petition

unredeemed chips and tokens should be treated as general unsecured claims.  In addition, they

claim that neither plan accounts in its liquidation analysis for Chapter 5 causes of action, which

should only inure to the benefit of unsecured creditors.


As part of the debtors' request for first day orders, debtors sought authorization to pay

---

[65]    Oracle USA, Inc.'s objections have been withdrawn.

certain prepetition customer related claims and obligations, including a category of "gaming

claims," which included prepetition casino chips and tokens in the public domain.  The debtors

explained that it would be a tremendous cost to the estate, a major disruption to their business,

and nearly impossible to distinguish between casino chips and tokens that were distributed

prepetition from those that were distributed postpetition.  As well, the debtors' inability to satisfy

these claims would have a negative impact on their reputation, and would severely damage their

reorganization efforts.  The court entered an order approving the payments on February 19, 2009.


On February 20, 2009, an order was entered approving the payment of certain identified

critical vendors.  The continuation of the debtors' gaming and hospitality business depended on

their ability to continue their operations and to maintain their reputation and customer loyalty

during the bankruptcy process.  Without a regular and continuous supply of foods, room

amenities, or adequate gaming equipment, among many other types of supplies, the debtors'

operations would have been irreparably harmed.  It was essential that the debtors maintain their

business relationships with vendors and service providers who were identified as the most

essential to the debtors' operations.  The critical vendors were required to maintain their credit

arrangements with the debtors as a condition of the receipt of payments on account of prepetition

claims.  An amended order was entered on June 16, 2009.


The former shareholders are correct that both plans, each of which have left undisturbed

the treatment of gaming claims and critical vendors, discriminate against other general unsecured

creditors, who are receiving only a nominal return under the AHC/Debtor Plan, and no

-112-

distribution under the Beal/Icahn Plan.  The question is whether each plan discriminates unfairly

in this regard.  The discrimination here is clearly supported by reasonable bases, was necessary

for the debtors' reorganization, was proposed in good faith, and is proportionate to the need for

the discrimination.  See, e.g., In re Hawaiian Telcom Communications, supra at 31.  In each case,

there was more than adequate justification for, and no unfair discrimination behind, the payments

made to these creditors.  The objection of the former shareholders in this regard is overruled.


        The former shareholders' objection with respect to Chapter 5 causes of action, although

couched as a fair and equitable argument, is based on the "best interests of creditors" test in §

1129(a)(7).  Section 7.7 of the AHC/Debtor Plan specifically preserves all causes of action for

the benefit of the Reorganized Debtors rather than for the benefit of unsecured creditors.  The

unsecured creditors' claims, to the extent allowed, would receive their pro rata cash distribution

and their pro rata share of subscription rights provided for in the plan.  See AHC/Debtor Plan §§

1.26, 1.41, and 4.5.  But there is no provision for the distribution of any Chapter 5 recoveries to

unsecured creditors.  Likewise, there is no provision in the Beal/Icahn Plan reserving these

potential causes of action for the benefit of the unsecured creditors.


        In the hypothetical Chapter 7 liquidation analysis required under section 1129(a)(7), the

Chapter 5 causes of action would inure to the benefit of the unsecured creditor body before the

debtors would recover.[66]  In re Transport Group, Inc., No. 93-30015, 2007 WL 1083887 (Bankr.

---

        [66]     See In re Affiliated Foods, Inc., 249 B.R. 770, 788 (Bankr. W.D.Mo. 2000)
(hypothetical liquidation "requires an estimation of the value of all of the bankruptcy estate's
assets, including such hard to determine values as disputed and contingent claims, id., the

W.D.Ky. Apr. 9, 2007) (debtor is the last party to receive a distribution under 726); In re Butler,

42 B.R. 777, 787 (Bankr. E.D.Ark. 1984)(unsecured creditors receive before debtors in a 726

analysis).  The best interest of creditors test requires that each creditor not accepting the plan

receive at least the amount they would have received if the debtor were liquidated.  In re

American Family Enters., 256 B.R. 377, 403 (D.N.J. 2000).  Each plan proponent will be

required to amend its plan to provide that if any Chapter 5 causes of action are pursued and result

in any recovery, that recovery must inure to the benefit of the general unsecured creditors.


       B.       <u>Kahn Objection</u>.


       Eugene Kahn objects to both plans as not being fair and equitable to personal injury

claimants such as him, and as not being filed in good faith.  He objects to the nominal recovery

he will receive under the AHC/Debtor Plan, and the lack of any recovery under the Beal/Icahn

Plan, when gaming claims and professional fees and expenses are being paid in full.  Mr. Kahn

asserted a $1 million claim against the debtors, which was reduced to $337,000, inclusive of

medical expenses, at a mandatory non-binding personal injury arbitration.  After a 40% reduction

for comparative negligence, Mr. Kahn's claim against the debtors was determined to be

$202,000.


       The debtors self-insure claims up to $500,000 under their comprehensive liability

---

potential disallowance of claims (under § 502(d)), id., the probability of success and value of
causes of action held by the estate, and, in this case, potential preference actions.").

policies, and up to $1 million under their general casualty insurance policies.  Accordingly, Mr.

Kahn's claim is not covered by the debtors' insurance coverage.  His claim was properly

classified and afforded the same treatment as other general unsecured creditors in both plans.

The approval given to the debtors to satisfy certain specified gaming claims was addressed

above.  There is no support for the contention that the plans were filed in bad faith, or that the

treatment afforded here is not fair and equitable.  While Mr. Kahn's frustration with the nominal

recovery to unsecured creditors is certainly understandable, his objection must be overruled.


VII.    Competing Plans.


        I have concluded that both the AHC/Debtors' Plan and the Beal Bank/Icahn Plan are

confirmable.  Under § 1129(c), "[I]f the requirements of subsections (a) and (b) of this section [§

1129] are met with respect to more than one plan, the court shall consider the preferences of

creditors and equity security holders in determining which plan to confirm."  11 U.S.C. §

1129(c).  See In re Orchards Village Investments, LLC, No. 09-30893-rldll, 2010 WL 143706,

*21 (Bankr. D.Or. Jan. 8, 2010) ("Based on the clear terms of § 1129(c), . . . primary

consideration [is given] to the preferences of creditors and equity holders."); In re Milford

Connecticut Associates, L.P., 389 B.R. 303, 304 (Bankr. D.Conn. 2008), aff'd, 404 B.R. 699

(D.Conn. 2009); In re Coram Healthcare Corp., 315 B.R. 321, 351-52 (Bankr. D.Del. 2004).  See

also In re River Village Assocs., 181 B.R. 795, 807 (E.D.Pa. 1995) ("Under the language of §

1129(c), a bankruptcy court is only obligated to consider the preferences of the creditors and

equity interests, not obey them.").  It is incumbent upon the court to "make the choice that is

most beneficial to all creditors and equity security holders." In re River Valley Fitness One Ltd.

P'ship, No. 01-12829- JMD, 2003 WL 22298573, *9 (Bankr. D.N.H. Sep. 19, 2003) (citing to In

re Sound Radio, Inc., 93 B.R. 849, 859 (Bankr. D.N.J. 1988)).

Beyond considering the preferences of creditors and equity security holders, the court

must consider:  "(1) the type of plan; (2) the treatment of creditors and equity security holders;

(3) the feasibility of the plan." In re Holley Garden Aparts., Ltd., 238 B.R. 488, 493 (Bankr.

M.D.Fla 1999).  See also In re ASARCO LLC, 420 B.R. 314, 332 (S.D.Tex. 2009); Orchards

Village Invests., 2010 WL 143706 at *21; In re Internet Navigator Inc., 289 B.R. 128, 131

(Bankr. N.D.Iowa 2003); In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 245 (Bankr.

D.N.J. 2000).  As to the types of plans presented, both plans contemplate the continued operation

of the Reorganized Debtors.[67]  The focus is on the treatment of creditors,[68] the feasibility of the

plan, and the creditors' preferences.

As to the treatment of creditors, both plans provide for a full recovery to First Lien

Lenders, one through conversion of the debt to equity, and the other through deferred cash

payments at present value.  But the two plans differ markedly otherwise, particularly as to the

---

[67]     The AHC/Debtor Plan proponents promote their plan as a true reorganization that
benefits all creditors while labeling the Beal/Icahn Plan as a liquidating plan akin to a
foreclosure, benefitting only the First Lien Lenders.  It is true that only the First Lien Lenders
benefit from the Beal/Icahn Plan, but it is not a liquidating plan.  The plan contemplates the
debtors' financial restructuring, with ongoing business operations.

[68]     The interests of the equity security holders under each plan are cancelled and
extinguished, and are therefore not considered in this analysis.

treatment of Second Lien Noteholders.  Except for providing a pro rata share of $500,000 to the

Convenience Class, the Beal/Icahn Plan provides no distribution to any other stakeholders in the

case.  In contrast, the AHC/Debtor Plan provides for a nominal recovery of cash, subscription

rights and liquid stock to the Second Lien Noteholders and General Unsecured Creditors.  More

importantly, the plan provides, to a large number of the Second Lien Noteholders,

(approximately 61% of the Noteholders), the opportunity to receive the only value that is left in

the case after satisfaction of the First Lien Lenders' claims.  That value is the potential future

benefit of the reorganization, if the reorganization succeeds.  The Ad Hoc Committee is making a

substantial payment of $225 million for the opportunity to participate in the future upside

potential of the debtors, which would otherwise inure to the exclusive benefit of the First Lien

Lenders.  The treatment of creditors favors the AHC/Debtor Plan in this regard.

The feasibility factor clearly weighs in favor of the Beal/Icahn Plan.  The proposed

deleveraging of the debtors and infusion of capital in the form of equity, leaving the debtors with

a clean balance sheet and adequate capital to rebuild the business, is certainly advantageous.  In

re Greate Bay Hotel & Casino, Inc., 251 B.R. at 247.  As well, although the Icahn Parties have no

specific plan for the manner in which the operations of the Tropicana in Atlantic City, which they

now own, and the debtors will co-exist, it is recognized that consolidation of gaming companies

can produce substantial opportunities for revenue enhancements and cost savings.  Id. at 247-48.

The feasibility of the Beal/Icahn Plan is marred somewhat by several factors.  There is

uncertainty about the opportunity of the Reorganized Debtors to utilize the Trump brand in its

continuing operations.  I have concluded that the plan is feasible nevertheless, because the

casinos may be rebranded at a cost (approximately $15 million) that can be borne by the

proponent.  However, the rebranding would cause temporary but substantial disruption of the

business operations of the debtors.

As well, there is agreement among the experts who testified at trial that although the

prospect for ultimate regulatory approval of the Beal/Icahn Plan are reasonably good, there will

be a delay of several months, including an initial FTC investigation period, followed by hearings

before the CCC, on the issue of undue economic concentration.  While the liquidity of the

debtors during this time would be protected by DIP financing provided by the proponents, the

continued uncertainty and lack of finality of the reorganization process would hinder the debtors'

opportunity to move forward more quickly with its rehabilitation plans.

While the AHC/Debtor Plan is less attractive on the issue of the company's balance sheet

at its emergence from Chapter 11, leaving the company with about $334 million of debt, I have

concluded that the plan is feasible as proposed, and presents other favorable aspects that enhance

its feasibility.  Most notably, the Reorganized Debtors under the AHC/Debtor Plan would

continue to benefit from the use of the Trump brand, and the future support of Donald and Ivanka

Trump, free from potential litigation, rebranding costs and disruptions, and the associated

business risks with losing the brand.  The prospect of prompt regulatory approval is stronger for

the AHC/Debtor Plan, and the plan has the support of a significant number of debtors'

employees, as reflected by the submission of the employees union.[69]  The members of the AHC

have worked closely with debtors' management for several months, and share a joint vision of a

business direction for the company.

The prospect that the Reorganized Debtors would emerge from bankruptcy completely

deleveraged is highly desirable, causing the feasibility element to favor the Beal/Icahn Plan.

However, the factors discussed above mitigate somewhat the finding in favor of the Beal/Icahn

Plan on the feasibility element.

The most significant element in choosing between two confirmable plans is the statutory

direction to the court to "consider the preferences of creditors and equity security holders in

determining which plan to confirm."  11 U.S.C. § 1129(c).  The preference of creditors is

reflected in the voting results.  See In re Greate Bay Hotel & Casino, Inc., 251 B.R. at 245

(Bankr. D.N.J. 2000).

As expected, the First Lien Lender Secured Claims filed 5 ballots, totaling

$485,062,701.38, all in favor of accepting the Beal/Icahn Plan and rejecting the AHC/Debtors'

plan.  Likewise, as expected, the DJT Claimholders voted unanimously to accept the

---

[69]     In its submission in connection with confirmation hearings, UNITE HERE Local
54 expressed a preference for the AHC/Debtor Plan over the Beal/Icahn Plan.  The union is
concerned that confirmation of the Beal/Icahn Plan would result in consolidation of ownership
and a disincentive to keep each property in operation.  The closing of any of the facilities would
put Local 54 employees out of work.  Local 54 also seeks to retain its long standing relationship
with the existing Trump management team.  Finally, the Union believes that the AHC/Debtor
Plan demonstrates a greater commitment to the ultimate success of the reorganization.

AHC/Debtors Plan.  The votes of neither class is determinative of the creditors' preference here.

Nor are the voting results of the General Unsecured Creditors and the Convenience Class

particularly helpful in identifying creditor preferences.  The General Unsecured Creditors voted

overwhelmingly, at least 70% in number and over 93% in amount, to reject the plans proposed by

both proponents.  The Convenience Class voted convincingly in favor of accepting the Beal

Bank/Icahn plan, approximately 89% in number and 90% in amount, while their vote for the

AHC/Debtor Plan did not constitute formal acceptance by the class, 11 U.S.C. § 1126(c), with

approximately 58% in number and amount voting to accept.  The voting of the Convenience

Class is less significant in light of the AHC/Debtors' subsequent amendment of their plan to

provide for the same treatment as proposed in the Beal/Icahn Plan, a pro rata share of $500,000.[70]

This leaves us with the class of Second Lien Noteholders, the largest creditor constituency in the

case, holding in excess of $1.2 billion of claims.

As to the AHC/Debtor Plan, the Second Lien Noteholders cast 1,374 ballots, representing

over $1.1 billion in claims.  Over 96% in number and 79.72% in amount voted in favor of the

AHC/Debtors Plan.  In contrast, the Second Lien Noteholders cast 1,316 ballots in the Beal/Icahn

Plan, representing over $1 billion in claims.  The Second Lien Noteholders voted 90% in number

---

[70]    Beal Bank/Icahn contends that the voting reflects a "meaningful preference for the
Beal/Icahn Plan among the disinterested creditors," pointing out that approximately 90% of the
Convenience Class voted in favor of the Beal Bank/Icahn Plan and only 58% voted in favor of
the AHC/Debtor Plan.  Of those who voted to approve both plans, 84% indicated a preference for
the Beal Bank/Icahn Plan.  As noted above, these numbers, representing a very small subset of
creditors in the case, are not determinative here.  The voting took place prior to the amendment
of the AHC/Debtor Plan, which now provides the same treatment in both plans to the
Convenience Class.

and 84% in amount to reject the Beal/Icahn Plan.[71]

The end result of the voting is that an overwhelmingly number of creditors voted in favor of the AHC/Debtor Plan and against the Beal/Icahn Plan.  Of course, it must be recalled that both the AHC members and the Icahn parties obviously support their own plans.  But the significant support for the AHC/Debtor Plan by the largest creditor constituency, coupled with the treatment of creditors and feasibility considerations noted above, compels the conclusion that the AHC/Debtor Plan, as modified, should be confirmed.[72]  Confirmation of the AHC/Debtor Plan will allow the debtor to shed approximately $1.4 billion in secured debt, to pay the First Lien Lenders in full, and to offer to creditors the opportunity to participate in the upside potential of the debtors.

Debtors' counsel is instructed to submit an order in conformance with this opinion.

Dated: April 12, 2010

_____
JUDITH H. WIZMUR
CHIEF JUDGE
U.S. BANKRUPTCY COURT

---

[71]    The AHC/Debtor Plan proponents submit that Classes 4 and 5 should be deemed to have rejected the Beal/Icahn Plan because they will not receive a distribution.  In fact, both classes have actually rejected the plan by their votes.

[72]    If the proponents of the AHC/Debtor Plan do not accept the required modifications of the plan, or if DIP financing for that plan is not approved, the Beal/Icahn Plan may be confirmed.

-121-